**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY (at Louisville)**
*Electronically Filed*

| | | |
|---|---|---|
| **SISTERS FOR LIFE, INC., et. al.** | : | Case No.   3:21-cv-367-RGJ |
| *Plaintiffs* | : | |
| v. | : | |
| **LOUISVILLE-JEFFERSON COUNTY METRO GOVERNMENT**, et. al. | : | |
| | : | |
| *Defendants* | : | |
| | : | |

**MEMORANDUM IN SUPPORT OF EMERGENCY MOTION FOR TEMPOARY RESTRAINING ORDER, AND PRELIMINARY INJUNCTION**

Plaintiffs, Sisters for Life, Inc. and Angela Minter, submit this Memorandum in Support of their Emergency Motion for Temporary Restraining Order and Preliminary Injunction.

**Introduction**

Almost every day in Kentucky a young woman in crisis because of an unplanned pregnancy considers terminating her pregnancy through abortion.  In plain English, she considers killing the unborn human being in her womb because she believes she has no other choice.  To do so, she travels to the abortoria in Louisville.  She may be unaware that there are alternatives to abortion, that resources exist, and that others care.  Until a few days ago, and every single day that the Louisville abortion facility operated since 2003, she would be met on the sidewalk outside that facility by the Plaintiffs, who operate a Christian ministry on that sidewalk.  They walk with that young woman, who is often a person of color, and minister to her, telling her that she has actually does have a choice.   They let her know there are people who care about her, love her, and will help her and her unborn child.  But now, that can no longer happen.  Because Defendants made this interaction and sidewalk ministry illegal, this sidewalk ministry.  This case

1

seeks to restore the constitutional right of Plaintiffs to conduct their life-saving sidewalk ministry within a traditional public forum.

## I.      FACTS

Plaintiff, Sisters for Life, Inc. ("Sisters for Life"), is a Kentucky non-profit corporation, with its headquarters located in Louisville, Kentucky.[1]  (Pl's Verified Compl., ¶2).  Formed in 2003, Sisters for Life is a Christian, non-profit organization and ministry inspired by God to put into action a comprehensive advocacy for preborn babies, and their mothers and fathers who are faced with an unplanned or crisis pregnancy.  *Id.*  They also advocate for God's family values. They believe God has a good plan and purpose for every life and family, and they see it as their Christian mission to help God's family have hope and a future, particularly the most vulnerable of God's family, the unborn.  *Id.*  As such, they believe it is their assignment to serve and assist God's family in fulfilling God's plan.  *Id.*

Angela Minter is the founder of Sisters for Life, and is also its President, who regularly engages in evangelism associated with intervention with pregnant women entering abortion facilities, and specifically EMW Women's Surgical Center ("EMW"), which is the abortion facility located at 136 W Market St, Louisville, KY 40202.  (Pl's Verified Compl., ¶3).  For almost two decades, Angela has personally ministered to mothers and fathers outside EMW, sharing her own experiences and regrets with abortion, connecting with them by telling them about her experience as a teenager who aborted two of her children, and her lifelong regret from having done so.  *Id.*  Outside of sidewalk ministry, Angela ministers in the community, reaching out to Louisville's black churches, engages in all forms of outreach, and seeks to end the cycle of

---

[1] https://www.sisforlife.org/ (last visited 6/6/2021).

death brought on by the abortion industry, including its purposely disproportionate impact upon her black community.  *Id.*

Defendant Louisville-Jefferson County Metro Government ("Louisville Metro") is a duly organized combined municipal and county government under KRS Chapter 67C, governing Jefferson County.  (Pl's Verified Compl., ¶4).  Its legislative body is the Metro Council, and its executive is the Mayor.  *Id.*

Defendant Mayor Greg Fischer is the duly elected Mayor of the Louisville-Jefferson County Metro Government.  (Pl's Verified Compl., ¶5).  Pursuant to KRS 67C.105, "[a]ll executive and administrative power of the government shall be vested in the office of the mayor."  *Id.*  Further, pursuant to KRS 67C.105(5)(d), the Mayor is charged to, and does, "[e]nforce the ordinances of the consolidated local government."  *Id.*

Defendant Ericka Shields is the duly appointed Chief of the Louisville Metro Police Department, who, among other things, has primary responsibility for the enforcement of city ordinances and other Kentucky laws within the City of Louisville.  (Pl's Verified Compl., ¶6).  Defendant Mike O'Connell is the Jefferson County Attorney.  (Pl's Verified Compl., ¶7).   In that capacity, and pursuant to KRS 15.725(2), he is commanded to, and does, "prosecute all violations whether by adults or by juveniles subject to the jurisdiction of the regular or juvenile session of the District Court of criminal and penal laws."  *Id.*

As part of the practice of their faith, Angela and Sisters for Life engage in sidewalk ministry outside 136 W Market St, Louisville, KY 40202, which is the location of EMW, the last abortion facility located in the Commonwealth of Kentucky, and the most prolific provider of surgical abortions within the Commonwealth, having been responsible for 3,645 abortions in

2019, or 99.5% of all abortions in Kentucky in 2019.[2]  (Pl's Verified Compl., ¶10).  Angela and

Sisters for Life have engaged in their ministry since 2003.    *Id.*  Sidewalk ministry involves

offering both verbal and written materials outlining alternatives to abortion and help for anyone

wishing to pursue those options.  (Pl's Verified Compl., ¶11).

Angela and Sisters for Life inform women and their partners of other life choices

available to them for their child other than abortion, including adoption, free housing during and

after the pregnancy, free child care, free help with college tuition if they choose not to abort their

child, parenting resources including diapers, formula, clothes, parenting classes, counseling and

more, including information about child development that shows parents how developed their

child is at the particular stage of their pregnancy.  (Pl's Verified Compl., ¶12).

Angela and Sisters for Life typically will initiate a conversation by, among other things,

asking would-be patients if they would like some literature.  (Pl's Verified Compl., ¶13).  During

these exchanges, Angela and Sisters for Life consider it essential to maintain a caring demeanor,

a calm tone of voice, and direct eye contact.  (Pl's Verified Compl., ¶14).  Such interactions,

Plaintiffs believe, are a much more effective means of dissuading women from having abortions

than confrontational methods such as shouting, brandishing signs, blocking access, loud

speakers, or other methods which, in Plaintiffs' view, tend only to alienate their intended

audience.  *Id.*

Some of the things Plaintiffs are called to do (and do) are make efforts to engage women

and hand them literature, walk alongside and talk to women headed towards the entrance to

---

[2] https://chfs.ky.gov/agencies/dph/dehp/vsb/Forms/2019KYAbortionAnnualReport.pdf (last
visited 6/6/2021).

EMW who, presumably, want to procure an abortion, and pray for the women who start to enter the abortion facility.  (Pl's Verified Compl., ¶15).

Angela will often, as part of this ministry, tell these women about her own harrowing experience with abortion as a teenager and the lifelong regret she has suffered as a result.  (Pl's Verified Compl., ¶16).  And, as part of this experience, she will tell the women that God loves them and their baby, regardless of the decision they make.  *Id.*

Necessarily, this sidewalk ministry is not loud, obnoxious, or confrontational. Experience has shown Plaintiffs that those tactics are counter-productive.  (Pl's Verified Compl., ¶17).  Nor is the sidewalk ministry a protest or meant or intended to block access to the facility – the message and ministry are a final intervention with women who often are in crisis and wrongly believe they have no alternative to abortion.  *Id.*  Plaintiffs deliberately walk along with the women who are in the process of walking into EMW, and deliberately do not block them.  *Id.*

Spectacularly, the ministry and interventions of Angela and Sisters for Life have been responsible for saving over 800 babies outside EMW.  (Pl's Verified Compl., ¶18).  Those 800 children are alive today, thereby saving their mothers, fathers and families from the guilt and grief of having a hand in their death.  *Id.*

For the avoidance of all doubt, the sidewalk ministry and counseling are part of the sincerely held religious beliefs of the Plaintiffs, and are undertaken in accordance with those same beliefs.  (Pl's Verified Compl., ¶19).

Given this success, it is not surprising that, at the insistence of EMW, which substantially profits from procuring the death of the unborn, the Metro Council of Louisville Metro passed

legislation substantially restricting activities on the sidewalk outside EMW.  (Pl's Verified Compl., ¶20).

On May 20, 2021, the Metro Council passed Ordinance O-179-21 (the "Ordinance"), in a 14-11 divided vote.  (Pl's Verified Compl., ¶21).  A true and accurate copy of that Ordinance is attached as Exhibit 1 to the Complaint.  *Id.*  Thereafter, Mayor Fischer signed the Ordinance on June 2, 2021, and, upon information and belief, it has been published in accordance with law or is in the process of being so published.  (Pl's Verified Compl., ¶22).

The Ordinance, while perhaps appearing modest at first blush, is actually remarkable in both its overbreadth and scope.  (Pl's Verified Compl., ¶23).  First, it provides: "(1) No person shall knowingly obstruct, detain, hinder, impede, or block another person's entry to or exit from a healthcare facility."  *Id.*

It further provides that "(2) No person shall knowingly enter, remain on, or create any obstruction within the driveway of a healthcare facility or within a 'buffer zone' on the public way or sidewalk extending from the entrance of a healthcare facility to the closest adjacent sidewalk curb and 10 feet from side to side, during the facility's posted business hours, except: (a) persons entering or leaving such facility; (b) persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility; or (c) law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; or (d) employees or agents of such facility acting within the scope of their employment."  (Pl's Verified Compl., ¶24).

The Ordinance defines "Entrance" as "any door to a healthcare facility that directly abuts the public sidewalk; provided, however, that if the door does not directly about the public

sidewalk, the 'entrance' shall be the point at which the public sidewalk intersects with a pathway leading to the door."  (Pl's Verified Compl., ¶25).

We have denoted, for purposes of this Memorandum, the "buffer zone" as that area on the public way or sidewalk extending from the entrance of a healthcare facility to the closest adjacent sidewalk curb and 10 feet from side to side, where the "entrance" described herein as the point at which the public sidewalk intersects with a pathway leading to the door.  (Pl's Verified Compl., ¶26).

All told, the Ordinance prohibits anyone other than those coming within one of the four secular exceptions to the Ordinance, including Plaintiffs herein, from being located in a buffer zone.  (Pl's Verified Compl., ¶27).  This buffer zone extends out to the street and, given the width of the pathway that leads from the clinic to the sidewalk (which is 8 feet in width) is approximately 73 feet long, and ten feet wide (blocking a total of some 730 square feet), and in terms of what has been marked and demarked as EMW property, totals approximately half a city block of sidewalk that is now restricted.   *Id.*

More particularly, there is a pathway on EMW's property that extends in two directions from the door to the EMW facility.  (Pl's Verified Compl., ¶28).  The EMW pathway, which totals approximately 73 feet in length and approximately 8 feet in width, intersects and connects with the public sidewalk running parallel to Market street.  *Id.*  Therefore, all of those points on the pathway that touch the public sidewalk constitute an "entrance" under the Ordinance.  *Id.*

A true and accurate aerial depiction of this layout is depicted below.  (Pl's Verified Compl., ¶7).  The white area depicted below is EMW property that is adjacent to the public sidewalk property, which EMW now has marked with "no trespassing" markers:



But that is not all. EMW is also bordered by two other "Healthcare facilities" under the

Ordinance. (Pl's Verified Compl., ¶30). As a result of the Ordinance, there is now a buffer zone

around both of those facilities. *Id.* Using the map depiction above, to the left of EMW is

BSideU for Life Pregnancy Center ("BSideU") at 140 West Market Street, Louisville, KY

40202, which happens to be a pro-life center that provides pregnancy related services other than

abortion. BSideU permits Plaintiffs to conduct their sidewalk ministry from BSideU's property,

but this is now explicitly prohibited by the Ordinance. *Id.*

Using the map depiction above, to the right of EMW is an Optometrists' office, namely

the offices of Drs. Vance and Stovall, at 120 W Market St, Louisville, KY 40202 ("Stovall").

(Pl's Verified Compl., ¶31).

The effect of these healthcare facilities being located where they are, in terms of the

Ordinance, is a buffer zone that practically completely envelopes the entire city block:



(Pl's Verified Compl., ¶32).

Louisville Metro, in enacting the Ordinance, included all healthcare facilities within its ambit, even though there were no instances of any issues other than at EMW, only because it intended to restricting the entire block above from being accessed by the Plaintiffs and others seeking to dissuade women from obtaining abortions.  (Pl's Verified Compl., ¶33).  In other words, and as the photo above depicts, it was a not-so-clever gerrymander to restrict an entire city block from being accessed by opponents to abortion.   *Id.*

In the photo above, the yellow area approximately depicts the EMW property, and specifically the parking lot and pathways that lead to the door, all of which are "driveways" or "entrances" under the Ordinance.  (Pl's Verified Compl., ¶34).  The orange depicts the pathways that lead to the door and the parking lots of BSideU and Stovall, all of which are also "driveways" or "entrances" under the Ordinance.   *Id.*  And, the red area approximately depicts

the buffer area under the Ordinance, which covers substantially all of the public streets and sidewalks accessing EMW.   *Id.*

As depicted, the buffer area expands across an entire city block.  (Pl's Verified Compl., ¶35).  The buffer zone effectively prohibits persons from walking through it or into it, except as expressly permitted under an exception to the Ordinance.  (Pl's Verified Compl., ¶36).

The Ordinance is enforced with fines of up to $500 for each violation.  (Pl's Verified Compl., ¶37).

As it turns out, the buffer zone Ordinance prohibits the Plaintiffs and other sidewalk ministers from speaking, praying, or interacting with those entering the EMW facility, including, without limitation, even with those entering who invite or otherwise solicits contact with Plaintiffs.  (Pl's Verified Compl., ¶38).

The buffer zone compromises the Plaintiffs' ability to initiate the close, personal conversations that Plaintiffs view as essential to their sidewalk ministry.  (Pl's Verified Compl., ¶39).  Another pernicious effect of the buffer zone is to relegate the Plaintiffs to raising their voices at parents from outside the zone – and as a practical matter, requires this to occur from across the street – a mode of communication sharply at odds with the compassionate message Plaintiffs wish to convey.  (Pl's Verified Compl., ¶40).

The buffer zone also makes it substantially more difficult for Plaintiffs to distribute literature to arriving parents, again even where the parents wish to receive the literature.  (Pl's Verified Compl., ¶41).

At the same time, the Ordinance explicitly permits EMW staff and volunteers to escort those seeking an abortion into the buffer zone and into the EMW facility, where those staff and volunteers regularly, and within the scope of their employment or volunteer status, escort,

10

encourage, and counsel the women seeking to enter the facility to follow through with an abortion, thus providing speech in the buffer zone, but on only one side of the abortion debate. (Pl's Verified Compl., ¶42).

For the avoidance of all doubt, volunteers and employees of EMW will, within the scope of their employment or volunteer status, and within the buffer zone, thwart or attempt to thwart or block Plaintiffs' efforts to speak or hand literature to those in the process of walking to the EMW property, regularly disparage Plaintiffs to those seeking to enter the EMW facility, and will offer encouragement of those seeking to obtain an abortion to do so, again providing speech on only one side of the abortion debate.  (Pl's Verified Compl., ¶43).

Again, for the avoidance of all doubt, EMW authorizes its escorts to have these conversations, with those being escorted, within the buffer zone.  (Pl's Verified Compl., ¶44). The Ordinance is an insidious content and viewpoint-based speech gerrymander, designed to squelch dissenting speech, and the practice of sincerely held religious beliefs, in the vicinity of EMW.  (Pl's Verified Compl., ¶45).

It should be noted that prior to the passage of the challenged Ordinance, Louisville Metro already had ordinances on the books to prevent blocking sidewalks.  (Pl's Verified Compl., ¶46). Specifically, the City has had, at all times relevant hereto, ordinance 97.072, which provides:

> It shall be unlawful for any person in or on any sidewalk or any premises in or abutting thereon to make any speech or harangue; to demonstrate, sell, or offer for sale goods, wares, or merchandise; or to display any signs, device, information, or exhibition in consequence of which there is caused or created such a gathering of persons on the sidewalk as to interfere with pedestrian traffic thereon.   *Id.*

Louisville Metro has not seriously attempted less restrictive measures to combat the purported ills that it contends required the passage of the Ordinance, including individual prosecutions, injunctions, ordinances against following and harassing people within a certain

number of feet of a health care facility, passage of legislation similar to the federal Freedom of

Access to Clinic Entrances Act of 1994 (18 USC 481(a)(1)), or ordinances requiring, at the

directives of the police, the dispersal of individuals blocking entrances to healthcare facilities.

(Pl's Verified Compl., ¶47).

The Ordinance in question provides a number of secular exceptions to the buffer zone

requirement, but makes no allowance for the practice of sincerely held religious beliefs, such as

those engaged in by the Plaintiffs.  (Pl's Verified Compl., ¶48).  Specifically, the Ordinance

allows persons within the buffer zone who are (a) entering or leaving such facility; (b) traversing

the sidewalk but only if they are reaching a destination; (c) law enforcement, ambulance,

firefighting, construction, utilities, public works and other municipal agents acting within the

scope of their employment; and (d) employees or agents of such facility acting within the scope

of their employment.  *Id.*

## II.    LAW AND ARGUMENT

### A.  Standard of Review

When deciding whether to issue a temporary restraining order or preliminary injunction,

the court must consider the following four factors: (1) Whether the movant has demonstrated a

strong likelihood of success on the merits; (2) Whether the movant would suffer irreparable

harm; (3) Whether issuance would cause substantial harm to others; and (4) Whether the public

interest would be served by issuance.  *Suster v. Marshall*, 149 F.3d 523, 528 (6th Cir. 1998);

*Northeast Ohio Coalition for the Homeless v. Blackwell*, 467 F.3d 999, 1009 (6th Cir.

2006).   These "are factors to be balanced, not prerequisites that must be met." *In re DeLorean

Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

Clear Sixth Circuit law establishes that the remaining factors are met where constitutional

rights are infringed upon and so, in these cases, the likelihood of success factor is dispositive.

*H.D.V. - Greektown, LLC v. City of Detroit*, 568 F.3d 609 (6th Cir. 2009) (abuse of discretion not to grant preliminary injunction where constitutional violation found); *Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020); *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020); *Foster v. Dilger*, 2010 U.S. Dist. LEXIS 95195 (EDKY 2010) (no substantial harm to others, even where registry incurred printing costs, where constitutional rights at stake); *Martin-Marietta Corp. v. Bendix Corp*., 690 F.2d 558, 568 (6th Cir. 1982); *see also G & V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1999) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.").  *See, also, Elrod v. Burns*, 427 U. S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

**B.  Plaintiffs have demonstrated a likelihood of success on the merits**

1.  <u>The Ordinance violates the First Amendment's Free Speech Guaranties</u>

The First Amendment guaranties, among other things, that government may make no law "abridging the freedom of speech."  U.S. Const., Amend. I.  It has been incorporated against the states.  *Gitlow v. New York*, 268 U.S. 652 (1925).

Public streets and sidewalks comprising the buffer zone under the Ordinance are traditional public forums, triggering the traditional public forum analysis under First Amendment analysis and scrutiny.  *McCullen v. Coakley*, 573 U.S. 464, 476-477 (2014).  To begin, the Government's ability to restrict speech in such locations is "very limited."  *Id.*  Restrictions in such areas can be upheld only if they are "reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, they are narrowly tailored to serve a significant governmental interest, and they leave open alternative channels for communication of the information."  *Id.* at 477.

The tailoring requirement "does not simply guard against an impermissible desire to censor." *Id.* at 486. "The government may attempt to suppress speech not only because it disagrees with the message being expressed, but also for mere convenience." *Id.* "But by demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrific[ing] speech for efficiency.'" *Id.*

First, the restrictions here are not content neutral (and, in fact, constitute viewpoint discrimination, which is presumptively unconstitutional) because they permit EMW and its staff and volunteers to engage in pro-abortion speech within the buffer zone, while criminalizing any attempt by Plaintiffs to engage in pro-life speech within the buffer zone. For the avoidance of all doubt, EMW staff and volunteers do speak, within the scope of their employment or volunteer status, within the buffer zone, encouraging would-be patients to obtain abortion services at EMW.

As *Coakley* made clear, "an exemption from an otherwise permissible regulation of speech may represent a governmental 'attempt to give one side of a debatable public question an advantage in expressing its views to the people.'" *Id.* at 483. And, in *Coakley*, where the Supreme Court held that the ordinance in question did not amount to viewpoint discrimination, the Court also observed that "[i]t would be a very different question if it turned out that a clinic authorized escorts to speak about abortion inside the buffer zones." *Id.* at 484. "In that case, the escorts would not seem to be violating the Act because the speech would be within the scope of their employment." *Id.* at 484-485. "The Act's exemption for clinic employees would then facilitate speech on only one side of the abortion debate—a clear form of viewpoint discrimination that would support an as-applied challenge to the buffer zone at that clinic." *Id.* at 485. But that is the record here. (Pl's Verified Compl., ¶¶ 42, 43, 56). And thus the Ordinance

14

fails on that basis alone.  It clearly is not narrowly tailored to meeting a compelling governmental interest.

The exceptions to the Ordinance permit a variety of people, including the general public, to occupy the buffer zones for various purposes.  For instance, if someone from the general public is walking down the sidewalk with an intention to reach another point, they are permitted within the zone for that purpose.  But for the Plaintiffs, who engage in the same exact walk along on the same exact sidewalk to convey speech and their ministry to someone on their way to enter EMW, their conduct is illegal.  The application of the Ordinance is thus "drawn based on the message a speaker conveys," it is therefore "subject to strict scrutiny."  *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015).  Said another way, the applicability of the statute "depend[s] entirely on the communicative content" of the petition.  *Id.*

This is true when a set of rules that may not be viewpoint discrimination on their face, become so in an as-applied manner when some speech is permitted or encouraged, but where other speech is discouraged.  *McCullen*, 573 U.S. 464 at 484-485 (noting that permitting one class of speakers to speak and not another raises questions of viewpoint discrimination).  It goes without saying that "[g]ranting waivers to favored speakers (or . . . denying them to disfavored speakers) would of course be unconstitutional."  *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002).

Courts have not hesitated to find as-applied viewpoint discrimination in situations such as these, where a policy may be viewpoint neutral on its face, but in application favors one side of a debate, or some speakers, but not others.  *Aids Action Comm. v. Massachusetts Bay Transp. Auth.*, 42 F.3d 1, 9-12 (1st Cir. 1994).  Moreover, "regulations that 'selectively grant[] safe passage to speech of which [officials] approve while curbing speech of which they disapprove'

are impermissible." *Nieto v. Flatau*, 715 F. Supp. 2d 650, 655 (EDNC 2010). *See, also, L.D. Mgmt. Co. v. Thomas*, 2020 U.S. Dist. LEXIS 72593 (WDKY 2020) (finding viewpoint discrimination based on selecting targeting or enforcement of speech); *Teufel v. Princeton City Sch. Dist. Bd. of Educ.*, 2013 U.S. Dist. LEXIS 4923 (SDOH 2013) (finding a facially valid policy can be applied in a discriminatory manner raising viewpoint discrimination claims); *Hart v. Thomas*, 422 F. Supp. 3d 1227 (EDKY 2019) (inconsistent enforcement coupled with suppression of the Plaintiff's expression constituted as-applied viewpoint discrimination); *Foti v. City of Menlo Park*, 146 F.3d 629 (9th Cir. 1998) (explaining as-applied viewpoint and content based discrimination); *Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012) (explaining as-applied enforcement and discrimination of neutral policies is unconstitutional).

But even if the Ordinance did not amount to content and viewpoint discrimination, it also is not narrowly tailored under the less exacting narrow tailoring in a content-neutral forum analysis, and it fails to leave open alternative channels for communication of the information. Specifically, in application, it restricts an even greater area than the U.S. Supreme Court struck down in *Coakley*, 573 U.S. 464, and, as in *Coakley*, Louisville Metro has not undertaken less restrictive measures to achieve its purported ends.  573 U.S. 464 at 490-496.

We suspect, perhaps, that Defendants may respond by citing *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357 (1997), because, in that case, the Supreme Court upheld a fixed buffer zone within 15 feet of the clinics' doorways, parking lot entrances, driveways, and driveway entrances. *See, also, Madsen v. Women's Health Ctr.*, 512 U.S. 753 (1994).  But *Schenck* and *Madsen* are distinguishable, and not applicable, for several compelling reasons. First, and critically, *Schenck* and *Madsen* involved tailored injunctions that were specifically directed at persons who had previously blocked clinic entrances, not a generally applicable law

16

directed at everyone and anyone, regardless of whether those people had blocked clinic entrances.  *Id.* at 364.  Secondly, the injunction in *Schenk* contained an exception for just the type of activity these Plaintiffs engage in here, permitting such persons "to have 'a conversation of a nonthreatening nature' with individuals entering or leaving the clinic."  *Id.*  And, significantly, the zone at issue in this case, which spans an entire city block, is substantially broader than the zones at issue in *Schenk* and *Madsen*.  Indeed, the Ordinance here bans Plaintiffs from occupying space on the public sidewalks in front of adjacent health care facilities, ***even with the permission of those facility owners***.

The Supreme Court in *Coakley* addressed just these distinctions in that case, and observed that the injunctions at issue in *Schenk* were, and are, substantially of a different nature than generally applicable statutory buffer zones, such as the buffer zone at issue in this matter. 573 U.S. 464, 492-493.  As the *Coakley* Court observed, "[w]e have previously noted the First Amendment virtues of targeted injunctions as alternatives to broad, prophylactic measures."  *Id.* at 492.  The Supreme Court in *Coakley* observed that "[s]uch an injunction 'regulates the activities, and perhaps the speech, of a group,' but only 'because of the group's past *actions* in the context of a specific dispute between real parties.'"  *Id.* (emphasis in original).  Thus, "given the equitable nature of injunctive relief, courts can tailor a remedy to ensure that it restricts no more speech than necessary."  *Id.*

"In short, injunctive relief focuses on the precise individuals and the precise conduct causing a particular problem."  *Id.*  A statutory buffer zone, "by contrast, categorically excludes non-exempt individuals from the buffer zones, unnecessarily sweeping in innocent individuals and their speech."  *Id.* at 492-493.  As in *Coakley*, the Metro Government "has available to it a

variety of approaches that appear capable of serving its interests, without excluding individuals from areas historically open for speech and debate." *Id.* at 493-494.

Thus, "[t]o meet the requirement of narrow tailoring [in the context of content-neutral regulations], the government **must demonstrate** that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *Id.* at 495. (emphasis added).

The Supreme Court has been particularly hesitant to close off channels of communication which provide individuals with inexpensive means of disseminating core political messages. *See, e.g., City of Ladue v. Gilleo*, 512 U.S. 43, 54-56 (1994) (ordinance banning residential signs almost completely foreclosed "a venerable means of communication that is both unique and important" and for which there is no adequate substitute, particularly for persons of modest means"); *Martin v. City of Struthers*, 319 U.S. 141, 146 (1943) ("Door to door distribution of circulars is essential to the poorly financed causes of little people.").

The Supreme Court has stressed the importance of providing access "within the forum in question." *Heffron v. International Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 655 (1981). "One is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Reno v. ACLU*, 521 U.S. 844, 880 (1997).

Restricting all pro-life speech to across the street is no constitutional substitute. *United States v. Grace*, 461 U.S. 171 (1983). Supreme Court jurisprudence directs reviewing courts to look at the purpose and goals of the speech in question, and to determine if the proposed alternative is as effective as the original intended forum. *Id.*

In *McCullen*, the size of the buffer zone made it difficult to distinguish persons headed to the clinic from passersby "in time to initiate a conversation before they enter[ed] the buffer zone." 573 U.S. 464 at 487.  As a result, the plaintiffs were often forced to raise their voices from outside the buffer zone once they identified those considering abortion, thereby forcing a mode of communication contrary to their compassionate message and preventing them from distributing pamphlets. *Id.*  Where the plaintiffs wished to engage in quiet conversations with women seeking abortions and not in noisy protest speech, the Court held it was "no answer to say that petitioners can still be 'seen and heard' by women within the buffer zones." *Id.* at 489.  Instead, the Supreme Court concluded the buffer zones had "effectively stifled petitioners' message" by prohibiting the plaintiffs' chosen means of communication.  *Id.*  Indeed, the Sixth Circuit has repeatedly observed that "[a]n alternative is not ample if the speaker is not permitted to reach the intended audience."  *Saieg v. City of Dearborn*, 641 F.3d 727 (6th Cir. 2011).

Applying *McCullen* and *Saig*, the objective of these Plaintiffs is to be heard by the women on their way to entering the EMW facility, not in a loud, shouting manner, but in a soft, non-confrontational, caring manner.  The substitute offered by the Defendants, to be forced to shout from a distance, is no substitute at all.

"Plaintiffs wish to converse with their fellow citizens about an important subject on the public streets and sidewalks—sites that have hosted discussions about the issues of the day throughout history."  573 U.S. 464 at 496.  "Respondents assert undeniably significant interests in maintaining public safety on those same streets and sidewalks, as well as in preserving access to adjacent healthcare facilities."  *Id.*  "But here the [Defendants] ha[ve] pursued those interests by the extreme step of closing a substantial portion of a traditional public forum to all speakers." Id. "It has done so without seriously addressing the problem through alternatives that leave the

forum open for its time-honored purposes." *Id.* They "may not do that consistent with the First Amendment." *Id.*

The Ordinance thus violates the First Amendment's Free Speech guaranties.

2.   The Ordinance violates the First Amendment's Freedom of Assembly

The First Amendment also guaranties the right "of the people peaceably to assemble." This guaranty has also been incorporated against the states. *DeJonge v. Oregon*, 299 U.S. 353 (1937). Assembly on public streets and sidewalks is among the guaranties protected by the First Amendment. *Shuttlesworth v. Birmingham*, 394 U.S. 147 (1969). These rights, being fundamental rights, trigger strict scrutiny. *Clark v. Jeter*, 486 U.S. 456, 461 (1988). The Ordinance is not narrowly tailored to achieve a compelling governmental interest. It is thus also a violation of the Freedom of Assembly guaranty of the First Amendment.

3.   The Ordinance violates the First Amendment's Free Exercise of Religion

The First Amendment also provides that: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." This clause, too, has been incorporated against the states. *Cantwell v. Connecticut*, 310 U.S. 296 (1940).

"[A] law that discriminates against religious practices usually will be invalidated because it is the rare law that can be 'justified by a compelling interest and is narrowly tailored to advance that interest.'"[3] *Roberts v. Neace*, 958 F.3d 409, 413 (6th Cir. 2020). That is because a "a law might appear to be generally applicable on the surface but not be so in practice due to exceptions for comparable secular activities." *Id.* "Do the four [categories] of exceptions in the [ordinance], and the kinds of [exceptions] allowed, remove them from the safe harbor for generally applicable laws? We think so." *Id.* "At some point, an exception-ridden policy takes

---

[3] This case also presents hybrid First Amendment rights, which also triggers strict scrutiny under *Employment Div. v. Smith*, 494 U.S. 872, 881-882 (1990).

on the appearance and reality of a system of individualized exemptions, the antithesis of a neutral and generally applicable policy and just the kind of state action that must run the gauntlet of strict scrutiny." *Id.* at 413-414.  *See, also, Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63 (2020).

The exceptions to the Ordinance permit a variety of people, including the general public, to occupy the buffer zones for various purposes.  For instance, if someone from the general public is walking down the sidewalk with an intention to reach another point, they are permitted within the zone for that purpose.  But for the Plaintiffs, who engage in the same exact walk along the same exact sidewalk to convey speech and their ministry to someone on their way to enter EMW, their conduct is illegal.  This cannot stand under *Roberts*, 958 F.3d 409 at 413.  And the Ordinance in question and its enforcement thus violates these Plaintiffs' Free Exercise rights.

4.  The Ordinance violates Plaintiffs rights under KRS 446.350

KRS 446.350 provides:

Government shall not substantially burden a person's freedom of religion. The right to act or refuse to act in a manner motivated by a sincerely held religious belief may not be substantially burdened unless the government proves by clear and convincing evidence that it has a compelling governmental interest in infringing the specific act or refusal to act and has used the least restrictive means to further that interest. A "burden" shall include indirect burdens such as withholding benefits, assessing penalties, or an exclusion from programs or access to facilities.

"The point of the law is to exercise an authority every State has: to provide more protection for religious liberties at the state level than the U.S. Constitution provides at the national level." *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 612 (6th Cir. 2020). "Application of this test requires little elaboration in most respects." *Id.* "Defendants' actions substantially burden the [Plaintiffs'] sincerely held religious practices—and plainly so." *Id.* "Religion motivates the [sidewalk ministry.]" *Id.* The likelihood-of-success inquiry instead

21

turns on whether [Defendants' Ordinance was] 'the least restrictive means' of achieving [the Defendants' interests]. Ky. Rev. Stat. § 446.350." *Id.* "That's a difficult hill to climb, and it was never meant to be anything less." *Id.*

Defendants had and have numerous less restrictive measures they can pursue, but did not – and the U.S. Supreme Court made just this observation in *Coakley*. 573 U.S. 464, 493-495. Thus, the Ordinance violates KRS 446.350.

## III.   CONCLUSION

Plaintiffs have demonstrated that the requested Emergency Temporary Restraining Order and Preliminary Injunction should be granted.

Respectfully submitted,

/s/ Christopher Wiest
Christopher Wiest (KBA 90725)
Chris Wiest, Atty at Law, PLLC
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
859/486-6850 (v)
513/257-1895 (c)
859/495-0803 (f)
chris@cwiestlaw.com

/s/Thomas Bruns
Thomas Bruns (KBA 84985)
4750 Ashwood Drive, STE 200
Cincinnati, OH 45241
tbruns@bcvalaw.com
513-312-9890
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that I have served the foregoing via the Court's CM/ECF system, which will provide notice to all counsel or parties of record and I will also serve this motion on the opposing parties with the service of the Complaint and summons in this matter, this 7 day of June, 2021.  I have also served a copy of the foregoing upon Assistant Jefferson County Attorneys by electronic mail this 6 day of June, 2021;

/s/ Christopher Wiest_____