# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY (at Louisville)
*Electronically Filed*

| | | |
|---|---|---|
| **SISTERS FOR LIFE, INC., et. al.** | : | Case No. 3:21-CV-00367 |
| *Plaintiffs* | : | |
| v. | : | |
| **LOUISVILLE-JEFFERSON COUNTY METRO GOVERNMENT**, et. al. | : | |
| | : | |
| *Defendants* | : | |

## REPLY IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER, AND PRELIMINARY INJUNCTION

Plaintiffs, Sisters for Life, Inc., Angela Minter, and Kentucky Right to Life Association, Inc. ("Plaintiffs"), submit this Reply in Support of their Emergency Motion for Temporary Restraining Order and Preliminary Injunction ("Plaintiffs' Motion"). Given the July 16, 2021 current effective date of the Ordinance, Plaintiffs request that this Court enter at least status quo relief to restrain the effective date of the Ordinance prior to that date. (RE#9).

**1. Response to Defendants' "History of Ordinance"**

Defendants (who we also collectively refer to as "Metro Government" in this Reply) begin their Response by contending that there were issues with harassing, stalking, intimidating, and assaulting others outside of the EMW Clinic that prompted the need to pass the Ordinance. One might respond, simply, that if this illegal activity was and is occurring, then it would be appropriate to actually enforce the laws prohibiting this clearly criminal misconduct, rather than criminalize pro-life, but not pro-abortion, speech in the newly created buffer zone. In fact, ignoring the self-serving, hearsay statements of the EMW Clinic and National Abortion Federation, all of whom wish to silence dissenting viewpoints to their activities, the actual police

1

surveillance reveals that "most of the activity of the protesters is clearly lawful." (RE#10-5 at PageID#132).[1]

Nor does Defendants' Response leave any doubt that they never attempted less restrictive measures to combat the purported ills they contend required the passage of the Ordinance, all of which we set out in detail in the Complaint and Motion. (Pl's Am. Verified Compl., RE#5, ¶47).

2. **Response to Defendants' "Counterstatements of Facts"**

Not having sufficient, actual "facts" to overcome Plaintiffs' Motion, Defendants attempt to rewrite the Ordinance, through the declaration of a public works director, in an effort to make it more defensible, and less constitutionally objectionable. But the Ordinance says what it says. And despite claiming that Plaintiffs are "distorting" the clear and unambiguous Ordinance, it is Defendants, and not Plaintiffs, who engage in serious misrepresentation to this Court.

So let us turn to the plain language of the Ordinance where it defines the term "Entrance:"

***ENTRANCE.*** Any door to a healthcare facility that directly abuts the public sidewalk; provided, however, that if the door does not directly abut the public sidewalk, the "entrance" shall be the point at which the public sidewalk intersects with a pathway leading to the door.

Here, it is undisputed that EMW's door does not directly abut the public sidewalk. [See, also, photo at RE#10-7, PageID#136]. Instead, there is a concrete pathway extending left to right, that runs parallel to the EMW facility. *Id.* Therefore, under the clear and unambiguous

---

[1] Metro Government argues that all legislative records are admissible under *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291 (6th Cir. 2008). We agree in part. We agree to the extent that the records are themselves records of the City under FRE 803(8), concerning, for instance, police reports and the city's documentation of police calls. However, when it comes to reports from the EMW Clinic and the National Abortion Federation (NAF), or other third parties, those reports are not admissible. FRE 803; FRE 805. Such reports by third parties, particularly those who have a vested interest in passage of the Ordinance, cannot be and should not be deemed trustworthy. This is particularly true where, as is the case here, such reports conflict with police reports concerning the same activity and period of time. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988).

terms of the Ordinance, the "Entrance" is the entire pathway that runs parallel to the facility, as it is undisputed this is the point "at which the public sidewalk intersects with a pathway leading to the door."

Defendants ignore/rewrite other clear and unambiguous terms as well. Section (B)(2) of the Ordinance provides:

> (B) *Access to a healthcare facility.*
>
> (2) No person shall knowingly enter, remain on, or create any obstruction within the driveway of a healthcare facility or within a "buffer zone" on the public way or sidewalk extending from the entrance of a healthcare facility to the closest adjacent sidewalk curb and ten feet from side to side, during the facility's posted business hours, except:
>
> (a) Persons entering or leaving such facility;
>
> (b) Persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility; or
>
> (c) Law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; or
>
> (d) Employees or agents of such facility acting within the scope of their employment.

So what can we discern from this language? First, the buffer zone extends from the "entrance" of a healthcare facility, and ten feet from side to side. We know that this extends the entire length of the sidewalk, and not the smaller area that the Defendants now misleadingly claim, because the Ordinance defines "entrance" as the point where the public sidewalk intersects with the pathway leading to the door, which is the entire strip of concrete. [RE#10-7, PageID#136].

Next, Defendants falsely claim that the Ordinance does not apply to the neighboring optometrist or the pregnancy clinic next door to EMW, because there has been no request for signage by those businesses. But, as it turns out, there simply is no such requirement to request signage, in section (B)(2) of the ordinance, which is the operative buffer zone section, nor is there any such requirement contained in Section (F), the penalty section. Although it is true that

under section (C) of the Ordinance it ***allows*** for signage to be placed by Metro Government upon request, there simply is ***nothing*** in Section (B) (which is the operative section), or Section (F) (the penalty section), that would in any way limit the operation of the Ordinance only to areas containing requested signage.

Simply put, Defendants must attempt to rewrite the Ordinance, through their pleadings, in an attempt to justify its indefensibly overbroad and unconstitutional scope. But "[t]his ordinance is not susceptible to a limiting construction because … its language is plain and its meaning unambiguous." *Houston v. Hill*, 482 U.S. 451, 468 (1987).[2]

### 3. **Plaintiffs established their entitlement to a preliminary injunction**

Significantly, Defendants do concede that, in constitutional cases such as this, the critical factor is the likelihood of success on the merits. *Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020); *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020).

#### a. **The Ordinance violates the First Amendment's Free Speech Guaranties**

Public streets and sidewalks comprising the buffer zone under the Ordinance are traditional public forums, triggering the traditional public forum analysis under First Amendment analysis and scrutiny. *McCullen v. Coakley*, 573 U.S. 464, 476-477 (2014). To begin, the Government's ability to restrict speech in such locations is "very limited." *Id.* Restrictions in such areas can be upheld only if they are "reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, they are narrowly tailored to serve a significant governmental interest, and they leave open alternative channels for communication of the information." *Id.* at 477.

---

[2] As an aside, even if the buffer zone *were* as narrow as Defendants claim, and plainly it is not, the constitutional issues would remain. The exact size of the buffer zone, under *McCullen v. Coakley*, 573 U.S. 464 (2014) is not the critical factor, as explained below.

The tailoring requirement "does not simply guard against an impermissible desire to censor." *Id.* at 486. That is because "the government may attempt to suppress speech not only because it disagrees with the message being expressed, but also for mere convenience." *Id.* "But by demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrific[ing] speech for efficiency.'" *Id.*

1. The Ordinance is not content neutral

Defendants are wrong in their contentions about content neutrality. The Ordinance is not content neutral (and, in fact, constitutes viewpoint discrimination, which is presumptively unconstitutional) because it clearly permits EMW staff and volunteers to engage in pro-abortion speech within the buffer zone, while criminalizing any attempt by Plaintiffs to engage in pro-life speech with EMW patrons within the buffer zone. For the avoidance of all doubt, EMW staff and volunteers do speak, within the scope of their employment or volunteer status, within the buffer zone, encouraging would-be patients to obtain abortion services at EMW. However, what the Ordinance clearly criminalizes is any speech within the buffer zone directed towards encouraging those same would-be patients not to have an abortion at EMW.

Defendants falsely claim that this is not so, but they offer not one scintilla of evidence to refute the Plaintiffs' Verified Amended Complaint that makes this point clear. (Pl's Am. Verified Compl., RE#5, at ¶¶ 44-46). On this issue then, and despite Defendants' Response, Plaintiffs' Verified Amended Complaint remains unrebutted, competent evidence. *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008). More specifically, Defendants claim that the scope of the EMW clinic escorts' job duties is not to encourage or facilitate abortions, but offer not one bit of evidence that would substantiate this contention. More to the point, Ms. Minter, who is

5

frequently on the sidewalks outside the clinic, knows what she hears on those sidewalks and has tendered the verified complaint, which is competent evidence. *Roop*, 530 F.3d 407, 414.

As *Coakley* made clear, "an exemption from an otherwise permissible regulation of speech may represent a governmental 'attempt to give one side of a debatable public question an advantage in expressing its views to the people.'" *Id.* at 483. And, in *Coakley*, where the Supreme Court held that the ordinance in question did not amount to viewpoint discrimination, the Court also observed that "[i]t would be a very different question if it turned out that a clinic authorized escorts to speak about abortion inside the buffer zones." *Id.* at 484. "In that case, the escorts would not seem to be violating the Act because the speech would be within the scope of their employment." *Id.* at 484-485. "The Act's exemption for clinic employees would then facilitate speech on only one side of the abortion debate—a clear form of viewpoint discrimination that would support an as-applied challenge to the buffer zone at that clinic." *Id.* at 485. But that is the undisputed record here. (Pl's Verified Compl., ¶¶ 42, 43, 56). Thus, the Ordinance fails on that basis alone. It clearly is not narrowly tailored to meeting a compelling governmental interest.

Without doubt, the exceptions to the Ordinance permit a variety of people, including the general public, to occupy the buffer zones for various purposes. For instance, if two members of the general public walk down the sidewalk with an intention to reach another point while engaging in a discussion about sports, they are permitted within the zone for that purpose. But for the Plaintiffs, who engage in the same exact walk, on the same exact sidewalk, but wish to convey constitutionally protected speech and carry out their ministry to someone heading to the entrance to EMW, their conduct is illegal. The application of the Ordinance is thus "drawn based on the message a speaker conveys," it is therefore "subject to strict scrutiny." *Reed v.*

*Town of Gilbert*, 576 U.S. 155, 164 (2015). Said another way, the applicability of the statute "depend[s] entirely on the communicative content" of the person on the sidewalk. *Id.*

This is true when a set of rules that may not be viewpoint discrimination on their face, become so in an as-applied manner when some speech is permitted or encouraged, but where other speech is discouraged. *Coakley*, 573 U.S. 464 at 484-485 (noting that permitting one class of speakers to speak and not another raises questions of viewpoint discrimination). It goes without saying that "[g]ranting waivers to favored speakers (or . . . denying them to disfavored speakers) would of course be unconstitutional." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002).

Courts have not hesitated to find as-applied viewpoint discrimination in situations such as these, where a policy may be viewpoint neutral on its face, but in application favors one side of a debate, or some speakers, but not others. *Aids Action Comm. v. Massachusetts Bay Transp. Auth.*, 42 F.3d 1, 9-12 (1st Cir. 1994); *Nieto v. Flatau*, 715 F. Supp. 2d 650, 655 (EDNC 2010). *See, also, L.D. Mgmt. Co. v. Thomas*, 2020 U.S. Dist. LEXIS 72593 (WDKY 2020) (finding viewpoint discrimination based on selective targeting or enforcement of speech); *Teufel v. Princeton City Sch. Dist. Bd. of Educ.*, 2013 U.S. Dist. LEXIS 4923 (SDOH 2013) (finding a facially valid policy can be applied in a discriminatory manner raising viewpoint discrimination claims); *Hart v. Thomas*, 422 F. Supp. 3d 1227 (EDKY 2019) (inconsistent enforcement coupled with suppression of the Plaintiff's expression constituted as-applied viewpoint discrimination); *Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012) (explaining as-applied enforcement and discrimination of neutral policies is unconstitutional).

  2. <u>The Ordinance is not narrowly tailored under a content neutral analysis</u>

Even if the Ordinance did not amount to content and viewpoint discrimination, it still is not narrowly tailored under the less exacting narrow tailoring in a content-neutral forum analysis, and it fails to leave open alternative channels for communication of the information.

Defendants primarily rely upon *Hill v. Colo.*, 530 U.S. 703 (2000). But *Hill* is easily distinguishable, as it involved an ordinance that was far narrower than the Ordinance here. In *Hill*, the ordinance made it "unlawful within the regulated areas for any person to 'knowingly approach' within eight feet of another person, without that person's consent, 'for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person.'" *Id.* at 707. And, importantly, "[a]lthough the statute prohibits speakers from approaching unwilling listeners, it does not require a standing speaker to move away from anyone passing by." *Id.* at 708.

As it turns out, the Supreme Court in *Hill* upheld the Colorado statute for reasons <u>*not applicable*</u> to the Ordinance here. First, the Supreme Court observed that the prohibitions contained in the Colorado law "only apply to communications that interfere with these rights rather than those that involve willing listeners." *Id.* at 718. In contrast, the present Ordinance, as we pointed out above, applies in front of <u>*each and every*</u> healthcare facility (including the two that border EMW, notwithstanding the Metro Government's arguments to the contrary), applies <u>*regardless*</u> of whether those entering or exiting consent to being approached, and only bars pro-life speech, but not pro-abortion speech from clinic employees and escorts.

Second, the *Hill* Court analyzed, for both narrow tailoring and ample alternatives, the actual speech the protesters in that case engaged in, and determined that they would be able to do so, even with the 8-foot floating buffer (and went further and observed that in some regards, some speech might be furthered by the floating buffer). *Id.* at 726.

8

For instance, and with respect to signs, the *Hill* Court observed that the:

8-foot separation between the speaker and the audience should not have any adverse impact on the readers' ability to read signs displayed by demonstrators. In fact, the separation might actually aid the pedestrians' ability to see the signs by preventing others from surrounding them and impeding their view. Furthermore, the statute places no limitations on the number, size, text, or images of the placards. And, as with all of the restrictions, the 8-foot zone does not affect demonstrators with signs who remain in place. *Id.*

For speech and oral communications, the Court observed:

Unlike the 15-foot zone in *Schenck*, this 8-foot zone allows the speaker to communicate at a "normal conversational distance." *Ibid.* Additionally, the statute allows the speaker to remain in one place, and other individuals can pass within eight feet of the protester without causing the protester to violate the statute. Finally, here there is a "knowing" requirement that protects speakers "who thought they were keeping pace with the targeted individual" at the proscribed distance from inadvertently violating the statute. *Id.* at 726-727.

Thus, the *Hill* Court observed, that the floating buffer "might encourage the most aggressive and vociferous protesters to moderate their confrontational and harassing conduct, and thereby make it easier for thoughtful and law-abiding sidewalk counselors like petitioners to make themselves heard." *Id.* at 727.

Finally, with respect to handbills, the *Hill* Court observed that: "The burden on the ability to distribute handbills is more serious because it seems possible that an 8-foot interval could hinder the ability of a leafletter to deliver handbills to some unwilling recipients. The statute does not, however, prevent a leafletter from simply standing near the path of oncoming pedestrians and proffering his or her material, which the pedestrians can easily accept." *Id.* at 727. This, of course, is consistent with the Sixth Circuit's admonition that "[a]n alternative is not ample if the speaker is not permitted to reach the intended audience." *Saieg v. City of Dearborn*, 641 F.3d 727 (6th Cir. 2011).

9

That then takes us back to *Coakley*, 573 U.S. 464. Based upon the relevant facts involved, we submit that *Coakley*, and not *Hill*, is applicable here. As noted, *Hill* dealt with the narrower, floating buffer zone with the continued ability to approach willing listeners, and even remain stationary and reach unwilling listeners, versus *Coakley*, 573 U.S. 464, which involved a fixed buffer zone and a prohibition on disfavored speech, but not other favored speech, which is exactly the case with the Ordinance here. In fact, *Coakley* at least required the posting of the no-speech zone. But, while Metro Government claims that the same is true here, the clear and unambiguous language of the Ordinance says otherwise.

Also as in *Coakley*, Defendants have not undertaken less restrictive measures to achieve their purportedly constitutional ends. 573 U.S. 464 at 490-496. In particular, and as in *Coakley*, Metro Government "has available to it a variety of approaches that appear capable of serving its interests, without excluding individuals from areas historically open for speech and debate." *Id.* at 493-494.

Thus, "[t]o meet the requirement of narrow tailoring [in the context of content-neutral regulations], the government **must demonstrate** that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *Id.* at 495. (emphasis added). Here, Defendants' Response completely fails to meet this burden. In fact, all Defendants even argue is that while acknowledging that current laws already prohibit much of the ills the Ordinance targets, Defendants claim that the illicit activities continue. But that misses the point entirely. Metro Government actually has the burden to prove it has attempted to consistently enforce its laws, and come up short, or enacted less restrictive laws, and come up short, thus necessitating this new burden on free speech contained in the Ordinance. Metro Government completely fails to make this required showing.

10

In *Coakley*, the size of the buffer zone made it difficult to distinguish between persons headed to the clinic from passersby "in time to initiate a conversation before they enter[ed] the buffer zone." 573 U.S. 464 at 487. As a result, the plaintiffs were often forced to raise their voices from outside the buffer zone once they identified those considering abortion, thereby forcing a mode of communication contrary to their compassionate message and preventing them from distributing pamphlets. *Id.* Where the plaintiffs wished to engage in quiet conversations with women seeking abortions and not in noisy protest speech, the Court held it was "no answer to say that petitioners can still be 'seen and heard' by women within the buffer zones." *Id.* at 489. Instead, the Supreme Court concluded the buffer zones had "effectively stifled petitioners' message" by prohibiting the plaintiffs' chosen means of communication. *Id.* Indeed, the Sixth Circuit has repeatedly observed that "[a]n alternative is not ample if the speaker is not permitted to reach the intended audience." *Saieg v. City of Dearborn*, 641 F.3d 727 (6th Cir. 2011).

Applying *Coakley* and *Saieg*, the objective of these Plaintiffs is to be heard by the women on their way to entering the EMW facility, not in a loud, shouting manner, but in a soft, non-confrontational, caring manner. The substitute offered by Defendants, to be forced to raise their voices from a distance, is no substitute at all.

"Plaintiffs wish to converse with their fellow citizens about an important subject on the public streets and sidewalks—sites that have hosted discussions about the issues of the day throughout history." *Coakley,* 573 U.S. 464 at 496. "Respondents assert undeniably significant interests in maintaining public safety on those same streets and sidewalks, as well as in preserving access to adjacent healthcare facilities." *Id.* "But here the [Defendants] ha[ve] pursued those interests by the extreme step of closing a substantial portion of a traditional public forum to all speakers." *Id.* "It has done so without seriously addressing the problem through

11

alternatives that leave the forum open for its time-honored purposes." *Id.* They "may not do that consistent with the First Amendment." *Id.*

Metro Government claims that other cases have determined the Ordinance is constitutional. Such a claim does not withstand scrutiny of the content of those other cases. First, take *Turco v. City of Englewood*, 935 F.3d 155 (3rd Cir. 2019). In *Turco*, the Third Circuit Court of Appeals determined that "we conclude that there are genuine issues of material fact precluding the entry of summary judgment to either side, we will reverse and remand for further proceedings." Englewood had a buffer zone of eight feet from the actual entrance, versus the clear and unambiguous definition of "Entrance" contained in the Ordinance here which measures from the public sidewalk intersecting with any path leading to the entrance. So, unlike Englewood's fixed 8-foot buffer zone, Metro government's buffer zone encompasses the entire sidewalk bordering the path to the entrance to the EMW clinic.

*Turco* also observed that the critical analysis in that case needed to be examined in light of the "exact impact on the sidewalk counselors' speech and the concomitant efficacy of their attempts to communicate is unclear on this record," and "contradictory evidence regarding the extent to which the buffer zone prevented Turco from communicating her message as she wanted." *Id.* at 165. And, the record on summary judgment—"properly viewed in the light most favorable to the City—established that the City considered and attempted to implement alternative means of regulating speech, and that the City did attempt to enforce existing laws before creating the buffer zone." *Id.*

None of those facts are the facts here. Here, the record is clear that police observed that "most of the activity of the protesters is clearly lawful." (RE#10-5 at PageID#132). And, the

12

record here is absolutely clear on Metro Government's failure to pursue less restrictive alternatives, as conclusively demonstrated by the admissible evidence from both sides.

Here, Plaintiffs produced unrebutted evidence that Metro Government made no serious attempts at less restrictive measures to combat the purported ills that it contends required the passage of the Ordinance. This includes unrebutted evidence of Metro Government's failure to pursue individual prosecutions in any meaningful degree, its failure to pursue any injunctions, its failure to enact any ordinances against following and harassing people within a certain number of feet of a health care facility, or any attempt to pass legislation similar to the federal Freedom of Access to Clinic Entrances Act of 1994 (18 USC 481(a)(1)), and/or ordinances requiring, at the directive of the police, the dispersal of individuals blocking entrances to healthcare facilities. (Pl's Am. Verified Compl., RE#5, ¶¶ 49, 59).

Likewise, Metro Government's own submissions include public records demonstrating a serious lack of consideration of, or any attempts at, less restrictive alternatives. For instance, their submissions reflect police calls, from March 1, 2019 through November 15, 2020 (but not identifying the substance of those calls or who was at issue), with only a single arrest, for trespassing, during that time. (RE#11-5, PageID#200-202). And, as it turns out, scant attempts at enforcement of existing laws permeate the period before that as well. (RE#11-5, PageID#205). Thus, the record here, unlike *Turco*, but like *Coakley*, demonstrates a complete failure of Metro Government to actually attempt less restrictive alternatives.

Surprisingly, Metro Government also cites *Bruni v. City of Pittsburgh*, 941 F.3d 73 (3rd Cir. 2019), but the Third Circuit in *Bruni* upheld the buffer zone ordinance there ***precisely because*** it distinguished between what that ordinance prohibited, namely "congregat[ing]," "patrol[ling]," "picket[ing]," and "demonstrat[ing]", from what it allowed, namely protected

13

sidewalk counseling. The *Bruni* Court then adopted a narrowing construction (which would be binding upon the City in the future), and upheld that ordinance on this narrower basis – again because the ordinance allowed sidewalk counseling. As has been proven, the Ordinance here prohibits all pro-life sidewalk counseling within the buffer zone as these individuals are not within one of the four categories, all secular, allowed by the Ordinance. Therefore, and unlike *Bruni*, no narrowing interpretation allowing the Plaintiffs' constitutionally protected conduct is even possible.

Finally, Metro Government cites *Price v. City of Chicago*, 915 F.3d 1107 (7th Cir. 2019), which, like *Hill*, upheld a floating buffer zone that prohibited approaching within eight feet of pedestrians without their consent. But, again, that is <u>not</u> what we have here. There is no floating buffer zone here; rather, there is a complete prohibition on entering the buffer zone outside the EMW clinic unless someone falls within one of the four limited, all secular, exceptions.

Clearly, the floating buffer zone in *Price* and the tailored prohibitions in *Bruni* both represent a far more tailored and targeted approach to the purported problem at hand than the Ordinance here. Here, the problem claimed by Defendants is loud, aggressive protestors who block clinic entrances. The purported problem is not Plaintiffs, who are peaceful sidewalk counselors exercising constitutionally protected rights in a traditional public forum. Metro Government's solution is to cut with a chainsaw instead of a scalpel, where the Ordinance prohibits all of this peaceful, constitutionally protected activity within the buffer zone.

Overbreadth in the First Amendment context, as is the case here, requires that "a law may be overturned as impermissibly overbroad because a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1054 (6th Cir. 2015). "Consequently, because it impairs a

substantial amount of speech beyond what is required to achieve acceptable objectives, 'a statute which chills speech can and must be invalidated where its facial invalidity has been demonstrated.'" *Id., citing Citizens United v. FEC*, 558 U.S. 310, 336 (2010).

The Ordinance thus violates the First Amendment's Free Speech guaranties.

### b. The Ordinance violates the First Amendment's Guarantee of Freedom of Assembly

Not surprisingly, Metro Government does not even respond to the freedom of assembly argument, because it can't. The First Amendment guarantees the right "of the people peaceably to assemble." This guarantee has also been incorporated against the states. *DeJonge v. Oregon*, 299 U.S. 353 (1937). Assembly on public streets and sidewalks is among the guarantees protected by the First Amendment. *Shuttlesworth v. Birmingham*, 394 U.S. 147 (1969). These rights, being fundamental rights, trigger strict scrutiny. *Clark v. Jeter*, 486 U.S. 456, 461 (1988). The Ordinance is not narrowly tailored to achieve a compelling governmental interest. Thus, it is also a violation of the Freedom of Assembly guarantee of the First Amendment.

### c. The Ordinance violates the First Amendment's Guarantee of Free Exercise of Religion

"[A] law that discriminates against religious practices usually will be invalidated because it is the rare law that can be 'justified by a compelling interest and is narrowly tailored to advance that interest.'"[3] *Roberts v. Neace*, 958 F.3d 409, 413 (6th Cir. 2020). That is because a "a law might appear to be generally applicable on the surface but not be so in practice due to exceptions for comparable secular activities." *Id.* "Do the four [categories] of exceptions in the [ordinance], and the kinds of [exceptions] allowed, remove them from the safe harbor for generally applicable laws? We think so." *Id.* "At some point, an exception-ridden policy takes

---

[3] This case also presents hybrid First Amendment rights, which also trigger strict scrutiny under *Employment Div. v. Smith*, 494 U.S. 872, 881-882 (1990).

15

on the appearance and reality of a system of individualized exemptions, the antithesis of a neutral and generally applicable policy and just the kind of state action that must run the gauntlet of strict scrutiny." *Id.* at 413-414. *See, also, Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63 (2020).

The four, purely secular, exceptions to the Ordinance permit a variety of people, including the general public, to occupy the buffer zone for various secular purposes. As with Plaintiffs' other claims, Metro Government does not adequately address the issues with permitting generally broad, solely secular exceptions, but the disallowance of Plaintiffs' sincerely held religious beliefs. *Fulton v. City of Philadelphia*, --- U.S. --- (2021). "A law … lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* If the interest here is clearing the sidewalk to provide access, as Metro Government claims, allowing the general public on the sidewalk to walk through it undermines the Metro Government's asserted interests in a similar way.

For instance, if two members of the general public walk down the sidewalk with an intention to reach another point, but all the while talking about their views on sports, they are permitted within the zone for that purpose. But for Plaintiffs, who walk down the exact same sidewalk to convey constitutionally protected speech to potential patrons walking towards the EMW clinic, their conduct is illegal. This cannot stand under *Roberts*, 958 F.3d 409 at 413. And the Ordinance in question and its enforcement thus violates these Plaintiffs' Free Exercise rights.

Perhaps recognizing that the exceptions here are problematic as a result of *Roberts*, Metro Government falsely claims that the Ordinance is narrowly tailored. Clearly that is not the case.

The Ordinance catches within its sweep the sidewalk minister such as Angela Minter, but permits a host of secular exceptions, including the morning jogger or walker, the businessman, the couple walking to lunch, two friends debating sports issues, and a host of other secular exceptions. That is precisely the type of exception ridden policy the Sixth Circuit, and Supreme Court, have not countenanced. *Roberts*, 958 F.3d 409 at 413; *Cuomo*, 141 S. Ct. 63.

### d. The Ordinance violates Plaintiffs' rights under KRS 446.350

KRS 446.350 provides:

> Government shall not substantially burden a person's freedom of religion. The right to act or refuse to act in a manner motivated by a sincerely held religious belief may not be substantially burdened unless the government proves by clear and convincing evidence that it has a compelling governmental interest in infringing the specific act or refusal to act and has used the least restrictive means to further that interest. A "burden" shall include indirect burdens such as withholding benefits, assessing penalties, or an exclusion from programs or access to facilities.

"The point of the law is to exercise an authority every State has: to provide more protection for religious liberties at the state level than the U.S. Constitution provides at the national level." *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 612 (6th Cir. 2020). "Application of this test requires little elaboration in most respects." *Id.* "Defendants' actions substantially burden the [Plaintiffs'] sincerely held religious practices—and plainly so." *Id.* "Religion motivates the [sidewalk ministry.]" *Id.* The likelihood-of-success inquiry instead turns on whether [Defendants' Ordinance was] 'the least restrictive means' of achieving [the Defendants' interests]. Ky. Rev. Stat. § 446.350." *Id.* "That's a difficult hill to climb, and it was never meant to be anything less." *Id.*

Defendants had and have numerous less restrictive measures they can pursue, but did not – and the U.S. Supreme Court made just this observation in *Coakley*. 573 U.S. 464, 493-495. Thus, the Ordinance violates KRS 446.350. Defendants merely arguing that they pursued the

17

least restrictive means, without actually demonstrating it, much less in a clear and convincing manner, fails to satisfy their burden under the statute. Why couldn't Metro Government, as the City of Pittsburgh did in *Bruni*, 941 F.3d 73, target only "congregat[ing]," "patrol[ling]," "picket[ing]," and "demonstrat[ing]," but permit constitutionally protected sidewalk counseling?

Once again, there is no doubt that Defendants failed to attempt any less restrictive measures to combat the purported ills they contend required the passage of the Ordinance, including any meaningful attempts at individual prosecutions, any injunctions, any ordinances against following and harassing people within a certain number of feet of a health care facility, or passage of legislation similar to the federal Freedom of Access to Clinic Entrances Act of 1994 (18 USC 481(a)(1)), and/or other ordinances requiring, at the directives of the police, the dispersal of individuals blocking entrances to healthcare facilities. (Pl's Verified Compl., ¶47). Simply put, Defendants have no answers to any of these points about their failure to pursue these less restrictive options, despite their clear ability to do so. This is fatal.

### e. The remaining injunction factors are met

Defendants conclude by arguing that there is no irreparable harm, that the harm to others factor weighs against granting the injunction, and the public interest does not support an injunction. In support, Defendants cite a couple district courts, including this Court in a case that was overruled a few days later by the Sixth Circuit. *Cf. Maryville Baptist Church v. Beshear*, 455 F.Supp.3d 342 (WDKY 2020), *overruled by Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020).

Defendants are simply wrong again. Sixth Circuit case law is clear that the factors generally merge in First Amendment cases against the government, such as this case. *H.D.V. - Greektown, LLC v. City of Detroit*, 568 F.3d 609 (6th Cir. 2009) (abuse of discretion not to grant

18

preliminary injunction where constitutional violation found); *Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020); *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (irreparable harm from violation of rights).

4. **Conclusion**

The record, and the plain and unambiguous terms of the Ordinance, are clear. Plaintiffs conclusively demonstrated that the requested Emergency Temporary Restraining Order and Preliminary Injunction should be granted. In contrast, Defendants failed to meet their burden. Respectfully submitted,

/s/ Christopher Wiest_____
Christopher Wiest (KBA 90725)
Chris Wiest, Atty at Law, PLLC
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
513/257-1895 (c)
859/495-0803 (f)
chris@cwiestlaw.com

/s/Thomas Bruns
Thomas B. Bruns (KBA #84985)
Bruns, Connell, Vollmar & Armstrong, LLC
4750 Ashwood Drive, Suite 200
Cincinnati, OH 45241
(513) 312-9890
(513) 800-1263 (fax)
tbruns@bcvalaw.com
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that I have served the foregoing via the Court's CM/ECF system, which will provide notice to all counsel or parties of record this 28 day of June, 2021.

/s/ Christopher Wiest_____