**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY (at Louisville)**
*Electronically Filed*

| | | |
|---|---|---|
| **SISTERS FOR LIFE, INC., et. al.** | : | Case No. 3:21-CV-00367 |
| *Plaintiffs* | : | |
| v. | : | |
| **LOUISVILLE-JEFFERSON COUNTY METRO GOVERNMENT**, et. al. | : | |
| | : | |
| *Defendants* | : | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Plaintiffs, by and through Counsel, provide this Memorandum in Opposition to

Defendants' (collectively referred to as Defendants or as "Metro Government") Motion to

Dismiss.

**I.      FACTS AND RESPONSE TO DEFENDANTS' "FACTS"**

Before we recount the actual facts to be considered by the Court, and as noted below in

the standard of review, Defendants' recitation of its version of facts, taken from its submissions

of facts and evidentiary materials, is wholly at odds with the standard of review.  As Defendants

surely know, the standard of review requires that Plaintiffs' facts be taken as true, and all

reasonable inferences drawn in Plaintiffs' favor.  Instead, Defendants turn this standard on its

head with their motion, and argue facts and inferences in their own favor.  That is a strong

indication that Defendants' Motion to Dismiss is baseless.

For over 18 years (since 2003), and as part of the practice of their faith, Angela Minter

and Sisters for Life engaged in a peaceful, highly successful, sidewalk ministry outside 136 W

Market St, Louisville, KY 40202.  This is the location of EMW, one of the last abortion clinics

located in the Commonwealth of Kentucky, and the most prolific provider of surgical abortions

1

within the Commonwealth, having been responsible for 3,645 abortions in 2019, or 99.5% of all abortions in Kentucky in 2019.   (Pl.'s Am. Compl., RE#5, ¶11).

In like manner, Kentucky Right to Life Association members frequently engage in similar sidewalk ministry outside of EMW.  (Pl.'s Am. Compl., RE#5, ¶12).  Sidewalk ministry involves offering both verbal and written materials outlining alternatives to abortion and help for anyone wishing to pursue those options.  (Pl.'s Am. Compl., RE#5, ¶13).

Angela and Sisters for Life inform women and their partners of other life choices available to them for their child other than abortion, including adoption, free housing during and after pregnancy, free child care, parenting resources including diapers, formula, clothes, parenting classes, counseling and more, including information about child development that shows parents how developed their child is at the particular stage of their pregnancy and, ultimately, even free college tuition.  (Pl.'s Am. Compl., RE#5, ¶14).

Sidewalk ministry involves Angela and Sisters for Life typically initiating a conversation by, among other things, asking would-be patients if they would like some literature.  (Pl.'s Am. Compl., RE#5, ¶15).  During these exchanges, Angela and Sisters for Life consider it essential to maintain a caring demeanor, a calm tone of voice, and direct eye contact.  (Pl.'s Am. Compl., RE#5, ¶16).  Such interactions, Plaintiffs believe, are a much more effective means of dissuading women from having abortions than confrontational methods such as shouting, brandishing signs, blocking access, using loud speakers, or other methods which, in Plaintiffs' view, tend only to alienate their intended audience.  *Id.*

Some of the things Plaintiffs are called to do (and do) are make efforts to engage women and hand them literature, walk alongside and talk to women headed towards the clinic who,

presumably, want to procure an abortion, and pray for the women who start to enter the abortion clinic.  (Pl.'s Am. Compl., RE#5, ¶17).

Angela will often, as part of this ministry, tell these women about her own harrowing experience with abortion as a teenager and the lifelong regret she suffers as a result.  (Pl.'s Am. Compl., RE#5, ¶18).  And, as part of her own experience, she will tell the women that God loves them, and their baby, regardless of the decision they make.  Necessarily, this sidewalk ministry is not loud, obnoxious, or confrontational; as experience has shown Plaintiffs that those tactics are counter-productive.  (Pl.'s Am. Compl., RE#5, ¶19).  Nor is the sidewalk ministry a protest or meant or intended to block access to the clinic – the message and ministry are a final, peaceful intervention with women who often are in crisis and believe they have no alternative to abortion. *Id.*  Plaintiffs deliberately walk along with the women who are in the process of walking into EMW, and **deliberately do not block them**.  *Id.* (emphasis added).

Spectacularly, the ministry and interventions of Angela and Sisters for Life have been responsible for saving over 800 babies outside EMW.  (Pl.'s Am. Compl., RE#5, ¶20).  Those 800 children are alive today, thereby saving their mothers, fathers and families from the guilt and grief of having a hand in their death.  *Id.*

For the avoidance of all doubt, the sidewalk ministry and counseling are part of the sincerely held religious beliefs of the Plaintiffs, and are undertaken in accordance with those same beliefs.  (Pl.'s Am. Compl., RE#5, ¶21).

Given this success, it is not surprising that, at the insistence of EMW, which substantially profits from the abortion trade, the Metro Council of Louisville Metro passed legislation substantially restricting activities on the sidewalk outside EMW, including constitutionally protected activities.  (Pl.'s Am. Compl., RE#5, ¶22).  On May 20, 2021, the Metro Council

passed Ordinance O-179-21 (the "Ordinance"), in a 14-11 divided vote.  (Pl.'s Am. Compl., RE#5, ¶23).  A true and accurate copy of t Ordinance is attached as Exhibit 1 to the Amended Complaint.  *Id.*  Thereafter, Mayor Fischer signed the Ordinance on June 2, 2021, and, upon information and belief, it has been published in accordance with law or is in the process of being so published.  (Pl.'s Am. Compl., RE#5, ¶24).

The Ordinance, while perhaps appearing modest at first blush, is actually remarkable in both its overbreadth and scope.  (Pl.'s Am. Compl., RE#5, ¶25).  First, it provides: "(1) No person shall knowingly obstruct, detain, hinder, impede, or block another person's entry to or exit from a healthcare facility."  *Id.*  It further provides that "(2) No person shall knowingly enter, remain on, or create any obstruction within the driveway of a healthcare facility or within a 'buffer zone' on the public way or sidewalk extending from the entrance of a healthcare facility to the closest adjacent sidewalk curb and 10 feet from side to side, during the facility's posted business hours, except: (a) persons entering or leaving such facility; (b) persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility; or (c) law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; or (d) employees or agents of such facility acting within the scope of their employment."  (Pl.'s Am. Compl., RE#5, ¶26).

The Ordinance defines "Entrance" as "any door to a healthcare facility that directly abuts the public sidewalk; provided, however, that if the door does not directly about the public sidewalk, the 'entrance' shall be the point at which the public sidewalk intersects with a pathway leading to the door."  (Pl.'s Am. Compl., RE#5, ¶27).

We denoted, for purposes of the Complaint, the "buffer zone" as that area on the public way or sidewalk extending from the entrance of a healthcare facility to the closest adjacent sidewalk curb and 10 feet from side to side, where the "entrance" described herein as the point at which the public sidewalk intersects with a pathway leading to the door.  (Pl.'s Am. Compl., RE#5, ¶28).

All told, the Ordinance prohibits anyone other than those satisfying one of the four secular exceptions to the Ordinance, including Plaintiffs herein, from being located in a buffer zone.  (Pl.'s Am. Compl., RE#5, ¶29).  Significantly, the buffer zone in front of EMW extends out to the street and, given the width of the pathway that leads from the clinic to the sidewalk (which is 8 feet in width) is approximately 73 feet long, and ten feet wide (blocking a total of some 730 square feet), and in terms of what has been marked and demarked as EMW property, totals approximately half a city block of sidewalk that is now restricted.  *Id.*

This is because there is a pathway on EMW's property that extends in two directions from the door to the EMW facility.  (Pl.'s Am. Compl., RE#5, ¶30).  The EMW pathway, which totals approximately 73 feet in length and approximately 8 feet in width, intersects and connects with the public sidewalk running parallel to Market Street.  *Id.*  Therefore, all of those points on the pathway that touch the public sidewalk constitute an "entrance" to EMW under the Ordinance.  *Id.*

A true and accurate aerial depiction of this layout is depicted below.  (Pl.'s Am. Compl., RE#5, ¶31).  The white area depicted below is EMW property that is adjacent to the public sidewalk property, which EMW now has marked with "no trespassing" markers:



*Id.*

But that is not all.  EMW is also bordered by two other "Healthcare facilities" as defined by the Ordinance.  (Pl.'s Am. Compl., RE#5, ¶32).  As a result of the Ordinance, there is now a buffer zone around both of those facilities.  *Id.*  Using the map depiction above, to the left of EMW is BSideU for Life Pregnancy Center ("BSideU") at 140 West Market Street, Louisville, KY 40202, which happens to be a pro-life center that provides pregnancy related services other than abortion.  *Id.*  BSideU permits Plaintiffs to conduct their sidewalk ministry from BSideU's property, but this is now explicitly prohibited by the Ordinance.  *Id.*  Using the map depiction above, to the right of EMW is an Optometrists' office, namely the offices of Drs. Vance and Stovall, at 120 W Market St, Louisville, KY 40202 ("Stovall").  (Pl.'s Am. Compl., RE#5, ¶33).

The effect of these healthcare facilities being located where they are, in terms of the Ordinance, is a buffer zone that practically completely envelopes the entire city block:

6



Louisville Metro, in enacting the Ordinance, included all healthcare facilities within its ambit, not just the EMW abortion facility, even though there were no instances of any legitimate governmental concerns other than outside EMW.  Obviously, and based upon the clear and unambiguous language employed, Louisville Metro intended to restrict the entire block around EMW from being accessed by the Plaintiffs and others who seek to dissuade women from obtaining abortions.  (Pl.'s Am. Compl., RE#5, ¶35).  In other words, and as the photo above depicts, it was a not-so-clever gerrymander to restrict an entire city block from being accessed by opponents to abortion.  *Id.*

In the photo above, the yellow area approximately depicts the EMW property, and specifically the parking lot and pathways that lead to the door, all of which are "driveways" or "entrances" under the Ordinance.  (Pl.'s Am. Compl., RE#5, ¶36).  The orange depicts the pathways that lead to the door and the parking lots of BSideU and Stovall, all of which are also "driveways" or "entrances" under the Ordinance.  *Id.*  And, the red area approximately depicts

the buffer zones under the Ordinance, which cover substantially all of the public streets and sidewalks accessing EMW.  *Id.*

As depicted, the buffer zones spread across almost an entire city block.  (Pl.'s Am. Compl., RE#5, ¶37).  Each and every buffer zone effectively prohibits persons from walking through it, or into it, except as expressly permitted under the purely secular exceptions to the Ordinance.  (Pl.'s Am. Compl., RE#5, ¶38).  The Ordinance is enforced with fines of up to $500 for each violation.  (Pl.'s Am. Compl., RE#5, ¶39).

As it turns out, the buffer zones created by the Ordinance prohibit the Plaintiffs and other sidewalk ministers from speaking, praying, or interacting with those entering the EMW clinic, including, without limitation, even with those parents/potential patients who invite or otherwise solicit contact with Plaintiffs.  (Pl.'s Am. Compl., RE#5, ¶40).

The buffer zone eliminates the Plaintiffs' ability to initiate the close, personal conversations that Plaintiffs view as essential to their sidewalk ministry.  (Pl.'s Am. Compl., RE#5, ¶41).  Another pernicious effect of the buffer zone is to relegate the Plaintiffs to raising their voices at parents from outside the zone – and as a practical matter, requires this to occur from across the street – a mode of communication sharply at odds with the compassionate message Plaintiffs wish to convey.  (Pl.'s Am. Compl., RE#5, ¶42).

The buffer zone also makes it substantially more difficult for Plaintiffs to distribute literature to arriving parents, again even where the parents wish to receive the literature.  (Pl.'s Am. Compl., RE#5, ¶43).  At the same time, the Ordinance explicitly permits EMW staff and volunteers to escort those seeking an abortion into the buffer zone and into the clinic, where those staff and volunteers regularly, and within the scope of their employment or volunteer status, escort, encourage, and counsel the women seeking to enter the clinic to follow through

8

with an abortion, thus providing speech in the buffer zone, but on only one side of the abortion debate.  (Pl.'s Am. Compl., RE#5, ¶44).

For the avoidance of all doubt, volunteers and employees of EMW will, within the scope of their employment or volunteer status, and within the buffer zone, thwart or attempt to thwart or block Plaintiffs' efforts to speak or hand literature to those in the process of walking to the EMW clinic property, regularly disparage Plaintiffs to those seeking to enter the EMW clinic property, and will offer encouragement of those seeking to obtain an abortion to do so, again providing speech on only one side of the abortion debate.  (Pl.'s Am. Compl., RE#5, ¶45).  Again, for the avoidance of all doubt, EMW authorizes its escorts to have these conversations, with those being escorted, within the buffer zone.  (Pl.'s Am. Compl., RE#5, ¶46).

The Ordinance is an insidious content and viewpoint-based speech gerrymander, designed to squelch dissenting speech, and the practice of sincerely held religious beliefs, in the vicinity of EMW.  (Pl.'s Am. Compl., RE#5, ¶47).  It should be noted that prior to the passage of the challenged Ordinance, Louisville Metro already had ordinances on the books to prevent blocking sidewalks.  (Pl.'s Am. Compl., RE#5, ¶48).  Specifically, the Louisville Metro has had, at all times relevant hereto, Ordinance 97.072, which provides:

> It shall be unlawful for any person in or on any sidewalk or any premises in or abutting thereon to make any speech or harangue; to demonstrate, sell, or offer for sale goods, wares, or merchandise; or to display any signs, device, information, or exhibition in consequence of which there is caused or created such a gathering of persons on the sidewalk as to interfere with pedestrian traffic thereon.  *Id.*

Louisville Metro has not seriously attempted less restrictive measures to combat the purported ills that it contends required the passage of the Ordinance, including individual prosecutions, seeking injunctions, passing ordinances against following and harassing people within a certain number of feet of a health care facility, passing legislation similar to the federal Freedom of Access to Clinic Entrances Act of 1994 (18 USC 481(a)(1)), and/or passing

9

ordinances requiring, at the directives of the police, the dispersal of individuals blocking entrances to healthcare facilities.  (Pl.'s Am. Compl., RE#5, ¶49).

The Ordinance in question provides four secular exceptions to the buffer zone requirement, but makes no allowance for the practice of constitutionally protected, sincerely held religious beliefs, such as those engaged in by the Plaintiffs.  (Pl.'s Am. Compl., RE#5, ¶50). Specifically, the Ordinance allows persons within the buffer zone who are (a) entering or leaving such facility; (b) traversing the sidewalk but only if they are reaching a destination; (c) law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; and (d) employees or agents of such facility acting within the scope of their employment.  *Id.*

Defendants' response to these facts is to ignore them and, instead, attempt to rewrite the Ordinance through the declaration of a public works director, to try and make it more defensible, and less constitutionally objectionable.  But the Ordinance says what it says, and its language is both clear and unambiguous.

So turning to the plain language of the Ordinance, it defines the term "Entrance" as follows:

***ENTRANCE.*** Any door to a healthcare facility that directly abuts the public sidewalk; provided, however, that if the door does not directly about the public sidewalk, the "entrance" shall be the point at which the public sidewalk intersects with a pathway leading to the door.

It is an undisputed fact that EMW's door does not directly abut the public sidewalk. [See, also, photo at RE#10-7, PageID#136].  Instead, there is a concrete pathway, that extends left to right, and runs parallel to the EMW facility.  *Id.*  Under the clear and unambiguous language of the Ordinance, that makes the "Entrance" the entire pathway that runs parallel to the facility, which happens to be the point "at which the public sidewalk intersects with a pathway leading to the door."

10

Section (B)(2) of the Ordinance is equally clear and unambiguous and provides:

(B) *Access to a healthcare facility.*

(2) No person shall knowingly enter, remain on, or create any obstruction within the driveway of a healthcare facility or within a "buffer zone" on the public way or sidewalk extending from the entrance of a healthcare facility to the closest adjacent sidewalk curb and ten feet from side to side, during the facility's posted business hours, except:

(a) Persons entering or leaving such facility;

(b) Persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility; or

(c) Law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; or

(d) Employees or agents of such facility acting within the scope of their employment.

So what can we discern from applying this clear and unambiguous language to the unrebutted facts concerning the EMW property?  First, the EMW buffer zone extends from its "entrance", and ten feet from side to side.  We know that this then extends the entire length of the public sidewalk, and not the smaller area that the Defendants now claim, because the Ordinance defines "entrance" to be the point where the public sidewalk intersects with the pathway leading to the door, which is the entire strip of concrete.  [RE#10-7, PageID#136].

Metro Government falsely argues that the Ordinance does not apply to the neighboring optometrist or the pregnancy clinic next door to EMW, because there has been no request for signage by those businesses, but, as it turns out, there is no requirement for signage, in section (B)(2) of the ordinance, which is the operative buffer zone section, nor in Section (F), the penalty section.  While the Ordinance allows for signage to be placed by Metro Government upon request, under section (C) of the ordinance, there simply is ***nothing*** in Section (B) (which is the operative section), or Section (F) (the penalty section), that would in any way limit the operation of the Ordinance to only those areas where the premises owner has, in fact, requested signage.

11

Said another way, Metro Government is attempting to rewrite the Ordinance, through its pleadings, in order to justify its indefensibly overbroad and unconstitutional provisions.  But "[t]his ordinance is not susceptible to a limiting construction because … its language is plain and its meaning unambiguous." *Houston v. Hill*, 482 U.S. 451, 468 (1987).[1]  And, in any event, such attempts are wholly inappropriate for a motion to dismiss.

## II.    LAW AND ARGUMENT

### A.  Standard of Review for a Motion to Dismiss, Plaintiffs' objection to any request for conversion to a Motion for Summary Judgment, and certain evidentiary objections by the Plaintiffs

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (internal citations omitted) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). This Court must construe the complaint in the light most favorable to Plaintiffs and draw all reasonable inferences in their favor. *See Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008).

The issue to be resolved is "not whether [the plaintiff] will ultimately prevail . . . but whether his complaint [i]s sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011).  "A motion to dismiss for failure to state a claim is disfavored,

---

[1] As an aside, even if the buffer zone _were_ as narrow as Defendants claim, and plainly it is not, the constitutional issues would remain.  The exact size of the buffer zone, under *McCullen v. Coakley*, 573 U.S. 464 (2014) is not the critical factor, as explained below.

especially when one's civil rights are at stake." *McGlone v. Bell*, 681 F.3d 718, 728 (6th Cir. 2012).

Plaintiffs object to any conversion of Defendants' Motion into a Motion for Summary Judgment, and Plaintiffs are entitled to reasonable notice if the Court is entertaining such a path. "[O]nce the court opts to convert a 12(b)(6) motion into a summary judgment motion, it must give 'all parties . . . reasonable opportunity to present all material made pertinent to such a motion by Rule 56.'" *Aamot v. Kassel*, 1 F.3d 441 (6th Cir. 1993), quoting Fed. R. Civ. P. 12(b)(6).

Plaintiffs will request certain discovery in support of any opposition to summary judgment.  A FRCP 56(d) declaration of Mr. Wiest is attached, and, in this posture, such a conversion would be an abuse of discretion. *Jones v. Johnson*, 2020 U.S. App. LEXIS 875 (6th Cir. 2020) (denying needed discovery prior to ruling on summary judgment mandated reversal); *Moore v. Shelby Cty.*, 718 Fed. Appx. 315 (6th Cir. 2017) (granting summary judgment without the opportunity to conduct any discovery is presumptively reversible error); *White's Landing Fisheries, Inc. v. Buchholzer*, 29 F.3d 229, 231-32 (6th Cir. 1994) (same); *Vance v. United States*, 90 F.3d 1145, 1149 (6th Cir. 1996) (same).

Before turning to an analysis of the claims, Plaintiffs also raise certain objections to evidentiary materials improperly submitted by Defendants in support of their Motion to Dismiss. Of course, taking away the biased, self-serving, hearsay statements of the EMW Clinic and National Abortion Federation, all of whom wish to silence dissenting viewpoints to their activities, the actual police surveillance reports reveal that "most of the activity of the protesters is clearly lawful."  (RE#10-5 at PageID#132).

Metro Government argues that all legislative records are admissible under *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291 (6th Cir. 2008).  We agree in part.  We agree to the extent that the records are themselves records of the City under FRE 803(8), concerning, for instance, police reports and the city's documentation of police calls.  However, when it comes to reports from the EMW Clinic, the National Abortion Federation, or other third parties, their records are not admissible, are hearsay, and are proffered without laying any proper foundation. FRE 803; FRE 805.  Further, such reports by these third parties, who have a vested interest in supporting the passage of the Ordinance, cannot be deemed as trustworthy, particularly where, as is the case here, such reports conflict with police reports concerning the same activity and period of time.  *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988).

Plaintiffs likewise object to Defendants' Exhibits at RE#11-3 and RE#11-4, in that they are extraneous materials not appropriate for determining a motion to dismiss.  *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 484 (6th Cir. 2020).  Further, the declaration of the public works employee, and photos thereto, happen to involve a legal conclusion, i.e. the application of the Ordinance, and are thus incompetent for that reason as well.  "It is not for witnesses to instruct the jury as to applicable principles of law, but for the judge." *Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985); *M.T. v. Saum*, 3 F. Supp.3d 617 (WDKY 2014).

**B.  The Ordinance violates the First Amendment's Free Speech Guaranties**

Public streets and sidewalks comprising the buffer zone under the Ordinance are traditional public forums, triggering the traditional public forum analysis under First Amendment analysis and scrutiny.  *McCullen v. Coakley*, 573 U.S. 464, 476-477 (2014).  To begin, the Government's ability to restrict speech in such locations is "very limited."  *Id.*  Restrictions in such areas can be upheld only if they are "reasonable restrictions on the time, place, or manner of

protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, they are narrowly tailored to serve a significant governmental interest, and they leave open alternative channels for communication of the information." *Id.* at 477.

The tailoring requirement "does not simply guard against an impermissible desire to censor." *Id.* at 486. That is because "the government may attempt to suppress speech not only because it disagrees with the message being expressed, but also for mere convenience." *Id.* "But by demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrific[ing] speech for efficiency.'" *Id.*

    1.   <u>The Ordinance is not content neutral</u>

First, the restrictions here are not content neutral (and, in fact, constitute viewpoint discrimination, which is presumptively unconstitutional) because they permit EMW and its staff and volunteers to engage in pro-abortion speech within the buffer zone, while criminalizing any attempt by Plaintiffs to engage in pro-life speech within the buffer zone. As the Complaint makes clear, for the avoidance of all doubt, EMW staff and volunteers do speak, within the scope of their employment or volunteer status, within the buffer zone, encouraging would-be patients to obtain abortion services at EMW.

Defendants claim that this is not so, but they offer not one scintilla of evidence to refute the Plaintiffs' Verified Amended Complaint that makes this point clear. (Pl's Am. Verified Compl., RE#5, at ¶¶ 44-46). At this juncture, and in this procedural posture, the Court is required to deem these allegations as true.

As *Coakley* made clear, "an exemption from an otherwise permissible regulation of speech may represent a governmental 'attempt to give one side of a debatable public question an advantage in expressing its views to the people.'" *Id.* at 483. And, in *Coakley*, where the

Supreme Court held that the ordinance in question did not amount to viewpoint discrimination, the Court also observed that "[i]t would be a very different question if it turned out that a clinic authorized escorts to speak about abortion inside the buffer zones." *Id.* at 484. "In that case, the escorts would not seem to be violating the Act because the speech would be within the scope of their employment." *Id.* at 484-485. "The Act's exemption for clinic employees would then facilitate speech on only one side of the abortion debate—a clear form of viewpoint discrimination that would support an as-applied challenge to the buffer zone at that clinic." *Id.* at 485. But that is the record here. (Pl's Verified Compl., ¶¶ 42, 43, 56). Thus, the Ordinance fails on that basis alone. It clearly is not narrowly tailored to meet a compelling governmental interest.

The purely secular exceptions to the Ordinance permit a variety of people, including the general public, to occupy the buffer zones for various purposes. For instance, if two people from the general public walk down the sidewalk with an intention to reach another point, and all the while discuss sports scores, they are permitted within the zone for that purpose. But for the Plaintiffs, who engage in the exact same walk along, on the exact same sidewalk, but with the purpose of engaging in constitutionally protected speech about their ministry to a parent/potential patient on their way to enter EMW, the conduct, and speech, is illegal. The application of the Ordinance is thus "drawn based on the message a speaker conveys," it is therefore "subject to strict scrutiny." *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015). Said another way, the applicability of the statute "depend[s] entirely on the communicative content" of the purpose for which a person is within the zone. *Id.*

This is true when a set of rules that may not be viewpoint discrimination on their face, become so in an as-applied manner when some speech is permitted or encouraged, but where

other speech is discouraged.  *Coakley*, 573 U.S. 464 at 484-485 (noting that permitting one class of speakers to speak and not another raises questions of viewpoint discrimination).  It goes without saying that "[g]ranting waivers to favored speakers (or . . . denying them to disfavored speakers) would of course be unconstitutional." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002).

Courts have not hesitated to find as-applied viewpoint discrimination in situations such as these, where a policy may be viewpoint neutral on its face, but in application favors one side of a debate, or some speakers, but not others.  *Aids Action Comm. v. Massachusetts Bay Transp. Auth.*, 42 F.3d 1, 9-12 (1st Cir. 1994); *Nieto v. Flatau*, 715 F. Supp. 2d 650, 655 (EDNC 2010). *See, also, L.D. Mgmt. Co. v. Thomas*, 2020 U.S. Dist. LEXIS 72593 (WDKY 2020) (finding viewpoint discrimination based on selecting targeting or enforcement of speech); *Teufel v. Princeton City Sch. Dist. Bd. of Educ.*, 2013 U.S. Dist. LEXIS 4923 (SDOH 2013) (finding a facially valid policy can be applied in a discriminatory manner raising viewpoint discrimination claims); *Hart v. Thomas*, 422 F. Supp. 3d 1227 (EDKY 2019) (inconsistent enforcement coupled with suppression of the Plaintiff's expression constituted as-applied viewpoint discrimination); *Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012) (explaining as-applied enforcement and discrimination of neutral policies is unconstitutional).

2. <u>The Ordinance is not narrowly tailored under a content neutral analysis</u>

Even if the Ordinance did not amount to content and viewpoint discrimination, which it does, it also is not narrowly tailored under the less exacting narrow tailoring in a content-neutral forum analysis, and it fails to leave open alternative channels for communication of the information.

Defendants primarily rely upon *Hill v. Colo.*, 530 U.S. 703 (2000).  But, as it turns out, *Hill* is distinguishable as it involved a law that was far narrower than the Ordinance here.  In *Hill*, the law made it "unlawful within the regulated areas for any person to 'knowingly approach' within eight feet of another person, without that person's consent, 'for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person.'"  *Id.* at 707.  Also, in contrast to the Ordinance here, the law in *Hill* allowed far more access: "[a]lthough the statute prohibits speakers from approaching unwilling listeners, it does not require a standing speaker to move away from anyone passing by."  *Id.* at 708.

Accordingly, the Supreme Court in *Hill* upheld the Colorado statute for reasons not applicable to the Ordinance here.  First, that Court observed that the Colorado law would "only apply to communications that interfere with these rights rather than those that involve willing listeners."  *Id.* at 718.  The Ordinance here, as we pointed out above, applies in front of each and every healthcare facility (including the two that border EMW, notwithstanding the Metro Government's arguments to the contrary), applies regardless of whether those entering or exiting consent to being approached, and in fact bars all access to those who wish to enter the buffer zone for a constitutionally protected purpose, regardless of whether or not another person is within the prescribed distance.

Second, the *Hill* Court analyzed, for both narrow tailoring and ample alternatives, the actual speech the protesters in that case engaged in, and determined that they would be able to do so, even with the 8-foot floating buffer (and went further and observed that in some regards, some speech might be furthered by the floating buffer).  *Id.* at 726.

As far as holding signs, the *Hill* Court observed that the:

8-foot separation between the speaker and the audience should not have any adverse impact on the readers' ability to read signs displayed by demonstrators. In fact, the separation might actually aid the pedestrians' ability to see the signs by preventing others from surrounding them and impeding their view. Furthermore, the statute places no limitations on the number, size, text, or images of the placards. And, as with all of the restrictions, the 8-foot zone does not affect demonstrators with signs who remain in place. *Id.*

For speech and oral communications, the Court observed:

Unlike the 15-foot zone in Schenck, this 8-foot zone allows the speaker to communicate at a "normal conversational distance." Ibid. Additionally, the statute allows the speaker to remain in one place, and other individuals can pass within eight feet of the protester without causing the protester to violate the statute. Finally, here there is a "knowing" requirement that protects speakers "who thought they were keeping pace with the targeted individual" at the proscribed distance from inadvertently violating the statute. *Id.* at 726-727.

Thus, the *Hill* Court observed, that the floating buffer "might encourage the most aggressive and vociferous protesters to moderate their confrontational and harassing conduct, and thereby make it easier for thoughtful and law-abiding sidewalk counselors like petitioners to make themselves heard." *Id.* at 727.

Finally, with respect to handbilling, the *Hill* Court observed that: "The burden on the ability to distribute handbills is more serious because it seems possible that an 8-foot interval could hinder the ability of a leafletter to deliver handbills to some unwilling recipients. The statute does not, however, prevent a leafletter from simply standing near the path of oncoming pedestrians and proffering his or her material, which the pedestrians can easily accept." *Id.* at 727. This, of course, is consistent with the Sixth Circuit's admonition that "[a]n alternative is not ample if the speaker is not permitted to reach the intended audience." *Saieg v. City of Dearborn*, 641 F.3d 727 (6th Cir. 2011).

That then takes us back to *Coakley*, 573 U.S. 464. We submit that *Coakley*, and not *Hill*, is applicable, because *Hill* dealt with the narrower floating buffer zone while retaining the ability to approach, versus the issue in *Coakley*, 573 U.S. 464, which involved a fixed buffer zone,

which is the case with the Ordinance here. *Coakley* at least required the posting of the no-speech zone and, while Metro Government claims that it does also, the Ordinance unambiguously says differently.

Also as in *Coakley*, Defendants have not undertaken less restrictive measures to achieve their purported ends. 573 U.S. 464 at 490-496. But, Metro Government "has available to it a variety of approaches that appear capable of serving its interests, without excluding individuals from areas historically open for speech and debate." *Id.* at 493-494.

Thus, "[t]o meet the requirement of narrow tailoring [in the context of content-neutral regulations], the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *Id.* at 495. (emphasis added).

Metro Government's response is to acknowledge that current laws prohibit much of the ills that the Ordinance targets, and then to claim that illicit activities continue. But that misses the point. It is not merely laws on the books that the Metro Government must show, but rather that Metro Government has attempted to actually enforce them, and has come up short, and has taken steps to pass constitutionally sound laws that don't substantially burden constitutionally protected activities, and still needed to do more. In short, Metro Government simply has not met its burden to uphold the Ordinance.

In *Coakley*, the size of the buffer zone made it difficult to distinguish between persons headed to the clinic from passersby "in time to initiate a conversation before they enter[ed] the buffer zone." 573 U.S. 464 at 487. As a result, the plaintiffs were often forced to raise their voices from outside the buffer zone once they identified those considering abortion, thereby forcing a mode of communication contrary to their compassionate message and preventing them

20

from distributing pamphlets. *Id.* Where the plaintiffs wished to engage in quiet conversations with women seeking abortions and not in noisy protest speech, the Court held it was "no answer to say that petitioners can still be 'seen and heard' by women within the buffer zones." *Id.* at 489. Instead, the Supreme Court concluded the buffer zones had "effectively stifled petitioners' message" by prohibiting the plaintiffs' chosen means of communication. *Id.* Indeed, the Sixth Circuit has repeatedly observed that "[a]n alternative is not ample if the speaker is not permitted to reach the intended audience." *Saieg v. City of Dearborn*, 641 F.3d 727 (6th Cir. 2011).

Applying *Coakley* and *Saig*, the objective of these Plaintiffs is to be heard by the women on their way to entering the EMW facility, not in a loud, shouting manner, but in a soft, non-confrontational, caring manner. The substitute offered by the Defendants, to be forced to shout from a distance, is no substitute at all.

"Plaintiffs wish to converse with their fellow citizens about an important subject on the public streets and sidewalks—sites that have hosted discussions about the issues of the day throughout history." *Coakley*, 573 U.S. 464 at 496. "Respondents assert undeniably significant interests in maintaining public safety on those same streets and sidewalks, as well as in preserving access to adjacent healthcare facilities." *Id.* "But here the [Defendants] ha[ve] pursued those interests by the extreme step of closing a substantial portion of a traditional public forum to all speakers." Id. "It has done so without seriously addressing the problem through alternatives that leave the forum open for its time-honored purposes." *Id.* They "may not do that consistent with the First Amendment." *Id.*

Metro Government claims that other cases have determined that their ordinance is constitutional. A review of the content of those cases reveals the fallacy of that claim. First, take *Turco v. City of Englewood*, 935 F.3d 155 (3rd Cir. 2019). In *Turco*, the Third Circuit Court

of Appeals held "that there are genuine issues of material fact precluding the entry of summary judgment to either side, we will reverse and remand for further proceedings."  Englewood had an eight feet from the actual entrance buffer zone, versus the clear and unambiguous definition of "Entrance" under the Ordinance here that effectively blocks off the entire sidewalk in front of EMW.  *Turco* also observed that the critical analysis in that case needed to be examined in light of the "exact impact on the sidewalk counselors' speech and the concomitant efficacy of their attempts to communicate is unclear on this record," and "contradictory evidence regarding the extent to which the buffer zone prevented Turco from communicating her message as she wanted."  *Id.* at 165.  And "the record—properly viewed in the light most favorable to the City—established that the City considered and attempted to implement alternative means of regulating speech, and that the City did attempt to enforce existing laws before creating the buffer zone." *Id.*

What about Metro Government's record of enforcing existing laws including dispatching of police?  Unlike *Turco,* here the record is absolutely scant in terms of Metro Government's response under existing law and/or its pursuit of less constitutionally burdensome alternatives.

Rather, Plaintiffs have come forward with unrebutted evidence that Metro Government has not seriously attempted less restrictive measures to combat the purported ills that it contends required the passage of the Ordinance, including a lack of individual prosecutions, pursuing any injunctions, and/or passing ordinances against following and harassing people within a certain number of feet of a health care facility, or legislation similar to the federal Freedom of Access to Clinic Entrances Act of 1994 (18 USC 481(a)(1)), or even ordinances requiring, at the directives of the police, the dispersal of individuals blocking entrances to healthcare facilities.  (Pl's Am. Verified Compl., RE#5, ¶¶ 49, 59).

Likewise, Metro Government submitted public records that demonstrate a serious lack of consideration or attempts of less restrictive alternatives, revealing police calls, for instance, from March 1, 2019 through November 15, 2020 (but not identifying the substance of those calls or who was at issue), but only a single arrest, for trespassing, during that time. (RE#11-5, PageID#200-202). And, as it turns out, scant attempts at enforcement of existing laws permeate the period before that as well. (RE#11-5, PageID#205). Thus, the record here, unlike *Turco*, but like *Coakley*, demonstrates a complete failure of Metro Government to actually attempt less restrictive alternatives.

Surprisingly, Metro Government also cites *Bruni v. City of Pittsburgh*, 941 F.3d 73 (3rd Cir. 2019), but the Third Circuit upheld the buffer zone ordinance there because it distinguished between what that ordinance prohibited, namely "congregat[ing]," "patrol[ling]," "picket[ing]," and "demonstrat[ing]" from what it protected, namely sidewalk counseling. It then adopted a narrowing construction (which would be binding upon the City in the future), and upheld the ordinance on that basis –precisely because it allowed sidewalk counseling. The Ordinance here prohibits anyone from being inside the buffer zone unless they are within one of four secular categories, which these Plaintiffs who engage in constitutionally protected sidewalk counseling are not.

Finally, Metro Government cites *Price v. City of Chicago*, 915 F.3d 1107 (7th Cir. 2019), which, like *Hill*, upheld a floating buffer zone that prohibited approaching someone else without their consent, within a floating buffer zone of eight feet. But, again, that is not what we have here. There is no floating buffer zone here; there is rather a complete prohibition on occupying the zone unless someone falls within one of four secular exceptions.

The floating buffer zone in *Price* and the tailored prohibitions in *Bruni*, both represent a far more tailored and targeted approach to the problem at hand than the Ordinance here. Admittedly, the problem at hand is loud, aggressive protestors who purportedly are blocking clinic entrances. Not peaceful sidewalk counselors like Plaintiffs. But Metro Government cuts with a chainsaw instead of a scalpel when it prohibits all such activity, prohibiting Plaintiffs from even entering a not insubstantial part of a public forum to conduct their faith-based ministry.

Overbreadth in the First Amendment context, as is the case here, requires that "a law may be overturned as impermissibly overbroad because a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1054 (6th Cir. 2015). "Consequently, because it impairs a substantial amount of speech beyond what is required to achieve acceptable objectives, 'a statute which chills speech can and must be invalidated where its facial invalidity has been demonstrated.'" *Id., citing Citizens United v. FEC*, 558 U.S. 310, 336 (2010).

The Ordinance thus violates the First Amendment's Free Speech guaranties.

## C.  The Ordinance violates the First Amendment's Guarantee of Freedom of Assembly

Not surprisingly, Metro Government does not even address the freedom of assembly argument. The First Amendment also guaranties the right "of the people peaceably to assemble." This guaranty has also been incorporated against the states. *DeJonge v. Oregon*, 299 U.S. 353 (1937). Assembly on public streets and sidewalks is among the guaranties protected by the First Amendment. *Shuttlesworth v. Birmingham*, 394 U.S. 147 (1969). These rights, being fundamental rights, trigger strict scrutiny. *Clark v. Jeter*, 486 U.S. 456, 461 (1988). The Ordinance is not narrowly tailored to achieve a compelling governmental interest. Thus, it also violates the Freedom of Assembly guaranty of the First Amendment.

24

### D.  The Ordinance violates the First Amendment's Guarantee of the Free Exercise of Religion

"[A] law that discriminates against religious practices usually will be invalidated because it is the rare law that can be 'justified by a compelling interest and is narrowly tailored to advance that interest.'"  *Roberts v. Neace*, 958 F.3d 409, 413 (6th Cir. 2020).  That is because a "a law might appear to be generally applicable on the surface but not be so in practice due to exceptions for comparable secular activities."  *Id.*  "Do the four [categories] of exceptions in the [ordinance], and the kinds of [exceptions] allowed, remove them from the safe harbor for generally applicable laws? We think so."  *Id.*  "At some point, an exception-ridden policy takes on the appearance and reality of a system of individualized exemptions, the antithesis of a neutral and generally applicable policy and just the kind of state action that must run the gauntlet of strict scrutiny."  *Id.* at 413-414.  *See, also, Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63 (2020).

The purely secular exceptions to the Ordinance permit a variety of people, including the general public, to occupy the buffer zones for various purposes.  Metro Government does not adequately address the constitutional issues raised by the fact the exceptions are solely for secular purposes, while the Ordinance prohibits all religious purposes.  Metro Government cites *Employment Div. Dep't of Human Resources of Ore v. Smith*, 494 U.S. 872, 879 (1990), and claims that the law is neutral and of general applicability, but simply saying it does not make it so.  As the Supreme Court stated in a case decided within the last couple weeks, "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs…"  *Fulton v. City of Philadelphia*, --- U.S. --- (2021).  "A law … lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way."  *Id.*  If the interest here is clearing the sidewalk to provide completely

25

unimpeded access, as Metro Government claims, allowing the general public on the sidewalk to walk through it undermines the Metro Government's asserted interests in a similar way.

Once again, if two members of the general public walk down the sidewalk with an intention to reach another point and are discussing sports scores, they are permitted within the zone for that purpose.  But for the Plaintiffs, who engage in the exact same walk along, on the exact same sidewalk, but to discuss their ministry to a parent/potential patient on their way to enter EMW, their conduct is illegal.  This cannot stand under *Roberts*, 958 F.3d 409 at 413.  And the Ordinance in question and its enforcement thus violates these Plaintiffs' Free Exercise rights.

Perhaps recognizing that the exceptions here are akin to the secular, but not religious exceptions in *Roberts*, Metro Government claims that the Ordinance is narrowly tailored.  It is not.  The Ordinance completely catches within its sweep the sidewalk minister, while permitting a host of secular exceptions, including the morning jogger or walker, the businessman, the couple walking to lunch, two people discussing sports scores and a host of others.  That is exactly the type of exception ridden policy that the Sixth Circuit, and Supreme Court, have not countenanced.  *Roberts*, 958 F.3d 409 at 413; *Cuomo*, 141 S. Ct. 63.

### E.    The Ordinance violates Plaintiffs rights under KRS 446.350

KRS 446.350 provides:

> Government shall not substantially burden a person's freedom of religion. The right to act or refuse to act in a manner motivated by a sincerely held religious belief may not be substantially burdened unless the government proves by clear and convincing evidence that it has a compelling governmental interest in infringing the specific act or refusal to act and has used the least restrictive means to further that interest. A "burden" shall include indirect burdens such as withholding benefits, assessing penalties, or an exclusion from programs or access to facilities.

"The point of the law is to exercise an authority every State has: to provide more protection for religious liberties at the state level than the U.S. Constitution provides at the

national level." *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 612 (6th Cir. 2020). "Application of this test requires little elaboration in most respects." *Id.* "Defendants' actions substantially burden the [Plaintiffs'] sincerely held religious practices—and plainly so." *Id.* "Religion motivates the [sidewalk ministry.]" *Id.* The likelihood-of-success inquiry instead turns on whether [Defendants' Ordinance was] 'the least restrictive means' of achieving [the Defendants' interests]. Ky. Rev. Stat. § 446.350." *Id.* "That's a difficult hill to climb, and it was never meant to be anything less." *Id.*

Defendants have numerous less restrictive measures they can pursue, but failed to do so. This is a fatal flaw as the U.S. Supreme Court observed in *Coakley*. 573 U.S. 464, 493-495. Thus, the Ordinance violates KRS 446.350. Metro Government merely arguing that they pursued the least restrictive means, without actually demonstrating it, much less in a clear and convincing manner, fails to satisfy the statute and their burden under it. Why couldn't Metro Government, as the City of Pittsburgh did in *Bruni*, 941 F.3d 73, target only "congregat[ing]," "patrol[ling]," "picket[ing]," and "demonstrat[ing]," but continue to permit constitutionally protected sidewalk counseling? pursuant to sincerely held beliefs, as permitted? To pose this question is to answer this question. This is fatal to Defendants' Motion to Dismiss.

## III.   <u>CONCLUSION</u>

There are no grounds for a Motion to Dismiss here. As such, Defendants' Motion should be denied.

/s/Christopher Wiest_____
Christopher Wiest (KBA #90725)
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
513-257-1895
(859) 495-0803 (fax)
chris@cwiestlaw.com

/s/ Thomas B. Bruns_____
Thomas B. Bruns (KBA #84985)
Bruns, Connell, Vollmar & Armstrong, LLC
4750 Ashwood Drive, Suite 200
Cincinnati, OH 45241
(513) 312-9890
(513) 800-1263 (fax)
tbruns@bcvalaw.com
***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

I certify that I have served the foregoing via the Court's CM/ECF system, which will provide notice to all counsel or parties of record this 28 day of June, 2021.

/s/ Christopher Wiest_____