UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

SISTERS FOR LIFE, INC., et al.                                    *Plaintiffs*

v.                                        Civil Action No. 3:21-cv-367-RGJ

LOUISVILLE-JEFFERSON COUNTY                              *Defendants*
METRO GOVERNMENT, et al.

\* \* \* \* \*

## MEMORANDUM OPINION & ORDER

This matter is before the Court on the Emergency Motion for Temporary Restraining Order and Preliminary Injunction filed by Sisters for Life, Inc. ("Sisters") and Angela Minter ("Minter") (collectively "Plaintiffs"). [DE 2].  Defendants Louisville/Jefferson Country Metro Government ("Metro Government"), Mayor Greg Fischer, Chief Erika Shields, and Mike O'Connell (collectively "Defendants") responded, [DE 10], and Plaintiffs replied.  [DE 14].  Defendants moved for dismissal for failure to state a claim, or alternatively, for summary judgment.  [DE 11]. Plaintiffs responded, [DE 15], and Defendants replied.  [DE 16].  These matters are ripe.  For the reasons below, Plaintiffs' Motion for Leave to File Excess Pages for their Reply [DE 13] is **GRANTED**, the Emergency Motion for Temporary Restraining Order [DE 2] is **DENIED** as moot, and the Motion for Preliminary Injunction [DE 2] is **DENIED**.  Defendants' Motion to Dismiss [DE 11] is also **DENIED**.

## I.      BACKGROUND

Plaintiffs dispute the constitutionality of Ordinance O-179-21 (the "Ordinance") passed by Metro Government and signed by Mayor Fisher earlier this year.  [DE 2-1 at 43].  The Ordinance states, in relevant part:

1

(A) *Definitions*.  For the purpose of this chapter, the following definitions shall apply unless the context clearly indicates or requires a different meaning.

> **DRIVEWAY.**  An entry from a public street to a public or private parking area used by a healthcare facility.
>
> **ENTRANCE.** Any door to a healthcare facility that directly abuts the public sidewalk; provided, however, that if the door does not directly about [sic] the public sidewalk, the 'entrance' shall be the point at which the public sidewalk intersects with a pathway leading to the door.

. . . .

(B) *Access to a healthcare facility*.

> (1) No person shall knowingly obstruct, detain, hinder, impede, or block another person's entry to or exit from a healthcare facility.
>
> (2) No person shall knowingly enter, remain on, or create any obstruction within the driveway of a healthcare facility or within a "buffer zone" on the public way or sidewalk extending from the entrance of a healthcare facility to the closest adjacent sidewalk curb and ten feet from side to side, during the facility's posted business hours, except:
>
> > (a) Persons entering or leaving such facility;
> >
> > (b) Persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility; or
> >
> > (c) Law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; or
> >
> > (d) Employees or agents of such facility acting within the scope of their employment.

(C) *Signage*. The Department of Public Works shall, at the request of a healthcare facility, paint or lay on the public way or sidewalk two easily-distinguishable demarcation lines running from either side of the facility entrance to the closest adjacent sidewalk curb and extending ten feet from each other.  Healthcare facilities shall post such zone with signage stating: "Healthcare facility: No standing within this zone. [Metro Ordinance]."

[DE 11-2 at 164].

Sisters "is a Kentucky non-profit corporation," and Minter is the founder and President. [DE 2-1 at 39].  Sisters "regularly engages in evangelism associated with intervention with pregnant women entering abortion facilities[.]"  [*Id.*].  Sisters and Minter use "sidewalk ministry. . . [which] involves offering both verbal and written materials outlining alternatives to abortion and help for anyone wishing to pursue those options."  [*Id.* at 41].  They offer educational materials presenting alternatives to abortion as well as several resources for pregnant women who choose

2

not to have an abortion.  [*Id.*].  To disseminate this information and offer their services, Plaintiffs "consider it essential to maintain a caring demeanor, a calm tone of voice, and direct eye contact[,]" which they believe to be "a much more effective means of dissuading women from having abortions than confrontational methods such as shouting, brandishing signs, blocking access, loud speakers, or other methods which, in Plaintiffs' view, tend only to alienate their intended audience."  [*Id.*].  Plaintiffs represent that "this sidewalk ministry is not loud, obnoxious, or confrontational."  [*Id.* at 42].

Much of the parties' briefing focuses on the Ordinance's application outside one specific healthcare clinic: EMW Women's Surgical Center ("EMW").  [DE 2-1 at 40-41]; [DE 10 at 107]. Defendants assert that there is "a long history of anti-abortion protests" in Louisville/Jefferson County and specifically "outside of . . . EMW[.]"  [DE 10 at 107].  According to Defendants, the anti-abortion protests at EMW "are distinct because . . . EMW . . . is one of the only clinics in Kentucky that provides abortion services[,]" so it "consistently has presence from out of town protestors as well as local protestors[,]" who "regularly harass, stalk, intimidate and assault patients entering and exiting the clinic."  [*Id.*].  Defendants represent that from January 2021 to March 2021, there were "a total of at least 1,447 reported protestors outside of . . . EMW[.]"  [*Id.*]. Defendants assert that the "Ordinance was passed because Metro Council determined, after hearing and seeing all of the evidence, that a legitimate and significant government interest existed to protect patients entering and exiting healthcare facilities in Jefferson Count[y], [sic] KY" by creating a buffer zone at the facility entrance.  [*Id.* at 108].  Plaintiffs focus much of their sidewalk ministry efforts at EMW.  [DE 2-1 at 39].

Plaintiffs seek a temporary restraining order and preliminary injunction against the enactment and enforcement of the Ordinance's "buffer zone," arguing that it violates the First

Amendment and KRS § 446.350.  [DE 2-1 at 50-59].  EMW has requested buffer zone demarcation and signage pursuant to the Ordinance; however, the Department of Public Works has not yet painted the buffer zone or installed the requisite signage at EMW.  [DE 10 at 116].  After the filing of Plaintiff's Motion, the parties agreed that Defendants would not enforce the Ordinance until briefing was complete and this Court ruled on the pending motions.  [DE 8; DE 17; DE 18].

## II.    DISCUSSION

### A.  Temporary Restraining Order.

"[A] temporary restraining order is an extraordinary remedy designed for the limited purpose of preserving the status quo pending further proceedings on the merits[.]" *Stein v. Thomas*, 672 Fed. App'x 565, 572 (6th Cir. 2016).  "TRO's are of a short duration and usually terminate with a ruling on a preliminary injunction."  *Walnut Private Equity Fund, L.P. v. Argo Tea, Inc.*, No. 1:11-cv-770, 2011 U.S. Dist. LEXIS 138884, at *26 (S.D. Ohio Dec. 2, 2011) (citing *Workman v. Bredesen*, 486 F.3d 896, 922 (6th Cir. 2007); Fed. R. Civ. P. 65(b)).

To determine whether a temporary restraining order should issue under Fed. R. Civ. P. 65(b), the Court considers four factors:  "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether  the public interest would be served by the issuance of the injunction." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (quoting *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005)).  The Court need not make findings on each factor if fewer resolve the issue.  *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985) (citing *United States v. School Dist. of Ferndale. Mich.*, 577 F.2d 1339, 1352 (6th Cir. 1978)).  "The party seeking [injunctive relief] bears the burden of justifying such relief, including

4

irreparable harm and likelihood of success." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012)

(citing *Ganny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 441 (1974)).

Here, the parties have already agreed to preserve the status quo while this Court considers

the pending motion for preliminary injunction and motion to dismiss.  [*See* DE 18].  Because

Defendants will "not enforce [the] Ordinance . . . until this Court rules on the foregoing pending

motions[,]" a temporary restraining order is not warranted under these circumstances, as the status

quo is already being preserved by the parties' Agreed Order.  [*Id.* at 1399].  As a result, Plaintiffs'

Motion for Temporary Restraining Order [DE 2] is **DENIED as moot**.

### B.  Preliminary Injunction.

In the Sixth Circuit,

> [f]our factors guide the decision to grant a preliminary injunction: "(1) whether the
> movant has a strong likelihood of success on the merits; (2) whether the movant
> would suffer irreparable injury absent the injunction; (3) whether the injunction
> would cause substantial harm to others; and (4) whether the public interest would
> be served by the issuance of an injunction."

*S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017)

(quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012)).  "[T]hese are factors to

be balanced, not prerequisites to be met."  *Id.* (citing *Tenke*, 511 F.3d at 542).  "For example, a

finding that the movant has not established a strong probability of success on the merits will not

preclude a court from exercising its discretion to issue a preliminary injunction if the movant has,

at minimum, shown serious questions going to the merits and irreparable harm which decidedly

outweighs any potential harm to the defendant if the injunction is issued." *Six Clinics Holding*

*Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 399–400 (6th Cir. 1997) (internal quotations

omitted).  However, "[w]hen a party seeks a preliminary injunction on the basis of a potential

constitutional violation, 'the likelihood of success on the merits often will be the determinative

factor.'" *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (quoting *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009)).

Plaintiffs argue that "the likelihood of success factor is dispositive[,]"[1] and that they have demonstrated a likelihood of success on the merits entitling them to a preliminary injunction. [DE 2-1 at 50]. As a result, Plaintiffs do not present arguments for the remaining factors. [*Id.* at 49]. In contrast, Defendants argue that Plaintiffs cannot establish a likelihood of success on the merits, and that the other factors do not support injunctive relief. [DE 10 at 111].

The Court's findings of fact and conclusions of law at the injunctive relief stage are not binding at a trial on the merits. *United States v. Owens*, 54 F.3d 271, 276 (6th Cir. 1995). As a result, the rules of evidence are more relaxed at this stage than at trial. *Univ. of Texas v. Camenisch*, 451 U.S. 390 (1981); *Tenke*, 511 F.3d at 542.

1. <u>Likelihood of Success on the Merits</u>

Because Plaintiffs challenge the constitutionality of the Ordinance, the Court must "look to '[t]he relevant constitutional test' to resolve the inquiry, bearing in mind that a party seeking to invalidate a law in its entirety bears a heavy burden[.]" *Bruni v. City of Pittsburgh*, 941 F.3d 73, 83 (3d Cir. 2019) ("*Bruni II*") (citation omitted) (first bracket in original). "[T]he relevant test" in this matter "is that governing free speech claims." *Id.* "The government's ability to restrict speech

---

[1] Plaintiffs cite several cases to support this conclusion. [*See* DE 2-1 at 49-50]. Each case, however, found that a likelihood of success *may* be determinative where there is a constitutional violation. *Compare* [DE 2-1 at 49] ("Clear Sixth Circuit law establishes that the remaining factors are met where constitutional rights are infringed upon and so, in these cases, the likelihood of success factor is dispositive.") *with H.D.V. – Gredektown, LLC v. City of Detroit*, 568 F.3d 609, 620 (6th Cir. 2009) ("so long as the district court continues to hold the ordinances unconstitutional," it abuses its discretion in withholding injunctive relief); *Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020) ("Preliminary injunctions in constitutional cases *often* turn on likelihood of success on the merits, *usually* making it unnecessary to dwell on the remaining three factors." (emphasis added)); *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 615-16 (6th Cir. 2020) ("Preliminary injunctions in constitutional cases *often* turn on likelihood of success on the merits, *usually* making it unnecessary to dwell on the remaining three factors." (emphasis added)). Thus, in the cases cited by Plaintiffs, there was a strong likelihood of a constitutional violation, and the other factors were therefore not weighed heavily.

6

in a traditional public forum, such as a sidewalk, is 'very limited.'" *Id.* (quoting *McCullen v. Coakley*, 573 U.S. 464, 477 (2014)). "That is because traditional public fora 'are areas that have historically been open to the public for speech activities[,]'" so "[i]n such fora, the government may not restrict speech based on its 'communicative content[.]'" *Id.* (quoting *McCullen*, 573 U.S. at 476; *Bruni v. City of Pittsburgh*, 824 F.3d 353, 364 (3d Cir. 2016) ("*Bruni I*")). In these traditionally public fora, "the government 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content,'" however "the government has greater leeway to regulate 'features of speech unrelated to its content.'" *Id.* (quoting *Bruni I*, 824 F.3d at 363; *McCullen*, 573 U.S. at 477). So "'[e]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *McCullen*, 573 U.S. at 477 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Thus,

> [t]he level of scrutiny a court applies to a restriction on speech depends on whether it is content based or content neutral. If the restriction is content based, it is subject to strict scrutiny and is therefore presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests.' If a restriction is content neutral, 'we apply intermediate scrutiny and ask whether it is narrowly tailored to serve a significant governmental interest.' The threshold question, therefore, is whether the restriction here is content based or content neutral.

*Bruni II*, 941 F.3d at 84 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 155 (2015); *Bruni I*, 824 F.3d at 363-64) (citing *McCullen*, 573 U.S. at 478).

     a.   Whether the Ordinance is Content Based or Content Neutral

The Ordinance contains two provisions outlining the conduct it prohibits. [DE 1-2 at 164].

> (1) No person shall knowingly obstruct, detain, hinder, impede, or block another person's entry to or exit from a healthcare facility.
> (2) No person shall knowingly enter, remain on, or create any obstruction within the driveway of a healthcare facility or within a 'buffer zone' on the public way or sidewalk . . .

[*Id.*].

The Ordinance "would be content based if it required 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred." *McCullen*, 573 U.S. at 516 (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984)). "But it does not[,]" because "[w]hether petitioners violate the [Ordinance] 'depends' not 'on what they say,' but simply on where they say it." *Id.* (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27 (2010)). "Indeed, petitioners can violate the [Ordinance] merely by standing in a buffer zone, without displaying a sign or uttering a word." *Id.* Even though, as Plaintiffs argue, the Ordinance might have "the 'inevitable effect' of restricting abortion-related speech more than speech on other subjects[,] . . . . "a facially neutral law does not become content based simply because it may disproportionately affect speech on certain topics." *Id.* "On the contrary, '[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.'" *Id.* (quoting *Ward*, 491 U.S. at 791).

The Ordinance creates four exceptions to the proscribed conduct [O-179-21(B)(2)(a)-(d)]. Plaintiffs argue that the Ordinance is viewpoint (and thus content) based "because [the Ordinance] permit[s] EMW and its staff and volunteers to engage in pro-abortion speech within the buffer zone" under the exception in O-179-21(B)(2)(d)for "[e]mployees or agents of such facility acting within the scope of their employment." [DE 2-1 at 51]. However, "[t]here is nothing inherently

suspect about providing some kind of exemption to allow individuals who work at the clinics to enter or remain within the buffer zone[].” *McCullen*, 573 U.S. at 518.  Instead,

> [g]iven the need for an exemption for clinic employees, the 'scope of their employment' qualification simply ensures that the exemption is limited to its purpose of allowing the employees to do their jobs.  It performs the same function as the identical 'scope of their employment' restriction on the exemption for 'law enforcement, ambulance, fire-fighting, construction, utilities, public works and other municipal agents.'

*Id.*  The exemption “makes clear—with respect to both clinic employees and municipal agents—that exempted individuals are allowed inside the zones only to perform those acts authorized by their employers.” *Id.* at 518-19.  Thus, the Ordinance is content neutral, and the exceptions do not render it viewpoint based.  *See McCullen* at 518-19.

> b.  Whether the Ordinance is Narrowly Tailored to Serve a Significant Government Interest

Having found the Ordinance to be content neutral, the Court must apply intermediate scrutiny and ask whether the Ordinance is narrowly tailored to serve a significant governmental interest. *See McCullen*, 573 U.S. at 477; *Bruni II*, 941 F.3d at 84. As discussed below, Defendants claim that Metro Government “had a substantial interest in protecting Louisville citizens, particularly vulnerable patients, entering and exiting healthcare facilities and that current ordinances were not effective.”  [DE 10 at 144].  Plaintiffs do not address or dispute the significance of this interest in their briefing.  The Supreme Court has recognized the “legitimacy of the government's interests in 'ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services.'” *McCullen*, 573 U.S. at 486–87 (citing *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 376 (1997)).  As discussed below, whether the buffer zone

would serve a significant government interest is not in dispute. But what is in dispute is whether the Ordinance is narrowly tailored and that is primary focus of the Court's analysis.

         i.   *Supreme Court's Narrow Tailoring Framework for Buffer Zone Cases.*

     The Supreme Court has established the framework for narrow tailoring in two key cases concerning the constitutionality of buffer zones around abortion clinics or healthcare facilities. The first buffer zone the Supreme Court analyzed was in *Hill v. Colorado*, 530 U.S. 703 (2000). The *Hill* buffer zone "regulate[d] speech-related conduct within 100 feet of the entrance to any health care facility." *Id.* at 707. The buffer zone "ma[de] it unlawful within the regulated areas for any person to 'knowingly approach' within eight feet of another person, without that person's consent, 'for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person . . . .'" *Id.* The Supreme Court found that the buffer zone was content and viewpoint neutral, *id.* at 724-25, and thus the appropriate test was whether the buffer zone served "significant and legitimate" governmental interests and was "narrowly tailored" to serve those interests. *Id.* at 725-26.

     The Court determined that Colorado had a "substantial and legitimate interest in protecting . . . persons [attempting to enter health care facilities] from unwanted encounters, confrontations, and even assaults[.]" *Id.* at 729. The Court also determined that the buffer zone was narrowly tailored to serve the government's interest because the eight foot zone "allow[ed] the speaker to communicate at a 'normal conversational distance[,]'" and adequately protected "the right of every citizen to 'reach the minds of willing listeners . . . .'" *Id.* at 726-27, 728 (internal citations omitted). The Court also considered "the place to which the regulations apply in determining whether these restrictions burden more speech than necessary[,]" noting that hospitals uniquely require a "restful, uncluttered, relaxing, and helpful atmosphere" to facilitate medical treatment. *Id.* at 728-29

(quoting *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 772 (1994)) (internal quotations omitted). Finally, the Court considered and rejected the petitioners' claims of overbreadth, unconstitutional vagueness, and unconstitutional prior restraint. *Id.* at 730-34. Ultimately, the Supreme Court upheld the *Hill* buffer zone as constitutional. *Id.* at 734-35.

The Supreme Court next considered a relevant buffer zone in *McCullen v. Coakley*, 573 U.S. 464 (2014). The *McCullen* buffer zone "ma[de] it a crime to knowingly stand on a 'public way or sidewalk' within 35 feet of an entrance or driveway to any place, other than a hospital, where abortions are performed." *Id.* at 469. The Court found that the buffer zone was content neutral because "[w]hether petitioners violate the [buffer zone] 'depends' not 'on what they say,' but simply on where they say it. Indeed, petitioners can violate the [buffer zone] merely by standing in [the] zone, without displaying a sign or uttering a word." *Id.* at 479-80 (quoting *Humanitarian Law Project*, 561 U.S. 1, 27 (2010)). The Court noted that "a facially neutral law does not become content based simply because it may disproportionately affect speech on certain topics. On the contrary, 'a regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.'" *Id.* at 480 (quoting *Ward*, 491 U.S. at 791).

The *McCullen* buffer zone contained exemptions for "four classes of individuals," including "employees or agents of a reproductive healthcare facility acting within the scope of their employment." *Id.* at 482 (internal quotations, citations omitted). The *McCullen* petitioners argued that this exemption "allow[ed] clinic employees and agents—including the volunteers who 'escort' patients arriving at the Boston clinic—to speak inside the buffer zones[,]" but the Court found that the record "contain[ed] insufficient evidence to show that the exemption operates in

this way at any of the clinics, perhaps because the clinics d[id] not want to doom the [buffer zone] by allowing their employees to speak about abortion within the buffer zones." *Id.* at 483, 485.

The *McCullen* Court "recognized the legitimacy of the government's interests in 'ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services[,]'" which were interests that "the buffer zones clearly serve[d.]" *Id.* at 486-87. Yet the Court found that the size of the buffer zone "compromise[d] petitioners' ability to initiate the close, personal conversations that they view as essential to 'sidewalk counseling.'" *Id.* at 487. The 35-foot buffer zones also "pushed petitioners so far back from the clinics' driveways that they c[ould] no longer even attempt to offer literature as drivers turn into the parking lots[,]" so "[i]n short, the [buffer zone] operate[d] to deprive petitioners of their two primary methods of communicating with patients." *Id.* at 488. Because the petitioners in *McCullen* engaged in calm and conversational "sidewalk counseling," the Court determined that "[i]f all that the women [entering an abortion clinic] can see and hear are vociferous opponents of abortion, then the buffer zones have effectively stifled petitioners' message." *Id.* at 489-90. Relying on such findings, the Court held that "[t]he buffer zones burden substantially more speech than necessary to achieve the Commonwealth's asserted interests" of "ensuring public safety outside abortion clinics, preventing harassment and intimidation of patients and clinic staff, and combating deliberate obstruction of clinic entrances." *Id.* at 490.

The *McCullen* Court placed import on the "variety of approaches" that were available to the Commonwealth and were "capable of serving its interests, without excluding individuals from areas historically open for speech and debate." *Id.* at 494. The Court reasoned that the issues the Commonwealth sought to remedy were "limited principally to [one] Boston clinic on Saturday

mornings[,]" but the buffer zones were created outside every clinic in the state, and that the Commonwealth had not tried less intrusive measures such as individual prosecutions or injunctions. *Id.* at 495. Finally, the Court reiterated that the Commonwealth had legitimate interests which were impermissibly pursued "by the extreme step of closing a substantial portion of a traditional public forum to all speakers . . . without seriously addressing the problem through alternatives that leave the forum open for its time-honored purposes" which ultimately violated the First Amendment. *Id.* at 497.

ii.   *Circuit Court Rulings Applying* Hill *and* McCullen

Since the Supreme Court's decisions in *Hill* and *McCullen*, many other circuits have analyzed the tailoring of buffer zones under the Supreme Court's framework, although the Sixth Circuit has not. In *Turco v. City of Englewood*, the Third Circuit considered an ordinance that prohibited persons from knowingly entering or remaining "on a public way or sidewalk adjacent to a health care facility or transitional facility within a radius of eight feet of any portion of an entrance, exit or driveway of such facility or within the area within a rectangle created by extending the outside boundaries of any entrance, exit or driveway of such facility in straight lines to the point where such lines intersect the sideline of the street in front of such entrance, exit or driveway." 935 F.3d 155, 159 (3d Cir. 2019). "The practical effect of the ordinance was the creation of three overlapping buffer zones[:] . . . Two semicircular buffer zones extended outwards eight feet from either side of the facility's entrance. The third buffer zone spanned the width of the facility's entrance and extended to the street." *Id.* The Third Circuit reversed and remanded the District Court's grant of summary judgment because the record contained "a multitude of contradicting factual assertions" about the "restraint on the plaintiff's ability to engage in constitutionally-protected communication" and whether the buffer zones actually "affected [the]

plaintiff's ability to reach her intended audience." *Id.* at 170.  The record was also unclear as to whether the City considered alternative (less restrictive) options, and the Third Circuit highlighted "the intensely factual nature of the inquiry that is usually needed to resolve disputes arising from imposition of buffer zones[.]" *Id.*  Noting the incompleteness of the record, and rejecting the plaintiff's overbreadth claim, the Third Circuit reversed and remanded the matter for proceedings consistent with its opinion. *Id.* at 172.

The Seventh Circuit considered a buffer zone nearly identical to the one before the Supreme Court in *Hill v. Colorado*, except it applied to a smaller physical zone.  *Price v. City of Chicago*, 915 F.3d 1107, 1109, 1113 (7th Cir. 2019).  The Seventh Circuit upheld the buffer zone because *Hill* was directly controlling on the issues.  *Id.* at 1119.  The Court noted that it "would open a circuit split if [it] allowed th[e] facial challenge [of the buffer zone] to move forward." *Id.* at 1109 (citing *Brown v. City of Pittsburgh*, 586 F.3d 263, 270-73 (3d Cir. 2009)).

### iii.    *Application of Narrowly Tailored Case Law*

Given the "intensely factual nature" of Plaintiffs' challenge to the buffer zone, *see Turco*, 935 F.3d at 170, it is difficult to determine Plaintiffs' likelihood of success on the merits at this stage. This is a nuanced and contested area of the law that relies heavily upon the facts of each buffer zone and their effects on speech. *Id.*

Defendants argue that Metro Government "had a substantial interest in protecting Louisville citizens, particularly vulnerable patients, entering and exiting healthcare facilities and that current ordinances were not effective." [DE 10 at 144].  Defendants assert that EMW "consistently has presence from out of town protestors as well as local protestors" that "regularly harass, stalk, intimidate, and assault patients entering and exiting the clinic." [*Id.* at 107]. Defendants also argue that EMW produces monthly reports that "indicate a pattern of obstruction,

trespassing, assault and stalking" which happen "on a regular basis[.]" [*Id.*]. Finally, Defendants assert that law enforcement efforts to curtail these incidents have been ineffective because "officers are required to make judgment calls on whether enforcing existing ordinances or laws would violate the protestor's First Amendment rights." [*Id.* at 108]. The Supreme Court has "previously recognized the legitimacy of the government's interests in 'ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services.'" *McCullen,* 573 U.S. at 486-87 (citing *Schenck*, 519 U.S. at 376). The Ordinance "clearly serve[s] these interests." *Id.* at 487. The issue is therefore whether the Ordinance is narrowly tailored to serve Metro Government's significant interests.

Plaintiffs assert that the "buffer zone extends out to the street and, given the width of the pathway that leads from the clinic to the sidewalk (which is 8 feet in width) is approximately 73 feet long, and ten feet wide (blocking a total of some 730 square feet), and in terms of what has been marked and demarked as EMW property, totals approximately block of sidewalk that is now restricted."[2] [DE 2-1 at 44]. Plaintiffs argue that the buffer zone includes the entire sidewalk outlined in red below:

---

[2] It is not clear to the Court how Plaintiffs arrive at these measurements or Plaintiffs' depiction below of the buffer zone. In their Response to Defendants' Motion to Dismiss, Plaintiffs clarify that they have depicted a buffer zone extending across the entire length of the front of EMW's property, which is around 73 feet in length. [DE 15 at 1355]. This Court can find no reading of the plain language of the statute to create such a buffer zone. Instead, the Ordinance defines "entrance" as "[a]ny door to a healthcare facility that directly abuts the public sidewalk; provided, however, that if the door does not directly ab[]ut the public sidewalk, the 'entrance' shall be **the point** at which the public sidewalk intersects with a pathway leading to the door." [DE 11-2 at 164] (emphasis added). As shown below, a buffer zone demarcated from *the point* at which EMW's pathway intersects with the sidewalk will be only ten feet in width, per the Ordinance's plain language.



[DE 2-1 at 46].

The plain language of the Ordinance,[3] however, creates a buffer zone from EMW's entrance to the curb of the sidewalk measuring just "ten feet from side to side." [DE 14 at 1334]. The Ordinance establishes that the buffer zone's "two easily-distinguishable demarcation lines" will "extend[] **ten feet from each other**." [DE 11-2 at 164 (emphasis added)]. Defendants provided an affidavit from the Assistant Director of Public Works which details where the buffer zone would be demarcated at EMW, with a photo attachment confirming the buffer zone's width of just ten feet. [*See* DE 10-8]. The following photo depicts, in yellow, how the buffer zone's demarcation lines will be drawn by the Department of Public Works:

---

[3] The parties do not assert that the Ordinance's language is ambiguous.



[DE 11-3 at 167].

While the Ordinance clearly prohibits obstruction of any healthcare facility's entry or exit,

[*see* DE 11-2 at 164, Section (B)(1)], the Ordinance only prohibits remaining on "the driveway of

a healthcare facility *or within a 'buffer zone'* on the public way or sidewalk[.]" [*Id.*, Section (B)(2)]

(emphasis added).  The Ordinance defines "entrance" and "driveway" in Section (A),[4] but uses the

term "buffer zone," in quotations, to discuss the prohibited zone at issue in Section (B).  [DE 11-

2 at 164].  "[W]hen the legislature uses certain language in one part of the statute and different

language in another, the court assumes different meanings were intended."  *Bruni II*, 941 F.3d at

86.  Rather than prohibit remaining on the sidewalk adjacent to *any healthcare facility's entrance*,

---

[4] Section (A) includes definitions for the terms "driveway," "entrance," and "healthcare facility" as used
within the Ordinance.  [DE 11-2 at 164].

the legislature specifically proscribed such conduct within a "buffer zone."  [DE 11-2 at 164].[5]
When read within the context of the Ordinance as a whole, the quoted term "buffer zone" in Section
(B)(2) specifically refers to the demarcated zone that is created under the signage requirements in
Section (C).  [*Id.*].[6]

Thus, Plaintiffs' arguments about the Ordinance's purported overbreadth are premised on
an incorrect reading of the Ordinance which creates a buffer zone much larger than the one
invalidated in *McCullen*.  [*See* DE 2-1 at 45] (the "buffer zone . . . practically completely envelopes
the entire city block"); [*id.* at 47] (an "effect of the buffer zone is to relegate the Plaintiffs to raising
their voice at parents from outside the zone – and as a practical matter, requires this to occur from
across the street"); [*id.* at 54] ("the zone at issue in this case, which spans an entire city block, is
substantially broader than the zones at issue in *Schenck* [*v. Pro-Choice Network of W. N.Y.*, 519
U.S. 357 (1997)] and *Madsen* [*v. Women's Health Ctr., Inc.*, 512 U.S. 753 (1994)].").

Plaintiffs also argue that because EMW is on the same city block as two neighboring health
care facilities, the buffer zones from each respective health care facility will overlap and create
one large buffer zone.  [DE 14 at 1334-35].  However, the Ordinance only demarcates a buffer
zone outside a healthcare facility "at the request of [that] healthcare facility[.]"  [DE 11-2 at 164].
Plaintiffs, though, assert that the Ordinance automatically creates a prohibited zone outside "all
healthcare facilities[,]" [DE 2-1 at 46], however the Ordinance does not readily lend itself to such

---

[5] Even if the Ordinance's language is not abundantly clear as to this point, the Court may reasonably
construe a piece of legislation facing a First Amendment challenge where said legislation is "'readily
susceptible' to a narrowing construction that would make it constitutional[.]"  *Bruni II*, 941 F.3d at 85.

[6] For example, Section (E) requires "[a]ny health care facility that requests that the Louisville Department
of Public Works paint or lay demarcation lines as described in subsection (C)(1)" to "monitor during its
hours of operation **the 'buffer' zone created by the demarcation lines** for obstructions[.]"  [DE 11-2 at
164] (emphasis added).  Likewise, Section (D) discusses reporting requirements for "any health care facility
that requested the demarcation line as described in [Section (C)] regarding the efficacy of the 'buffer'
zone[.]"  [*Id.*] (emphasis added).

a reading.  Neither party alleges that the healthcare facilities surrounding EMW have requested buffer zones, so the Court need not consider or decide what the hypothetical implication of such requests might be.  *See Phelps-Roper v. Strickland*, 539 F.3d 356, 373 (6th Cir. 2008) (the Court "need not further consider . . . 'hypothetical applications' of the challenged provision to find it valid on its face.") (citing *Frisby*, 487 U.S. 474, 488 (1988)).

Even if the facilities surrounding EMW requested a buffer zone, Plaintiffs' assertion that the buffer zones would "practically envelope[] the entire city block" is incorrect.  [DE 2-1 at 45]. Based on the Department of Public Works's anticipated placement of the demarcation lines, [DE 11-3 at 167], Plaintiffs would still be able to engage in sidewalk counseling outside of EMW due to the large stretches of sidewalk out front of EMW that will remain outside the buffer zone's boundaries.  The buffer zone will effectively require Plaintiffs to stand no more than ten feet away from any patients entering the facility.  [*Id.*].  The Supreme Court noted in *Hill* that an eight foot "separation between [a] speaker and the audience should not have any adverse impact on the readers' ability to read signs[,]" and that, at a distance of eight feet, a "speaker [can] communicate at a 'normal conversational distance.'"  530 U.S. at 726-27.  As a practical matter, if a person were to enter EMW by walking through the middle of the buffer zone, Plaintiffs could counsel them from merely five feet away on either side.  Thus, Plaintiffs will be able to continue their sidewalk counseling, at a normal conversational distance, even after the buffer zone is demarcated.  The only thing Plaintiff's would be prevented from doing as a result of the buffer zone is physically obstructing a patient from entering the healthcare facility.

Given Plaintiffs' flawed underlying factual conclusions, the size of the Ordinance's proposed buffer zone, and the detailed Supreme Court and Circuit Court precedent upholding buffer zones more narrowly tailored than the one in *McCullen*, Plaintiffs' likelihood of success on

the merits is not strong at this stage of the litigation.  Several district courts have denied injunctive relief in buffer zone challenges, even when analyzing larger buffer zones than the one created by the Ordinance.  *See Bruni v. City of Pittsburgh*, 91 F. Supp. 3d 658, 661 (W.D. Pa. 2015), *vacated on other grounds*, 824 F.3d 353 (3d Cir. 2016);[7] *Reilly v. City of Harrisburg*, 336 F. Supp. 3d 451, 454 (M.D. Pa. 2018), *aff'd*, 790 Fed. App'x 468 (3d Cir. 2019); *see also Price v. City of Chi.*, No. 16-cv-8268, 2017 U.S. Dist. LEXIS 519, *12 (N.D. Ill. Jan. 4, 2017) (the district court did not consider plaintiffs request for injunctive relief because the court granted the defendants' motion to dismiss), *aff'd*, 915 F.3d 1107 (7th Cir. 2019). As a result, this factor weighs against issuance of a preliminary injunction on the merits of their constitutional claim.

c.  Likelihood of Success on the Merits of Plaintiffs' Kentucky's Religious Freedom Statute Claim

Plaintiffs argue that the Ordinance substantially burdens their sincerely held religious practices in violation of Ky. Rev. Stat. § 446.350.  [DE 2-1 at 58-59].  Ky. Rev. Stat. § 446.350 prohibits the government from "substantially burden[ing] a person's freedom of religion." Plaintiffs argue that this argument requires little elaboration because the Ordinance substantially burdens their sincerely held religious practices.  [DE 2-1 at 58].  Because Plaintiffs have not shown that they will be unable to continue their sidewalk counseling from a normal conversational distance reading the demarcation of the buffer zone as set forth *supra* section II.B.1.b.iii, the Ordinance does not substantially burden Plaintiffs' practices.  Plaintiffs have failed to establish a strong likelihood of success on the merits of this argument.

---

[7] The *Bruni* plaintiffs did not appeal the district court's denial of their request for injunctive relief.  *See* 824 F.3d at 360.

2. Plaintiffs' Irreparable Injury Absent an Injunction

The next factor that the Court must balance is whether Plaintiffs would suffer irreparable injury absent an injunction. *See S. Glazer's Distribs.*, 860 F.3d at 849. This factor supports injunction where "the Ordinance constitutes harm to Plaintiffs' First Amendment rights," and conversely, it weighs against injunction where "the Ordinance is a reasonable and constitutionally appropriate time, place, and manner limitation[.]" *Reilly*, 336 F. Supp. 3d at 471-72.

As noted above, Plaintiffs did not brief any of the remaining elements of a temporary restraining order or preliminary injunction, including allegations of irreparable injury. Taking these reasons along with Plaintiffs' misinterpretation of the Ordinance, *see supra* Section II.B.1.b.iii, it is impossible for the Court to determine what injury Plaintiffs might sustain even if the Ordinance were enforced. The record fails to include information to determine the effects of a fixed 10-foot buffer zone on the communications Plaintiffs engage in. *Cf. McCullen*, 573 U.S. at 521 (considering the petitioner's uncontradicted testimony about the actual effects of the buffer zone on her speech). As a result, the Court cannot conclude that Plaintiffs face irreparable injury absent an injunction. As a result, this factor also weighs against injunction.

3. Whether Injunction Would Cause Others Substantial Harm

Defendants argue that "it is clearly demonstrated that injunction [would open] doors for more harm to occur to patients entering and exiting healthcare facilities." [DE 10 at 119]. In Defendants' view, therefore, issuance of an injunction "would amount to substantial harm to others." [*Id.*]. Essentially, issuance of injunction would permit "the exact harm that led to the enactment of the Ordinance[,]" and this factor therefore does not support injunction. *Reilly*, 336 F. Supp. 3d at 472. Plaintiffs did not brief this issue and carry "the burden of justifying [the injunctive] relief" they seek. [DE 14 at 1349; *Wilson v. Williams*, 961 F.3d 829, 837 (6th Cir.

2020)].  The Court only has before it Defendants' uncontested representation that injunction would risk harm to patients.  This factor therefore does not support injunction.

4. Whether Public Interest is Served by Issuance of Injunction

As with the previous factor, Plaintiffs have not briefed the fourth factor for injunctive relief. [*See* DE 14 at 1349].  Defendants have offered that "stalking, harassment, assault and intimidation against vulnerable individuals does not serve the public interests[,]" so injunction should not issue. [DE 10 at 119].  Accordingly, this factor also weighs against temporary restraining order or injunction.

In reviewing the four factors for temporary restraining order or injunction, Plaintiffs have not carried their burden of justifying injunctive relief.  *See Wilson*, 961 F.3d at 837.  Due in part to their misinterpretation of the Ordinance, Plaintiffs have not demonstrated a strong likelihood of success on the merits or the pendency of irreparable injury to them absent injunctive relief. Plaintiffs also did not fully brief the final factors for injunctive relief, so the record includes no argument suggesting that these factors support injunction.  As a result, none of the four factors support injunctive relief and Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction, [DE 2], is **DENIED**.

**C.  Motion to Dismiss**

Defendants move for dismissal, "urge[ing] the court to examine the evidence presented and treat this Motion as a Motion for Summary Judgement. In the alternative, Defendants ask the Court to take judicial notice of the evidence and treat this Motion as a Motion to Dismiss." [DE 11-1 at 151-52].  Plaintiffs object to converting Defendants' Motion to Dismiss into a Motion for Summary Judgment.  [DE 15 at 1363].  Plaintiffs also oppose dismissal and reiterate many arguments presented in their motion for injunctive relief.  [*Id.* at 1364, 1365-70].  As with the

motion for injunctive relief, Plaintiffs' response to the motion to dismiss misinterprets the Ordinance to create a buffer zone encompassing an entire city block.  [*Id.*].

Under Fed. R. Civ. P. 12(d), if "matters outside the pleadings are presented to and not excluded by the court" on a Rule 12(b)(6) or 12(c) motion, "the motion must be treated as one for summary judgment under Rule 56[,]" and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  A court "may also consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice[]" without converting a motion to dismiss into one for summary judgment.  *Wyser-Pratte Mgmt. Co. v. Telxon Corp.*, 413 F.3d 553, 560 (6th Cir. 2005).  "The reason that a court must convert a motion to dismiss to a summary judgment motion if it considers extraneous evidence submitted by the defense is to afford the plaintiff an opportunity to respond."  *Bruni I*, 824 F.3d at 361 (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993)) (internal quotation marks omitted).

Defendants have submitted the legislative record of the Ordinance, [DE 11-5], as well as an affidavit from the Assistant Director of Public Works and photographs detailing where the Department of Public Works will paint the "buffer zone" demarcation lines outside EMW.  [DE 11-4; DE 11-3].  Because Plaintiffs have misinterpreted the Ordinance, Plaintiffs have not yet responded with arguments tailored to the actual effect of the Ordinance.  Though Plaintiffs advance several categories of discovery that they need prior to responding to a motion for summary judgment, [DE 15-1], the remaining issues ripe for discovery have a narrower scope.  Specifically, Plaintiffs "must be given a reasonable opportunity to present material" detailing what the practical effects of the ten-foot buffer zone would be on their sidewalk counseling efforts. Fed. R. Civ. P. 12(d); *Bruni I*, 824 F.3d at 368 ("What matters is the burden on speech that such zones impose, of

which size is one but only one feature." . . . Buffer zone "cases turn[] on their distinct factual records[.]").   Additionally, Defendants "have to show either that substantially less-restrictive alternatives were tried and failed, or that the alternatives were closely examined and ruled out for good reason." *Id.* at 370.   Because these matters are pertinent to Defendants' motion to dismiss, the motion is more akin to one for summary judgment. *See Bruni I*, 824 F.3d at 368-73 (finding a motion to dismiss a first amendment buffer zone challenge for failure to state a claim was more akin to a summary judgment motion, and the district court's dismissal was premature given the fact-intensive nature of buffer zone challenges).   Because of the remaining fact issues identified, summary judgment is not proper at this stage of the litigation. *See id.*   Accordingly, Defendants' Motion to Dismiss [DE 11] is **DENIED**.

### III.   CONCLUSION

For all these reasons, and the Court being otherwise sufficiently advised, **IT IS ORDERED** as follows:

(1) Plaintiffs' Emergency Motion for Temporary Restraining Order [DE 2] is **DENIED**;

(2) Plaintiffs' Motion for Preliminary Injunction [DE 2] is **DENIED**;

(3) Plaintiffs' Motion for Leave to File Excess Pages [DE 13] is **GRANTED**;

(4) Defendants' Motion to Dismiss for Failure to State a Claim [DE 11] is **DENIED**;

(5) The Court will issue a separate Order setting this matter for Rule 16 conference.

Rebecca Grady Jennings, District Judge

United States District Court

September 3, 2021

24