**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**
**(Louisville Division)**
*Electronically Filed*

| | | |
|---|---|---|
| **Sisters for Life, Inc.** | : | |
| c/o Christopher Wiest, Esq. | | Case No. 3:21-CV-00367-RGJ |
| 25 Town Center Blvd, Ste. 104 | : | |
| Crestview Hills, KY 41017 | | Judge Jennings |
| | : | |
| AND | | |
| | : | |
| **Angela Minter** | | |
| c/o Christopher Wiest, Esq. | : | |
| 25 Town Center Blvd, Ste. 104 | | |
| Crestview Hills, KY 41017 | : | |
| | | |
| AND | : | |
| | | |
| **Kentucky Right To Life Association, Inc.** | : | |
| c/o Christopher Wiest, Esq. | | |
| 25 Town Center Blvd, Ste. 104 | : | |
| Crestview Hills, KY 41017 | | |
| | : | |
| *Plaintiffs* | | |
| | : | |
| v. | | |
| | : | |
| **Louisville-Jefferson County Metro Government** | : | |
| c/o Mayor Greg Fischer | | |
| 527 W. Jefferson Street | : | |
| Louisville, KY 40202 | | |
| | : | |
| AND | | |
| | : | |
| **Mayor Greg Fischer** | | |
| 527 W. Jefferson Street | : | |
| Louisville, KY 40202 | | |
| | : | |
| AND | | |
| | : | |
| **Erika Shields, Chief of Police** | | |
| **Louisville Metro Police Department** | : | |
| 633 W Jefferson Street | | |
| Louisville, KY 40202 | : | |

1

AND

                                                      :

**Mike O'Connell**
600 W Jefferson St                              :
Louisville, KY 40202

                                                      :

     *Defendants*

## PLAINTIFFS' SECOND AMENDED VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### Introduction

1. Almost every day in Kentucky a young woman in crisis because of an unplanned pregnancy considers terminating her pregnancy through abortion. In plain English, she considers killing the unborn human being in her womb because she believes she has no other choice. To do so, she travels to the abortoria in Louisville. She may be unaware that there are alternatives to abortion, that resources exist, and that others care. Until a few days ago, and every single day that the Louisville abortion facility operated since 2003, she would be met on the sidewalk outside that facility by the Plaintiffs, who operate a Christian ministry on that sidewalk. They walk with that young woman, who is often a person of color, and minister to her, telling her that she has actually does have a choice. They let her know there are people who care about her, love her, and will help her and her unborn child. But now, that can no longer happen. Because Defendants made this interaction and sidewalk ministry illegal, this sidewalk ministry. This case seeks to restore the constitutional right of Plaintiffs to conduct their life-saving sidewalk ministry within a traditional public forum.

**Parties**

2. Plaintiff, Sisters for Life, Inc. ("Sisters for Life"), is a Kentucky non-profit corporation, with its headquarters located in Louisville, Kentucky.[1] Formed in 2003, Sisters for Life is a Christian, non-profit organization and ministry inspired by God to put into action a comprehensive advocacy for preborn babies, and their mothers and fathers who are faced with an unplanned or crisis pregnancy. They also advocate for God's family values. They believe God has a good plan and purpose for every life and family, and they see it as their mission to help God's family have hope and a future. As such, they believe it is their assignment to serve and assist God's family in fulfilling God's plan. Jeremiah 1:5, Jeremiah 29:11.

3. Angela Minter is the founder of Sisters for Life, and is also its President, who regularly engages in evangelism associated with intervention with pregnant women entering abortion clinics, and specifically EMW Women's Surgical Center ("EMW"), which is the abortion clinic located at 136 W Market St, Louisville, KY 40202. For almost two decades, Angela has personally ministered to mothers and fathers outside EMW, sharing her own experiences and regrets with abortion, connecting with them and telling them about her experience as a teenager who aborted two of her children, and her lifelong regret from having done so. Outside of sidewalk ministry, Angela ministers in the community, reaching out to Louisville's black churches, engages in all forms of outreach, and seeks to end the cycle of death brought on by the abortion industry, including its disproportionate impact to her black community.

---

[1] https://www.sisforlife.org/ (last visited 6/6/2021).

4. Plaintiff, Kentucky Right to Life Association, Inc. ("KRLA"), founded in 1973, serves as the state coordinating body for local Right to Life Chapters representing tens of thousands of Kentucky citizens. It is a volunteer, non-profit organization composed of grassroots people of different political persuasions, faiths, and economic, social and ethnic backgrounds. KRLA exists to protect life. Its members frequently conduct sidewalk ministry outside EMW in furtherance of the KRLA mission, and KRLA and its members are harmed by the challenged ordinance, and, further, the ordinance impairs the KRLA's mission.

5. Defendant Louisville-Jefferson County Metro Government ("Louisville Metro") is a duly organized combined municipal and county government under KRS Chapter 67C, governing Jefferson County. Its legislative body is the Metro Council, and its executive is the Mayor.

6. Defendant Mayor Greg Fischer is the duly elected Mayor of the Louisville-Jefferson County Metro Government. Pursuant to KRS 67C.105, "[a]ll executive and administrative power of the government shall be vested in the office of the mayor." Further, pursuant to KRS 67C.105(5)(d), the Mayor is charged to, and does, "[e]nforce the ordinances of the consolidated local government."

7. Defendant Ericka Shields is the duly appointed Chief of the Louisville Metro Police Department, who, among other things, has primary responsibility for the enforcement of city ordinances and other Kentucky laws within the City of Louisville.

8. Defendant Mike O'Connell is the Jefferson County Attorney. In that capacity, and pursuant to KRS 15.725(2), he is commanded to, and does, "prosecute all violations

whether by adults or by juveniles subject to the jurisdiction of the regular or juvenile session of the District Court of criminal and penal laws."

## JURISDICTION AND VENUE

9. Subject matter jurisdiction over the claims and causes of action asserted by Plaintiffs in this action is conferred on this Court pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, 28 U.S.C. §1331, 28 U.S.C. § 1367, 28 U.S.C. §§ 2201 and 2202, and other applicable law.

10. Venue in this District and division is proper pursuant to 28 U.S.C. §1391 and other applicable law, because much of the deprivations of Plaintiffs' constitutional rights occurred in counties within this District within Kentucky, and future deprivations of their constitutional rights are threatened and likely to occur in this District.

## FACTS

11. As part of the practice of their faith, Angela and Sisters for Life engage in sidewalk ministry outside 136 W Market St, Louisville, KY 40202, which is the location of EMW, the last abortion clinic located in the Commonwealth of Kentucky, and the most prolific provider of surgical abortions within the Commonwealth, having been responsible for 3,645 abortions in 2019, or 99.5% of all abortions in Kentucky in 2019.[2]  Angela and Sisters for Life have engaged in their ministry since 2003.

12. In the same vein, KLRA members frequently engage in similar sidewalk ministry outside of EMW, in the same manner that Angela and Sisters for Life do.

---

[2] https://chfs.ky.gov/agencies/dph/dehp/vsb/Forms/2019KYAbortionAnnualReport.pdf (last visited 6/6/2021).

13. Sidewalk ministry involves offering both verbal and written materials outlining alternatives to abortion and help for anyone wishing to pursue those options.

14. Angela and Sisters for Life inform women and their partners of other life choices available to them for their child other than abortion, including adoption, free housing during and after the pregnancy, free child care, free help with college tuition if they choose not to abort their child, parenting resources including diapers, formula, clothes, parenting classes, counseling and more, including information about child development that shows parents how developed their child is at the particular stage of their pregnancy.

15. Angela and Sisters for Life typically will initiate a conversation by, among other things, asking would-be patients if they would like some literature.

16. During these exchanges, Angela and Sisters for Life consider it essential to maintain a caring demeanor, a calm tone of voice, and direct eye contact. Such interactions, Plaintiffs believe, are a much more effective means of dissuading women from having abortions than confrontational methods such as shouting, brandishing signs, blocking access, loud speakers, or other methods which, in Plaintiffs' view, tend only to alienate their intended audience.

17. Some of the things Plaintiffs are called to do (and do) are make efforts to engage women and hand them literature, walk alongside and talk to women headed towards the clinic who, presumably, want to procure an abortion, and pray for the women who start to enter the abortion clinic.

18. Angela will often, as part of this ministry, tell these women about her own harrowing experience with abortion as a teenager and the lifelong regret she has suffered as a

result. And, as part of this experience, she will tell the women that God loves them, and their baby, regardless of the decision they make.

19. Necessarily, this sidewalk ministry is not loud, obnoxious, or confrontational; experience has shown Plaintiffs that those tactics are counter-productive. Nor is the sidewalk ministry a protest or meant or intended to block access to the clinic – the message and ministry are a final intervention with women who often are in crisis and believe they have no alternative to abortion. Plaintiffs deliberately walk along with the women who are in the process of walking into EMW, and deliberately do not block them.

20. Spectacularly, the ministry and interventions of Angela and Sisters for Life have been responsible for saving over 800 babies outside EMW. Those 800 children are alive today, thereby saving their mothers, fathers and families from the guilt and grief of having a hand in their death.

21. For the avoidance of all doubt, the sidewalk ministry and counseling are part of the sincerely held religious beliefs of the Plaintiffs, and are undertaken in accordance with those same beliefs.

22. Given this success, it is not surprising that, at the insistence of EMW, which substantially profits from the abortion trade, the Metro Council of Louisville Metro passed legislation substantially restricting activities on the sidewalk outside EMW.

23. On May 20, 2021, the Metro Council passed Ordinance O-179-21 (the "Ordinance"), in a 14-11 divided vote. A true and accurate copy of that Ordinance is attached as **Exhibit 1**.

24. Thereafter, Mayor Fischer signed the Ordinance on June 2, 2021, and, upon information and belief, it has been published in accordance with law.

25. The Ordinance, first provides: "(1) No person shall knowingly obstruct, detain, hinder, impede, or block another person's entry to or exit from a healthcare facility."

26. It further provides that "(2) No person shall knowingly enter, remain on, or create any obstruction within the driveway of a healthcare facility or within a 'buffer zone' on the public way or sidewalk extending from the entrance of a healthcare facility to the closest adjacent sidewalk curb and 10 feet from side to side, during the facility's posted business hours, except: (a) persons entering or leaving such facility; (b) persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility; or (c) law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; or (d) employees or agents of such facility acting within the scope of their employment."

27. The Ordinance defines "Entrance" as "any door to a healthcare facility that directly abuts the public sidewalk; provided, however, that if the door does not directly about the public sidewalk, the 'entrance' shall be the point at which the public sidewalk intersects with a pathway leading to the door."

28. A true and accurate photo of the buffer zone is below:



29. The buffer zone effectively prohibits persons from walking through it, or into it, except as expressly permitted under an exception to the Ordinance.

30. The Ordinance is enforced with fines of up to $500 for each violation.

31. Since the operation of the Ordinance in question, Plaintiffs have been materially impacted in their ministry.[3]

32. Specifically, Plaintiffs have attempted to engage in sidewalk ministry both before, and after the ordinance, and have been largely unable to successfully do so after the passage and implementation of the ordinance.

33. The Plaintiffs' ministry is substantially burdened by the ordinance, including as a result of the practice of EMW clinic escorts to block Plaintiffs access to those

---

[3] And, as it turns out, Plaintiff Minter has received a warning for entering the zone and thus it has been enforced against her.

9

entering the clin<u>ic (</u>both physically and by shouting over us talking with their pro-choice messaging), as well as a result of the clinic escorts dropping patrons off in a vehicle directly into the buffer zone, which, coupled with the zone, has led Plaintiffs to be unable as a practical matter to interact with those entering the clin<u>ic.</u>

<u>34</u>. Further, as an impediment to messaging by Plaintiffs towards those entering the clinic has been shouting and loud speaker usage by protesters of the clinic that drown out Plaintiffs' messaging (again, Plaintiffs cannot and do not use loud speakers to try to compete with protesters because that is not what Plaintiffs are trying to do with our messaging, which relies on a softly spoken calm, message).

35. Collectively, these features render Plaintiffs unable to interact with most of the persons who are entering the clinic who Plaintiffs are trying to reach with their message.

36. As it turns out, the buffer zone Ordinance prohibits the Plaintiffs and other sidewalk ministers from speaking, praying, or interacting with those entering the EMW clinic, including, without limitation, even with those entering who invite or otherwise solicits contact with Plaintiffs.

37. The buffer zone compromises the Plaintiffs' ability to initiate the close, personal conversations that Plaintiffs view as essential to their sidewalk ministry.

38. Another pernicious effect of the buffer zone is to relegate the Plaintiffs to raising their voices at clinic patrons from outside the zone – a mode of communication sharply at odds with the compassionate message Plaintiffs wish to convey.

39. The buffer zone, in large part for the reasons set forth in the preceding paragraphs, also makes it substantially more difficult for Plaintiffs to distribute literature to arriving parents, again even where the clinic patrons wish to receive the literature.

40. At the same time, the Ordinance explicitly permits EMW staff and volunteers to escort those seeking an abortion into the buffer zone and into the clinic, where those staff and volunteers regularly, and within the scope of their employment or volunteer status, escort, encourage, and counsel the women seeking to enter the clinic to follow through with an abortion, thus providing speech in the buffer zone, but on only one side of the abortion debate.

41. For the avoidance of all doubt, volunteers and employees of EMW will, within the scope of their employment or volunteer status, and within the buffer zone, thwart or attempt to thwart or block Plaintiffs' efforts to speak or hand literature to those in the process of walking to the EMW clinic property, regularly disparage Plaintiffs to those seeking to enter the EMW clinic property, and will offer encouragement of those seeking to obtain an abortion to do so, again providing speech on only one side of the abortion debate.

42. Again, for the avoidance of all doubt, EMW authorizes its escorts to have these conversations, with those being escorted, within the buffer zone.

43. The Ordinance is an insidious content and viewpoint-based speech gerrymander, designed to squelch dissenting speech, and the practice of sincerely held religious beliefs, in the vicinity of EMW.

44. It should be noted that prior to the passage of the challenged Ordinance, Louisville Metro already had ordinances on the books to prevent blocking sidewalks.

Specifically, the City has had, at all times relevant hereto, ordinance 97.072, which provides:

> It shall be unlawful for any person in or on any sidewalk or any premises in or abutting thereon to make any speech or harangue; to demonstrate, sell, or offer for sale goods, wares, or merchandise; or to display any signs, device, information, or exhibition in consequence of which there is caused or created such a gathering of persons on the sidewalk as to interfere with pedestrian traffic thereon.

45. Louisville Metro has not seriously attempted less restrictive measures to combat the purported ills that it contends required the passage of the Ordinance, including individual prosecutions, injunctions, ordinances against following and harassing people within a certain number of feet of a health care facility, passage of legislation similar to the federal Freedom of Access to Clinic Entrances Act of 1994 (18 USC 481(a)(1)), or ordinances requiring, at the directives of the police, the dispersal of individuals blocking entrances to healthcare facilities.

46. The Ordinance in question provides a number of secular exceptions to the buffer zone requirement, but makes no allowance for the practice of sincerely held religious beliefs, such as those engaged in by the Plaintiffs. Specifically, the Ordinance allows persons within the buffer zone who are (a) entering or leaving such facility; (b) traversing the sidewalk but only if they are reaching a destination; (c) law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; and (d) employees or agents of such facility acting within the scope of their employment.

## ALLEGATIONS CONCERNING STANDING

47. For the purposes of removing all doubt, Defendants Fischer, Shields, and O'Connell are charged with enforcing, and actually do enforce, city ordinances, including the ordinance challenged in this action.

48. Defendants Fischer and Shields made public statements demonstrating their intention to regularly and systemically enforce the challenged ordinance, including statements to public media, and threatened having the police charge people with violations of the challenged ordinance. For his part, O'Connell's office systemically prosecutes violations of city ordinances.

49. Plaintiffs, for their part, intend to violate the ordinance on a regular and systemic basis, each and every day that EMW is open for business, including engaging in their sidewalk ministry within the buffer zone, each and every one of those days.

50. And, in fact, Plaintiff Minter has violated the ordinance since its passage and implementation.

## COUNT I – 42 USC 1983, Violation of the First Amendment – Freedom of Speech

51. Plaintiffs reincorporate the preceding paragraphs as if fully written herein.

52. The First Amendment guaranties, among other things, that government may make no law "abridging the freedom of speech." U.S. Const., Amend. I. It has been incorporated against the states. *Gitlow v. New York*, 268 U.S. 652 (1925).

53. Public streets and sidewalks comprising the buffer zone under the Ordinance are traditional public forums, triggering the traditional public forum analysis under First Amendment analysis and scrutiny. *McCullen v. Coakley*, 573 U.S. 464, 476-477

(2014).  The Government's ability to restrict speech in such locations is "very limited."  *Id.*

54. Restrictions in such areas can be upheld only if they are "reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, they are narrowly tailored to serve a significant governmental interest, and they leave open alternative channels for communication of the information." *Id.* at 477.

55. The restrictions here are not content neutral (and, in fact, constitute viewpoint discrimination, which is presumptively unconstitutional) because they permit EMW and its staff and volunteers to engage in pro-abortion speech within the buffer zone, while foreclosing Plaintiffs from engaging in pro-life speech.  For the avoidance of all doubt, EMW staff and volunteers do speak, within the scope of their employment or volunteer status, within the buffer zone, encouraging would-be patients to obtain abortion services at EMW.  *Id.* at 484-485.  Thus, because the Ordinance does not satisfy strict scrutiny in that it is not narrowly tailored to achieve a compelling governmental interest, the Ordinance is unconstitutional on that basis alone.

56. Even if the Ordinance did not amount to content and viewpoint discrimination, it also is not narrowly tailored under the less exacting narrow tailoring in a content-neutral forum analysis, and it fails to leave open alternative channels for communication of the information.  Specifically, in application, it restricts an even greater area than the U.S. Supreme Court struck down in *Coakley*, 573 U.S. 464, and, as in *Coakley*, Louisville Metro has not undertaken less restrictive measures to achieve its purported ends.

57. The Ordinance thus violates the First Amendment's Free Speech guarantees.

58. Plaintiffs therefore seek declaratory judgment and injunctive relief for the foregoing violations, as well as reasonable attorney fees and costs under 42 USC 1988.

**COUNT II – 42 USC 1983, Violation of the First Amendment – Freedom of Assembly**

59. Plaintiffs reincorporate the preceding paragraphs as if fully written herein.

60. The First Amendment also guaranties the right "of the people peaceably to assemble." This guaranty has also been incorporated against the states. *DeJonge v. Oregon*, 299 U.S. 353 (1937).

61. Assembly on public streets and sidewalks is among the guaranties protected by the First Amendment. *Shuttlesworth v. Birmingham*, 394 U.S. 147 (1969).

62. These rights, being fundamental rights, trigger strict scrutiny. *Clark v. Jeter*, 486 U.S. 456, 461 (1988).

63. The Ordinance is not narrowly tailored to achieve a compelling governmental interest. It is thus also a violation of the Freedom of Assembly guaranty of the First Amendment.

64. Plaintiffs therefore seek declaratory judgment and injunctive relief for the foregoing violations, as well as reasonable attorney fees and costs under 42 USC 1988.

**COUNT III – 42 USC 1983, Violation of the First Amendment – Free Exercise of Religion**

65. Plaintiffs reincorporate the preceding paragraphs as if fully written herein.

66. The First Amendment also provides that: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." This clause, too, has been incorporated against the states. *Cantwell v. Connecticut*, 310 U.S. 296 (1940).

67. "[A] law that discriminates against religious practices usually will be invalidated because it is the rare law that can be 'justified by a compelling interest and is narrowly tailored to advance that interest.'" *Roberts v. Neace*, 958 F.3d 409, 413 (6th Cir. 2020). That is because a "a law might appear to be generally applicable on the surface but not be so in practice due to exceptions for comparable secular activities."[4] *Id.* "Do the four [categories] of exceptions in the [ordinance], and the kinds of [exceptions] allowed, remove them from the safe harbor for generally applicable laws? We think so." *Id.* "At some point, an exception-ridden policy takes on the appearance and reality of a system of individualized exemptions, the antithesis of a neutral and generally applicable policy and just the kind of state action that must run the gauntlet of strict scrutiny." *Id.* at 413-414.

68. The Ordinance thus constitutes a violation of Plaintiffs' Free Exercise rights.

69. Plaintiffs therefore seek declaratory judgment and injunctive relief for the foregoing violations, as well as reasonable attorney fees and costs under 42 USC 1988.

**COUNT IV – KRS 446.350 – Violation of the Kentucky Religious Freedom Restoration Act**

70. Plaintiffs reincorporate the preceding paragraphs as if fully written herein.

71. KRS 446.350 provides:

Government shall not substantially burden a person's freedom of religion. The right to act or refuse to act in a manner motivated by a sincerely held religious belief may not be substantially burdened unless the government proves by clear and convincing evidence that it has a compelling governmental interest in infringing the specific act or refusal to act and has used the least restrictive means to further that interest. A "burden" shall include indirect burdens such as withholding benefits, assessing penalties, or an exclusion from programs or access to facilities.

---

[4] This case also presents hybrid First Amendment rights, which also triggers strict scrutiny under *Employment Div. v. Smith*, 494 U.S. 872, 881-882 (1990).

72. Defendants have substantially burdened Plaintiffs' freedom of religion, including their right to act in a manner motivated by their sincerely religious beliefs, i.e. sidewalk ministry. Defendants cannot overcome, by clear and convincing evidence, that they have a compelling governmental interest in infringing the specific act or refusal to act and have used the least restrictive means to further that interest.

73. Plaintiffs therefore seek declaratory judgment and injunctive relief for the foregoing violations.

**WHEREFORE**, Plaintiffs' demand judgment against Defendants:

- For declaratory and injunctive relief, including a restraining order, preliminary injunction, and permanent injunction;
- For reasonable attorney fees and costs under 42 USC 1988; and
- For such other relief as this Court may find just and proper.

Respectfully submitted,

/s/Christopher Wiest_____
Christopher Wiest (KBA #90725)
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
513-257-1895
(859) 495-0803 (fax)
chris@cwiestlaw.com

/s/ Thomas B. Bruns_____
Thomas B. Bruns (KBA #84985)
Bruns, Connell, Vollmar & Armstrong, LLC
4750 Ashwood Drive, Suite 200
Cincinnati, OH 45241
(513) 312-9890
(513) 800-1263 (fax)
tbruns@bcvalaw.com
*Attorneys for Plaintiffs*

CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing in the Court's CM/ECF system, this 7 day of December, 2021, and that I will serve same with the summons in this matter.

/s/Christopher Wiest_____
Christopher Wiest (KBA #90725)