Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF KENTUCKY

AT LOUISVILE

CASE NUMBER: 3:21-cv-00367-RGJ


SISTERS FOR LIFE,
INC., et al.,                              PLAINTIFFS,


     vs.


LOUISVILLE/JEFFERSON
COUNTY METRO GOVERNMENT,
et al.,                                    DEFENDANTS.


* * * * * * * *

DEPONENT:        CALEB STEWART

DATE:            January 11, 2022

* * * * * * * *


LEE ANN GOFF, COURT REPORTER


B a r l o w
Raising the Bar
Reporting & Video Services, LLC
620 Washington Street
Covington, Kentucky 41011
(859) 261-8440

```
 1        The videotaped deposition of CALEB STEWART,

 2   taken for the purpose of discovery and/or use as

 3   evidence in the within action, pursuant to notice,

 4   heretofore taken via Zoom, on January 11, 2022, at

 5   9:02 a.m., upon oral examination, and to be used in

 6   accordance with the Federal Rules of Civil

 7   Procedure.

 8                    * * * * * * * *

 9                      APPEARANCES

10

11   REPRESENTING THE PLAINTIFFS:

12   Christopher Wiest, Esq.
     Chris Wiest, Atty at Law, PLLC
13   25 Town Center Boulevard, Suite 104
     Crestview Hills, Kentucky 41017
14        and
     Thomas B. Bruns, Esq.
15   Bruns, Connell, Vollmar & Armstrong, LLC
     4750 Ashwood Drive, Suite 200
16   Cincinnati, Ohio 45241

17   REPRESENTING THE CONSOL PLAINTIFFS:

18   Francis Manion, Esq.
     Geoffrey Surtees, Esq.
19   American Center for Law and Justice
     6375 New Hope Road
20   New Hope, Kentucky 40052

21   REPRESENTING THE DEFENDANTS:

22   John F. Carroll, Esq.
     Natalie Johnson, Esq.
23   Jefferson County Attorney's Office
     200 South Fifth Street, Suite 300
24   Louisville, Kentucky 40202

25   ALSO PRESENT:  Angela Minter, Addia Wuchner
```

1                    I N D E X

2    Examination of CALEB STEWART                 Page

3    BY MR. WIEST:                                  5

4    BY MR. MANION:                               103

5    BY MR. WIEST:                                113

6    BY MS. JOHNSON:                              117

7    BY MR. WIEST:                                120

8

9

10

11                 E X H I B I T S

12

13   Exhibit                                     Page

14   Plaintiff's Exhibit Number 1A                 6

15   Plaintiff's Exhibit Number 1                  15

16   Plaintiff's Exhibit Number 2                  19

17   Plaintiff's Exhibit Number 3                  35

18   Plaintiff's Exhibit Number 4                  53

19   Plaintiff's Exhibit Number 5                  60

20   Plaintiff's Exhibit Number 6                  60

21   Plaintiff's Exhibit Number 7                  62

22   Plaintiff's Exhibit Number 8                  64

23   Plaintiff's Exhibit Number 9                  67

24   Plaintiff's Exhibit Number 10                 68

25   Plaintiff's Exhibit Number 11                 69

```
 1      Plaintiff's Exhibit Number 12              72

 2      Plaintiff's Exhibit Number 13              73

 3      Plaintiff's Exhibit Number 14               74

 4      Plaintiff's Exhibit Number 15               76

 5      Plaintiff's Exhibit Number 16               81

 6      Plaintiff's Exhibit Number 17               82

 7      Plaintiff's Exhibit Number 18               85

 8      Plaintiff's Exhibit Number 19               86

 9      Plaintiff's Exhibit Number 20               87

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    CALEB STEWART

2    called on behalf of the Plaintiff, after having been

3    first duly sworn, was examined and testified as

4    follows:

5                    CROSS-EXAMINATION

6    BY MR. WIEST:

7         Q.    Sir, can you state your name for the

8    record.

9         A.    Caleb Stewart.

10        Q.    And I see by the uniform that you're

11   wearing that you are employed with the Louisville

12   Metro Police Department; fair?

13        A.    That's correct.

14        Q.    Okay.  What is your duties with respect

15   to Louisville Metro Police Department?

16        A.    I am a lieutenant in the downtown area

17   patrol.

18        Q.    Okay.  Does that area include 136 West

19   Market, also known as the EMW Women's Clinic?

20        A.    Yes, it does.

21        Q.    Okay.  I'm going to share with you --

22   hopefully you can see the little chat box.  I'm

23   going to share my document exhibits by that chat

24   box on the right.  And I'm going to go ahead and

25   share the first exhibit that we've got today.

1           This is the deposition notice for you

2    and the topic list.  Actually it's not a

3    deposition notice for you, it's a deposition

4    notice for Louisville/Metro Government and

5    there's a topic list attached to that.  Have you

6    had a chance to review this particular notice

7    before beginning this deposition?

8           (Plaintiff's Exhibit Number 1A

9           was marked for identification.)

10   A.    Yes, I have.

11   Q.    And are you familiar with and prepared

12   to talk about all of the topics that are

13   contained on this list?

14   A.    Yes.

15   Q.    Okay.  I want to begin, just backing up,

16   with the EMW Women's Clinic that's located on

17   West Market.  You're aware that is, among other

18   things, that they are an abortion clinic;

19   correct?

20   A.    Yes.

21   Q.    And there are certain hours that they

22   are in operation and there are certain hours that

23   they are not in operation; right?

24   A.    That sounds correct.

25   Q.    Okay.  They're -- when they're in

1        operation, out in front on the sidewalk there are

2        individuals known as clinic escorts.  Are you

3        familiar with them?

4             A.   Yes, I am.

5             Q.   And they wear, I think, you know, vests

6        that identify them as clinic escorts?

7             A.   I'm sorry.  You cut out for just a

8        second.  Can you repeat that?

9             Q.   Yeah.  They wear vests that identify

10       themselves as clinic escorts?

11            A.   Yes.

12            Q.   Okay.  We're going to talk about them

13       more in a couple minutes, but one of the -- one

14       of the concepts that I want to discuss with you

15       today is that at times, and maybe frequently,

16       there are protesters that are out front at that

17       clinic as well; correct?

18            A.   Yes.

19            Q.   And there are also individuals that

20       include my clients in this case that engage in

21       what they call sidewalk ministry.  Are you

22       familiar with that?

23            A.   I am.  I'm vaguely familiar with the

24       concept, yes.

25            Q.   Okay.  We're going to talk a lot today

1    about the concept of what I am going to use the

2    term to describe protesters and, and distinguish

3    that from what I am going to call sidewalk

4    counselors.  And let me tell you the differences

5    as I'm using the nomenclature so that we can have

6    a meaningful discussion today.

7              The protesters are there primarily to

8    protest the activities inside the clinic.  At

9    times they will show up with loudspeakers, we're

10   going to talk about that today.  The sidewalk

11   counselors generally are not -- actually never --

12   they are not out there to yell, to scream.  They

13   are attempting generally to approach the

14   individuals that are walking in and to try and

15   dissuade them from engaging in the activity

16   inside, namely to obtain abortion services.

17             And so as we talk about protesters, I am

18   referring to the individuals with the

19   loudspeakers that are there to protest the

20   activity.  As we talk today about sidewalk

21   counseling, I am talking about the individuals

22   that are attempting to approach the folks that

23   are walking inside and have a soft conversation.

24   So, so that we're at least talking about the same

25   nomenclature.

1              And I'm just curious, sir, before I

2    continue, have you observed both activities on

3    that sidewalk?

4         A.   Yes, I have.

5         Q.   Okay.  How often have you observed --

6    let me back up.

7              Have you ever observed anyone using

8    loudspeakers or amplification devices out on that

9    sidewalk?

10        A.   Yes, I have.

11        Q.   How often does that occur?

12        A.   I'm sorry.  Can you repeat that?  The

13   audio feed --

14        Q.   Yeah.  How often have you observed that

15   to occur?

16             MR. CARROLL:  Mr. Wiest, we're having

17   some trouble with the audio feed all of a sudden.

18   It's, it's like it's -- I don't know.  I'm not

19   really sure what the -- what the problem is, but

20   it's -- you're going in and out.  Maybe it's

21   that --

22             MR. WIEST:  Is anyone -- am I -- am I --

23   is my examination being broken up for anyone else

24   or is it just on Louisville's end?

25             MR. MANION:  Not here.

```
 1              MR. WIEST:  Okay.

 2              MR. BRUNS:  Yeah, not here, Chris.

 3              MR. WIEST:  Okay.  Mr. Carroll, we'll

 4      give you a minute, maybe we can see if we can fix

 5      that.

 6              MR. CARROLL:  Yeah.

 7                      (Off the record.)

 8  BY MR. WIEST:

 9      Q.    Okay.  Lieutenant Stewart, my question

10      was, and I think you indicated you had previously

11      observed individuals with amplification devices

12      and loudspeakers down at the EMW Clinic; right?

13      A.    Correct.

14      Q.    How often have you observed that?

15      A.    I would say it would probably be a safe

16      assumption to say on a weekly basis.  At some

17      point throughout each week, most likely I've seen

18      that.

19      Q.    Let me back up.  My understanding, and

20      you can tell me if this is your understanding as

21      well, is that the clinic's most busy day and

22      hours happens to be Saturdays, and in particular

23      Saturday mornings; would you agree?

24      A.    Yes.  I would agree with that.

25      Q.    And would you agree that generally that
```

1    is when we see the loudspeakers also come in with

2    the -- with the protesters?

3         A.   I'm sorry, let me back up for

4    clarification.  When you say busy, are you

5    referring to traffic in and out of the clinic or

6    people outside?

7         Q.   Both.

8         A.   Okay.  I don't know that I could say

9    that the clinic is busiest on Saturday.  And I'm

10   not saying that's not true, but I don't think I

11   could speak to that one way or the other, which

12   day they're the busiest, but --

13        Q.   Okay.

14        A.   -- I think it would definitely be true

15   to say there's more people outside on Saturday

16   mornings than any other day.

17        Q.   Okay.  And pretty much every Saturday

18   morning there's someone out there with a

19   loudspeaker; would you agree?

20        A.   I would say -- I would say it would be

21   safe to say the majority of Saturdays, yes.

22        Q.   Okay.  If someone wanted to have a close

23   intimate conversation with an individual that was

24   entering or -- entering the clinic, would the

25   loudspeaker and the presence of the loudspeakers

1    make that more difficult?

2         A.   I think it would be safe to say it would

3    if they're in close proximity to them.

4         Q.   Well, and that's the other point.   To

5    have that intimate kind of conversation, one

6    would have to get closer with the presence of the

7    loudspeakers; would you agree?

8         A.   Yes.   If they're -- if they're close to

9    the person with the loudspeaker that would make

10   sense.

11        Q.   Right.   And the loudspeakers, as you

12   observed them, have been just a couple feet from

13   the entrance of the clinic, you know, let's say

14   usually within 30 -- 30 feet of the entrance of

15   the clinic; right?   That's usually where they set

16   up?

17        A.   Yes.

18        Q.   Okay.   And so to have an intimate

19   conversation with someone entering or exiting the

20   clinic, that would be hampered by the presence of

21   the loudspeakers; fair?

22        A.   I believe so, yes.

23        Q.   And you would have -- if you wanted to

24   have that kind of conversation, you would have to

25   get closer to the individual that was entering or

Page 13

1      exiting the clinic; correct?

2          A.   Yes.

3          Q.   Okay.  I am curious, how often are

4      you -- how often have you been down at the EMW

5      Clinic to observe the activities at the clinic

6      and, in particular, on the sidewalk out front?

7          A.   I would say almost on a daily basis I

8      will drive by the clinic.  As far as getting out

9      on foot and being there in person, it's typically

10     just going to be when we get a call for service

11     there.

12         Q.   Okay.  Are those calls for service

13     typically coming from the clinic or the Marshalls

14     that operate it?

15         A.   Yes.

16         Q.   Okay.  So there's another concept we're

17     going to talk about today, and then we're going

18     to get into some exhibits.

19              Have you witnessed the shuttle

20     operations that the clinic conducts in connection

21     with shuttling the patients up to the front of

22     the clinic?

23         A.   I have to the extent that I've observed

24     people being dropped off by a vehicle that has

25     some kind of a marking on it that indicates it's

Page 14

1    a shuttle.

2        Q.    And typically it's an orange marking

3    that's marked shuttle; right?

4        A.    I'm afraid I can't recall exactly what

5    color it is or --

6        Q.    And you're familiar with the shuttles,

7    what they do in terms of picking the patients up

8    and dropping them off directly out front into

9    what is now the buffer zone; right?

10       A.    Yes.

11       Q.    Okay.  Have you ever taken the time to

12   observe the amount of time that it takes from the

13   time that someone is dropped off with the shuttle

14   to the time that they're inside the door of the

15   clinic?  Have you ever timed that?

16       A.    I've never timed it.  I -- I've observed

17   it take place.

18       Q.    Would you say that that's a very, very

19   quick operation, usually under ten seconds?

20       A.    I would say from the time they exit the

21   vehicle till they get in the front door, that

22   would be a pretty safe estimate.

23       Q.    Okay.  And we're going to look at some

24   video today to show some of that, but I just -- I

25   wondered what your experience was before we look

Page 15

1    at exhibits.

2           I want to -- and we're going to look

3    at -- I think it would be appropriate at this

4    point to go ahead and look at the first exhibit

5    that I've got for you today.  These were -- there

6    it goes.  This is a big packet, I'll represent to

7    you was produced in this matter by your counsel.

8    And I'll give you a minute, just tell me when

9    you've got that up.

10                 (Off the record.)

11          MS. JOHNSON:  We have the document up.

12          (Plaintiff's Exhibit Number 1

13           was marked for identification.)

14     Q.    Okay.  Lieutenant, I'm looking at, it

15    looks like the first page of this exhibit is a --

16    a report of number of incidents at different

17    hospital facilities in the Louisville area; is

18    that fair?

19     A.    Yes, it appears so.

20     Q.    Have you seen this exhibit before?

21     A.    No, I have not.

22     Q.    But you have no reason to question the

23    data that counsel for the city has put into the

24    record in this case; right?

25     A.    You're stating that counsel for the city

1      put this in the record?

2          Q.   Yes, sir.  I will represent to you that

3      this is part of a filing that they made.

4          A.   Okay.  Yes.  Yeah, I have no reason to

5      doubt it.

6          Q.   Okay.  Are you familiar with calls for

7      service at University Hospital?  Is that within

8      your area or not?

9          A.   To some extent, yes.

10         Q.   Okay.  Significantly more calls for

11     service at University Hospital than at the EMW

12     Women's Clinic?

13         A.   I'm sorry.  Are the EMW statistics on

14     this page?  I'm only seeing --

15         Q.   They are.  They are number 16.

16         A.   -- the first page.

17         Q.   Yeah, they're number 16 at the bottom.

18         A.   Okay.  I hadn't gotten that far.

19              Yes, I can see that.

20         Q.   Okay.  All right.  If we go to the

21     second page of this exhibit, this is the calls

22     for service at EMW, 136 West Market Street, from

23     March 1st, 2019 to November 15th, 2020.  Do you

24     see that?

25         A.   Yes, I do.

1        Q.   And again, I'll represent to you that

2   this was part of a filing that the counsel for

3   the city made.  And I see domestic trouble,

4   burglar alarms, investigation, general trouble

5   calls, disorderly persons.  Is this pretty

6   typical for what -- for what the city is seeing

7   in terms of calls for service at EMW?

8        A.   Yes.

9        Q.   And when it says clear with no report,

10  does that mean that there was no incident that

11  was found or that there was no one that was

12  cited?

13       A.   It means that no report number was

14  associated with the call for service.  So no

15  police report was taken.  It could be because

16  there was no evidence of one found or it could be

17  that whoever the alleged victim was did not want

18  to file a report.  But, yeah, it means no -- no

19  police report was filed.

20       Q.   Okay.  And when we see a report taken,

21  that means we do have some sort of police report

22  associated with the call; right?

23       A.   Correct.

24       Q.   Okay.  I see an attempt to locate.  What

25  does that mean?

1        A.    So that's kind of a call for the

2   sergeant to make.  If there is a call for service

3   that comes in and they opt to not dispatch a

4   specific officer to it, they will put out a

5   attempt to locate, so it's kind of like an -- let

6   all the officers in the area know what is going

7   on and that that's something that if they come

8   across, they'll be familiar with it.

9        Q.    Let me ask, sir, if police officers

10  would have witnessed any crimes occurring at EMW,

11  would it be fair to say that they would take

12  appropriate action including criminal action if

13  they thought it was appropriate?

14       A.    Yes, if they thought it was appropriate.

15       Q.    Okay.  In the same period, if you go

16  down to the fourth page of this exhibit, I see a

17  single arrest for trespass on December 14th,

18  2019.  Do you see that?

19       A.    Just one second.

20       Q.    Sure.

21       A.    I don't see -- I mean, I see an incident

22  there.  I don't necessarily -- I see --

23       Q.    Look at page 3.  It says -- it's the

24  fourth page down on this exhibit.  It's 4 of 7

25  and it's got LMPD arrests -- at the top it says

Page 19

1      page 3 of 4, 136 West Market Street.

2          A.    Okay.  Yes.  Yes, I see that page.  I

3      guess my only issue is you said there was an

4      arrest that was made.  And I think that could

5      indicate that there was a citation issued as --

6      it could be a citation issued or an arrest being

7      made.

8          Q.    Okay.  It's either a citation or an

9      arrest.  Is the absence of any other arrests or

10     citations that -- that would suggest that there

11     was no other cause to arrest anyone or issue a

12     citation during this particular period; fair?

13         A.    Correct.

14         Q.    Okay.  All right.  I think I'm done with

15     Exhibit 1.  I want to look at Exhibit 2 with you.

16     I'm going to upload that as well.  It's going to

17     take just a second, it's 4.5 megabytes.  It's

18     getting there.  And I'll give you a minute and

19     your counsel can tell us when you guys have that

20     open.

21             (Plaintiff's Exhibit Number 2

22              was marked for identification.)

23             MS. JOHNSON:  All right.  It's up.  We

24     have the exhibit up.

25     BY MR. WIEST:

```
 1          Q.   Okay.  Sir, we're going to go through --
 2     I will represent to you that your counsel
 3     produced in this case the arrest reports at or in
 4     the vicinity of EMW Clinic from, it looks like at
 5     least 2013 to the present.  And I wanted to talk
 6     about them with you, just to kind of go through,
 7     it looks like about seven or eight years of
 8     criminal history.  And I will tell you, I -- I
 9     pulled the arrest reports.  There were other
10     reports that were there, but I just looked at the
11     arrests.
12               And I -- and I understand from your
13     testimony a minute ago, these might not actually
14     be an arrest, but they could be a citation; is
15     that fair?
16          A.   I know the one on the -- the last
17     exhibit that would have been the case.  I'm not
18     positive I'm familiar with this format that I'm
19     looking at right here.
20          Q.   Okay.
21          A.   I mean, it's not the type of paperwork I
22     look at.  Sometimes an arrest refers to a
23     citation arrest, which is where just a citation
24     is issued.
25          Q.   Okay.
```

1          A.    So I'm afraid I can't be a hundred

2     percent sure on that.

3          Q.    Yeah.  We're going to go through these,

4     and obviously we're here to talk about a buffer

5     zone ordinance today, and we're going to look at

6     that in a minute.  But, but prior to the

7     enactment of that ordinance, there was -- and

8     we're going to look at these calls for service,

9     or these arrest reports -- there were issues

10    going on around the clinic.  And one of the

11    things I wanted to talk about today with you are

12    the kinds of activities that were generating

13    these arrests that we see.

14          And I will tell you I -- I printed out

15    these arrest reports.  I did not print out, you

16    know, each necessary -- you know, necessarily the

17    call for service because if it didn't generate an

18    arrest -- and maybe you can confirm this, an

19    officer wasn't either able to confirm the

20    criminal activity or did not believe that it

21    warranted an arrest or it might not support a

22    prosecution.

23          There's a lot of reasons, and maybe

24    others that you could talk to me about, about why

25    an arrest or a citation might not be issued;

1       right?

2            A.    Correct.

3            Q.    Okay.  Let's look at this first one,

4       this is an Antonio Colindres, it looks like it

5       was in May of 2013.  And he was -- if you go to

6       the second page -- he was trying car and building

7       handles.  Do you see that?

8            A.    Yes, I do.

9            Q.    You would agree that that has nothing to

10      do with blocking clinics or ensuring access to

11      the EMW Clinic; right?

12           A.    Yeah.  It appears it does not.

13           Q.    Okay.  Let's look at the next one.  And

14      this -- if you go down to page 3, this is a James

15      Soderna.  And this was either an arrest or a

16      citation -- I think it might have been an

17      arrest -- on May 13th, 2017, at 8:15 in the

18      morning.  And he was charged with criminal

19      trespassing and resisting.

20                And if you go to the narrative of the

21      second page, he was sitting in front of the door,

22      blocking the entrance to the EMW Women's Surgical

23      Clinic, refusing to move.  Do you see that?

24           A.    Yes, I do.

25           Q.    Okay.  Just to be clear, there were

Page 23

1    existing laws on the books that allowed for --

2    and we've seen what he's been charged with --

3    that allowed for him to be arrested for blocking

4    the clinic access; right?

5         A.    In this case I would say he was arrested

6    for trespassing, meaning that --

7         Q.    Right.

8         A.    -- he was on their property and wouldn't

9    leave.

10        Q.    Right.  And there's a walkway that

11   separates the sidewalk to the very front door of

12   the clinic; right?  It's -- I know I haven't

13   measured it.  You know, frankly I'm afraid to

14   measure it, given the buffer zone ordinance, I

15   don't want to be arrested or cited but, you know,

16   it's maybe 10 to 15 feet in length?  I -- maybe

17   you could tell us how long that is from the door

18   to the sidewalk?

19        A.    Yeah.  I mean, I've never measured it

20   myself, but I would say a rough estimate of ten

21   foot, yeah.

22        Q.    Okay.  And in any event, this -- to

23   actually block the door, you would have to be on

24   the clinic property itself; right?

25        A.    Correct.

1      Q.    Okay.  And he, in fact, was doing that.

2    He was asked to leave, he refused, and so he was

3    arrested for trespass; right?

4      A.    It -- it appears so.

5      Q.    Is there any reason to believe that that

6    would not have been effective in at least dealing

7    with this individual?

8      A.    I'm sorry, can you rephrase the

9    question?

10      Q.    Yeah.  Is there any reason to believe

11    that, at least in terms of this individual

12    blocking the door to the clinic, that that arrest

13    would not be sufficient to appropriately deal

14    with him?  The arrest for trespass?

15      A.    No, I believe that would be sufficient.

16      Q.    Okay.  Let's go down and look at number

17    five.  This is an Austin Hemze, and it was on

18    December 12th, 2016.  It looks like it's in the

19    evening, about 7:50 in the evening.  And if we

20    look at the narrative, that was just a bench

21    warrant and tampering with evidence; right?

22      A.    Yes.

23      Q.    That has nothing to do with the clinic

24    or access to the clinic; correct?

25      A.    Well, I don't think I can -- those

Page 25

1    specific charges, no, but I can't speak to what

2    caused the officers to be there.

3        Q.   Okay.  But it says that they were

4    serving a warrant under charge one.

5        A.   Yes, but I mean, typically there's going

6    to be a reason why officers came in contact with

7    the person that's unrelated to the warrant

8    itself.

9        Q.   Okay.

10       A.   So I'm assuming they were called to that

11   location for some reason, got that individual's

12   information for some reason, and then it turned

13   out he had a warrant.

14       Q.   Okay.  If you go down to the seventh

15   page of this exhibit, there's an Elizabeth

16   Crawford.  Tell me when you're there.

17       A.   Okay.  We're there.

18       Q.   It's December 1st, 2017, 8:12 in the

19   morning.  And if you go to the narrative, she was

20   refusing to leave.  She was asked by the

21   clinic -- by the employees of the clinic and the

22   officers to leave and she refused and she was

23   charged with trespassing; correct?

24       A.   Yes.

25       Q.   Okay.  Is there any reason to believe

Page 26

1      that that response was not -- the trespassing

2      arrest was not sufficient to deal with her and

3      her blocking the clinic access?

4          A.   No.

5          Q.   All right.  Go down to the ninth page,

6      the report on my client, Ms. Minter.  I'm not

7      going to get into the background of this

8      particular charge, I think it's still pending,

9      but in any event it was cleared by an arrest with

10     a criminal trespass, right, charge?

11         A.   I believe -- I'm a little bit familiar

12     with this one.  I believe that a citation was

13     issued, I think.

14         Q.   Okay.  Fair enough, I think you're

15     right.  So a citation was issued.  And my

16     understanding is she was actually physically

17     inside the clinic itself; right?

18         A.   I -- I believe so.

19         Q.   Yeah.  She had come in.  I think her

20     story is that she was told to go in to speak with

21     management --

22              MR. CARROLL:  Excuse me.

23         Q.   -- but I think there's a dispute about

24     that.

25              MR. CARROLL:  I'm going to place an

```
 1      objection --
 2           Q.   There's no --
 3                MR. CARROLL:  I'm going to place an
 4      objection.
 5                MR. WIEST:  That's fine.
 6  BY MR. WIEST:
 7           Q.   There is no reason to believe that --
 8      that that arrest wasn't sufficient to deal with
 9      the situation -- or the citation wasn't; correct?
10           A.   I'm not -- I'm not sure.  I would think
11      if someone's arrested and taken to jail, then
12      clearly they're not there anymore.  If they're
13      issued a citation, it would just depend on their
14      actions afterward.
15           Q.   Okay.  As you sit here today, are you
16      aware of any reason to believe that that citation
17      wasn't sufficient to deal with the situation?
18           A.   Not that I'm aware of.
19           Q.   Okay.  Let's go down to the twelfth
20      page.  This is a Lakiesha Oliver and it's a
21      charge from 8/31/13 -- actually, there's a number
22      of charges.  It looks like there was a wanton
23      endangerment, some other charges.  And this deals
24      with someone driving in the vicinity of West
25      Market Street without a license, if you look at
```

Page 28

1      the narrative, do you see that, among other

2      things?  There's a lot of things that were going

3      on there.  And it looks like some kind of wreck

4      happened with respect to the vehicle.

5            Tell me when you're there.

6      A.    Yes, I'm there.

7      Q.    Okay.  You -- you agree that's a fair

8      characterization of this citation?

9      A.    Yes.  It appears so.

10     Q.    This has nothing to do with the clinic,

11     blocking the clinic, or access to the clinic;

12     right?

13     A.    It does not appear that it does.

14     Q.    Okay.  Let's look at page 14.  This is

15     Timothy Haste on December 15th, 2015 at 9:40 at

16     night.  With a criminal mischief e-warrant;

17     right?

18     A.    Yes.

19     Q.    As you sit here today, do you have any

20     reason to believe that this had anything to do

21     with the clinic, blocking the clinic, or access

22     to the clinic?

23     A.    No.  I mean, I don't have any knowledge

24     of what it was at all.

25     Q.    Okay.  All right.  There's another issue

1    with Mr. Haste.  It looks like he was actually

2    picked up on a warrant from the -- from the one

3    that starts on page 16.  Tell me when you're

4    there.

5              That December arrest looks like it's

6    actually -- I wasn't trying to trick you -- from

7    this November report, 11/11/2015.  Starts on page

8    16 of the exhibit.  Tell me when you're there.

9        A.    Okay.  I'm on page 16.

10       Q.    Okay.  And if you look at the narrative,

11   it looks like this was an individual at night who

12   was in a dark hoodie and he broke the front glass

13   door of the clinic.  Looks like he was trying to

14   hide and he was protesting the clinic.  I guess

15   he had also told people he was going to burn the

16   clinic down.  Do you see that?

17       A.    Yes, I see that.

18       Q.    In any event, he was charged with

19   criminal mischief and it looks like he was

20   arrested for that?

21       A.    Okay.  It -- based on the previous one,

22   it looks like maybe a -- I was going to say a

23   warrant was taken and he was arrested but I don't

24   know if that was related or not.

25       Q.    Okay.  Is there any reason to believe

1    that this response was insufficient to deal with

2    Mr. Haste?

3         A.   No.

4         Q.   All right.  It looks like there was

5    another issue with him maybe about a month later.

6    Go down to page 18.  It looks like on December

7    4th, 2015, he was charged with criminal

8    trespassing-3rd and harassment.  Do you see that?

9         A.   Yes.

10        Q.   Okay.  So do you know, was that just

11   getting him picked up from the prior issue that

12   we looked at?

13        A.   I -- I don't know.

14        Q.   Okay.

15        A.   Since it was a warrant, it assumably

16   would have been something prior.

17        Q.   Okay.  All right.  If we go down to the

18   20th page of this exhibit, this is a -- it looks

19   like it's related to an altercation at the

20   abortion clinic between the victim and the perp.

21   Upon leaving the clinic, the victim is pregnant

22   with the perp's child.  Both victim and perp deny

23   any physical altercation, but this dispute

24   appears to relate to individuals -- an individual

25   attempting to obtain service at the clinic and

1    perhaps the father of the child.  Would you

2    agree?

3         A.   Give me just a second to read it.

4         Q.   Yeah, absolutely.

5         A.   Okay.  I've read the narrative.

6         Q.   Okay.  This is an individual who was

7    attacked by the father of their child because she

8    chose not to get the abortion; right?

9         A.   Yes, it appears so.

10        Q.   And that does not -- and by the way, the

11   person that called in that request for assistance

12   for this victim was Angela Minter; do you see

13   that?

14        A.   Yes, I do.

15        Q.   And -- and just to be clear, that does

16   not deal with access to the clinic or the ability

17   to access the clinic; right?

18        A.   No, I don't think so.

19        Q.   Okay.  If we go down to the 21st page,

20   there's Mr. Wainscott.  Tell me when you're

21   there.

22        A.   We're on -- we're on 21.

23        Q.   Okay.  And this was November 17th, 2016.

24   It looks like there was some terroristic

25   threatening, harassment, and disorderly conduct.

Page 32

1          There were some threats, it looks like between --
2     if I look at the narrative, this individual and
3     some of the clinic escorts.  Do you see that?
4          A.   Yes, I do.
5          Q.   Okay.  And then this individual was
6     cleared by arrest and there were three charges
7     that were leveled against him; right?
8          A.   Yes.
9          Q.   Any reason to believe that that was not
10    a sufficient response to dealing with this
11    particular individual?
12         A.   No, not that I know of.
13         Q.   Okay.  If you look at Mr. Hemze on the
14    23rd page, this looks like it was -- date of
15    arrest, or maybe it was a citation, on December
16    12th, 2016, at 19:50.  And this says the officer
17    received a call on listed suspect who was trying
18    to pull listed victim out of her vehicle.
19              Do you see that on the narrative?
20         A.   Yes, I do.
21         Q.   Okay.  Any reason to believe that that
22    had anything to do with access to the clinic?
23         A.   I don't know if there's enough --
24         Q.   Okay.
25         A.   -- information to determine that.

1          Q.    It may be that the individual was trying

2     to pull the person out to obtain an abortion.  We

3     don't know; right?

4          A.    Yeah.  Correct.  I, I have no idea.

5          Q.    In any event, this has nothing to do

6     with blocking the clinic or, actually, access to

7     the clinic though; right?

8          A.    It doesn't appear to.

9          Q.    Okay.  All right.  Let's -- there's

10    actually a narrative on the same individual on

11    the next page, on 25, trying to pull a female out

12    of a silver vehicle with temp tag; right?

13         A.    Yes.

14         Q.    Victim stated to officer listed

15    perpetrator was yelling at the victim for losing

16    his phone and money.  Based on that, is it fair

17    to say that this has nothing to do with the

18    clinic or access to it?

19         A.    Well, I mean, I would assume that they

20    were possibly there because of the clinic.  I

21    mean, I don't -- I don't know.

22         Q.    Okay.  We don't know.  But it -- in any

23    event, it wasn't somebody blocking the clinic or

24    it wasn't an access issue to the clinic; right?

25         A.    Correct.  It does not appear to be.

Page 34

1          Q.    Okay.  If we go down to the next one,

2     this is a 2017.  This is Mr. Green, Darrell

3     Green, this is on page 26 of the exhibit, July

4     26, 2017, at 11:40.  This was a criminal mischief

5     charge and it looks like it was a warrant pickup;

6     right?

7          A.    Yes, it appears so.

8          Q.    Okay.  No reason to believe that that

9     had anything to do with access to the clinic or

10    obtaining services of the clinic?

11         A.    Well, once again, I don't know why the

12    officers were called there initially.  I would

13    assume they received a call for service.

14         Q.    Okay.

15         A.    And then they came in contact with the

16    subject and he had a warrant.

17         Q.    Okay.  If we look at the next page, this

18    is a domestic abuse issue on page 28.  Tell me

19    when you're there.

20         A.    Yes, we're on 28.

21         Q.    Okay.  And if we go down to the

22    narrative, it looks like there was some domestic

23    abuse that arose over a boyfriend and the

24    victim -- over her obtaining an abortion; right?

25         A.    Give me just one second to read it.

Page 35

1          Q.   Yes.

2          A.   Okay.  I've read it.

3          Q.   Okay.  Was this individual charged?

4          A.   I would assume -- well, it seems to be a

5     little conflicting.  It says domestic duties,

6     typically means there are no charges, but then it

7     says terroristic threatening, which indicates

8     that there is.

9          Q.   Right.

10         A.   And there would be an accompanying

11    citation.

12         Q.   So sir, I'll represent to you it was not

13    produced to us, but I did run this individual on

14    CourtNet and there was a terroristic threatening

15    charge.  So assuming that that's true, there's no

16    reason to believe that that wasn't a sufficient

17    response to this incident; right?

18         A.   It -- it appears so.

19         Q.   All right.  We're going to look at what

20    I have marked as Exhibit 4 next -- oh, I'm sorry.

21    Exhibit 3.  It would help if I could count.  Tell

22    me when you're there.

23              (Plaintiff's Exhibit Number 3

24               was marked for identification.)

25         A.   Okay.  We have it pulled up.

1        Q.   And I'll represent to you, sir, if you

2    look, there's two different reports here.  The

3    first was dated March 21st -- I'm sorry, March

4    24th, 2021.  The second report dated April 5th,

5    2021, that's on the fourth page down in the

6    exhibit.  So I just want to -- we're going to go

7    through each of them in turn.

8        A.   Okay.

9        Q.   This is a report that you generated to

10   Major Matt Meagher, the first division commander,

11   on March 24th, 2021, the first page of this

12   exhibit; right?

13       A.   Yes.  It's Major Matt Meagher.

14       Q.   Matt Meagher, okay.  And just to be

15   clear, you -- you authored this report; right?

16       A.   Yes.

17       Q.   Okay.  And you indicate that on

18   Saturday, March 20 -- March 20th, 2021, Sergeant

19   Christina Beaven, Officer Jennifer Del Valle, and

20   Officer Brigid Christiansen were detailed to

21   observe and take appropriate action directly

22   outside the area surrounding the EMW Women's

23   Surgical Center located at 136 West Market Street

24   in Louisville, Kentucky.

25            You indicate that there are members of

1       the community that regularly gather outside of

2       the EMW Clinic in opposition to the procedures

3       that take place inside.  And you've been -- you

4       indicate that there's been concern that the

5       actions of these protesters go beyond that which

6       is protected by law, primarily the First

7       Amendment to the U.S. Constitution.  And then you

8       list a number of potential statutes and

9       ordinances that may be potentially violated by

10      the activities going on on the sidewalk; fair?

11          A.   Yes.

12          Q.   Okay.  The LMPD members arrived on the

13      scene at 0700 and remained until approximately

14      10:30; correct?

15          A.   Yes.

16          Q.   And I think you, you indicated this

17      earlier when we began speaking, but this was on a

18      Saturday morning, which is one of the busier

19      mornings in terms of the activities on the

20      sidewalk outside the clinic; right?

21          A.   Yes.

22          Q.   Your officers positioned themselves

23      directly across Market Street from the EMW Clinic

24      to provide an optimal view of the area; right?

25          A.   Yes.

Page 38

1          Q.    And Sergeant Beaven activated her WVS

2     eight times to capture what was taking place;

3     right?

4          A.    Yes.

5          Q.    And the WVS, is that -- that's a camera

6     system; right?

7          A.    Correct.

8          Q.    Okay.  Did you yourself review the

9     camera footage?

10         A.    Yes, I did.

11         Q.    Okay.  And while she was working the

12    detail, she contacted you by phone to report the

13    observations and to get clarification relating to

14    enforcement action; right?

15         A.    Yes.

16         Q.    The city -- and I know we're going to

17    look at, in a minute, some emails.  The city had

18    received complaints from Ona Marshall and Ernest

19    Marshall, who operate the clinic, about the

20    activities on the sidewalk; right?

21         A.    Yes.

22         Q.    And that prompted this particular -- I'm

23    going to call it an investigation, but in any

24    event, and you can correct me as to the

25    characterization if you have a different one, but

1       it prompted the officers to go out themselves and

2       see what happens.  In fact, three officers were

3       dispatched; right?

4            A.   We were directed by our, our chief to

5       conduct these details on Saturday mornings for a

6       period of time.

7            Q.   Okay.  And in fact, the details

8       comprised a bit of an investigation to see what

9       was going on outside the clinic; right?

10           A.   Yes.  I believe that would be accurate.

11           Q.   Okay.  The activity and actions of

12      the -- and I'm just reading from the memo

13      again -- the activities and actions of the

14      protesters that were communicated to Lieutenant

15      Stewart by Sergeant Beaven did not warrant

16      enforcement action based on current understanding

17      of KRS, LMCO, and LMPD common practices; right?

18           A.   Yes.

19           Q.   For instance, Sergeant Beaven asked you

20      if the subject utilizing the microphone with the

21      amplifier or similar device should be charged

22      with a violation of LMCO 99, which is the noise

23      ordinance; right?

24           A.   Correct.

25           Q.   And you told her, no, I don't think we

Page 40

1      should do that, in part because of freedom of

2      speech, in part because of -- someone speaking

3      without an amplifier could be heard more than 50

4      feet away as well, and in part because there's

5      other activities around the city in which

6      amplifiers are used and it could be classified as

7      some sort of selective enforcement possibly;

8      right?

9           A.   Correct.

10          Q.   And so you told her I don't think we

11     should do that.  And by the way, in part that's

12     because there's been amplifiers outside Churchill

13     Downs and outside Jefferson Square Park; right?

14          A.   Yes.  That was part of what played into

15     the decision.

16          Q.   Sure.  And the noise ordinance itself

17     has seven specific examples of violations, but

18     none of it was speech coming from someone on a

19     sidewalk; right?

20          A.   Correct.

21          Q.   Okay.  Let me ask:  There is nothing

22     within the context of the current -- and we're

23     going to look at the buffer zone ordinance in a

24     minute, but there's nothing within the context of

25     the buffer zone ordinance that prohibits people

Page 41

1       from having amplifying devices on the sidewalk

2       outside the buffer zone that would broadcast in

3       and within -- in the immediate vicinity of the

4       clinic currently; correct?

5              A.    Correct.  It does not address that.

6              Q.    Okay.  The next thing that Sergeant

7       Beaven wanted to talk to you about was the

8       protesters utilizing what I call the handheld

9       signs, the handheld -- or the billboards that

10      they have on the sidewalk as well.  That was the

11      second thing she wanted to talk about; right?

12             A.    Yes.

13             Q.    And in that instance, I think you

14      determined that no one had affixed it or attached

15      it to a pole or, or a permanent fixture and so

16      that would not be a violation; right?

17             A.    Yes.  The determination was that it

18      hadn't rose to the level of being affixed.

19             Q.    Okay.  And that's the requirement to

20      violate the ordinance; right?

21             A.    Yes.

22             Q.    And nothing in the current buffer zone

23      ordinance would deal with these board signs;

24      right?  It deals with, instead, a zone around the

25      entrance to the clinic; right?

Page 42

1      A.    I think the signs could potentially play

2    into the ordinance if the signs were in the zone.

3      Q.    Sure.  And in two instances she showed

4    clients being escorted down the sidewalk and into

5    the clinic without being hindered by the signs;

6    right?

7      A.    Yes.

8      Q.    Okay.  She also observed some of the

9    protesters following a client who was being

10    escorted down the sidewalk and into the clinic;

11    do you see that?

12      A.    Yes.

13      Q.    But nobody -- none of the protesters

14    physically blocked the sidewalk; correct?

15      A.    Correct.

16      Q.    And you indicate it's been observed in

17    the past and assumed that the protesters were

18    attempting to talk the client out of entering the

19    clinic; do you see that?

20      A.    Yes.

21      Q.    Are we referring here -- I'm assuming

22    we're not dealing with the people that are

23    yelling at the folks with the loudspeakers or

24    shouting the fire and brimstone, but instead what

25    we previously have referred to as sidewalk

Page 43

1       counseling?

2              A.    That would be my assumption, yes.

3              Q.    Okay.  And you indicate that there will

4       be LMPD personnel conducting a similar detail at

5       this location each Saturday morning for at least

6       the next few weeks; right?

7              A.    Yes.

8              Q.    In conclusion, it seems that most of the

9       activity of the protesters is clearly lawful, but

10      there's some activity that could be interpreted

11      as violations to the city ordinances or perhaps

12      KRS, but it's a fine line and clarification needs

13      to be provided; right?

14             A.    Yes.

15             Q.    Have you received any clarification that

16      anything that was observed on March 21st or, I'm

17      sorry, March 24th, 2021, was a violation of the

18      KRS or city ordinances, the things we've just

19      looked at?

20             A.    I spoke with our legal counsel about

21      some of the issues and was advised, based on what

22      we were observing, it was something we were not

23      going to take action on.

24             Q.    Okay.  All right.  I'm going to look --

25      there's follow-up memo that you do to Major --

Page 44

1      and is it Meagher?

2           A.   Meagher.

3           Q.   Meagher.  Let me write that down.

4      Meagher, but not like the city mayor.  Okay.

5                There's a followup memo that you issued

6      to Major Meagher on April 5th, 2021, and that

7      starts on page 4.  Tell me when you're there.

8           A.   Okay.  We're there.

9           Q.   This was another Saturday morning, April

10     3rd, 2021, and you have the detail officers there

11     from 0730 to 0930; right?

12          A.   Yes.

13          Q.   Were the reason that those hours were

14     chosen because those are really the peak hours in

15     terms of sidewalk activity?

16          A.    It was a combination of that and

17     availability of LMPD personnel.

18          Q.   Okay.  Let me ask:  If EMW wanted to pay

19     for officer details on Saturday mornings or other

20     peak times, would LMPD provide that -- provide an

21     officer?

22          A.   LMPD doesn't provide those type of

23     services.  If someone wants an off-duty officer,

24     that's hired out through like a third party.

25          Q.   Okay.  Does LMPD prohibit off-duty

Page 45

1      officer employment?

2           A.   No.   There are some restrictions, but

3      it's not prohibited.

4           Q.   Okay.   Would the restrictions prohibit a

5      detail outside EMW?

6           A.   I cannot think of any restriction that

7      would prohibit an officer from working there, no.

8           Q.   Okay.   Are they allowed to conduct those

9      details in uniform?

10          A.   You're referring to like an off -- we

11     refer to it as off duty?   Is that what you're

12     talking about?

13          Q.   Yes, sir.   Yes.

14          A.   Yes.   Those -- yes, you would -- in

15     almost all instances, you're required to wear a

16     uniform.   You would have to get special

17     permission to be in plain clothes.

18          Q.   Okay.   And so if EMW wanted to, they

19     could hire off-duty officers to be outside the

20     clinic?

21          A.   Correct.

22          Q.   Okay.   In any event, this was an on-duty

23     detail; correct?

24          A.   Yes.

25          Q.   Could the city continue the detail on

1    Saturday mornings outside the EMW Clinic?

2         A.   By "could," what do you -- could you

3    qualify that?

4         Q.   Is there any reason why the city --

5    well, let me back up.

6              Is there anything that would prohibit

7    the city from continuing this, this detail to

8    have an officer outside the clinic on Saturday

9    mornings?

10        A.   Well, I mean, it's really a manpower

11   issue and, I mean, there's several factors why we

12   don't.

13        Q.   Okay.

14        A.   I mean, it would be feasible for it -- I

15   mean, they could if the proper person made the

16   decision.

17        Q.   Okay.  And so if the chief wanted to,

18   there would be nothing that would keep her from

19   doing that; fair?

20        A.   Correct.

21        Q.   Okay.  In any event, I'm back to April

22   3rd, 2021, 0730 to 0930, they were -- they were

23   at the clinic to take appropriate action related

24   to regular protest activities that take place

25   outside the clinic.  This is the third

Page 47

1      consecutive Saturday morning this type of detail

2      has been conducted; right?

3           A.   Yes.

4           Q.   And in this instance there were about 50

5      people present that seemed to be in opposition to

6      the activities of the clinic.  This was a much

7      higher number than usual.  It's believed that the

8      higher number was due to it being Easter weekend;

9      right?

10          A.   Yes.

11          Q.   And in fact Sergeant Beaven, I'm

12     guessing she probably approached the individuals

13     that were outside and determined what was going

14     on, because she was able to determine that they

15     were from out of town; right?

16          A.   Yeah.  I'm afraid I can't speak to how

17     she determined that.  I, I don't recall.

18          Q.   Okay.  But specifically she was able to

19     identify where they were from.  They were from

20     the Sovereign King Church, which is located in

21     Henryville, Indiana, and another group from

22     the -- from the Reformation Church located in

23     Shelbyville, Kentucky; right?

24          A.   Yes.

25          Q.   And she indicates, while the vast

1    majority of the protesters were not causing

2    problems, there were a few issues that were

3    observed and addressed that had not been observed

4    during previous details; right?

5         A.   Yes.

6         Q.   She said, for instance, there was a

7    large number of protesters on the sidewalk that

8    made it less passable, but there were no

9    instances where a pedestrian was not able to pass

10   through; right?

11        A.   Correct.

12        Q.   There was one individual holding a large

13   sign in the middle of the sidewalk that could

14   have made passage difficult due to there being

15   people on either side of the sidewalk, but the

16   sergeant informed him he needed to move and he

17   immediately complied; right?

18        A.   Yes.

19        Q.   Okay.  There was another instance where

20   the person was standing in front of the canopy

21   that would have made passage difficult for a

22   pedestrian to enter the clinic, but again --

23             MR. CARROLL:  Scroll down.

24             MR. WIEST:  Yeah.  Yeah.  Tell me when

25   you're there.

1           MR. CARROLL:  Yes, we're caught up.

2      Thank you.

3  BY MR. WIEST:

4      Q.   I'm sorry.  There was another instance

5      where a person was standing in front of the

6      canopy that would have made passage difficult for

7      a pedestrian trying to enter the clinic, but

8      there was not an instance observed where a person

9      was impeded from entering, but it seemed as

10     though that could be the case.  And in any event,

11     Sergeant Beaven explained to the person that he

12     needed to stand elsewhere and he complied; right?

13     A.   Yes.

14     Q.   There was one protester who grabbed or

15     touched the arm of a client as she was walking on

16     the sidewalk towards the clinic, but again

17     Sergeant Beaven addressed the issue and told the

18     protester they couldn't do that; right?

19     A.   Yes.

20     Q.   One of the things she says is, Sergeant

21     Beaven was able to determine that local groups

22     that regularly protest outside the clinic were

23     not causing issues; do you see that?

24     A.   Yes.

25     Q.   Are you referring to what we previously

1      have talked about as the sidewalk counselors?

2           A.    I think that that would be an accurate

3      statement, yes.

4           Q.    Okay.  But then -- but some of the

5      groups that only show up on limited occasions who

6      are from out of town were the ones causing the

7      issues.  Are those the protesters that we

8      sometimes see with the loudspeakers?

9           A.    I would say in some cases that would be

10     the case.

11          Q.    Okay.  And, in fact, she said it seems

12     that the groups from Henryville and Shelbyville

13     were causing most, if not all, of the issues;

14     right?

15          A.    Yes.

16          Q.    Okay.  This is an interesting paragraph

17     here and I wanted to discuss it with you.

18     Sergeant Beaven also reported that there is

19     disagreement and sometimes altercations between

20     the local protest groups and the ones from out of

21     town over how the ones from out of town conduct

22     themselves; do you see that?

23          A.    Yes, I do.

24          Q.    What are you aware of in terms of these

25     disagreements between the out-of-town protesters

1      and the in-town sidewalk counselors?

2          A.   My understanding is that there is

3      disagreement about how the different groups

4      conduct themselves.

5          Q.   So you're familiar with the fact that

6      the sidewalk counselors don't appreciate the

7      loudspeakers, that that might impede what they're

8      trying to do?

9          A.   Yes.  They've communicated that to me.

10         Q.   Okay.  Because if someone were to try to

11     have an intimate, you know, caring conversation,

12     the presence of people shouting fire and

13     brimstone in the background might not be helpful

14     to that cause; right?

15         A.   That -- yes, that's what they've

16     communicated to me.

17         Q.   Right.  And in part it -- it is a volume

18     issue.  It's hard to have a soft, intimate

19     conversation when a loudspeaker is going on in

20     the background; right?

21         A.   Yes.

22         Q.   And in part it's also just the

23     messaging, because if you're shouting that

24     somebody is, you know, quote/unquote, going to

25     hell, it's hard to connect with them; correct?

Page 52

1          A.    I believe that's their position, yes.

2          Q.    Right.  And then Sergeant Beaven

3     indicates also that the few instances of

4     protesters making passage on the sidewalk more

5     difficult than they should be, and one time one

6     of the clients was touched on the arm by a

7     protester seemed to be infrequent issues; right?

8          A.    Yes.

9          Q.    And, in fact, she went during the week

10    and observed that there was no -- three different

11    occasions and there was only a handful of

12    protesters and no issues; right?

13         A.    Well, that -- that would have been -- I

14    would have been the one that did that, but yes.

15         Q.    Oh, you did that.  I'm sorry, that was

16    -- you're referring in the first sentence -- or

17    first person.  So you -- you drove by and there

18    was no -- only a handful of protesters and no

19    issues; right?

20         A.    Correct, during the week.

21         Q.    And the first two Saturday mornings of

22    the detail, there were also no issues of concern

23    observed?

24         A.    Correct.

25         Q.    All right.  We're going to look at

Page 53

1      Exhibit 4.  All right.

2                (Plaintiff's Exhibit Number 4

3                was marked for identification.)

4      Q.   All right.  This is another one of your

5      counsel's exhibits.  And I'll represent to you

6      that this is the ordinance regarding the buffer

7      zone.  Tell me when you're there.

8      A.   Yes, we're there.

9      Q.   You're familiar with this ordinance, I

10     take it; correct?

11     A.   Yes, I am.

12     Q.   Okay.  And this is what we have referred

13     to this morning as the buffer zone ordinance;

14     right?

15     A.   Yes.

16     Q.   And I understand that, at least how the

17     city interprets and enforces it, that there's a

18     two-step process.  First the clinic contacts the

19     city and has the buffer zone marked; right?

20     A.   Correct.

21     Q.   And then the police can then go out and

22     enforce the ordinance; right?

23     A.   Correct.

24     Q.   And there's some exceptions to who --

25     and by the way, the buffer zone is a 10-foot zone

1        from side to side and extends from the door of

2        the facility out to the nearest adjacent sidewalk

3        curb.  And again we talked about the width,

4        that's 10 feet; right?

5            A.   Correct.

6            Q.   It's applicable during the facility's

7        posted business hours; right?

8            A.   Correct.

9            Q.   And there are four exceptions to the

10       ordinance; correct?

11           A.   Yes.

12           Q.   And we're going to go through those

13       right now.  The first one are people entering or

14       leaving the facility.  They are exempt from the

15       application of the ordinance; correct?

16           A.   Yes.

17           Q.   The second one is people using the

18       sidewalk or street right-of-way solely for the

19       purpose of reaching a destination other than such

20       facility; right?

21           A.   Yes.

22           Q.   And just to be clear on that exception,

23       if -- if I am a sidewalk counselor, I am not

24       allowed to start on one side of the buffer zone

25       and walk through it to get to the other side;

1    correct?

2         A.   No, I don't believe that would be

3    correct to say that.

4         Q.   So they are allowed to cross the buffer

5    zone to get to the other side of the zone?

6         A.   I've been advised that someone walking

7    through the zone is typically not going to be

8    considered a violation.

9         Q.   Okay.

10        A.   There could be exceptions, such as if

11   someone is pacing back and forth, or maybe they

12   take an unreasonable amount of time to cross it,

13   but I've been told by our legal advisors that if

14   someone is starting on one side of the zone and

15   they're going to the other side of the zone,

16   the -- the purpose of it really doesn't matter.

17        Q.   Okay.  There's an exception for law

18   enforcement, ambulance, firefighting,

19   construction, utilities, public works and other

20   municipal agents within the scope of employment;

21   right?

22        A.   Yes.

23        Q.   And there's an exception for employees

24   or agents of the facility acting within the scope

25   of their employment; correct?

1        A.    Yes.

2        Q.    And that would include what we have

3   previously referred to as the clinic escorts;

4   correct?

5        A.    Yes.

6        Q.    Okay.  One of the -- by the way, have

7   you ever witnessed any of the clinic escorts

8   talking to the patients within the buffer zone?

9        A.    I can't say that I've ever been able to

10  hear a conversation --

11       Q.    Okay.

12       A.    -- or even know that there's a

13  conversation.  I have observed someone -- a --

14  somebody I assume was a patient going through the

15  zone with escorts beside them.

16       Q.    Okay.  There would be nothing that would

17  prohibit the escorts from talking with the

18  patients within the zone; right?

19       A.    No.

20       Q.    No one at EMW has ever told you or

21  informed the police that talking to the patients

22  within the zone is outside the scope of their

23  employment or agency, have they?

24       A.    No one from the clinic has ever

25  communicated that to me.

1      Q.   Okay.  And would it be fair to say that

2    you are one of the primary points of contact in

3    terms of the enforcement of this ordinance?  And

4    I'll just stop the question there.

5      A.   Yes.

6      Q.   Okay.  I mean, you're directing other

7    officers in their enforcement of this ordinance;

8    correct?  It's within the scope of your

9    employment?

10     A.   Well, I would hesitate to say that I

11   direct other officers to take action.

12     Q.   No, that wasn't -- that was not what I

13   meant.  What I meant was that, when it comes to

14   enforcing this ordinance, you are the individual

15   within LMPD who is responsible for directing your

16   subordinates, your sergeants and your officers,

17   regarding how this ordinance is enforced?

18     A.   Yes, I think that would be accurate.

19     Q.   Okay.  If my client were to say that

20   there are frequent conversations that escorts

21   have with clinic patients within the buffer zone,

22   would you have any reason to dispute that?

23     A.   I mean, I don't -- I don't have any

24   knowledge of it.

25     Q.   Okay.  Or if, for instance, she were to

Page 58

1    testify that clinic escorts have told patients

2    that are walking in to ignore the sidewalk

3    counselors and the protesters, would you have any

4    reason to dispute that?

5         A.   I'm sorry, could you repeat that?

6         Q.   Yeah.  If -- if she were to testify that

7    the escorts have told patients to ignore the

8    sidewalk counselors or the protesters, would you

9    have any reason to dispute that?

10        A.   I mean, I don't have any firsthand

11   knowledge of it.

12        Q.   Okay.  And again, there would be nothing

13   that would violate the ordinance for them to do

14   that; correct?  For the escorts to have those

15   conversations?

16        A.   I do not believe the ordinance addresses

17   the escorts speaking to the patients.

18        Q.   Right.  Under the ordinance, the escorts

19   are permitted to speak to the patients; right?

20        A.   I don't see where the ordinance

21   prohibits it.

22        Q.   Okay.  Fair enough.  All right.  And to

23   be clear, since September of this year, the city

24   has, in fact, enforced this ordinance; correct?

25        A.   I'm afraid I'm not exactly sure on the

1      date of when we started enforcing it, but that

2      sounds -- that sounds correct.

3           Q.   In any event, presently and currently

4      the city is enforcing this ordinance; correct?

5           A.   Correct.

6           Q.   And people that violate this ordinance

7      are being given warnings or citations as may be

8      appropriate under the terms of the ordinance;

9      correct?

10          A.   Correct.

11          Q.   You would agree with me that the EMW

12     Clinic has surveillance equipment that they

13     utilize; correct?

14          A.   Yes.

15          Q.   And they have shared that surveillance

16     equipment with, with LMPD in part for purposes of

17     enforcement; correct?

18          A.   Yes.

19          Q.   In those instances, LMPD is able to

20     witness -- and by the way, that was true prior to

21     the buffer zone ordinance also; correct?  They've

22     had surveillance?

23          A.   Yes.  I have no reason to think they

24     didn't have it prior to the buffer zone.

25          Q.   And if they wanted enforcement action

Page 60

1    taken, do they -- do they share any of that

2    footage with the city prior to the enactment of

3    the buffer zone ordinance?

4         A.   I don't have firsthand knowledge of that

5    taking place, but I have heard officers say that

6    they had reviewed security footage previous to

7    the buffer zone.

8         Q.   Okay.  All right.  We may come back to

9    this ordinance, but I'm going to move on to my

10   next exhibit.  Tell me when you're there.

11              (Plaintiff's Exhibit Number 5

12               was marked for identification.)

13        A.   Yes.  We're on the -- page 1.

14        Q.   Right.  This is a -- I will represent to

15   you, sir, this is an approximation of where the

16   zone would be that your counsel produced or filed

17   in this case.  Do you see that?

18        A.   Yes, I do.

19        Q.   Pages 1 and 2.  And actually, because

20   the ordinance is now in effect, we're going to

21   look at another exhibit that I'm going to put up.

22   It's Exhibit 6.  This is a photograph of the

23   buffer zone as it actually exists; correct?

24              (Plaintiff's Exhibit Number 6

25               was marked for identification.)

1      A.    We haven't got it pulled up just yet.

2      Q.    Yes.

3      A.    Okay.  Yes, I see it.

4      Q.    Okay.  And so the buffer zone is the

5   area that is painted in yellow; correct?

6      A.    Yes.  The area in between the two yellow

7   lines.

8      Q.    Right.  Said another way, the two yellow

9   lines mark the boundaries of the buffer zone;

10  right?

11     A.    Correct.

12     Q.    And we know that when we get to the far

13  end of that, where that white line is, that then

14  begins the EMW property; correct?

15     A.    Yes.  That is my understanding.

16     Q.    Okay.  And so if someone were on the

17  other side of the white line, they would be

18  trespassing on the EMW property; right?

19     A.    I mean that would be up to EMW to

20  determine if they're trespassing.

21     Q.    Okay.  We previously have looked at

22  trespassing citations.  The city has previously,

23  and officers have previously arrested people for

24  trespassing within EMW's property; correct?

25     A.    Yes.  I believe so.

1          Q.   Okay.  And that includes in the area

2     that's right in front of the doors.  We looked at

3     the individual that was cited for that; right?

4          A.   Correct.

5          Q.   And then obviously if you're within the

6     two yellow lines, now you're within the buffer

7     zone; right?

8          A.   Currently, yes.

9          Q.   Okay.  All right.  I'm going to look at

10    Exhibit 7.  Your counsel produced this to us, but

11    there are -- and I think we looked at some of

12    these charges.  In terms of activities outside

13    the sidewalk, there -- if lines are crossed and

14    people become disorderly, there are charges that

15    can be lodged against them for that; right?

16              (Plaintiff's Exhibit Number 7

17               was marked for identification.)

18         A.   Yes.

19         Q.   And there's also harassment charges if

20    you cross the line into harassment; right?

21         A.   Correct.

22         Q.   There's a failure to disburse if an

23    officer tells somebody to leave because they're

24    causing trouble, that is also a criminal offense;

25    right?

1        A.    Yes.

2        Q.    There's city ordinances that talk about

3    actually obstructing public ways, if you're

4    actually obstructing the ingress or egress of

5    someone in or out of the clinic, that was already

6    an offense under Louisville Ordinance 97.070;

7    right?

8        A.    I'm -- I only hesitate because you said

9    in and out of the clinic.  I don't -- I know that

10   deals with public ways, but I think that would be

11   private property entering and exiting the clinic.

12       Q.    Okay.  Well, that would be trespassing.

13   But if you were on the sidewalk and you were

14   obstructing someone moving across the sidewalk to

15   try and get in the clinic, that would be a

16   violation of 97.070; right?

17       A.    Yes, I believe so.

18       Q.    Okay.  There's also a blocking the

19   sidewalk ordinance, to obstruct pedestrian

20   traffic, 97.072.  That was another ordinance

21   that's been on the books since at least 1999;

22   right?

23       A.    Correct.

24       Q.    Okay.  And it looks like it may have

25   been amended in 2005, but in any event that's

1      been on the books since prior to the passage of

2      the buffer zone ordinance; right?

3          A.    Yes.

4          Q.    Okay.  There's another ordinance that I

5      think EMW has -- has indicated for violations,

6      99.02, unlawful conduct; right?

7          A.    Yes.

8          Q.    Okay.  There's a disorderly conduct

9      ordinance as well; right?

10         A.    Yes.

11         Q.    Okay.  Then there's a sign placement

12     ordinance we talked about before about affixing

13     signs under 155.23, right, of the Louisville Code

14     of Ordinances?

15         A.    Correct.

16         Q.    Okay.  Exhibit 7.

17             Okay.  Exhibit 8.  This is an email from

18     Laura Landenwich to Chief Shields.  Your counsel

19     has produced it in discovery.  And it -- the

20     subject of it is EMW violations.  Do you see

21     that?

22             (Plaintiff's Exhibit Number 8

23              was marked for identification.)

24         A.    Yes, I do.

25         Q.    And this was an email that was dated

Page 65

1    March 16, 2021; correct?

2        A.    Yes.

3        Q.    This was prior to the passage of the

4    buffer zone ordinance; right?

5        A.    Correct.

6        Q.    And in this email, Ms. Landenwich

7    indicates a number of violations that they see

8    among protesters; right?

9        A.    Yes.

10       Q.    Do you know, sir, was this what prompted

11   your March and April memos and the details that

12   were conducted outside the clinic?

13       A.    I'm afraid I don't know.

14       Q.    Okay.  Your first memo was March 21st --

15   24th, I'm sorry.  Do you remember that?

16       A.    Are you saying do I remember writing the

17   memo?

18       Q.    Well, I'm just -- I'm just confirming

19   the date of the memo that we looked at previously

20   in Exhibit 3, that the first one was March 24th,

21   your first memo to Major Meagher?

22       A.    I don't have it right in front of me,

23   but that sounds correct.

24       Q.    Okay.  And the first time that you did

25   the detail was March 20th; right?

Page 66

1        A.    If that's what the memo says then yes,

2    that would be correct.

3        Q.    Right.  And here, about four days prior

4    to that, on March 16th, Ms. Landenwich, on behalf

5    of EMW, sent the email to Chief Shields; right?

6        A.    Yes.

7        Q.    Okay.  Based on the timing, do you think

8    we could infer that this email from Laura

9    Landenwich prompted the detail outside the

10   clinic?

11       A.    I think we can infer that it may have

12   been a factor.

13       Q.    Okay.  Fair enough.  In any event, we've

14   looked at the March and April memos, you folks

15   did not see out there these violations that Ms.

16   Landenwich contended were occurring; right?

17       A.    I'm not aware of any enforcement action

18   we took in relation to them.

19       Q.    If you saw clear violations of

20   ordinances or laws, is there any reason to

21   believe you would not have taken enforcement

22   action?

23       A.    I think that there were some verbal

24   warnings that were given, and you kind of

25   referenced that Sergeant Beaven, some of the

Page 67

1      action she took as far as, you know, warning

2      people.  So I think a verbal warning is -- could

3      also have been appropriate.

4            Q.    Okay.  Let's go and look at 9.

5                  (Plaintiff's Exhibit Number 9

6                  was marked for identification.)

7            Q.    This is an email by Ms. Marshall to,

8      among other people, Chief Shields.  And I think

9      you're also -- I think it was sent to you on or

10     about September 13th.

11           A.    September 13th, yes.

12           Q.    Right.  She talks about the operation of

13     the shuttle cars; right?

14           A.    Yes.

15           Q.    And I think we talked about that and

16     we're going to look at some video in a minute of

17     these shuttle cars in operation.  She talks about

18     loudspeakers; right?

19           A.    Yes.

20           Q.    And I think you previously confirmed the

21     loudspeakers are present most Saturday mornings;

22     right?

23           A.    Yeah, I think the majority would be

24     accurate.

25           Q.    Okay.  And she shares some -- we're

Page 68

1       going to look at some photos in a minute, but it

2       looks like there is an individual, Mr. Schneider,

3       who is etching sidewalk -- crosses into the

4       public sidewalk with chalk.  Are you familiar

5       with that activity?

6           A.   Yes, I am.

7           Q.   Okay.  Is there anything illegal with

8       that?

9           A.   I think it would be possible you could

10      say it would be criminal mischief, defacing

11      property.  We've reached out to public works and

12      at this point it -- they don't want to prosecute.

13          Q.   Okay.  Is that because it just can be --

14      eventually it comes off?

15          A.   I can't really speak --

16          Q.   Like paint?

17          A.   I can't really speak to why they didn't

18      want to prosecute.

19          Q.   All right.  Okay.  Look at Exhibit 10.

20      Tell me when you're there.

21              (Plaintiff's Exhibit Number 10

22              was marked for identification.)

23          A.   Yes.  We're on this one.

24          Q.   Okay.  This was an email that was sent

25      to, it looks like Chief Shields, June 16th, 2021.

Page 69

1      Have you seen this before?

2           A.    I'm sorry.  Can you scroll down?

3                 MS. JOHNSON:  Oh, yes.

4           A.    It's likely that I have seen it.  But I

5      don't specifically recall this email.

6           Q.    Okay.  And she is complaining -- Ms.

7      Marshall is complaining about violations of

8      existing city ordinances; correct?

9           A.    Yes, it appears so.

10          Q.    Okay.  All right.  Go to Exhibit 11.

11     We're going to start to look at some video.  Tell

12     me when you're there.

13                (Plaintiff's Exhibit Number 11

14                 was marked for identification.)

15                MS. JOHNSON:  We're there.

16          A.    Yes, we're on Exhibit 11.

17          Q.    Okay.  It looks like you have had

18     interactions with Ms. Marshall at the EMW Clinic;

19     correct?

20          A.    Correct.

21          Q.    And you were able to review their

22     surveillance videos and prepare written warnings

23     for Joseph Spurgeon and Justin Govanus?

24          A.    Well, just to clarify, I would look at

25     the security footage and if it's a clear

Page 70

1      violation, then I would essentially document that

2      those individuals need to receive a written

3      warning next time we come in contact with them.

4            Q.   Sure.  Fair enough.  But you were able

5      to ascertain a violation based on looking at the

6      security footage; correct?

7            A.   Oftentimes, yes.

8            Q.   Okay.

9            A.   In this case it seems that that's the

10     case.

11           Q.   Okay.  All right.  Have you ever had

12     instances where Ms. Marshall was reporting things

13     to you as violations that you did not determine

14     were, in fact, violations?

15           A.   Yes.

16           Q.   Okay.  And so you've got an independent

17     duty to ascertain for yourself whether or not

18     there's a violation; right?

19           A.   Absolutely.

20           Q.   Okay.  I think -- I think that's all

21     I've got on this exhibit.

22                Sir, I'm going to show you some video

23     now, and I'm not going to do that in the chat box

24     because it's a really bad way to do it.  Although

25     if I need to, I will.  I'm going to share screen.

Page 71

1    If this doesn't work, then I will put the video

2    up to share and we can try it that way, but I'm

3    going to go ahead and -- if I can.

4                     (Off the record.)

5    BY MR. WIEST:

6        Q.   All right.  Are you ready -- and I don't

7    know if you can -- if you're going to be able to

8    hear this or not, but is the -- is the video up?

9        A.   Yes, we can see it.

10            MR. MANION:  We can see it.

11       Q.   Okay.  I don't know if you'll be able to

12   hear it, but we're going to give it a try.  And

13   if we can't, I will share it and then we'll do it

14   that way.

15                    (Video played.)

16   BY MR. WIEST:

17       Q.   Okay.  Were you able to hear that?

18       A.   I could hear there's audio.  I can't

19   necessarily make out what's being said.

20       Q.   Do you know what we're going to do?  We

21   are going to share the videos.  And it may take a

22   little while.

23            Tell you what, why don't we -- why don't

24   we take a break and I'm going to upload the next

25   five videos and then everybody will have it and

Page 72

1     we can proceed with the deposition.  So why don't

2     we just take a quick five-minute break and I'm

3     just going to upload them all and then we can

4     just go one by one through them, if that makes

5     sense.

6                      (Brief recess.)

7     BY MR. WIEST:

8          Q.   Okay.  If you can open Exhibit 12, and

9     I'm going to just let you play that and then tell

10    me when you have finished playing it.

11         A.   Okay.

12              (Plaintiff's Exhibit Number 12

13              was marked for identification.)

14                   (Video played.)

15         A.   Okay.  We've watched it.

16         Q.    I think we've talked before about

17    loudspeakers, but we can hear the gentleman in

18    the background on a loudspeaker; right?

19         A.   Yes, it seems so.

20         Q.    And you have personally witnessed that

21    outside the clinic, that activity with

22    individuals on loudspeakers, and I'm sure you

23    hear him preaching the fire and brimstone;

24    correct?

25         A.   Yes, I have.

Page 73

1          Q.   Okay.  Depicted on the photo, and I

2    don't know if -- or in the video, I don't know if

3    you're aware of this or not, is my client, Angela

4    Minter.  Are you familiar with her?

5          A.   I don't believe I've had a personal

6    interaction with her, but I'm -- I'm somewhat

7    familiar.

8          Q.   And she is attempting as best she can to

9    have a conversation with someone in light of the

10   loudspeaker in the background; right?

11         A.   I can't really speculate what she's

12   doing, but...

13         Q.   Okay.  Go ahead and look at Exhibit 13.

14   Go ahead and play that and tell me when you --

15              (Plaintiff's Exhibit Number 13

16              was marked for identification.)

17                   (Video played.)

18         Q.   Same thing.  We hear the individual with

19   the loudspeaker, right, that you've indicated

20   that you previously have witnessed on, on -- I

21   think it was the majority of Saturday mornings;

22   right?

23         A.   Correct.

24         Q.   And we see the individual in the video

25   trying to -- and having to raise her voice to try

1     and be heard over the loudspeaker; right?

2          A.   It appears so.

3          Q.   Okay.  Go ahead and look at 14 with me.

4              (Plaintiff's Exhibit Number 14

5              was marked for identification.)

6                    (Video played.)

7          Q.   This is part of the shuttle operation,

8     correct, that you've seen before?

9          A.   I guess I can't say a hundred percent

10    sure that -- that's a shuttle, based on what I

11    saw.  I'm not sure if we need to replay it, if I

12    could see the placard or not.

13         Q.   Okay.

14         A.   But it seems consistent with how they

15    operate.

16         Q.   Let me ask, backing up to the shuttle,

17    would you agree that the majority of patients are

18    being dropped off, at least on Saturday mornings,

19    via these shuttles?

20         A.   I don't know if I could say that or not.

21         Q.   Okay.  If my client were to testify that

22    in her experience the majority of people are

23    currently being dropped off by shuttles, would

24    you have any reason to be able to dispute that?

25         A.   No.  I don't think I've spent enough

1      time observing an entire Saturday to make a good

2      determination on that.

3           Q.   Okay.  And if someone were to be dropped

4      off by shuttle, they exit the vehicle and they

5      walk right into the clinic; correct?

6           A.   I mean I would say that, yeah, they

7      would exit the vehicle and, yes, make a direct

8      line to the clinic typically.

9           Q.   And as we see in the video that we just

10     showed at Exhibit 14, that is a very fast, quick

11     process; right?

12          A.   I guess fast and quick are relative,

13     but...

14          Q.   Well, I mean, let's -- let's pin that

15     down.  From the time -- and I'll allow you to

16     time it.  You can replay it if you want, but it's

17     less than ten seconds that we see in this video

18     from the time these individuals exit the vehicle

19     to the time they get into the clinic.  And if you

20     want to dispute me on it or you want to time it,

21     please feel free.

22          A.   Okay.  No, I don't have any reason to

23     dispute that.

24          Q.   Okay.  Go ahead and play 15 for me if

25     you don't mind.

Page 76

1              (Plaintiff's Exhibit Number 15

2              was marked for identification.)

3                   (Video played.)

4        Q.   Same -- same principle, an individual

5    exiting a shuttle and then walking into the

6    clinic; right?

7        A.   Once again, I --

8        Q.   Or a vehicle in any event.

9        A.   Yeah.  I would say I don't think I can

10   confirm that that's specifically a shuttle, but

11   yes.

12       Q.   Okay.  And again, we're at -- we're at

13   less than 10 seconds from the exiting of that

14   vehicle till the time that that person has

15   entered the clinic; right?

16       A.   Yes.  That time I paid attention to the

17   timing.

18       Q.   If -- if I wanted to have an intimate

19   conversation to try and talk that person out of

20   it with the loudspeaker in the background, I

21   would have to get up pretty close to that

22   individual to have that conversation; right?

23       A.   I would believe so.

24       Q.   And, in fact, to be able to do that

25   effectively, it would not be possible to do that

1    with the operation of the current buffer zone

2    ordinance, would it?

3         A.   Well, I believe it's 10 foot wide so if

4    the person is walking down the middle, someone

5    could be within five feet of them.

6         Q.   And with the loudspeaker, it would not

7    be possible to have an intimate conversation with

8    them within that -- within that area; right?

9         A.   I think it would just depend on how loud

10   it is and how close they are.

11        Q.   Well, you've heard how loud it is.

12   You've seen the buffer zone.  You've seen the

13   loudspeakers, right, the individual with the

14   loudspeakers that's there most Saturday mornings.

15   You've seen the buffer zone.  Do you think it

16   would be possible to have an intimate

17   conversation without raising your voice with

18   those loudspeakers going on in the background?

19        A.   I mean, once again, it just depends on

20   how loud it is and where they're located, how

21   close they are to the zone.

22        Q.   When you say how -- you mean how close

23   the loudspeakers are to the zone?

24        A.   Correct.  Yes.

25        Q.   Okay.  Most of those loudspeakers are

1      right out front on that sidewalk within about, I

2      don't know, 20 feet of the entrance of the

3      clinic; correct?

4          A.   I mean, I think it would probably have

5      to be a little bit farther than 20 feet by the

6      time you take into account the private property

7      there.

8          Q.   Okay.  And again just to be clear, no

9      one is allowed, other than the clinic and escorts

10     or the patients, on the private property; right?

11         A.   That would be a determination made by

12     the clinic.

13         Q.   The clinic does not allow sidewalk

14     counselors or protesters on the private property

15     to your knowledge, do they?

16         A.   To my knowledge, I -- I would be -- that

17     would be an assumption I would have to make.

18         Q.   Okay.  Have you ever witnessed them

19     allowing protesters or sidewalk counselors on

20     their private property?

21         A.   No, but I would only be called if there

22     was an issue.

23         Q.   Okay.  And you have, in fact, been

24     called to have individuals ejected from their

25     private property; correct?

1       A.   I've personally never been there when

2  someone was inside that needed to be removed, but

3  they have contacted me when people have been on

4  their property, yes, for a report.

5       Q.   And that includes the outside of the

6  clinic property, on their private property.  You

7  have received calls for that; correct?

8       A.   Yes.  The only personal encounter I've

9  had with trespassing there is when someone was

10  across their -- across the white no trespassing

11  line close to the doors.

12       Q.   Okay.  I'm going to look, because we may

13  not be done.  We just did -- we just did 15;

14  right?  We just did Exhibit 15, did we not?

15            MR. CARROLL:  Yes.

16       Q.   Okay.  If you could play that again, I

17  just want to confirm that this is a shuttle.  And

18  you can see it -- I'm going to get you an exact

19  time stamp.  If you look at about seven seconds

20  in, you can see the shuttle placard on the truck

21  door.

22                 (Video played.)

23       Q.   Do you see the shuttle there at --

24       A.   I can see --

25       Q.   Yeah, about seven to eight seconds in?

Page 80

1        A.    I can see some type of placard on the

2     front passenger side door.  I mean, I can't read

3     what it says, but...

4        Q.    You can't depict the shuttle; okay.

5     Okay.  And it looks like she steps out at about

6     the ten second mark in this video; correct?

7                      (Video played.)

8        Q.    Do you agree, it's about ten seconds in?

9                      (Video played.)

10       A.    Yes, I would agree she steps out at the

11    ten second mark.

12       Q.    Okay.

13       A.    Approximately.

14                     (Video played.)

15       Q.    And there's -- and, and by the 15 second

16    mark, she is onto the EMW Clinic property on the

17    other side of that white line; correct?

18                      (Video played.)

19       A.    Yes.  I would say about the 15, 16

20    second mark she's on their property.

21       Q.    Okay.  And so if someone wanted to

22    engage in sidewalk counseling to talk her out of

23    it, they've got about five seconds before she's

24    on the clinic property; correct?

25       A.    In this instance, yes.

Page 81

1      Q.   Right.  And we know that the area where

2   at least she walks through is what is currently

3   the buffer zone; correct?

4      A.   Yeah.  It appears it's very close there,

5   if not in it.

6      Q.   Right.  All right.  Let's go look at

7   Exhibit 16 together.

8               (Plaintiff's Exhibit Number 16

9               was marked for identification.)

10                      (Video played.)

11     Q.   You see the clinic escorts in this photo

12   having a conversation with the patient, do you

13   not?

14     A.   I'm afraid I have to watch it again.

15     Q.   Please, yeah, watch it again.  Yeah,

16   yeah.

17                      (Video played.)

18     A.   I mean, they're wearing masks.  I hear

19   speaking.  I could assume it's coming from the

20   escorts, but I -- I couldn't definitively say

21   that.

22     Q.   Okay.  All right.  Have you ever gone

23   out and tried to observe what the escorts are

24   saying or not saying to the patients?

25     A.   I've never been over there with that

Page 82

1       specific intent, no.

2            Q.   Okay.  Go ahead and look at -- go ahead

3       and look at Exhibit 17.

4                 (Plaintiff's Exhibit Number 17

5                 was marked for identification.)

6                      (Video played.)

7            Q.   All right.  A few things.  First of all,

8       this vehicle is one of the shuttles; right?  We

9       can now clearly see the shuttle demarcation on

10      it?

11           A.   Yeah.  It appeared to me that the

12      placard said shuttle, yes.

13           Q.   Right.  And the driver is wearing a vest

14      as well?

15           A.   Okay.  I don't think I noticed that.

16           Q.   You could scroll back to the two second

17      mark.  You can see it in the video.

18           A.   Okay.

19                     (Video played.)

20           A.   Yes, it appears the driver is wearing an

21      orange vest.

22           Q.   And just to be clear for the record,

23      everything we have observed so far, you are

24      familiar with the surroundings as being the EMW

25      Clinic; correct?

Page 83

1          A.    Yes.

2          Q.    Okay.  If we look -- it looks like she

3     is out of the vehicle at the six second mark;

4     correct?

5                         (Video played.)

6          A.    Yes.  It appears she exits at the six

7     second mark.

8          Q.    Okay.  We have -- we have the

9     loudspeaker going on in the background.  That

10    definitely is pretty loud; right?

11         A.    I mean, once again, loud is a relative

12    term.

13         Q.    Let me ask.  In terms of the volume, is

14    that pretty typical in terms of what you're

15    seeing out there when these loudspeakers are set

16    up?

17         A.    I would think so.  Obviously with the

18    recordings, it's hard to be accurate, you know,

19    with how loud things are, but that seems to be

20    typical.

21         Q.    Okay.  And if we look, she is on the

22    clinic property at the 11 second mark of Exhibit

23    17; correct?  She's onto the white line?

24                         (Video played.)

25         A.    Yes.  That's accurate.

Page 84

1      Q.   Okay.  So again, about five seconds from

2  the time she's out of the vehicle to the time

3  she's on the private property; right?

4      A.   Correct.

5      Q.   Okay.  Let's go look at exhibit --

6  actually, if I go back to Exhibit 17, do you see

7  any of the clinic folks talking with her as she's

8  walking in?  Any of the escorts?

9      A.   I can't tell if any of them are talking

10  to her or not.

11      Q.   Okay.  If you -- and I just want to look

12  just for a second.  If you go back to the --

13  about the eight second mark and just pause that

14  frame in this video.

15      A.   Okay.

16                  (Video played.)

17      Q.   If you look on the left, do you see Ms.

18  Minter?

19                  (Video played.)

20      A.   Okay.  Yeah, we're paused at eight

21  seconds and I do see her, yes.

22      Q.   And she is trying to get right next to

23  this individual to try and have a conversation

24  with her.  Do you see that?

25      A.   I mean, I can't speak to her intentions,

1    but I could see where it appears that that's what

2    she's doing.

3         Q.   Well, if you follow her -- if you get

4    from about the eight to the 10 second mark, you

5    see Ms. Minter -- do you see her mouth moving as

6    if she's speaking and you see her attempt to at

7    least get kind of close to the individual and

8    follow her as she's walking in; right?

9         A.   Okay.  I wouldn't object to that.

10        Q.   You would agree; right?

11        A.   Correct.  I would agree that that's what

12   it appears that she's doing.

13        Q.   Okay.  And where she's standing right

14   now, if you look, that is presently within the

15   buffer zone, is it not?

16        A.   It's difficult to definitively say that.

17        Q.   Okay.

18        A.   I --

19        Q.   That's fair, and I realize we took this

20   video in September, prior to the marking.  I

21   think it was like maybe a week or two before it

22   was marked, so...

23        A.   Okay.

24        Q.   Let's look at Exhibit 18 together.

25             (Plaintiff's Exhibit Number 18

Page 86

1          was marked for identification.)

2                    (Video played.)

3     Q.   And you see her step out of the vehicle

4  at about the three second mark; right?  The two

5  to three second mark?

6     A.   Yes.  I believe so.

7     Q.   And again, she is in by the seven second

8  mark, she's past the -- she has passed the -- and

9  onto the clinic property; right?

10                   (Video played.)

11    A.   Oh, I'm sorry.  I lost which one she is?

12    Q.   Yeah.  She's wearing a sweatshirt.  You

13 can see the door open at the six second mark for

14 her to walk in.

15    A.   Okay.  Yes, I --

16    Q.   Okay.

17    A.   I would agree with that.

18    Q.   Okay.  All right.  We're going to look

19 at Exhibit 19 with you.

20         (Plaintiff's Exhibit Number 19

21          was marked for identification.)

22                   (Video played.)

23    Q.   We see Ms. Minter there in this video;

24 correct?

25    A.   Yes.  I believe that's her.

1        Q.     She doesn't have a loudspeaker; right?

2        A.     Correct.

3        Q.     She is trying to get close and have an

4    intimate conversation with the individual that's

5    walking into the clinic; fair?

6        A.     It appears.  I don't have any reason to

7    doubt that's what she's doing.

8        Q.     Okay.

9        A.     I can't say --

10       Q.     And we hear the individual with the

11   loudspeaker in the background that, at least from

12   this vantage point, completely drowns her out.

13   We really can't hear what Ms. Minter is saying,

14   all we hear is the loudspeaker; right?

15       A.     I would say it -- the loudspeaker

16   probably makes it more difficult for her to be

17   heard.  I mean, there are obviously other sounds

18   we hear besides that, but...

19       Q.     Sure, sure.  Okay.  I'm going to share

20   another exhibit with you.  This is Exhibit 20.

21   It is not a video.

22              (Plaintiff's Exhibit Number 20

23              was marked for identification.)

24       A.     Okay.  We've got it pulled up.

25       Q.     Have you seen this email from Ona

Page 88

1    Marshall to Natalie Johnson?

2         A.    It sounds familiar.  I believe I have.

3         Q.    There's a photo -- yeah.  If you go

4    down, on the fifth page there's a photo of Ms.

5    Minter within the zone, attempting to have a

6    conversation with a person that's stepping out of

7    a shuttle; right?

8         A.    I'm sorry.  Which page did you say, 5?

9         Q.    The fifth page of the exhibit, there's a

10   photo.

11        A.    Okay.  I mean, I can't speak to say for

12   sure that's her with the -- with what I can see.

13        Q.    Okay.  Fair enough.  And in any event,

14   Ms. Marshall reports it as being Angela Minter;

15   right?

16        A.    I -- yes, yes.  I believe she said the

17   lady with the pink socks.

18        Q.    Okay.  And the lady with the pink socks

19   is trying to have a conversation with that person

20   that's stepping out of that shuttle truck; right?

21        A.    I mean, once again --

22        Q.    On page 5.

23        A.    -- I, I can't say that that's her

24   intention.

25        Q.    Fair enough.  But in any event, someone

Page 89

1      is stepping out of a shuttle truck.  We see it,

2      we see someone else in the zone; right?

3          A.    Correct.

4          Q.    Okay.  All right.  I've got some

5      follow-ups -- actually I've got a couple pages of

6      follow-ups, so...

7               In terms of the clinic escorts and the

8      speaking to patrons, having seen the video,

9      you're aware that at least that does occur to

10     some degree; correct?

11         A.    I don't know if I recall a specific

12     video we watched where I could definitively say

13     that they were speaking to them.

14         Q.    Okay.  Has anyone at EMW ever told you

15     that they're not allowed -- that the clinic

16     escorts are not allowed to speak to the patrons?

17         A.    No, I've not been told that.

18         Q.    Has anyone at EMW ever told you or

19     called you to cite or arrest the escorts in the

20     zone who -- who speak to patrons?

21         A.    No.

22         Q.    Or that -- has anyone at EMW ever told

23     you that the clinic escorts are not performing

24     the duties within the scope of their employment

25     if they speak to patrons within the zone?

Page 90

1          A.    No, I have not been told that.

2          Q.    Okay.  I want to talk about some -- some

3     other options maybe the city has looked at in

4     terms of clinic access.  To your knowledge, has

5     the city ever pursued injunctions against anyone

6     that has blocked or impeded access to the clinic?

7          A.    I'm sorry.  Are you asking if --

8          Q.    Yeah.

9          A.    -- charges have been filed?

10          Q.    To your knowledge, has the city ever

11     pursued court injunctions against anyone that has

12     blocked or impeded access to the clinic -- to the

13     EMW Clinic?

14          A.    I'm afraid you have to explain what a

15     court injunction is to me.

16          Q.    A court order from a judge in a civil

17     case usually that would say that XYZ person has

18     been blocking access and is not allowed to be

19     within, you know, X feet of the clinic.  To your

20     knowledge, has the city ever done that?

21          A.    Yes.

22          Q.    Who -- who and when has that been done

23     against?

24          A.    From my understanding there was a court

25     order that Ms. Donna Durning is not to be within

Page 91

1      500 feet of the clinic.

2          Q.   Okay.  Is that in connection with a

3      criminal case?

4          A.   It's in connection with violations of

5      the buffer zone ordinance.

6          Q.   Okay.  And is that a condition of her

7      release in connection with those criminal

8      citations?

9          A.   I -- I can't say a hundred percent.  I,

10     I --

11         Q.   Other than Donna Durning, are you

12     familiar with -- are you familiar with any other

13     examples of court orders to keep people away?

14         A.   I'm not aware of any, no.

15         Q.   Okay.  And I think we've looked at it,

16     you have been able to cite people who have

17     blocked or impeded access under trespassing and

18     other charges; correct?

19         A.   There have been instances where LMPD has

20     charged people with trespassing.

21         Q.   Right.

22         A.   I think --

23         Q.   Go ahead.

24         A.   I was just going to say, I don't think I

25     could definitively say that at that time that

Page 92

1      person was impeding access --

2           Q.   Okay.

3           A.   -- because I don't know.

4           Q.   If someone were impeding access, you

5      would be able to confirm that with security

6      footage; correct?

7           A.   I would assume so, yes.  They have

8      security footage right there at the front door,

9      so yes.

10          Q.   And LMPD has spent at least three

11     weekends out at the clinic on Saturday mornings

12     that we've looked at, without detecting anyone

13     who has blocked or impeded access; fair?

14          A.   I believe there were instances where

15     Sergeant Beaven determined that there were people

16     that were potentially blocking or impeding access

17     and she informed them that they needed to move.

18          Q.   And they did so; correct?

19          A.   Yes.

20          Q.   And I think she also indicated though

21     that there was no one who was actually impeded

22     from entering the clinic; correct?

23          A.   Correct.

24          Q.   Okay.  Under the buffer zone ordinance,

25     it -- even if -- even if somebody walking into

1      the clinic wanted to have a conversation with

2      someone on the sidewalk, that person on the

3      sidewalk would not be able to enter into the

4      buffer zone to have that conversation; right?

5          A.   I'm sorry.  May I go back to the last

6      point?

7          Q.   Yes, sir.

8          A.   Just for clarification.  I believe you

9      said something to the effect that there was no

10     one that was impeded.  I think it would be more

11     accurate to say that there was no time when LMPD

12     observed that taking place.  Obviously we

13     can't --

14         Q.   That's fair.

15         A.   -- speak to when we weren't there or

16     watching.

17         Q.   No, that's fair.  And if you weren't

18     there and you weren't watching, and EMW had

19     evidence -- so let me back up.

20              EMW has cameras out there that operate

21     24/7; right?

22         A.   I don't know.  I would assume they

23     operate 24/7, but I can't say for sure.

24         Q.   EMW has never provided LMPD security

25     footage that indicates that the front door has

Page 94

1      been blocked or impeded; right?

2          A.   I, I couldn't say that they haven't.

3          Q.   Okay.  As you sit here today, are you

4      familiar with any instances when they have done

5      that?

6          A.   I cannot think of a specific instance

7      where they provided video footage that shows the

8      front door being blocked.

9          Q.   Okay.  One of the things that the city

10     could do if they wanted to would be to move

11     people with the loudspeakers farther away from

12     the door and farther away from the clinic

13     entrance to facilitate both what I'm going to

14     call the sidewalk counseling with intimate

15     conversations and the loudspeakers who are

16     simply, you know, preaching fire and brimstone;

17     correct?

18         A.   I'm not sure how the city would

19     accomplish that.

20         Q.   Okay.  They couldn't write an ordinance

21     that would do that?

22         A.   I mean, I suppose Metro Council can

23     write any ordinance they want, but I...

24         Q.   Okay.  An ordinance dealing with

25     amplification devices around healthcare

1          facilities, they could write an ordinance that

2          did that; right?

3                A.    I, I suppose they could.

4                Q.    And that would simply regulate the

5          manner of the speech under a time, place, manner

6          restriction; correct?

7                A.    I believe so.

8                Q.    Okay.  I think we've looked at

9          harassment charges, those are an option as well

10         for individuals that are engaged in harassing

11         behavior outside the clinic; right?

12               A.    Yes.

13               Q.    Are you familiar, sir, with -- with

14         federal FACE legislation?

15               A.    I believe I had a conversation with an

16         FBI agent once that he referenced that and -- so

17         I have very, very limited knowledge of it.

18               Q.    Are you familiar with the US Attorney

19         for the Western District of Kentucky pursuing a

20         FACE injunction in the 2017 time frame?

21               A.    No, I -- I'm not aware of that.

22               Q.    Okay.  And are you aware whether or not

23         FACE legislation deals with physical obstruction

24         to healthcare facilities, and specifically

25         abortion clinics?

1     A.   I'm afraid my knowledge doesn't extend

2  that far.

3     Q.   One of the things that -- if, if someone

4  were blocking or obstructing in any way access to

5  the facility, to the clinic, police have the

6  power to give them an order to disperse or move

7  out of the way; right?

8     A.   You're asking if, if someone is

9  blocking -- I'm sorry.  Can you rephrase that?

10     Q.   Yeah.  If someone is blocking or

11  impeding access to the clinic or the sidewalk

12  outside the clinic, the police have the power to

13  direct them to move; correct?

14     A.   Yes.  If they were blocking a public

15  sidewalk, then yes.

16     Q.   Right.  And, in fact, I think we've

17  looked at the March and April '21 details that

18  you folks performed, and in a couple of instances

19  when someone was obstructing in some way the

20  sidewalk, there wasn't -- there was such an order

21  that was issued and they moved; correct?

22     A.   Yes.

23     Q.   Okay.  Do you believe that -- and then

24  one of the things that can also be done, I think

25  we looked at the city ordinance, that there is an

Page 97

1      ordinance for blocking or obstructing a sidewalk;

2      correct?

3          A.    Correct.

4          Q.    Do you believe that LMPD is capable of

5      singling out lawbreakers for enforcement actions?

6          A.    Are you saying in regards to blocking a

7      sidewalk or just in general?

8          Q.    Blocking the sidewalks or impeding

9      access to clinics.

10         A.    I think it's very difficult.

11         Q.    In what way?

12         A.    Well, because if you're -- if we get a

13     call that someone's blocking the sidewalk, it

14     would be difficult to determine who is the one

15     doing the blocking.  I mean, absent someone

16     standing out there holding a 2-by-4 that crosses

17     the entire sidewalk, it would normally probably

18     be accomplished in conjunction with multiple

19     other people.  So it would be hard to single out

20     someone and say you're the one blocking the

21     sidewalk.

22         Q.    Sergeant Beaven was out at the site in,

23     in I think it was April and detected some of that

24     activity and asked them to move though; right?

25         A.    Yes, I believe so.

1        Q.   Okay.  So she was able to enforce that,

2   at least as, as -- with respect to people that

3   she perceived may be in some way obstructing the

4   sidewalk; right?

5        A.   I think enforce might be too strong of a

6   word.  I -- I don't know in that specific

7   incidence if she would have had probable cause to

8   charge somebody, but oftentimes we'll let

9   somebody know that they're maybe close to a

10  violation or -- you know, and so it may have been

11  more of an ask.  I'm not sure if it rose to the

12  level of having probable cause.

13       Q.   One of the things that struck me from

14  Sergeant Beaven's memo was her ability to

15  distinguish between those folks that are in town

16  and out of town.  Do you remember that?

17       A.   Yes.

18       Q.   Would it be fair to say that LMPD is

19  familiar with who the regular players are outside

20  the clinic?

21       A.   I think that the officers that regularly

22  make calls for service to that area would

23  probably recognize some of the people that are

24  out there.

25       Q.   And I know we looked at EMW surveillance

1    footage, a little bit of it anyways, today;

2    correct?

3         A.   Yes.  Well, I'm sorry, let me back up.

4    I believe that all the videos we watched, I

5    believe it seems like those are all ones probably

6    from cell phone footage as opposed to --

7         Q.   No, I think you're right, but you have

8    had EMW share with you their surveillance

9    footage; right?

10        A.   Yes.

11        Q.   And if we can use that surveillance

12   footage to show a violation of the law, we could

13   also use that to support, you know, a criminal

14   prosecution or a civil injunction, you know, as

15   evidence in court as well; right?  That -- that

16   video is video that's usable in court; correct?

17        A.   Yes.  If somebody was criminally charged

18   and that video captured the incident, then that

19   would be evidence.

20        Q.   Has the buffer zone ordinance made your

21   life easier from an enforcement perspective?

22        A.   I think in the aspect that it's much

23   more concrete than the other ordinances and KRS

24   that's been referenced so far today, yes.

25        Q.   Okay.  And by the way, the clinic does

1       share its footage with LMPD; right?

2            A.    That does happen, yes, on occasion.

3            Q.    Okay.  And if LMPD wanted to access the

4       clinic's footage, it would be able to do that;

5       right?  The Marshalls have never told you no or

6       go get a warrant, have they?

7            A.    They have not to me personally.

8            Q.    Okay.

9            A.    I can't speak to say that that's never

10      happened.

11           Q.    Okay.  You would agree that if someone

12      was intentionally blocking the clinic, the police

13      could order the person to move, and if they did

14      not, you would then know the person was

15      intentionally blocking the clinic; correct?

16           A.    I mean, if their actions were so obvious

17      that, that that's what they were doing and they

18      refused to stop, then yes, we could tell them to

19      stop.

20           Q.    And if they refused to, you would be

21      able to then prove that they were intentionally

22      blocking the clinic, right, because they're

23      refusing to follow police orders to move?

24           A.    I think that that would potentially get

25      us probable cause that that's what they were

1    doing.

2        Q.    Right.  The police are permitted to

3    maintain a presence outside EMW; right?

4        A.    Could you expand on "permitted"?

5        Q.    Yeah.  I mean, there's nothing that

6    would keep the police from being outside the EMW

7    Clinic if they chose to; correct?

8        A.    Correct.

9        Q.    Could the city, as opposed to the buffer

10   zone ordinance, have enacted an anti-congregation

11   ordinance that would allow individual sidewalk

12   counselors to be outside, but not to permit

13   people to gather in groups?

14       A.    I -- I don't know.

15       Q.    Okay.  In terms of blocking and traffic

16   outside the clinic, that ordinance is in effect

17   any time EMW is -- the buffer zone ordinance is

18   in effect any time EMW is in operation; correct?

19       A.    I believe the ordinance states any time

20   during their posted business hours.

21       Q.    Okay.  Their posted business hours.  And

22   their posted business hours I think are Monday

23   through Saturday; right?

24       A.    I'm afraid I'm not a hundred percent

25   sure on that.

1     Q.   Okay.  The only time that you've

2   witnessed any kind of serious traffic outside the

3   clinic is on a Saturday morning, would you agree,

4   in terms of crowds?

5     A.   No, I don't think that would be true to

6   be a blanket statement.  There are some days

7   during the week when it can potentially be pretty

8   busy.

9     Q.   Okay.  Is that -- is that typical?

10     A.   No.  It's not typical, but I just don't

11   want to blanketly say that there's never a crowd

12   during the week.

13     Q.   Okay.  Let me ask, how many businesses

14   in Louisville have hired or typically hire

15   off-duty officers for various purposes?

16     A.   I would have no way to answer that.

17     Q.   Do any of the downtown bars do it?

18     A.   I don't know if I could speak of a

19   specific bar that I'm aware of that does.

20     Q.   Okay.

21     A.   I'm not saying they don't, I just -- I

22   don't have firsthand knowledge of it.

23          MR. WIEST:  Okay.  All right.  Give me

24   just one second, sir.  I may be done, and I'm

25   going to pass you to Mr. Manion, but let me just

 1          check with my co-counsel, if we can just go off

 2          the record for just a couple minutes, and then I

 3          may be done.

 4                    THE WITNESS:  Okay.

 5                         (Off the record.)

 6                    MR. WIEST:  Lieutenant, I don't have

 7          anything further.  I'm going to pass you to Mr.

 8          Manion.

 9                    THE WITNESS:  Okay.  Thank you, sir.

10                    CROSS-EXAMINATION

11     BY MR. MANION:

12          Q.    Okay.  Good morning, Lieutenant.  This

13          is Frank Manion and I represent Plaintiffs Ed

14          Harpring and Mary Kenney in this consolidated

15          matter.  I just have a few minutes' worth of

16          questions.  Most of what I would have asked you

17          has been covered by Mr. Wiest.

18                    Specifically I want to talk about an

19          exhibit that was attached to the complaint that

20          we filed.  And I apologize in advance because I'm

21          not nearly as adept as Mr. Wiest is at this, so

22          I'm going to try to put that document that I want

23          to show you in the chat room.  It says it's

24          coming in.

25                    All right.  Can everybody see the

 1      exhibit that I've just put in the chat room?

 2              THE WITNESS:  We're currently

 3      downloading it.

 4              MR. MANION:  Okay.  This was also sent

 5      to us by your counsel yesterday along with some

 6      other documents.  This specific document was

 7      included in that package.

 8              THE WITNESS:  Okay.

 9              MR. MANION:  Everybody see it?  It's two

10      pages, the first is just a cover page that we had

11      attached to our complaint.  The second page is

12      what we're talking about here, it's the courtesy

13      notice that was issued to one of my clients, Mary

14      Kenney.

15   BY MR. MANION:

16         Q.   Are you familiar with this document,

17      sir?

18         A.   Yes, I am.

19         Q.   All right.  Am I correct in concluding

20      that you actually are the person who issued this

21      to Mary Kenney?

22         A.   Yes.  That's correct.

23         Q.   All right.  Could you walk me through

24      how this came about?  In other words, did you

25      initiate this, did the county attorney's office

1    initiate this, or were you contacted by EMW?

2         A.   So I would have been contacted by EMW to

3    let me know that they had video footage of a

4    potential violation of the buffer zone ordinance.

5         Q.   Okay.

6         A.   And then upon reviewing that, I believe

7    in this particular instance I was a little, I

8    guess, hesitant whether or not it was a

9    violation.  And so I sent it to the county

10   attorney's office so they could weigh in on it

11   and they -- they said that it was one they would

12   prosecute -- they would potentially prosecute on

13   and they believed it was a violation, so the

14   warning was then issued.

15        Q.   All right.  What did the video show as

16   you recall it?

17        A.   It showed her initially standing on one

18   side of the buffer zone, just on the outside, and

19   rather slowly walking through the zone while she

20   was, like, looking into the front doors.  And as

21   she got to the other side of the zone, she stood

22   there for a few seconds and then immediately

23   proceeded back across it in a similar manner.

24   And so the determination was that she wasn't just

25   someone that was crossing the zone, going from

1       one destination to another, but was in this case

2       pacing -- you know, paced back and forth within

3       the zone.

4           Q.   Okay.  Now, you're familiar, obviously,

5       with the terms of the buffer zone ordinance

6       itself; correct?

7           A.   Yes.  Fairly familiar.

8           Q.   And presumably we're talking about

9       Section (B)(2) which says, No person shall

10      knowingly enter, remain on, or create any

11      obstruction in the driveway of a healthcare

12      facility or within a buffer zone, et cetera.

13              Is it -- is it fair to say that my

14      client was given this warning because she entered

15      the buffer zone?

16          A.   I think it's fair to say that she was

17      given it because she entered it multiple times in

18      a short period of time.

19          Q.   Is there anything in the language of the

20      buffer zone ordinance itself that's -- that

21      contains anything about how long one may take

22      walking through the buffer zone or how many times

23      one may walk back and forth through the buffer

24      zone?  Is there anything in the ordinance itself

25      that talks about that?

1      A.    No, I don't believe so.

2      Q.    All right.

3      A.    Not directly.

4      Q.    Is there anything that indirectly says

5    that?

6      A.    Well, I believe indirectly, because

7    this -- this warning was written under Section,

8    was it, (B)(2)(b), if I'm saying that right.

9    There is exceptions for a -- as it says, a person

10   using a public sidewalk or a street right-of-way

11   adjacent to such facility solely for the purpose

12   of reaching a destination other than the

13   facility.  And it was determination -- it was

14   determined based on her actions that she wasn't

15   just trying to reach another destination since

16   she walked back and forth across it in a short

17   period of time.

18     Q.    Okay.  I think you said that you were

19   hesitant about whether this constituted a

20   violation.  Why were you hesitant?

21     A.    You know, this is a very new process to

22   us, something that LMPD hasn't dealt with before,

23   and I hadn't come across one specifically like

24   this yet.

25     Q.    Okay.  I think you testified earlier

1      that sidewalk counselors are allowed to walk

2      through the zone with exceptions.  And my

3      question to you is:  Are those exceptions set

4      forth in the language of the ordinance itself?

5           A.   Yes.  I mean, I believe they're

6      inferred.

7           Q.   They're not -- okay.  Inferred means

8      they're not directly written out; correct?

9           A.   Correct.  Not -- not every possible

10     scenario is written out.

11          Q.   Okay.  And I think you testified that

12     you have been advised that there are exceptions.

13     And my question is:  Who has advised you of any

14     exceptions?

15          A.   I'm sorry.  Can you back -- back up?

16     What exceptions are we talking about?

17          Q.   I'm -- I'm particularly interested in

18     the idea of a counselor, in spite of the language

19     of the ordinance prohibiting entry into the

20     buffer zone, being allowed to walk through the

21     buffer zone in some cases but apparently not in

22     others as evidenced by the warning given to Mrs.

23     Kenney.  Those -- those exceptions are not set

24     forth in the ordinance; correct?

25          A.   I guess they're -- I mean, they're not

1    specifically laid out, no.  That's part of, I

2    guess, the interpretation that we've made.

3        Q.   And who is "we"?

4        A.   I would be referring to myself and then

5    the legal advisors for LMPD as well as the county

6    attorney's office.

7        Q.   Okay.  In this instance, does the video

8    that you reviewed still exist, as far as you

9    know?

10       A.   I would assume it does.

11       Q.   The narrative portion of this exhibit,

12   this written warning, says that the clinic

13   provided security footage which shows the listed

14   subject walked through the buffer zone twice in

15   the span of about 20 seconds.  Is there anything

16   in the ordinance that sets forth an amount of

17   time that a person is allowed to expend walking

18   through the buffer zone?

19       A.   No.  It doesn't specifically mention

20   amount of time.

21       Q.   Okay.  Who advised you that this

22   particular instance was a violation of the buffer

23   zone ordinance?

24       A.   I believe that it was a representative

25   of the county attorney's office.

1          Q.   Do you remember that person's name?

2          A.   I believe it was Ms. Jennifer Yancey.

3          Q.   Okay.  And what's her title?

4          A.   I think she's the warrant intake chief.

5     I'm probably not saying that correct -- exactly

6     correct.

7          Q.   As far as you know, that -- the video

8     still is in the possession of the county

9     attorney's office or the LMPD?

10         A.   Yes.  It should be.

11         Q.   All right.  Is it fair to say that if no

12    exception applies, no unwritten exception

13    applies, a person seeking to go from one side of

14    the buffer zone to the other must walk out into

15    Market Street to get to the other side?

16         A.   No.  The ordinance clearly says that

17    someone using the sidewalk as a right-of-way can

18    pass through it.

19         Q.   Right.  But if someone is not using the

20    sidewalk as a right-of-way.  Someone doesn't come

21    within the four exceptions that are set forth in

22    the ordinance itself.  Let's assume that.  That

23    person must walk out into Market Street; isn't

24    that correct?

25         A.   No, I -- I don't see an instance where

1      the ordinance in any way mandates somebody

2      walking into the street.

3            Q.   Someone who is a protester, let's say.

4      They're not allowed to walk through the buffer

5      zone, correct, according to the terms of the

6      ordinance?

7            A.   No.   The ordinance doesn't say anything

8      about protesters not being able to walk into the

9      buffer zone.

10           Q.   Could you take a look at (B)(2)?

11           A.   Okay.

12           Q.   Does it not say:  No person shall

13      knowingly enter the buffer zone?

14           A.   It does, but then it gives multiple

15      exceptions to include someone that's passing

16      through it.

17           Q.   Well, you'll have to help me out because

18      I don't see any language about including someone

19      who's passing through it.  Can you point to me

20      where that is?

21           A.   Okay.   In Section 2 there where you just

22      looked.

23           Q.   Right.

24           A.   Section (B) below that, it says that:

25      Persons using the public sidewalk or street

1   right-of-way adjacent to such facility solely for

2   the purpose of reaching a destination other than

3   facility.  So we've determined that means that

4   someone can walk through the zone if they're

5   going from one side to the other.  And that's one

6   of the exceptions here, along with the other

7   three.

8       Q.   So the protesters and/or sidewalk

9   counselors who are out there are, as far as your

10  understanding is, people who are not -- who are

11  using the sidewalk for the purpose of reaching a

12  destination other than the facility?

13      A.   If they're on one side of the buffer

14  zone and they want to walk to the other, then

15  yes.

16      Q.   Okay.

17      A.   Their -- their destination is not the

18  facility, clearly.

19      Q.   Okay.  Have you been given any written

20  list of exceptions or interpretive guidelines as

21  to how to interpret the restrictions of the

22  buffer zone ordinance?

23      A.   I haven't been given a specific list.

24  There's been multiple email -- emails have been

25  sent back and forth between myself and the county

1      attorney's office and our legal advisor.  We're

2      kind of hashing out some of these as they arise.

3                    MR. MANION:  Okay.  All right.  That's

4      all I have, Lieutenant.  Thank you.

5                    THE WITNESS:  Thank you.

6                    MR. WIEST:  I have just a couple

7      follow-ups in light of Mr. Manion's examination

8      if that's okay.

9                         RECROSS-EXAMINATION

10   BY MR. WIEST:

11        Q.   Lieutenant, you've got the ordinance in

12     front of you, do you not?  It was Exhibit 4.

13        A.   Yes, I do have it in front of me.

14        Q.   So I just want to understand what I

15     think you're telling -- what you told Mr. Manion.

16             There are four written exceptions to

17     (B)(2), right, (A) through (D)?

18        A.   Correct.

19        Q.   And then there's some unofficial

20     exceptions or interpretations as well, right,

21     that are not written?

22        A.   I mean, I think with -- with any

23     ordinance or law, we have to do our best to

24     interpret them to see if it fits within it, so...

25        Q.   Well, I understand.  And all of the

1    exceptions we deal with, the written exceptions

2    and the interpretations, that includes -- I just

3    want to go back through those -- persons entering

4    or leaving the facility; right?

5         A.   Correct.

6         Q.   People using the public sidewalk or

7    street right-of-way solely for the purpose of

8    reaching a destination other than the facility;

9    right?

10        A.   Correct.

11        Q.   And then we've got the municipal

12   workers, including law enforcement, firefighting,

13   ambulances; right?

14        A.   Correct.  And a few others.

15        Q.   And then we've got the employees and

16   agents of the facility; correct?

17        A.   Correct.  Acting within the scope of

18   their employment.

19        Q.   Right.  And those exceptions and the

20   interpretations of them all involve secular

21   activity; right?  All things that -- that are not

22   religious in nature; correct?

23        A.   Are you saying is their interpretation

24   of them secular?

25        Q.   Well, I'm going to get into that in a

1     minute, but when I look at the exceptions,

2     there's no exception for people engaged in

3     religious ministry outside the clinic; correct?

4          A.   No, there's no specific exception for

5     them.

6          Q.   Is there any interpretation that would

7     permit people within the buffer zone to engage in

8     religious ministry within the buffer zone?

9          A.   If someone -- if one of the four

10    exceptions doesn't apply, then no.

11         Q.   Okay.  And so if someone were to engage

12    in sidewalk counseling as an extension of

13    ministry, and follow someone into the buffer zone

14    to try and talk them out of an abortion, that

15    would not be permitted; correct?

16         A.   Correct.

17         Q.   There's a -- there's four, you know,

18    exceptions, but one of them does not include

19    religious ministry; correct?

20         A.   I mean, unless the -- it was done by a

21    person entering or leaving the facility or

22    somebody that's an agent or an employee of the

23    clinic.

24         Q.   Right.

25         A.   Like it doesn't address speech at all.

1       Q.   Okay.  Fair enough.  Well, it does -- it

2   does address speech in the sense that if

3   someone's doing -- engaged in speech within the

4   buffer zone and, and in the context of their

5   municipal duties or their duties on behalf of the

6   clinic, that's permitted; correct?

7       A.   Those people would be permitted inside

8   the zone.  The ordinance doesn't address what

9   they can or cannot say.

10      Q.   Right.  And once they're in the zone,

11  they can say anything they want as long as

12  they're within the exception; correct?

13      A.   I mean, the ordinance doesn't address

14  that.

15      Q.   Okay.  And so again, they -- if you are

16  within one of the four exceptions, there's no

17  limit on what you can say within the buffer zone;

18  correct?

19      A.   The ordinance doesn't limit it, but --

20      Q.   Okay.

21      A.   But clearly -- I mean certain things

22  would not be allowed to be said no matter where

23  you are.

24           MR. WIEST:  Fair enough.  Fair enough.

25  All right.  Sir, that is all the questions I

1    have.

2              MS. JOHNSON:  Can we take five?

3              MR. MANION:  Nothing further from me.

4              MS. JOHNSON:  Do you mind if we take a

5    five-minute break?  We may have -- we may have a

6    couple just like clarification questions.

7              MR. MANION:  Okay.

8              MR. WIEST:  Okay.

9                  (Brief recess.)

10                 CROSS-EXAMINATION

11   BY MS. JOHNSON:

12       Q.   Okay.  So Lieutenant Stewart,

13   plaintiff's counsel was asking you about the

14   buffer zone ordinance and when a sidewalk

15   counselor could cross through the ordinance and

16   when they can't.

17              Is it typical for LMPD officers to use

18   discretion or common sense when enforcing

19   ordinances?

20       A.   Yes.

21       Q.   And there are several ordinances that

22   use terms such as unreasonable noise, and you

23   would have to use your discretion or common sense

24   to determine what that was; correct?

25       A.   Correct.

1           MR. WIEST:   Objection to form.

2      Q.   And then I just want to address the

3 Federal Rules of Civil Procedure 30(b)(6) list

4 given by plaintiff's counsel, topic B on the

5 feasibility and effectiveness of the various

6 ordinances before the buffer zone ordinance was

7 enacted.

8           And can you explain just the process of

9 what happened when you would get a call about

10 harassment or blocking a sidewalk at the end of

11 the clinic?  What would the -- what are the steps

12 that LMPD would take after receiving that phone

13 call?

14     A.   So we'd obviously respond, and when we'd

15 get there, you know, we would talk to anybody

16 that's involved.  But the issue with like

17 harassment and blocking sidewalks and things like

18 that -- well, there's multiple issues.  One,

19 typically people behave differently when police

20 are present and when police aren't.  So if there

21 was some activity going on that was contrary to

22 an ordinance or KRS before we got there, a lot of

23 times it would cease when we got there so we

24 wouldn't have observed it.

25           And kind of another issue and problems

1    we've ran into with some of the other ordinances

2    and KRS that's been discussed is just the

3    difficulty of any kind of enforcement based on,

4    you know, video evidence alone.  So it's

5    difficult without being there in person to -- and

6    hear everything that's going on, to see, you

7    know, something like harassment.

8              And so oftentimes we would get calls for

9    service from the clinic about some of these

10   issues and we would show up and ultimately there

11   wasn't really any enforcement action we could

12   take, just based on the, the lack of evidence and

13   the inability to, I guess, rise to the level of

14   probable cause.

15             Whereas with -- with the buffer zone

16   ordinance, it's a little more concrete in that,

17   you know, here are the lines and if somebody is

18   in there without one of the exceptions, then

19   that's something that could be enforced.  And,

20   and video footage, regardless of audio, is, is

21   going to show that pretty clearly.

22   Q.    So would it be your opinion then that,

23   that really to effectively enforce previous

24   ordinances and statutes, it would require

25   constant police presence down at the EMW Clinic?

1              MR. WIEST:  Objection to form.

2              COURT REPORTER:  I didn't catch the end

3     of your question.  It would require constant

4     police?

5         Q.   Presence at the EMW clinic.

6         A.   Yes.  So in order to effectively enforce

7     many of those that we've discussed, it would

8     require us to be there constantly, watching for

9     them, which just really isn't feasible.

10        Q.   Or a victim could potentially file a

11    report; correct?

12        A.   Yes.

13        Q.   And that -- for whatever reason, that

14    just doesn't happen; correct?

15        A.   Yes.  Typically for, for whatever

16    reason, the victims at the location typically

17    decline police reports.

18             MS. JOHNSON:  That is all I have.

19             MR. MANION:  Nothing further from me.

20             MR. WIEST:  Yeah, I have a couple

21    follow-ups.

22                  FURTHER CROSS-EXAMINATION

23    BY MR. WIEST:

24        Q.   Lieutenant, again there is video from

25    EMW that they have to detect violations, and that

Page 121

1    has been the case prior to the buffer zone

2    ordinance; correct?

3         A.    Yes, they've had video prior to the

4    buffer zone ordinance.

5         Q.    Okay.  And we have seen -- we went

6    through the arrest reports early today.  There

7    have been arrests that were made prior to the

8    buffer zone ordinance with people that were

9    blocking the ordinance; correct?

10        A.    There have been arrests for people that

11   were trespassing on their property.

12        Q.    Right.  There were also arrests -- I

13   think there was an arrest for harassment -- one

14   of those arrests was, I think, for harassment;

15   right?

16        A.    It's possible.  There would have to be

17   another charge that was in conjunction with that.

18        Q.    Okay.

19        A.    Because without it -- we couldn't arrest

20   somebody for harassment.

21        Q.    You can cite someone for harassment on

22   the complaint of, of the clinic if they were --

23   or their escorts if they were being harassed,

24   could you not?

25        A.    Potentially, yes.

Page 122

1        Q.    Okay.  And while I realize that a

2   painted line on the sidewalk is easy to enforce,

3   if somebody were intentionally obstructing a

4   clinic and refused to move when a police officer

5   told him to, then there would be no question that

6   their continued conduct would be knowing or

7   intentional; correct?

8        A.    It would seem so, yes.

9        Q.    And then you -- I think you previously

10  testified you would then have probable cause, if

11  that happened, to take enforcement action;

12  correct?

13       A.    Yes.

14       Q.    Okay.  So essentially I think what

15  you're telling me is the buffer zone has made

16  your job easier; fair?

17       A.    It would be fair to say the buffer zone

18  ordinance is much easier to enforce than the

19  other ordinances that we've discussed.

20            MR. WIEST:  Okay.  Thank you.  I have

21  nothing further.

22            MR. MANION:  Nothing here.

23            MS. JOHNSON:  Nothing here.

24

25            (Witness excused.)

1            (Deposition concluded at 11:45 a.m.)

2

3

4

5

6

7   _____          _____

8   CALEB STEWART                             DATE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 124

1                             )
   COMMONWEALTH OF KENTUCKY    )
2                             )

3

4          I, Lee Ann Goff, Notary Public in and for

5    the Commonwealth of Kentucky, do hereby certify:

6          That the witness named in the deposition,

7    prior to being examined, was by me duly sworn;

8          That said deposition was taken before me at

9    the time and place therein set forth and was taken

10   down by me in shorthand and thereafter transcribed

11   into typewriting under my direction and supervision;

12         That said deposition is a true record of

13   the testimony given by the witness and of all

14   objections made at the time of the examination.

15         I further certify that I am neither counsel

16   for nor related to any party to said action, nor in

17   any way interested in the outcome thereof.

18         IN WITNESS WHEREOF I have subscribed my

19   name and affixed my seal this 17th day of January,

20   2022.

21

22                   _____

23                   Lee Ann Goff

24                   Notary Public KYNP30963

25   My Commission Expires:  7/1/25