UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

SISTERS FOR LIFE, INC., et al                                    Plaintiffs

v.                                              Civil Action No. 3:21-cv-367-RGJ

LOUISVILLE-JEFFERSON COUNTY                                      Defendants
METRO GOVERNMENT, et al

***

EDWARD HARPRING, et al.                                          Plaintiffs

                                               Civil Action No. 3:21-cv-691-RGJ

LOUISVILLE-JEFFERSON COUNTY                                       Defendant
METRO GOVERNMENT

* * * * *

**MEMORANDUM OPINION & ORDER**

Plaintiffs, Edward Harpring ("Harpring") and Mary Kenney ("Kenney") (collectively

"*Harpring* Plaintiffs"), move for a preliminary injunction. [DE 37]. Defendant

Louisville/Jefferson Country Metro Government ("Metro Government"), responded [DE 38], and

the *Harpring* Plaintiffs replied [DE 39]. Sisters for Life, Inc., Angela Minter, and Kentucky Right

to Life Association, Inc., (collectively "*Sisters* Plaintiffs"), joined the *Harpring* Plaintiffs' Motion

for Preliminary Injunction and renewed their request for a Temporary Restraining Order and

Preliminary Injunction. [DE 49]. Defendants Metro Government, Mayor Greg Fischer, and Chief

Erika Shields (collectively "Defendants") responded to the *Sisters* Plaintiffs' renewed request.

[DE 53]. A third party, Donna Durning ("Durning"), filed a Motion for Leave to File Brief Amicus

Curiae in support of Plaintiffs' motion for preliminary injunction. [DE 42]. Metro Government

1

responded [DE 43], and Durning replied.  [DE 51].  These matters are ripe.  For the reasons below, the *Harpring* Plaintiffs' Motion for Preliminary Injunction [DE 37] is **DENIED**, Durning's Motion for Leave to File Brief Amicus Curiae [DE 42] is **DENIED**, and the *Sisters* Plaintiffs' Renewed Motion for Temporary Restraining Order and Preliminary Injunction [DE 49] is **DENIED**.

## I.      BACKGROUND

The *Sisters* Plaintiffs filed suit in June 2021 against Metro Government and Mayor Greg Fischer, Chief Erika Shields, and Mike O'Connell (collectively "*Sisters* Defendants") (civil action number 3:21-cv-367-RGJ).  [DE 1; DE 28].  The *Harpring* Plaintiffs sued Metro Government in November 2021 (original civil action number 3:21-cv-691-RGJ).[1]  [*Harpring* DE 1].  The Court consolidated the *Sisters* and *Harpring* actions on January 6, 2022.  [DE 36].

Plaintiffs dispute the constitutionality of Ordinance O-179-21 (the "Ordinance") passed by Metro Government and signed by Mayor Fisher in 2021.  [*Harpring* DE 1 at 1, 5; DE 28 at 1480]. The Ordinance states, in relevant part:

> (A) *Definitions*.  For the purpose of this chapter, the following definitions shall apply unless the context clearly indicates or requires a different meaning.
> > **DRIVEWAY.**  An entry from a public street to a public or private parking area used by a healthcare facility.
> > **ENTRANCE.** Any door to a healthcare facility that directly abuts the public sidewalk; provided, however, that if the door does not directly about [sic] the public sidewalk, the 'entrance' shall be the point at which the public sidewalk intersects with a pathway leading to the door.
> . . . .
> (B) *Access to a healthcare facility*.
> > (1) No person shall knowingly obstruct, detain, hinder, impede, or block another person's entry to or exit from a healthcare facility.
> > (2) No person shall knowingly enter, remain on, or create any obstruction within the driveway of a healthcare facility or within a "buffer zone" on the public way or sidewalk extending from the entrance of a healthcare facility to the closest adjacent sidewalk curb and ten feet from side to side, during the facility's posted business hours, except:
> > > (a) Persons entering or leaving such facility;

---

[1] All docket entries from the original *Harpring* case are referred as "*Harpring* DE."  The *Sisters* and *Harpring* Plaintiffs are collectively referred to as "Plaintiffs."

(b) Persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility; or

(c) Law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; or

(d) Employees or agents of such facility acting within the scope of their employment.

(C) *Signage*. The Department of Public Works shall, at the request of a healthcare facility, paint or lay on the public way or sidewalk two easily-distinguishable demarcation lines running from either side of the facility entrance to the closest adjacent sidewalk curb and extending ten feet from each other. Healthcare facilities shall post such zone with signage stating: "Healthcare facility: No standing within this zone. [Metro Ordinance]."

[*Harpring* DE 1-1 at 23-25; DE 11-2 at 164].

The *Harpring* Plaintiffs are "sidewalk counselors who . . . have been active in speaking with and distributing pamphlets, handbills, and other literatures to individuals using the services . . . where abortions are performed." [*Harpring* DE 1 at 2]. The *Sisters* Plaintiffs use "sidewalk ministry. . . [which] involves offering both verbal and written materials outlining alternatives to abortion and help for anyone wishing to pursue those options." [DE 28 at 1478]. Much of Plaintiffs' focus is on the Ordinance's application outside one specific healthcare clinic: EMW Women's Surgical Center ("EMW"). [*Harpring* DE 1 at 2-16; DE 28 at 1475-86]. Plaintiffs focus much or all their sidewalk counseling efforts at EMW, where a buffer zone has been established pursuant to the Ordinance. [*Harpring* DE 1 at 2, 15; DE 28 at 1475, 1486]. Plaintiffs argue the Ordinance is unconstitutional because it violates the First Amendment by preventing them from counseling at EMW inside the buffer zone. [*Harpring* DE 1 at 1-15; DE 28 at 1485-88].

The *Harpring* Plaintiffs seek a preliminary injunction against the enactment and enforcement of the Ordinance and its "buffer zone." [DE 37-1 at 1542-43]. The *Sisters* Plaintiffs fully join this motion and renew their motion for temporary restraining order and preliminary injunction. [DE 49 at 2189]. The *Sisters* Plaintiffs renewed motion for a temporary restraining

order and preliminary injunction argues that the Ordinance violates the First Amendment as well as Plaintiffs' rights to freedom of religion under KRS § 446.350.  [DE 49 at 2207-15].   Durning is a third party to this action and moves for leave to file a brief in support of the Plaintiffs' motion for a preliminary injunction.  Metro Government argues that Durning's motion should be denied because Durning not an impartial party and because her brief is unhelpful to the Court.  [DE 43 at 1682-84]

## II.    DISCUSSION

### A.  Motion for Leave to file Brief Amicus Curiae

"[P]articipation as an amicus to brief and argue as a friend of the court was, and continues to be, a privilege within the sound discretion of the courts, depending upon a finding that the proffered information of amicus is timely, useful, or otherwise necessary to the administration of justice." *United States v. State of Mich.*, 940 F.2d 143, 165 (6th Cir. 1991) (internal citations and quotations omitted).  The historical purpose of an amicus "was to provide impartial information on matters of law about which there was doubt, especially in matters of public interest."  *Id.* at 164.  In determining whether to grant leave to file amicus briefing, courts consider several factors, including adequate representation, cognizable direct interest in the outcome, and whether the proposed amici addresses matters or advances arguments different from those raised by the parties. *See Nat'l Air Traffic Controllers Ass'n, MEBA, AFL-CIO v. Mineta*, No. 99CV1152, 2005 WL 8169395, at *1 (N.D. Ohio June 24, 2005).  "District courts focus on both the usefulness of the brief and the timeliness of the brief." *Kollaritsch v. Michigan State Univ. Bd. of Trustees*, No. 1:15-CV-1191, 2017 WL 11454764, at *1 (W.D. Mich. Oct. 30, 2017).

First, Durning is not an impartial party.  As she advised the Court, she "has interests aligned with plaintiffs which interests have been adversely affected," differently from Plaintiffs in that she

has faced more citations, and a number of other charges.  [DE 42-2 at 1643].  The purpose of an amicus is as "an *impartial* friend of the court—not an adversary party in interest in the litigation." *State of Mich.*, 940 F.2d at 164–65 (emphasis in original) (quoting *Miller-Wohl Co. v. Comm'r of Lab. & Indus. State of Mont.*, 694 F.2d 203, 204 (9th Cir. 1982)).  Amicus curiae compiled by those who are partial, contributing in "a totally adversarial fashion," are "consistently precluded." *State of Mich.*, 940 F.2d at 164–65; *Bright v. Brookdale Senior Living, Inc.*, No. 3:19-CV-00374, 2020 WL 12893860, at *2 (M.D. Tenn. Oct. 23, 2020).  Second, Durning's motion raises claims that are not at issue in this case, stating that that she has faced numerous citations, a 500 foot no contact order, two motions for contempt, and "can't safely go to White Castle in the next block from the clinic."  [DE 42-2 at 1643; DE 51 at 2223].  These issues are not useful to the Court. Finally, Durning's amicus brief mirrors Plaintiffs' brief on the issue of likelihood of success, merely duplicating Plaintiffs' efforts.  While Durning offers her own factual and personal experience with the Ordinance and buffer zone, the amicus brief presents little useful or new information to the Court.  In short, the amicus brief presents nothing that "is timely, useful, or otherwise necessary to the administration of justice."  *State of Mich.*, 940 F.2d at 165.

The Court thus finds that the proposed amicus brief will not aid the Court in deciding the issues before it.  Therefore, Durning's Motion for Leave to File Brief Amicus Curiae [DE 42] is **DENIED**.

## B. Motion for Preliminary Injunction[2]

In the Sixth Circuit,

[f]our factors guide the decision to grant a preliminary injunction: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction

---

[2] Much of the law and analysis is identical to that set forth in the Court's Memorandum Opinion and Order [DE 19] on the *Sisters* Plaintiffs original motion for temporary restraining order and preliminary injunction. However, for the sake of completeness, such law and analysis is repeated.

would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction."

*S. Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012)).  "[T]hese are factors to be balanced, not prerequisites to be met."  *Id.* (citing *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007)).  "For example, a finding that the movant has not established a strong probability of success on the merits will not preclude a court from exercising its discretion to issue a preliminary injunction if the movant has, at minimum, shown serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued."  *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 399–400 (6th Cir. 1997) (internal quotations omitted).  That said, "[w]hen a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor.'"  *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (quoting *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009)).

Plaintiffs argue that they "satisfy the requirements for issuance of a preliminary injunction," because the "[p]roper analysis of the challenged Ordinance using controlling Supreme Court precedent shows a substantial likelihood of success on the merits on several First

Amendment and Due Process grounds."[3]  [DE 37-1 at 1549].  As a result, Plaintiffs do not present arguments for the remaining factors.  [*Id.*].  In contrast, Defendants argue that Plaintiffs cannot establish a likelihood of success on the merits, and that the other factors do not support injunctive relief.  [DE 38 at 1574].

The Court's findings of fact and conclusions of law at the injunctive relief stage are not binding at a trial on the merits.  *United States v. Owens*, 54 F.3d 271, 276 (6th Cir. 1995).  As a result, the rules of evidence are more relaxed at this stage than at trial.  *Univ. of Texas v. Camenisch*, 451 U.S. 390 (1981); *Tenke*, 511 F.3d at 542.

### 1.   Likelihood of Success on the Merits

Because Plaintiffs challenge the constitutionality of the Ordinance, the Court must "look to '[t]he relevant constitutional test' to resolve the inquiry, bearing in mind that a party seeking to invalidate a law in its entirety bears a heavy burden[.]"  *Bruni v. City of Pittsburgh*, 941 F.3d 73, 83 (3d Cir. 2019) ("*Bruni II*") (citation omitted) (first bracket in original).  "[T]he relevant test" in this matter "is that governing free speech claims."  *Id.*  "The government's ability to restrict speech in a traditional public forum, such as a sidewalk, is 'very limited.'"  *Id.* (quoting *McCullen v. Coakley*, 573 U.S. 464, 477 (2014)).  "That is because traditional public fora 'are areas that have historically been open to the public for speech activities[,]'" so "[i]n such fora, the government

---

[3] Plaintiffs cite several cases to support this conclusion.  [*See* DE 37-1 at 1549].  Each case, however, found that a likelihood of success *may* be determinative where there is a constitutional violation.  *Compare* [DE 37-1 at 48-49] ("The Sixth Circuit has further refined [the preliminary injunction] test for the First Amendment contest: 'the crucial inquiry is usually whether the plaintiff has demonstrated a likelihood of success on the merits.'") *with H.D.V.-Greektown, LLC v. City of Detroit*, 568 F.3d 609, 620 (6th Cir. 2009) ("so long as the district court continues to hold the ordinances unconstitutional," it abuses its discretion in withholding injunctive relief); *Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020) ("Preliminary injunctions in constitutional cases *often* turn on likelihood of success on the merits, *usually* making it unnecessary to dwell on the remaining three factors." (emphasis added)); *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 615–16 (6th Cir. 2020) ("Preliminary injunctions in constitutional cases *often* turn on likelihood of success on the merits, *usually* making it unnecessary to dwell on the remaining three factors." (emphasis added)).  Thus, in the cases cited by Plaintiffs, there was a strong likelihood of a constitutional violation, and the other factors were therefore not weighed heavily.

may not restrict speech based on its 'communicative content[.]'" *Id.* (quoting *McCullen*, 573 U.S. at 476; *Bruni v. City of Pittsburgh*, 824 F.3d 353, 364 (3d Cir. 2016) ("*Bruni I*")).   In these traditionally public fora, "the government 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content,'" however "the government has greater leeway to regulate 'features of speech unrelated to its content.'" *Id.* (quoting *Bruni I*, 824 F.3d at 363; *McCullen*, 573 U.S. at 477).   So "'[e]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *McCullen*, 573 U.S. at 477 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).   Thus,

> [t]he level of scrutiny a court applies to a restriction on speech depends on whether it is content based or content neutral.  If the restriction is content based, it is subject to strict scrutiny and is therefore presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests.'   If a restriction is content neutral, 'we apply intermediate scrutiny and ask whether it is narrowly tailored to serve a significant governmental interest.'  The threshold question, therefore, is whether the restriction here is content based or content neutral.

*Bruni II*, 941 F.3d at 84 (quoting *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 155 (2015); *Bruni I*, 824 F.3d at 363-64) (citing *McCullen*, 573 U.S. at 478).

a.   Whether the Ordinance is Content Based or Content Neutral

The Ordinance contains two provisions outlining the conduct it prohibits.  [*Harpring* DE

1-1 at 24].

> (1) No person shall knowingly obstruct, detain, hinder, impede, or block another
>     person's entry to or exit from a healthcare facility.
> (2) No person shall knowingly enter, remain on, or create any obstruction within
>     the driveway of a healthcare facility or within a 'buffer zone' on the public way
>     or sidewalk . . .

[*Id.*].

The Ordinance "would be content based if it required 'enforcement authorities' to 'examine

the content of the message that is conveyed to determine whether' a violation has occurred."

*McCullen*, 573 U.S. at 516 (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383

(1984)).  "But it does not[,]" because "[w]hether petitioners violate the [Ordinance] 'depends' not

'on what they say,' but simply on where they say it."  *Id.* (quoting *Holder v. Humanitarian L.

Project*, 561 U.S. 1, 27 (2010)).  "Indeed, petitioners can violate the [Ordinance] merely by

standing in a buffer zone, without displaying a sign or uttering a word."  *Id.*  Even though, as

Plaintiffs argue, the Ordinance might have "the 'inevitable effect' of restricting abortion-related

speech more than speech on other subjects[,] . . . . "a facially neutral law does not become content

based simply because it may disproportionately affect speech on certain topics."  *Id.*  "On the

contrary, '[a] regulation that serves purposes unrelated to the content of expression is deemed

neutral, even if it has an incidental effect on some speakers or messages but not others.'"  *Id.*

(quoting *Ward*, 491 U.S. at 791).

The Ordinance creates four exceptions to the proscribed conduct [O-179-21(B)(2)(a)-(d)].

Plaintiffs argue that the Ordinance is viewpoint (and thus content) based "because [the Ordinance]

permit[s] EMW and its staff and volunteers to engage in pro-abortion speech within the buffer

zone" under the exception in O-179-21(B)(2)(d)for "[e]mployees or agents of such facility acting within the scope of their employment." [DE 37-2 at 1569]. However, "[t]here is nothing inherently suspect about providing some kind of exemption to allow individuals who work at the clinics to enter or remain within the buffer zone[]." *McCullen*, 573 U.S. at 518. Instead,

> [g]iven the need for an exemption for clinic employees, the 'scope of their employment' qualification simply ensures that the exemption is limited to its purpose of allowing the employees to do their jobs. It performs the same function as the identical 'scope of their employment' restriction on the exemption for 'law enforcement, ambulance, fire-fighting, construction, utilities, public works and other municipal agents.'

*Id.* The exemption "makes clear—with respect to both clinic employees and municipal agents— that exempted individuals are allowed inside the zones only to perform those acts authorized by their employers." *Id.* at 518–19. Thus, the Ordinance is content neutral, and the exceptions do not render it viewpoint based. *See McCullen* at 518-19.

> b. Whether the Ordinance is Narrowly Tailored to Serve a Significant Government Interest

Having found the Ordinance to be content neutral, the Court must apply intermediate scrutiny and ask whether the Ordinance is narrowly tailored to serve a significant governmental interest. *See McCullen*, 573 U.S. at 477; *Bruni II*, 941 F.3d at 84. As discussed below, Metro Government asserts its interest in "providing safe passage for patients entering and exiting healthcare facilities." [DE 38 at 1574]. Plaintiffs argue that the Ordinance is not narrowly tailored because Metro Government could meet this interest with less restrictive measures and because it is geographically overbroad. [DE 37-1 at 1550-62]. The Supreme Court has recognized the "legitimacy of the government's interests in 'ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services.'" *McCullen*, 573 U.S. at 486–87 (citing *Schenck v.*

*Pro-Choice Network Of W. New York*, 519 U.S. 357, 376 (1997)).  Whether the buffer zone would serve a significant government interest is not in dispute.  What is in dispute is whether the Ordinance is narrowly tailored and that is the primary focus of the Court's analysis.

> i.      *Supreme Court's Narrow Tailoring Framework for Buffer Zone Cases.*

The Supreme Court has established the framework for narrow tailoring in two key cases about the constitutionality of buffer zones around abortion clinics or healthcare facilities.  The first buffer zone the Supreme Court analyzed was in *Hill v. Colorado*, 530 U.S. 703 (2000).

Plaintiffs argue that *Hill* has no precedential value in this case.  [DE 37-1 at 1560-62]. They argue that, because the Supreme Court in *McCullen* did not cite, rely upon, explain, or apply *Hill,* this Court should not afford it any precedential value.  [*Id.*].  However, the court in *McCullen* does cite *Hill*, stating that "[t]he statute was modeled on a similar Colorado law that this Court had upheld in *Hill v. Colorado*."  *McCullen*, 573 U.S. at 470.  While the Supreme Court did not further explain or discuss its earlier decision in *Hill*, its statement regarding that decision signals to this Court that it was aware of *Hill*, was citing it with approval, and made a conscientious decision not to overturn it.[4]

Plaintiffs argue further that Hill involved a bubble zone within a buffer zone, and it is therefore inapplicable.  [DE 37-1 at 1560-62].  The *Hill* buffer zone "regulate[d] speech-related conduct within 100 feet of the entrance to any health care facility."  530 U.S. at 707.  The buffer zone "ma[de] it unlawful within the regulated areas for any person to 'knowingly approach' within eight feet of another person, without that person's consent, 'for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such

---

[4] In the Concurrence in *McCullen*, Justice Scalia discusses *Hill* in more detail and, in disagreement with the dicta and 'not opining on the holding' states that "*Hill* should be overruled.  Reasons for doing so are set forth in the dissents in that case."  *McCullen v. Coakley*, 573 U.S. 464, 505 (2014).

other person . . . .'"  *Id.*  The Supreme Court found that the buffer zone was content and viewpoint

neutral, *id.* at 724-25, and thus the appropriate test was whether the buffer zone served "significant

and legitimate" governmental interests and was "narrowly tailored" to serve those interests.  *Id.* at

725–26.

The Court determined that Colorado had a "substantial and legitimate interest in protecting

. . . persons [attempting to enter health care facilities] from unwanted encounters, confrontations,

and even assaults[.]"  *Id.* at 729.  The Court also determined that the buffer zone was narrowly

tailored to serve the government's interest because the eight foot zone "allow[ed] the speaker to

communicate at a 'normal conversational distance[,]'" and adequately protected "the right of every

citizen to 'reach the minds of willing listeners . . . .'"  *Id.* at 726–27, 728 (internal citations omitted).

The Court also considered "the place to which the regulations apply in determining whether these

restrictions burden more speech than necessary[,]" noting that hospitals uniquely require a "restful,

uncluttered, relaxing, and helpful atmosphere" to facilitate medical treatment.  *Id.* at 728–29

(quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 772 (1994)) (internal quotations

omitted).  Finally, the Court considered and rejected the petitioners' claims of overbreadth,

unconstitutional vagueness, and unconstitutional prior restraint.  *Id.* at 730-34.  Ultimately, the

Supreme Court upheld the *Hill* buffer zone as constitutional.  *Id.* at 734–35.

The Supreme Court next considered a relevant buffer zone in *McCullen v. Coakley*, 573

U.S. 464 (2014).  The *McCullen* buffer zone "ma[de] it a crime to knowingly stand on a 'public

way or sidewalk' within 35 feet of an entrance or driveway to any place, other than a hospital,

where abortions are performed."  *Id.* at 469.  The Court found that the buffer zone was content

neutral because "[w]hether petitioners violate the [buffer zone] 'depends' not 'on what they say,'

but simply on where they say it.  Indeed, petitioners can violate the [buffer zone] merely by

standing in [the] zone, without displaying a sign or uttering a word." *Id.* at 479–80 (quoting *Humanitarian Law Project*, 561 U.S. at 27). The Court noted that "a facially neutral law does not become content based simply because it may disproportionately affect speech on certain topics. On the contrary, 'a regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.'" *Id.* at 480 (quoting *Ward*, 491 U.S. at 791).

The *McCullen* buffer zone contained exemptions for "four classes of individuals," including "employees or agents of a reproductive healthcare facility acting within the scope of their employment." *Id.* at 482 (internal quotations, citations omitted). The *McCullen* petitioners argued that this exemption "allow[ed] clinic employees and agents—including the volunteers who 'escort' patients arriving at the Boston clinic—to speak inside the buffer zones[,]" but the Court found that the record "contain[ed] insufficient evidence to show that the exemption operates in this way at any of the clinics, perhaps because the clinics d[id] not want to doom the [buffer zone] by allowing their employees to speak about abortion within the buffer zones." *Id.* at 483, 485.

The *McCullen* Court "recognized the legitimacy of the government's interests in 'ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services[,]'" which were interests that "the buffer zones clearly serve[d.]" *Id.* at 486–87. Yet the Court found that the size of the buffer zone "compromise[d] petitioners' ability to initiate the close, personal conversations that they view as essential to 'sidewalk counseling.'" *Id.* at 487. The 35-foot buffer zones also "pushed petitioners so far back from the clinics' driveways that they c[ould] no longer even attempt to offer literature as drivers turn into the parking lots[,]" so "[i]n short, the [buffer zone] operate[d] to deprive petitioners of their two primary methods of communicating with

13

patients." *Id.* at 488.  Because the petitioners in *McCullen* engaged in calm and conversational "sidewalk counseling," the Court determined that "[i]f all that the women [entering an abortion clinic] can see and hear are vociferous opponents of abortion, then the buffer zones have effectively stifled petitioners' message." *Id.* at 489–90.  Relying on such findings, the Court held that "[t]he buffer zones burden substantially more speech than necessary to achieve the Commonwealth's asserted interests" of "ensuring public safety outside abortion clinics, preventing harassment and intimidation of patients and clinic staff, and combating deliberate obstruction of clinic entrances." *Id.* at 490.

The *McCullen* Court placed import on the "variety of approaches" that were available to the Commonwealth and were "capable of serving its interests, without excluding individuals from areas historically open for speech and debate."  *Id.* at 494.  The Court reasoned that the issues the Commonwealth sought to remedy were "limited principally to [one] Boston clinic on Saturday mornings[,]" but the buffer zones were created outside every clinic in the state, and that the Commonwealth had not tried less intrusive measures such as individual prosecutions or injunctions.  *Id.* at 495.  Finally, the Court reiterated that the Commonwealth had legitimate interests which were impermissibly pursued "by the extreme step of closing a substantial portion of a traditional public forum to all speakers . . . without seriously addressing the problem through alternatives that leave the forum open for its time-honored purposes" which ultimately violated the First Amendment. *Id.* at 497.

ii.     *Circuit Court Rulings Applying* Hill *and* McCullen

Since the Supreme Court's decisions in *Hill* and *McCullen*, many other circuits have analyzed the tailoring of buffer zones under the Supreme Court's framework, although the Sixth Circuit has not.  In *Turco v. City of Englewood*, the Third Circuit considered an ordinance that

prohibited persons from knowingly entering or remaining "on a public way or sidewalk adjacent to a health care facility or transitional facility within a radius of eight feet of any portion of an entrance, exit or driveway of such facility or within the area within a rectangle created by extending the outside boundaries of any entrance, exit or driveway of such facility in straight lines to the point where such lines intersect the sideline of the street in front of such entrance, exit or driveway." *Turco v. City of Englewood, New Jersey*, 935 F.3d 155, 159 (3d Cir. 2019). "The practical effect of the ordinance was the creation of three overlapping buffer zones[:] . . . Two semicircular buffer zones extended outwards eight feet from either side of the facility's entrance. The third buffer zone spanned the width of the facility's entrance and extended to the street." *Id.* The Third Circuit reversed and remanded the District Court's grant of summary judgment because the record contained "a multitude of contradicting factual assertions" about the "restraint on the plaintiff's ability to engage in constitutionally-protected communication" and whether the buffer zones actually "affected [the] plaintiff's ability to reach her intended audience." *Id.* at 170. The record was also unclear as to whether the City considered alternative (less restrictive) options, and the Third Circuit highlighted "the intensely factual nature of the inquiry that is usually needed to resolve disputes arising from imposition of buffer zones[.]" *Id.* Noting the incompleteness of the record, and rejecting the plaintiff's overbreadth claim, the Third Circuit reversed and remanded the matter for proceedings consistent with its opinion. *Id.* at 172.

The Seventh Circuit considered a buffer zone nearly identical to the one before the Supreme Court in *Hill v. Colorado*, except it applied to a smaller physical zone. *Price v. City of Chicago*, 915 F.3d 1107, 1109, 1113 (7th Cir. 2019). The Seventh Circuit upheld the buffer zone because *Hill* was directly controlling on the issues. *Id.* at 1119. The Court noted that it "would open a

circuit split if [it] allowed th[e] facial challenge [of the buffer zone] to move forward." *Id.* at 1109 (citing *Brown v. City of Pittsburgh*, 586 F.3d 263, 270–73 (3d Cir. 2009)).

### iii.  *Application of Narrowly Tailored Case Law*

Metro Government discusses its interest in "providing safe passage for patients entering and exiting healthcare facilities." [DE 38 at 1574]. Metro Government argues that, before the Ordinance was enforced, "there were numerous citations, reports, and arrests that occurred outside of the EMW Clinic ranging from destroying property to harassment/intimidation and criminal trespassing." [*Id.* at 1579]. Metro Government also argues that victims and patients fear and "face retaliation by protestors and sidewalk counselors once their identity becomes known" through public complaint records.  [*Id.*].  Metro Government asserts that, prior to the enactment of the Ordinance, constant police presence was needed at EMW, and that is impossible because the Louisville Metro Police Department has limited resources.  [*Id.*].  Finally, Metro Government contends that law enforcement efforts to curtail these incidents have been ineffective because "officers are required to make judgment calls on whether enforcing existing ordinances or laws would violate the protestor's First Amendment rights." [*Id.*].  The Supreme Court has "previously recognized the legitimacy of the government's interests in 'ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services.'" *McCullen*, 573 U.S. at 486–87 (citing *Schenck*, 519 U.S. at 376).  The Ordinance "clearly serve[s] these interests." *Id.* at 487. The issue is therefore whether the Ordinance is narrowly tailored to serve Metro Government's significant interests.

Plaintiffs state that, after the Ordinance was adopted, "a set of lines 10 feet apart was painted by Metro [Government] on the sidewalk going from the curb at Market Street to the

entrance doors of EMW . . . More recently, on October 12, 2021, signs were posted on the edge of EMW's property about 30 feet to either side of the painted lines . . . they read: 'Healthcare Facility: No Standing or Obstructions In This Zone – LMCO § 132.09.'" [DE 37-1 at 1546-47]. Plaintiffs argue that the Ordinance is not narrowly tailored because Metro Government did not pursue less restrictive alternatives and because it is geographically overbroad. [DE 37-1 at 1550-60]. Plaintiffs further argue that the less restrictive alternatives that Metro Government could pursue would be to issue injunctions and prosecute those causing problems at EMW in the first place. [DE 37-1 at 1555-58]. Metro Government argues that the buffer zone is the least restrictive means available. [DE 38 at 1584-85]. Plaintiffs also argue that the Ordinance is geographically overbroad because, although on its face it "sets up buffer zones at all healthcare facilities in Louisville/Jefferson County Metro," the problem the Ordinance addresses concerns only EMW. [DE 37-1 at 1558-60]. Metro Government argues in response that the Ordinance is a local ordinance addressing a local issue, that it does not automatically create buffer zones at every healthcare facility, and that EMW is the only clinic that has requested one. [DE 38 at 1586].

Based on the Department of Public Works' placement of the demarcation lines and signs, [DE 37-1 at 1547], Plaintiffs are still be able to engage in sidewalk counseling outside of EMW due to the large stretches of sidewalk out front of EMW that remain outside the buffer zone's boundaries. The buffer zone effectively requires Plaintiffs to stand no more than ten feet away from any patients entering the facility. [*Id.*]. The Supreme Court noted in *Hill* that an eight foot "separation between [a] speaker and the audience should not have any adverse impact on the readers' ability to read signs[,]" and that, at a distance of eight feet, a "speaker [can] communicate at a 'normal conversational distance.'" 530 U.S. at 726–27. As a practical matter, if a person enters EMW by walking through the middle of the buffer zone, Plaintiffs can counsel them from

merely five feet away on either side. Thus, Plaintiffs are able to continue their sidewalk counseling at a normal conversational distance. The only thing Plaintiffs are prevented from doing as a result of the buffer zone placement is physically obstructing a patient from entering the healthcare facility. The Court does not need to consider whether a less restrictive alternative is available, because it would not affect the Plaintiffs' success on the merits. *Lexington H-L Servs., Inc. v. Lexington-Fayette Urb. Cty. Gov't*, 879 F.3d 224, 232 (6th Cir. 2018); *Ward*, 491 U.S. at 798–800. Additionally, the Ordinance is not geographically overbroad; it is narrowly tailored to the problem: a healthcare facility with the type of problem described in the Ordinance can request the demarcation of a buffer zone.

Given the size of the Ordinance's proposed buffer zone and the detailed Supreme Court and Circuit Court precedent upholding buffer zones more narrowly tailored than the one in *McCullen*, Plaintiffs' likelihood of success on the merits is not strong at this stage of the litigation. Several district courts have denied injunctive relief in buffer zone challenges, even when analyzing larger buffer zones than the one created by the Ordinance. *See Bruni v. City of Pittsburgh*, 91 F. Supp. 3d 658, 661 (W.D. Pa. 2015), *vacated in part on other grounds*, 824 F.3d 353 (3d Cir. 2016);[5] *Reilly v. City of Harrisburg*, 336 F. Supp. 3d 451, 454 (M.D. Pa. 2018), *aff'd*, 790 Fed. App'x 468 (3d Cir. 2019); *see also Price v. City of Chi.*, No. 16-cv-8268, 2017 U.S. Dist. LEXIS 519, *12 (N.D. Ill. Jan. 4, 2017) (the district court did not consider plaintiffs request for injunctive relief because the court granted the defendants' motion to dismiss), *aff'd*, 915 F.3d 1107 (7th Cir. 2019). As a result, this factor weighs against issuance of a preliminary injunction on the merits of their constitutional claim.

---

[5] The *Bruni* plaintiffs did not appeal the district court's denial of their request for injunctive relief. *See* 824 F.3d at 360.

2.     Plaintiffs' Irreparable Injury Absent an Injunction

The next factor that the Court must balance is whether Plaintiffs would suffer irreparable injury absent an injunction.  *See Southern Glazer's Distributors of Ohio, LLC*, 860 F.3d at 849. Plaintiffs allege that their injury is a loss of First Amendment freedoms that is "readily apparent, indisputable, and irreparable."  [DE 37-1 at 1542].  They argue that the buffer zone hampers their First Amendment freedoms because Metro Government failed to pursue less restrictive alternatives and because the Ordinance is unconstitutionally vague and geographically over-inclusive.  [*Id.* at 1550-67].  They appear to specifically argue that their First Amendment freedoms have been injured by the Ordinance because it hampers their leafletting and pamphleteering and quiet counseling and that "[t]rue sidewalk counseling has become all but impossible.  Plaintiffs' First Amendment freedoms have been not merely or incidentally burdened.  For all practical purposes, they have been eliminated."  [*Id.* at 1548-50, 1567].

The factor of irreparable harm supports injunction where "the Ordinance constitutes harm to Plaintiffs' First Amendment rights," and conversely, it weighs against injunction where "the Ordinance is a reasonable and constitutionally appropriate time, place, and manner limitation[.]" *Reilly*, 336 F. Supp. 3d at 471–72.  When First Amendment freedoms are the only harm alleged, the factor of likelihood of success essentially merges with the irreparable injury factor in that if the plaintiffs cannot show that they are likely to succeed on the merits, they have also failed to demonstrate that they will suffer an irreparable harm.  *See McNeilly v. Land*, 684 F.3d 611, 620– 21 (6th Cir. 2012) ("Once a probability of success on the merits was shown, irreparable harm followed. . . . Because [the plaintiff] does not have a likelihood of success on the merits, . . . his argument that he is irreparably harmed by the deprivation of his First Amendment rights also fails.") *and Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) ("Thus, to the

extent that [the plaintiff] can establish a substantial likelihood of success on the merits of its First Amendment claim, it also has established the possibility of irreparable harm as a result of the deprivation of the claimed free speech rights").  Although Plaintiffs have not demonstrated a likelihood of success on their First Amendment claim, and this factor therefore weighs against injunction on that basis, the Court will consider their other arguments, those not discussed at length above, independently.

Plaintiffs argue that the buffer zone is not narrowly tailored because, on its face, it "sets up buffer zones at all healthcare facilities in Louisville/Jefferson County Metro" and that the government has failed to show that it has pursued its interests through less restrictive alternatives. [DE 37-1 at 1554-60].  As discussed above, the Ordinance is narrowly tailored (and thus Metro Government need not pursue less restrictive means in accomplishing its significant interest). *Ward*, 491 U.S. at 897–99.  The Plaintiffs do not suffer irreparable injury on this basis.

Plaintiffs contend that the Ordinance is "unconstitutionally vague, and for at two three [sic] reasons: (1) it does not define how or when a buffer zone is enforceable, and (2) it does address [sic] whether Plaintiffs, and those similarly situated, are permitted to cross through a buffer zone to get to the other side."  [*Id.* at 1562].  The Due Process Clause of the Fourteenth Amendment provides the foundation for the vagueness doctrine. *Columbia Nat. Res., Inc. v. Tatum*, 58 F.3d 1101, 1105 (6th Cir. 1995) (citing *Chapman v. United States*, 500 U.S. 453, 464 (1991)).  "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  A law is vague if it "fails to provide fair notice to those to whom it is directed."  *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1048 (1991) (citation omitted).  The standard for vagueness is whether "a person of ordinary

intelligence could identify the applicable standard for inclusion and exclusion." *Id.* Mathematical precision is not required. *Id.* at 110.

Plaintiffs first argue that the Ordinance is vague because they "cannot tell whether their intended speech falls within the ordinance's prohibitions" because the ordinance does not "explicitly provide how, or when, buffer zones are made operational." [DE 37-1 at 1563]. They further contend that, while section (C) of the Ordinance states that the Department of Public Works shall paint lines for buffer zones, nothing links this with Section B(2), where the Ordinance defines "healthcare facility," so there is no link providing that buffer zones are only operational after boundary lines have been painted. [*Id.*]. They further contend that this empowers law enforcement officials to make this decision – when the buffer zones are operational – on their own. [*Id.*]. The Court has previously construed the language of the Ordinance and concluded that the buffer zone is created by the demarcation lines. *See* [DE 19 at 18].   Plaintiffs argue that this application of the Ordinance is also unconstitutional because, if buffer zones were not created outside every healthcare facility when the Ordinance was passed, healthcare facilities can create one by asking Metro Government to create a buffer zone, and therefore have the ability to suppress free speech "for any reason at all." [DE 37-1 at 1564]. But the Ordinance does not allow suppression of free speech "for any reason at all;" as discussed at length above, the Ordinance is narrowly tailored to serve a significant government interest. [*Id.*]. Sections B and C of the Ordinance state, in relevant part:

> (B) *Access to a healthcare facility.*
>> (2) No person shall knowingly enter, remain on, or create any obstruction within the driveway of a healthcare facility or within a "buffer zone" on the public way or sidewalk extending from the entrance of a healthcare facility to the closest adjacent sidewalk curb and ten feet from side to side, during the facility's posted business hours . . .
> (C) *Signage.* The Department of Public Works shall, at the request of a healthcare facility, paint or lay on the public way or sidewalk two easily-distinguishable

> demarcation lines running from either side of the facility entrance to the closest adjacent sidewalk curb and extending ten feet from each other.  Healthcare facilities shall post such zone with signage stating: "Healthcare facility: No standing within this zone. [Metro Ordinance]."

[*Harpring* DE 1-1 at 23-25].  The Ordinance is not unconstitutionally vague because a person of ordinary intelligence reading the Ordinance as a whole would be on notice that the buffer zones are "operational" after the lines are painted, as the plain language of the Ordinance dictates. Logically, the way the Ordinance is written, first a healthcare facility makes a request, then the Department of Public Works paints two lines, and then the buffer zone is operational.  The Plaintiffs and others of ordinary intelligence are on notice of when their intended speech falls within the provisions of the ordinance and law enforcement officials are not left to decide when buffer zones are operational.  *See Schenck*, 519 U.S. at 383.

Plaintiffs also argue that the Ordinance is vague because Plaintiffs do not know if they "are free to cross through the zone to get to the other side."  [DE 37-1 at 1566].  Plaintiffs argue that this ambiguity arises because the Ordinance does not specify whether sidewalk counselors fall into Section B(2)(b).  [*Id.*].  Plaintiffs pose several hypotheticals and questions that the Ordinance does not address, among them whether sidewalk counselors can cross through the zone to meet patients approaching the clinic from the other side, and whether they can walk through the zone so the sun is not in their eyes.  [*Id.*].  Plaintiffs further state that Kenny was "informed by an LMPD officer that she was permitted to cross through the zones in order to continue sidewalk counseling on the other side" but when she later crossed though "twice in the span of 20 seconds" she was "issued a formal warning."  [*Id.*].

Section (B) of the Ordinance states:

(B) *Access to a healthcare facility*.
    (1) No person shall knowingly obstruct, detain, hinder, impede, or block another person's entry to or exit from a healthcare facility.

(2) No person shall knowingly enter, remain on, or create any obstruction within the driveway of a healthcare facility or within a "buffer zone" on the public way or sidewalk extending from the entrance of a healthcare facility to the closest adjacent sidewalk curb and ten feet from side to side, during the facility's posted business hours, except:
    (a) Persons entering or leaving such facility;
    (b) Persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility; or
    (c) Law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; or
    (d) Employees or agents of such facility acting within the scope of their employment.

[*Harpring* DE 1-1 at 24].  The Ordinance is not unconstitutionally vague because a person of ordinary intelligence reading the Ordinance as a whole would be on notice that any person, regardless of whether they were a sidewalk counselor, would fall into Section (B)(2)(b) if they were using the public sidewalk to reach a destination other than the healthcare facility.  As Plaintiffs point out, this is not a hypothetical—an officer informed Kenney that she was permitted to pass through the buffer zone.  [DE 37-1 at 1566].  The Ordinance also puts a person of ordinary intelligence of what is prohibited: obstructing entry or exit to and from the healthcare facility, and entering or creating an obstruction within the buffer zone for any reason other than the listed exceptions.  *See* Ordinance Section (B) [*Harpring* DE 1-1 at 24].

    The Court does not know the exact circumstances of the warning that Kenny received, or whether she was crossing in front of an individual entering the clinic or behind them, and the written warning submitted by the *Harpring* Plaintiffs states only that she "walk[ed] through buffer zone [sic] twice in the span of about 20 seconds and was considered [sic] a violation."  [DE 1-2 at 28].  Reading the text of the Ordinance, this conduct would be a violation of the Ordinance if, for instance, Kenney obstructed entry or exit to and from the healthcare facility, or if she was doing it for any purpose other than to reach a destination.  Common sense would dictate that sidewalk

counseling—or even pacing—do not fall within the definition of "reaching a destination." [*Harpring* DE 1-1 at 24].  On the other hand, Kenny's conduct would not be a violation if Kenney were using the sidewalk to reach a destination other than the healthcare facility.  The Ordinance does not specify or answer every question that Plaintiffs discuss in their brief, nor is it required to. The Ordinance has "flexibility and reasonable breadth, rather than meticulous specificity." *Grayned*, 408 U.S. at 110 (internal citation omitted).  Crossing the buffer zone twice in twenty seconds does not appear to a reasonable observer to be "for the purpose of reaching a destination other than such facility"—common sense dictates otherwise.  [*Harpring* DE 1-1 at 24].

Reading the Ordinance "as a whole," it gives individuals "of ordinary intelligence a reasonable opportunity to know what is prohibited."  *Grayned*, 408 U.S. at 110; *Schenck*, 519 U.S. at 383.  Therefore, the Ordinance is not unconstitutionally vague.  *See, e.g., United States v. Williams*, 553 U.S. 285, 304 (2008), *Grayned*, 408 U.S. at 110 *and Schenck*, 519 U.S. at 383.  As the Ordinance is not vague, the Plaintiffs do not suffer irreparable injury due to unconstitutional vagueness.

Plaintiffs also imply[6] that the Ordinance substantially restricts or eliminates sidewalk counselors in a public forum, and that their sidewalk counseling, leafletting, and pamphleteering is burdened or eliminated, because Metro Government has made it "more difficult" to hand out leaflets and communicate with patients.  [DE 37-1 at 1548-50, 1567; DE 39 at 1618].  Plaintiffs state that, since the passage of the Ordinance,

> EMW and its counselors have now devised a strategy which uses the buffer zone to effectively eliminate entirely any change of caring, personal conversation between sidewalk counselors and patients entering the clinic . . . the clinic either directs patients to be dropped off at the curbside entrance to the buffer zone or meets them at some remote location in a marked 'clinic shuttle.' The escorts flank the patients as they walk to the entrance.  This makes it impossible for sidewalk

---

[6] The following argument was not expressly developed by the Plaintiffs in their briefing, but to the extent the facts cited about EMW's counselors is relevant to their argument, the Court addresses it here.

> counselors to hand pamphlets to patients as the escorts typically grab the pamphlets or block the counselors' hands from reaching the vicinity of the patient's hand, even if patients may want to receive the information . . . the artificial distance now required between counselors and patients requires counselors to raise their voices and/or go into Market Street and hover over the vehicles dropping women off in order to try to speak with them.

[DE 37-1 at 1547] (internal citations omitted).  As the Supreme Court noted in *McCullen,* "while the First Amendment does not guarantee a speaker the right to any particular form of expression, some forms—such as normal conversation and leafletting on a public sidewalk—have historically been more closely associated with the transmission of ideas than others . . . When the government makes it more difficult to engage in these modes of communication, it imposes an especially significant First Amendment burden."  *McCullen*, 573 U.S. at 488, 449.

Here, the government has not made it "more difficult to engage in these modes of communication," in the way that the court in *McCullen* discussed.  In *McCullen*, because of the size of the buffer zone, the sidewalk counselors were pushed so far back from the clinics that they had no opportunity to even attempt to offer literature.  *Id.* at 488.  As discussed above, the size of the buffer zone is substantially smaller, and Plaintiffs have the opportunity to communicate with willing listeners and distribute leaflets to interested individuals.  Plaintiffs may approach the buffer zone and offer a leaflet to, and have a normal conversation with, someone even on the other side of the buffer zone.  Because the buffer zone size is relatively small, individuals can easily hear and see Plaintiffs speaking in a "quiet, caring, personal manor while handing them pamphlets," and then such individuals can choose whether or not to listen or accept the pamphlet.  [DE 37-1 at 1547].

Moreover, the buffer zone itself does not change a patient's right or ability to have an escort into the facility.  Before the buffer zone existed patients could be escorted into the facility and an escort could have swiped away a leaflet then just as they can swipe away a leaflet now when

escorting a patient through the buffer zone.  In other words, the ability to have an escort into the

facility was not created by the buffer zone or Ordinance.  The ability to have an escort into the

facility continues to be allowed under the Ordinance and does not change the status quo.  The

buffer zone thus does not substantially affect the ability to offer a pamphlet as the ability to have

an escort existed before.  In short, escorting patients through the buffer zone is private activity that

existed before the Ordinance, is not dictated by the Ordinance, and is not attributable to Metro

Government, and thus does not infringe on Plaintiffs' First Amendment rights.  *See, e.g., Lansing*

*v. City of Memphis*, 202 F.3d 821, 828 (6th Cir. 2000) ("a private entity acting on its own cannot

deprive a citizen of First Amendment rights"), *Flagg Bros. v. Brooks*, 436 U.S. 149 (1978) ("most

rights secured by the Constitution are protected only against infringement by governments"), *and*

*Hudgens v. N. L. R. B.*, 424 U.S. 507 (1976) ("It is, of course, a commonplace that the constitutional

guarantee of free speech is a guarantee only against abridgment by government, federal or state.").

Therefore, the Court finds that the buffer zone does not create irreparable harm to Plaintiffs' First

Amendment rights in this manner either.

Plaintiffs have not demonstrated a loss of their First Amendment rights, and the Court

concludes that Plaintiffs do not face irreparable injury absent an injunction.  Thus, this factor also

weighs against injunction.

3.   Whether Injunction Would Cause Others Substantial Harm

Defendants argue that "it is clearly demonstrated that injunction [would open] doors for

more harm to occur to patients entering and exiting healthcare facilities."  [DE 38 at 1591].  In

Defendants' view, therefore, issuance of an injunction "would amount to substantial harm to

others."  [*Id.* at 1592].  Essentially, issuance of injunction would permit "the exact harm that led

to the enactment of the Ordinance[,]" and this factor therefore does not support injunction.  *Reilly*,

336 F. Supp. 3d at 472.  Plaintiffs did not brief this issue and carry "the burden of justifying [the injunctive] relief" they seek.  *See* [DE 37-1 at 1549]; *Wilson v. Williams*, 961 F.3d 829, 837 (6th Cir. 2020).  The Court only has before it Defendants' uncontested representation that injunction would risk harm to patients.  This factor therefore does not support injunction.

    4.    <u>Whether Public Interest is Served by Issuance of Injunction</u>

As with the previous factor, Plaintiffs have not briefed the fourth factor for injunctive relief. [*See* DE 37-1 at 1549].  Defendants have offered that "stalking, harassment, assault and intimidation against vulnerable individuals does not serve the public interests[,]" so injunction should not issue.  [DE 38 at 1592].  Accordingly, this factor also weighs against temporary restraining order or injunction.

In reviewing the four factors for a temporary restraining order or injunction, Plaintiffs have not carried their burden of justifying injunctive relief.  *See Wilson*, 961 F.3d at 837.  Plaintiffs have not demonstrated a strong likelihood of success on the merits or the pendency of irreparable injury to them absent injunctive relief.  Plaintiffs also did not fully brief the final factors for injunctive relief, so the record includes no argument suggesting that these factors support injunction.  As a result, none of the four factors support injunctive relief and Plaintiffs' Motion for Preliminary Injunction, [DE 37], is **DENIED**.

  **C.** *Sisters* **Plaintiffs' Renewed Motion for Temporary Restraining Order and Preliminary Injunction**

The *Sisters* Plaintiffs Renew their Motion for Temporary Restraining Order and Preliminary Injunction.  [DE 49].  They again argue that "the likelihood of success factor is dispositive," and do not present arguments for the remaining preliminary injunction factors.  [DE 49-1 at 2207].  Defendants argue in response that the *Sisters* Plaintiffs are not likely to succeed on the merits, and the other factors weigh in favor of denying the motion.  [DE 53 at 2229].

The *Sisters* Plaintiffs' renewed motion is essentially identical to their original emergency motion for temporary restraining order an preliminary injunction [DE 2], with the exception of an updated facts section and a paragraph in which the *Sisters* Plaintiffs add analysis under *McCullen*, 573 U.S. at 477.  [DE 49-1 at 2191-2206, 2213].  Apart from one new paragraph, the *Sisters* Plaintiffs do not cite to the new depositions in their analysis or otherwise expand on how the updated facts support their motion.  The party seeking preliminary injunction bears the burden of justifying relief, and thus it is not the Court's duty to search the record for facts that support Plaintiff's motion.  *Wilson v. Williams*, 961 F.3d 829, 837 (6th Cir. 2020).  The Court incorporates its previous memorandum opinion & order denying temporary restraining order and preliminary injunction.  [DE 19].  In that previous order, the Court outlined what the Plaintiffs would need to present to the Court: a showing of irreparable injury, substantial harm to others, and whether public interest would be served by issuance of an injunction.  Although the *Sisters* Plaintiffs state that they have taken depositions, which they have filed with the Court, they have not provided the Court with the necessary information and analysis, as outlined in the previous order.  The updated facts section and minor changes in their brief do not change the Court's analysis of the *Sisters* Plaintiffs' motion.  Therefore, the *Sisters* Plaintiffs have not carried their burden of justifying injunctive relief, and their Renewed Motion for Temporary Restraining Order and Preliminary Injunction, [DE 49], is **DENIED**.

## III.   CONCLUSION

For all these reasons, and the Court being otherwise sufficiently advised, **IT IS**

**ORDERED** as follows:

(1) Plaintiffs' Motion for Preliminary Injunction [DE 37] is **DENIED**;

(2) Durning's Motion for Leave to File Brief Amicus Curiae [DE 42] is **DENIED**;

(3) *Sisters* Plaintiffs' Renewed Motion for Temporary Restraining Order and Preliminary

Injunction [DE 49] is **DENIED**.

Rebecca Grady Jennings, District Judge

United States District Court

February 25, 2022

Cc:    Counsel of record