**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

Deborah S. Hunt
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: December 21, 2022

Mr. Thomas Bernard Bruns
Bruns, Connell, Vollmar & Armstrong
4555 Lake Forest Drive
Suite 330
Cincinnati, OH 45242

Mr. John F. Carroll Jr.
Ms. Natalie Suzanne Johnson
Jefferson County Attorneys Office
200 S. Fifth Street, Suite 300N
Louisville, KY 40202

Mr. Daniel John Grabowski
Mr. Matthew Franklin Kuhn
Office of the Attorney General of Kentucky
700 Capitol Avenue, Suite 118
Frankfort, KY 40601

Mr. FRANCIS J. MANION
Mr. Geoffrey R. Surtees
American Center for Law and Justice
P.O. Box 60
New Hope, KY 40052

Mr. Edward Lawrence White
American Center for Law and Justice
3001 Plymouth Road, Suite 203
Ann Arbor, MI 48105

Mr. Christopher David Wiest
25 Town Center Boulevard, Suite 104
Crestview Hills, KY 41017

Re: Case Nos. 22-5150/5151, *Sisters for Life, Inc., et al v. Louisville-Jefferson Co, KY, et al*
Originating Case No. : 3:21-cv-00367 : 3:21-cv-00691

Dear Counsel,

    The court today announced its decision in the above-styled cases.

    Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                                            Yours very truly,

                                            Deborah S. Hunt, Clerk

                                            Cathryn Lovely
                                            Deputy Clerk

cc:  Mr. James J. Vilt Jr.

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0272p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

SISTERS FOR LIFE, INC., ANGELA MINTER, and KENTUCKY RIGHT TO LIFE ASSOCIATION, INC. (22-5150); EDWARD HARPRING and MARY KENNEY (22-5151),

*Plaintiffs-Appellants*,

*v*.

LOUISVILLE-JEFFERSON COUNTY, KY METRO GOVERNMENT (22-5150 & 22-5151); GREG FISCHER, Mayor, ERIKA SHIELDS, Chief of Police, Louisville Metro Police Department, and MIKE O'CONNELL (22-5150),

*Defendants-Appellees*.

Nos. 22-5150/5151

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
Nos. 3:21-cv-00367; 3:21-cv-00691—Rebecca Grady Jennings, District Judge.

Argued: December 8, 2022

Decided and Filed: December 21, 2022

Before: SUTTON, Chief Judge; GRIFFIN and NALBANDIAN, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Christopher Wiest, CHRIS WIEST, ATTY AT LAW, PLLC, Crestview Hills, Kentucky, for Appellants in 22-5150. Francis J. Manion, AMERICAN CENTER FOR LAW & JUSTICE, New Hope, Kentucky, for Appellants in 22-5151. Natalie Johnson, JEFFERSON COUNTY ATTORNEYS' OFFICE, Louisville, Kentucky, for Appellees. **ON BRIEF:** Christopher Wiest, CHRIS WIEST, ATTY AT LAW, PLLC, Crestview Hills, Kentucky, Thomas Bruns, BRUNS CONNELL VOLLMAR & ARMSTRONG, Cincinnati, Ohio for Appellants in 22-5150. Francis J. Manion, Geoffrey R. Surtees, AMERICAN CENTER FOR LAW & JUSTICE, New Hope, Kentucky, Edward L. White III, AMERICAN CENTER FOR LAW & JUSTICE, Ann Arbor, Michigan, for Appellants in 22-5151. Natalie Johnson, John F. Carroll, JEFFERSON COUNTY ATTORNEYS' OFFICE, Louisville, Kentucky, for Appellees.

Matthew F. Kuhn, Brett R. Nolan, Daniel J. Grabowski, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Amicus Curiae in 22-5150.

---

**OPINION**

---

SUTTON, Chief Judge. Sisters for Life, several individuals, and another pro-life organization wish to offer leaflets and compassionate, if sometimes unwelcome, speech to women entering abortion clinics in Louisville, Kentucky. But Louisville-Jefferson County limited their speaking and pamphleteering in buffer zones near the entrance of each clinic. Because these limits likely violate the First Amendment, *see McCullen v. Coakley*, 573 U.S. 464, 497 (2014), we preliminarily enjoin them.

I.

Edward Harpring, Mary Kenney, Angela Minter, Kentucky Right to Life, and Sisters for Life (collectively, Sisters for Life) believe "that abortion takes the life of an innocent human being and is harmful to mothers." R.1 ¶ 19. They distribute pamphlets to, and try to engage with, women entering abortion clinics, hoping to persuade the women not to end their pregnancies. They focus "much or all" of their advocacy on women entering Louisville's EMW Women's Surgical Center. R.55 at 3.

Two types of protestors have visited EMW in the past. Some have vandalized property, blocked access to the Clinic, or committed other torts. The three individuals claim not to want anything to do with such protests, and indeed say they do not "protest" or "demonstrate" near EMW at all. R.1 ¶ 25. Instead, in "quiet, compassionate, non-threatening one-on-one conversation[s]," they try to convince EMW's patients "that there are lifesaving alternatives" to abortion and that they "will accompany the woman in whatever way she may need." *Id.* ¶ 22. They call this practice "sidewalk counseling." *Id.* ¶ 20.

The Louisville-Jefferson County law does two things. It first says that no one shall "knowingly obstruct, detain, hinder, impede, or block another person's entry to or exit from a

healthcare facility." Louisville-Jefferson Ord. Code § 132.09(B)(1). No one objects to this prohibition on conduct.

The ordinance then creates a limitation on speech. It imposes a prophylactic ten-foot "buffer zone" around the entrance of any "healthcare facility" in the County and forbids any non-exempt individual from "knowingly enter[ing]" or "remaining . . . within" it. *Id.* § 132.09(B)(2). The law defines "healthcare facility" to include "any institution" that provides medical services, including abortion clinics like EMW. *Id.* § 132.09(A). It says that the buffer zone extends "from the entrance of a healthcare facility to the closest adjacent sidewalk curb and 10 feet from side to side," and applies "during [a] facility's posted business hours." *Id.* § 132.09(B)(2). And it exempts from the buffer-zone rules four groups: "[p]ersons entering or leaving" a healthcare facility; "[p]ersons using the public sidewalk or street right-of-way adjacent to [a healthcare] facility solely for the purpose of reaching a destination other than such facility"; "municipal agents acting within the scope of their employment"; and "[e]mployees or agents of [a healthcare] facility acting within the scope of their employment." *Id.*

Sisters for Life sued the County and various county officials. It alleged that this restriction on sidewalk speech violated its rights under the First (and Fourteenth) Amendment's Free Speech Clause, and it sought to enjoin enforcement of the ordinance. The district court declined to issue a preliminary injunction, reasoning that the ordinance likely did not violate anyone's free-speech rights and that the other factors did not favor an injunction.

II.

Those seeking a preliminary injunction must meet several requirements. They must show a likelihood of success on the merits. They must show irreparable harm in the absence of the injunction. They must show that the balance of equities favors them. And they must show that the public interest favors an injunction. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). In this case, as in many First Amendment cases, the key inquiry is the first one: Who is likely to prevail on the constitutional claim? *Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020) (per curiam).

We review a district court's preliminary injunction decision for abuse of discretion and any fact findings for clear error. *Mich. State AFL-CIO v. Schuette*, 847 F.3d 800, 803 (6th Cir. 2017). Notably, neither set of parties sought an evidentiary hearing and neither claims that any material disputes of fact underlie this case. Mistakes of law by definition constitute an abuse of discretion. *Law Off. of John H. Eggersten P.C. v. Comm'r*, 800 F.3d 758, 765 (6th Cir. 2015).

A.

"Congress shall make no law," the First Amendment says, "abridging the freedom of speech." The Fourteenth Amendment limits state and local governments in the same manner. *See, e.g.*, *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019).

Both sets of parties build from the same free-speech scaffolding. They agree that, "because of their historic role as sites for discussion and debate," streets and sidewalks "occupy a special position in terms of First Amendment protection." *McCullen*, 573 U.S. at 476. They agree that the ordinance restricts sidewalk expression, namely speech within the buffer zone. They agree that, if this restriction applies "without reference to [speech's] content," it must be narrowly tailored to serve a significant government interest. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). They agree that if the ordinance instead restricts expression based on its ideas or content, it must run the gauntlet of strict scrutiny—that is, it must be the least restrictive means to serve a compelling interest. *See United States v. Grace*, 461 U.S. 171, 177 (1983). And they agree (or at least the County does not contest) that the ordinance would not survive strict scrutiny.

That leaves two key questions. Is the ordinance content neutral? If so, is the ordinance narrowly tailored?

*Content neutral? McCullen* faced a similar question in the context of a similar buffer-zone restriction outside abortion clinics in Massachusetts. 573 U.S. at 469. The Court reasoned that the ordinance did not regulate speech based on its subject matter because it limited pro-life and pro-choice speech—in truth all speech—within the buffer zone. *Id.* at 479–84. But the Court cautioned that an ordinance, even if neutral on its face, could become content based if the government enforced it selectively. *Id.* at 484–85. That is not a new idea. We have long held

that a regulation may be content based by its nature, or may become so when applied with "an unequal hand." *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886).

The question is whether yesterday's caution has become today's case. In a Rule 30(b)(6) deposition, a representative of the County admitted that he "[did] not believe the ordinance address[ed] . . . [agents of EMW or other escorts] speaking to [clinic] patients" within the buffer zone. R.47 at 58. Consistent with that position, the County disclaims any plans to enforce the ordinance against escorts of women into the Clinic, even though they have discussed abortion-related topics in the buffer zone in non-neutral ways. *See, e.g.*, R.44 at 47–50 (escorts telling patients that the pro-life protestors are "liar[s]" and that patients should not "talk" or "listen to them"). If that's how the ordinance works—exempting pro-choice speakers while suppressing pro-life speakers—strict scrutiny would apply. *McCullen*, 573 U.S. at 484–85; *see Hoye v. City of Oakland*, 653 F.3d 835, 849–52 (9th Cir. 2011) (similar). But we need not resolve the point because the ordinance fails narrow tailoring anyway, and at all events some of the claimants (Harpring and Kenney) have not argued that the ordinance is content based. That said, the district court on remand may wish to consider whether this evidence, or other evidence introduced at trial, amounts to proof of content or viewpoint discrimination in the County's enforcement of the ordinance.

*Narrow tailoring?* Even a content-neutral regulation of the time, place, and manner of speech still counts as a regulation of speech. That is not something this country lightly allows. To satisfy the First Amendment, a content-neutral regulation must be "narrowly tailored to serve a significant governmental interest." *Ward*, 491 U.S. at 796. Why? Solving policy problems by regulating speech is a means of last resort, not first resort, making "mere convenience" insufficient and making us wary that "silencing the speech is sometimes the path of least resistance." *McCullen*, 573 U.S. at 486. Hence the "demand[]" of "a close fit between ends and means." *Id.* Hence the requirement that the government not "burden substantially more speech than . . . necessary." *Id.* Hence the goal of "prevent[ing] the government from too readily 'sacrific[ing] speech for efficiency.'" *Id.* A critical feature of this inquiry turns on whether the County "seriously undertook to address" the problems it faces "with less intrusive tools readily available to it." *Id.* at 494.

What interests does the buffer zone advance? The County claims that it facilitates safe, unimpeded access to abortion facilities and prohibits obstruction of them. The claimants do not challenge the validity of these interests. And the federal courts have accepted them before. *Id.* at 486–87. At the same time, the buffer zone imposes "serious burdens" on the claimants' speech by "compromis[ing]" their "ability to initiate the close, personal conversations that they view as essential to 'sidewalk counseling.'" *Id.* at 487. At stake is whether the buffer zone fits the County's access interests closely.

The County has not demonstrated the requisite degree of fit. The first problem is the breadth of the regulation. Even though caselaw permits a city to enact access laws focused on abortion facilities, *id.* at 479, the County sought to advance its interests by imposing a buffer zone on *all* medical facilities in Louisville. And why? The record does not reveal access problems beyond EMW, and indeed the County concedes that EMW's challenges are "unique." Appellee's Br. 26. Yet the ordinance covers every single hospital, clinic, and dentist's office in the area. *See* Louisville-Jefferson Ord. Code § 132.09(B)(2). Because the County may not "burden substantially more speech than is necessary" to further the County's order and access interests, *McCullen*, 573 U.S. at 486, and because the County has not made any showing that *all* medical facilities need this kind of regulation, the ordinance lacks any tailoring, to say nothing of narrow tailoring. "For a problem shown to arise only . . . at one clinic," authorizing buffer zones "at every" Louisville-Jefferson facility "is hardly a narrowly tailored solution." *Id.* at 493; *see, e.g.*, *Reynolds v. Middleton*, 779 F.3d 222, 231–32 (4th Cir. 2015).

The second problem is that the County has not shown that it "seriously undertook to address" its concerns "with less intrusive tools." *McCullen*, 573 U.S. at 494. Absent a prophylactic buffer zone, the County says, it cannot protect access and ensure order around its abortion clinics. But the County offers no tenable, or for that matter record-supported, explanation why the first prohibition in the law—that no one shall "knowingly obstruct, detain, hinder, impede, or block another person's entry to or exit from a healthcare facility," Louisville-Jefferson Ord. Code § 132.09(B)(1)—will not work. Unchallenged here, this aspect of the law bars anyone from "obstruct[ing]" or "hinder[ing]" or "imped[ing]" access to a clinic. *Id.* That's

assuredly a law whose ends and means fit snugly. Why not use that law to meet the County's access and order goals?

Keep in mind that EMW keeps video surveillance of its entrance. The County does not explain why it cannot use EMW's footage and, in connection with law enforcement, identify and cite harassing or obstructing protestors. Notably, in his Rule 30(b)(6) deposition, the County's representative admitted that he could "[o]ftentimes" "ascertain a violation" of existing County laws based on EMW's security footage. R.47 at 70. The County's only response is to say that this approach would be more "difficult." *Id.* at 119. "Of course" it would be. *McCullen,* 573 U.S. at 495. More than some difficulty, however, is required to uphold regulations that suppress speech. "A painted line on the sidewalk is easy to enforce, but the prime objective of the First Amendment is not efficiency." *Id.*

Most of the protestors that the law targets, moreover, appear to be repeat visitors to the Clinic. That permits the County or EMW to seek targeted injunctions preventing those individuals—and them alone—from standing outside the Clinic's entrances. On this point, in another portion of his Rule 30(b)(6) deposition, the County's representative conceded that "the [police] officers that regularly ma[de] calls for service" to EMW "would probably recognize some of the people that are out there." R.47 at 98. The County offers little explanation why customized injunctive relief would serve its interests less effectively. It does not explain how many, or how few, arrests or prosecutions it has initiated under the no-obstruction law. What was problematic for Massachusetts in *McCullen*—its failure to focus regulation on the problem through targeted injunctions, 573 U.S. at 494–95—is problematic for Louisville here.

It may be true that violations of the County's no-obstruction law would lead only to misdemeanor citations. Louisville-Jefferson Ord. Code § 132.09(F)(1)–(2). But if the concern is that law enforcement's remedial hand is weak, the County holds the key. Other legislative options exist. The County could enact a local copy of the federal Freedom of Access to Clinic Entrances Act, which bars "physical obstruction" meant to "interfere with" access to clinics like EMW and which permits graduated civil penalties and criminal sanctions. 18 U.S.C. § 248(a)(1)–(c). The Court made this precise point in *McCullen*. 573 U.S. at 490–91.

Along similar lines, the County admits that protestors tend not to harass or obstruct clinic visitors when police patrol near EMW. Yet the County has done little to show that additional patrols, or patrols focused on the times when the most obstructive protestors arrive, could not reduce protestors near EMW to acceptable levels. The County asserts that a "constant[]" police presence near EMW "just really isn't feasible," but does not explain whether constant patrols are needed and has not shown that the most obstructive protestors indeed are always there. R.47 at 120; *see McCullen*, 573 U.S. at 495.

Keep in mind, moreover, that the goal of the plaintiffs is not to harass or protest, whether loudly or violently. The point of their speech is to offer a compassionate ear. To this day, it remains unclear why the County has sought to suppress their speech along with those types of protests that are far more likely to hinder access to a clinic and are sometimes designed to do just that.

This limitation on speech has inhibited its effectiveness, just as it did in *McCullen*. By requiring EMW's patients to be as much as ten feet away from Sisters of Life as they enter the Clinic, the buffer zone "compromise[s]" Sisters for Life's "ability to initiate the close, personal conversations" that are "essential" to its compassionate, person-to-person message. *McCullen*, 573 U.S. at 487. The buffer zones likewise make it "substantially more difficult for" Sisters for Life "to distribute literature to arriving patients," because they place potential pamphleteers more than an arm's length away from EMW's entrants and make it easier for agents of EMW to deflect the literature they offer. *Id.* at 488. The buffer zone also makes "quiet conversations" with EMW clinic entrants difficult if not impossible. *Id.* at 489. Noise from protestors outside the buffer zones makes it infeasible for Sisters for Life to converse quietly with clinic entrants if they cannot enter the buffer zone to talk; meanwhile, the buffer zone makes Sisters for Life "stop abruptly at its painted border," making its members "appear 'untrustworthy' or 'suspicious.'" *Id.* at 487.

Consider how a buffer zone took a "toll" on the speech of sidewalk counselors in *McCullen* and here. *Id.* In *McCullen*, one counselor said that she had persuaded "far fewer people" "not to terminate their pregnancies" after passage of the law. *Id.* Another "estimated

having about 100 successful interactions over the years before the 2007 amendment, but not a single one since." *Id.* Still another said that "only one woman out of 100 will make the effort" to speak to her under the new law. *Id.* at 488 (quotation omitted). Something similar has happened in Louisville under its buffer zone. One of today's plaintiffs says she persuaded "three to six" women per month to forego abortion before passage of the buffer-zone law, but "none" afterwards. R.44 at 54–55. Another, who says he helped to prevent between fifty and sixty abortions per year prior to the ordinance, says the ordinance has "practically eliminated" effective sidewalk counseling. R.1 ¶ 23; R.45 at 29. Still another says that, given the buffer zones, she "really [doesn't] have a chance to talk" to most clinic entrants anymore. R.46 at 14.

The Court's conclusion in *McCullen* applies here. This buffer zone is not narrowly tailored.

The County offers several contrary arguments. It argues that the buffer zones are geographically small and thus burden speech only modestly. But what we have just said, backed up by uncontested record evidence parallel to that in *McCullen*, establishes that the buffer zone suppresses speech. It makes things "substantially more difficult" for Sisters for Life's members: they cannot "initiate" as many "close, personal conversations" with clinic entrants, since they must now stand several feet away from them; they cannot distribute as much literature, since distribution now takes place beyond an arm's length; and they can attempt far fewer "quiet conversations" with EMW's patients, since noise from protestors makes such conversations infeasible absent entry into the buffer zone. *McCullen*, 573 U.S. at 487–89. As a result, and as in *McCullen*, it is uncontested that Sisters for Life has persuaded "far fewer people" to decline abortion in the ordinance's wake. *Id.* at 487. The ordinance self-evidently burdens Sisters for Life's speech.

That the buffer zone in *McCullen* was larger does not change things. That decision does not create distinct sets of rules for a 35-foot buffer zone near an entrance, a 10-foot buffer zone near an entrance, and all manner of buffer zones in between. It instead says that narrow tailoring is required for all such burdens on speech. Once a buffer zone burdens speech, *McCullen* demands narrow tailoring. *Id.* at 489 (explaining that narrow tailoring takes effect "[w]hen the

government makes it more difficult to engage in" speech). Subsequent cases confirm the point: Narrow tailoring turns on whether a law sweeps more broadly than necessary, not on whether its yoke is heavy or light. *Am. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2384–85 (2021).

The County observes that Sisters for Life mainly visits EMW rather than other medical facilities. That does not help. In facial First Amendment challenges, we consider a statute's full range of applications even when some of them do not implicate a particular plaintiff. *See, e.g.*, *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 121–23 & n.* (1991). Put differently, if a statute is not narrowly tailored, it cannot be constitutionally applied to *anyone*, even if a more narrowly tailored statute might still capture a plaintiff's conduct. *Cutting v. City of Portland*, 802 F.3d 79, 86 (1st Cir. 2015); *Hodge v. Talkin*, 799 F.3d 1145, 1156–57 (D.C. Cir. 2015); *Am. for Prosperity*, 141 S. Ct. at 2387–89.

The County insists that injunctions would burden more speech than buffer zones. But we do not see how. Injunctions requiring *some* people (engaged in obstruction) to stay away from the Clinic's entrance constrict less than ordinances requiring *everyone* (whether engaged in obstruction or not) to stay away. The County's objections to injunctions at any rate do not explain its qualms about video surveillance or other order-restoring techniques.

The County adds that clinic entrants often refuse to file police reports and that county police cannot stand perpetual vigil over the Clinic. True but unresponsive. Neither videos nor injunctions rely on police reports or a constant police presence. The essential point of a video is to alleviate the need for round-the-clock surveillance by officers or others.

The County maintains that the ordinance creates buffer zones only when a facility requests painted lines outside its entrance. But that is not what the ordinance says. It applies always and everywhere there is a healthcare facility. Nothing in the ordinance at any rate limits the scenarios in which a medical facility may ask for painted lines, and the First Amendment "does not leave us at the mercy of *noblesse oblige*." *United States v. Stevens*, 559 U.S. 460, 480 (2010). Putting the same point more elaborately, we would not bless an ill-tailored statute if the government enforced it only in particularly worthy cases. *Id.* We do not see what changes when

an intermediate step towards enforcement—the decision whether or not to paint the lines—turns on private parties' discretionary acts. Many enforcement decisions, after all, begin with parallel private choices. A blanket ban on solicitation would not become constitutional if a municipality enforced it only after citizens reported pushy solicitors. *Cf. Martin v. City of Struthers*, 319 U.S. 141, 144–49 (1943).

*Hill v. Colorado*, 530 U.S. 703 (2000), does not require a different conclusion. True, *Hill* rejected an overbreadth challenge to a floating "bubble zone" law that applied to all medical facilities. *Id.* at 730–31. But in *Hill*, the defendants had argued that their ordinance helped clinic patients "avoid[] unwanted communication." *Id.* at 716. The *Hill* Court reasoned that *every* entrance to *every* medical facility potentially implicated that interest, such that the *Hill* ordinance's geographic reach did not raise overbreadth concerns. *Id.* at 731. Here, by contrast, the County has not deployed an unwanted-communication justification. Having turned away from *Hill*'s reasoning, the County cannot rely on its conclusions. True also, there may be some tension between *Hill* (which upheld a floating bubble zone restriction) and *McCullen* (which invalidated a fixed buffer zone restriction). But because the County's ordinance more closely resembles the fixed buffer zone invalidated in *McCullen* than the floating bubble zone upheld in *Hill* and because it does not comply with the "narrow tailoring" required by *McCullen*, the ordinance is likely unconstitutional.

All in all, the ordinance faces many narrow-tailoring problems, and Sisters for Life is likely to succeed on the merits.

B.

The other factors do not justify withholding preliminary relief. For starters, Sisters for Life faces irreparable harm. "The loss of First Amendment freedoms, for even minimal periods of time," amounts to irreparable injury. *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) (quotation omitted). Because the ordinance likely violates the First Amendment, applying it to Sisters for Life would irreparably injure them.

Nor do the remaining preliminary injunction factors alter the equation. The equities are neutral: some visitors to EMW may perceive the speech as harming them, but suppressing

Case: 22-5150 Document: 43-2 Filed: 12/21/2022 Page: 12 (14 of 15)

Nos. 22-5150/5151 *Sisters for Life, Inc., et al. v. Louisville-Jefferson Cnty., KY Metro Gov't, et al.* Page 12

speech harms the speakers. Similarly, the public interest cuts in favor of reducing disorder on public sidewalks but against violating the free-speech rights of Sisters for Life. Just as "[t]he First Amendment's guarantee of free speech does not extend only to categories of speech that survive an *ad hoc* balancing of relative social costs and benefits," *Stevens,* 559 U.S. at 470, we cannot re-weigh the equities so as to undercut the First Amendment, *see United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497–98 (2001).

We reverse and remand with instructions for the district court to preliminarily enjoin defendants from enforcing Louisville-Jefferson Ord. Code § 132.09(B)(2).

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 22-5150/5151

SISTERS FOR LIFE, INC., ANGELA MINTER, and KENTUCKY RIGHT TO LIFE ASSOCIATION, INC. (22-5150); EDWARD HARPRING and MARY KENNEY (22-5151),

Plaintiffs - Appellants,

v.

LOUISVILLE-JEFFERSON COUNTY, KY METRO GOVERNMENT (22-5150 & 22-5151); GREG FISCHER, Mayor, ERIKA SHIELDS, Chief of Police, Louisville Metro Police Department, and MIKE O'CONNELL (22-5150),

Defendants - Appellees.

FILED
Dec 21, 2022
DEBORAH S. HUNT, Clerk

Before: SUTTON, Chief Judge; GRIFFIN and NALBANDIAN, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Western District of Kentucky at Louisville.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is REVERSED.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk