**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | |
|---|---|
| SISTERS FOR LIFE, INC., *et al.* | Plaintiffs |
| v. | Lead Civil Action No. 3:21-cv-0367-RGJ |
| LOUISVILLE-JEFFERSON COUNTY METRO GOVERNMENT*, et al.* | Defendants |

\*\*\*

| | |
|---|---|
| EDWARD HARPRING, *et al.* | Plaintiffs |
| v. | Member Civil Action No. 3:21-cv-691-RGJ |
| LOUISVILLE-JEFFERSON COUNTY METRO GOVERNMENT | Defendant |

**PLAINTIFFS HARPRING AND KENNEY'S MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................................... 1

PROCEDURAL HISTORY ............................................................................................................ 2

STATEMENT OF UNDISPUTED FACTS .............................................................................. 3

SUMMARY JUDGMENT STANDARD .................................................................................. 10

ARGUMENT .................................................................................................................................. 10

I.      The Ordinance Fails Narrow Tailoring and Violates the First Amendment ........................... 10

        A.   The County bears the burden of justifying its regulation of speech .................................... 11

        B.   The narrow tailoring analysis of *McCullen* .................................................................. 13

        C.   The Ordinance burdens Plaintiffs' speech ...................................................................... 15

        D.   The breadth of the Ordinance alone demonstrates that it lacks *any* tailoring .................. 17

        E.   The County failed to apply less intrusive measures before regulating speech .................. 19

II.     This Case is Not Moot ...................................................................................................... 23

III.    Plaintiffs Are Entitled to a Permanent Injunction ............................................................. 26

CONCLUSION ............................................................................................................................... 27

CERTIFICATE OF SERVICE .................................................................................................. 28

## **TABLE OF AUTHORITIES**

## CASES

*Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016) ............................................................. 12

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936 (9th Cir. 2011) .................... 18

*Cutting v. City of Portland*, 802 F.3d 79 (1st Cir. 2015) ............................................................. 18

*Cameron v. EMW Women's Surgical Center, P.S.C., et al.*, --- S.W.3d ---,
   2022-SC-0329-TG, 2023 Ky. LEXIS 4 (Ky, Feb. 16, 2023) ......................................... 25

*ConnectU LLC v. Zuckerberg*, 522 F.3d 82 (1st Cir. 2008) ......................................................... 26

*County of Los Angeles v. Davis*, 440 U.S. 625 (1979) ............................................................. 25

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) .................................................. 17

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs (TOC), Inc.*, 528 U.S. 167 (2000) ........................ 36-37

*Frisby v. Schultz*, 487 U.S. 474 (1988) ................................................................................. 5

*Heathcoat v. Potts*, 905 F.2d 367 (11th Cir. 1990) .............................................................. 10

*Hill v. Colorado*, 530 U.S. 703 (2000) ..................................................................... 5, 13, 16-17

*Hunt v. Imperial Merch. Servs., Inc.*, 560 F.3d 1137 (9th Cir. 2009) ....................................... 25

*Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998) .............................................. 26

*Los Angeles v. Lyons*, 461 U.S. 95 (1983) ......................................................................... 25

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ............................ 10

*McCullen v. Coakley*, 573 U.S. 464 (2014) ............................................................... 1, *passim*

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) ...................................................... 1

*Meyer v. Grant*, 486 U.S. 414 (1988) ............................................................................... 1

*Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ............................... 38

*Nationalist Movement v. Cumming*, 913 F.2d 885 (11th Cir. 1990) ....................................... 5

*Odle v. Decatur Cty.*, 421 F.3d 386 (6th Cir. 2005) ............................................................. 25

*Ohio Citizen Action v. City of Englewood*, 671 F.3d 564 (6th Cir. 2012) ........................................ 11

*Reynolds v. Middleton*, 779 F.3d 222 (4th Cir. 2015) ................................................. 12, 18

*Sisters for Life, Inc. v. Louisville-Jefferson Cty.*, 56 F.4th 400 (6th Cir. 2022) ........................................ 1, *passim*

*State Farm Fire & Cas. Co. v. Amazon*, 528 F. Supp. 3d 686 (W.D. Ky. 2021) ........................................ 10

*Thomas v. City of Memphis*, 996 F.3d 318 (6th Cir. 2021) ................................................. 23

*United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000) ................................................. 11

*United States v. Hughes*, 505 F.3d 578 (6th Cir. 2007) ................................................. 10

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ................................................. 31

*Warren v. City of Athens*, 411 F.3d 697 (6th Cir. 2005) ................................................. 26

*Zillow, Inc. v. Bork*, 593 F. Supp. 3d 619 (E.D. Ky. 2022) ................................................. 27

**STATUTES**

Federal Access to Clinic Entrances Act, 18 U.S.C. § 248 ................................................. 14

Louisville County Metro Ordinance No. O-179-21 ........................................ 1, *passim*

# INTRODUCTION

Plaintiffs Edward Harpring and Mary Kenney wish to use a public sidewalk to speak with and hand pamphlets to women visiting the EMW Women's Surgical Center, located at 136 W. Market Street in Louisville ("EMW"). The activities Plaintiffs wish to engage in—one-on-one conversation and pamphleteering—have "historically been more closely associated with the transmission of ideas than" other types of speech. *McCullen v. Coakley*, 573 U.S. 464, 488 (2014). "One-on-one communication" is "the most effective, fundamental, and perhaps economical avenue of political discourse," *Meyer v. Grant*, 486 U.S. 414, 424 (1988), and "handing out leaflets in the advocacy of a politically controversial viewpoint . . . is the essence of First Amendment expression," *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995).

Before the adoption of Ordinance No. O-179-21 by the Louisville-Jefferson County Metro Government ("the County"), Plaintiffs were able to exercise their First Amendment liberties freely and without interference by the government. Allegedly intended to address the "willful obstruction" of access to healthcare facilities, the Ordinance does much more than forbid blocking or impeding access. It restricts speech in a traditional public forum by silencing nonexempt speech, such as the speech of Plaintiffs. The effect of the Ordinance on Plaintiffs' speech, before the entry of a preliminary injunction, was profound.

As the Sixth Circuit held on appeal in this case, the Ordinance, which imposes "a buffer zone on all medical facilities in Louisville," suffers "many narrow-tailoring problems." *Sisters for Life, Inc. v. Louisville-Jefferson Cty.*, 56 F.4th 400, 405, 408 (6th Cir. 2022). The breadth of the Ordinance reveals that it "lacks **any** tailoring, to say nothing of narrow tailoring," *id.* at 405 (emphasis added), and the County "has not shown that it seriously undertook to address its concerns with less intrusive tools." *Id.* (citation and quotation marks omitted).

Finally, even though EMW is allegedly not providing abortion services, on account of Kentucky's Heartbeat Ban and Trigger Law, the constitutionality of which is currently pending in state court, Plaintiff Harpring continues to visit the sidewalk outside EMW two to three times a week when he is town. He goes there in order to pray and speak with any women who are present. He has seen women entering and leaving the clinic and has counseled several of them. He has even directed some of them to a nearby pro-life crisis pregnancy center. [Ex. A, Harpring Declaration.] In other words, this case is not moot, as the County is now suggesting—nearly eight months after the time the County claims it became moot.

The Sixth Circuit held in this case that Plaintiffs are likely to succeed on the merits of their free speech claim. As the arguments below demonstrate, that likelihood is now a certainty. As there are no genuine issues of material fact in dispute, Plaintiffs are entitled to summary judgment on their First Amendment claim as a matter of law.

## PROCEDURAL HISTORY

Plaintiffs Harpring and Kenney[1] filed the instant suit on November 16, 2021. Their verified complaint alleged two causes of action: (1) a violation of the Free Speech Clause of the First Amendment, and (2) a violation of the Due Process Clause of the Fourteenth Amendment. [Verified Complaint, 3:21-cv-691, Doc. 1, PageID.12–15.][2]

Shortly after filing suit, Plaintiffs moved for a preliminary injunction on both causes of action. [3:21-cv-691, Doc. 5.]

On February 25, 2022, this Court denied Plaintiffs' preliminary injunction motion. [Doc. 55.]

---

[1] Unless otherwise noted, "Plaintiffs" refer to Edward Harpring and Mary Kenney.
[2] Harpring and Kenney's lawsuit was docketed as Case No. 3:21-cv-691. Their lawsuit was eventually consolidated with Case No. 3:21-cv-367. Docket references in this brief that refer to their original case will have Case No. 3:21-cv-691 in the citation. The other docket references, without any case number, will be to the lead case, Case No. 3:21-cv-367.

Plaintiffs appealed. [Doc. 57.]

On December 21, 2022, the Sixth Circuit reversed this Court's judgment and instructed it to enter a preliminary injunction. *Sisters For Life,* 56 F.4th at 409.

Regarding Plaintiffs' First Amendment claim, the Sixth Circuit held that Plaintiffs were likely to succeed on the merits of their free speech claim for two essential reasons: (1) "because the County has not made any showing that **all** medical facilities need this kind of regulation, the ordinance lacks any tailoring, to say nothing of narrow tailoring," *id.* at 405 (emphasis in original), and (2) the County "has "not shown that it 'seriously undertook to address' its concerns 'with less intrusive tools.'" *Id.* (quoting *McCullen*, 573 U.S. at 494).

With respect to Plaintiffs' Fourteenth Amendment claim, the Sixth Circuit did not rule that the Ordinance was void-for-vagueness. Instead, it ruled that the terms of the Ordinance are clear: the Ordinance does not "create buffer zones only when a facility requests painted lines outside its entrance . . . It applies always and everywhere there is a healthcare facility." *Id.* at 408.

This Court entered a preliminary injunction order on January 3, 2023. [Doc. 64.]

In light of the Sixth Circuit's decision, Plaintiffs relinquish their Fourteenth Amendment claim and move for summary judgment based on their free speech claim alone.

## STATEMENT OF UNDISPUTED FACTS

For the better part of four decades, Edward Harpring has engaged in "sidewalk counseling"[3] on the public sidewalks adjacent to and in the vicinity of EMW. [Verified Complaint, 3:21-cv-691, Doc. 1, PageID.4, ¶ 21.] Mary Kenney has been doing likewise for the past 15 years. [*Id.*] Harpring and Kenney share a deeply held religious belief regarding the sanctity of human life, including the

---

[3] In *McCullen*, the Supreme Court defined "sidewalk counseling" as "involv[ing] offering information about alternatives to abortion and help pursuing those options" [by engaging in] "personal, caring, consensual conversations with women about various alternatives." *McCullen*, 573 U.S. at 464, 489.

unborn. [*Id.* at PageID.4, ¶ 19.] This belief compels them to try to speak with and offer help to women seeking abortions at EMW. They do this by trying to approach such women in a caring manner, to walk alongside them, and to offer words of compassion, empathy, and consolation. [*Id.* at PageID.4, ¶ 21-22.] They also try to hand women pamphlets and other literature showing alternatives to abortion. [*Id.* at Page ID.4, ¶ 21.]

Harpring and Kenney do not go to the site to "protest" or "demonstrate" for or against abortion. On the contrary, they believe that the kind of loud, often harsh rhetoric and actions commonly associated with protests and demonstrations would be detrimental to their goals. [*Id.* at PageID.5, ¶ 25.] Neither Plaintiff engages in conduct that could be considered obstructing, trespassing, assaulting, or stalking of EMW patients, patients' companions, or staff. [*Id.* at PageID.5, ¶ 26.]

For Harpring and Kenney, every second counts when sidewalk counseling. For example, Harpring specifically recalls walking and speaking with a patient right up to the area in front of the clinic door—an area that now falls within the boundaries of the buffer zone created by the Ordinance. [*Id.* at PageID.5, ¶ 24.] Shortly after entering EMW, the patient came back out and told him that the last thing he had said to her caused her to change her mind about going through with an abortion. [*Id.*]

On May 20, 2021, Louisville Metro Council passed the Ordinance which is the subject matter of this case. The mayor signed the Ordinance, and it took effect on June 2, 2021. [*Id.* at PageID.5, ¶ 27.]

The Ordinance "does two things." *Sisters For Life,* 56 F.4th at 402. First, it bans non-speech, conduct-based activities, where no one shall "knowingly obstruct, detain, hinder, impede, or block another person's entry to or exit from a healthcare facility." *Id.* (quoting Ordinance § 132.09(B)(1)). Plaintiffs do not challenge this restriction on conduct. *Id.*

Second, the Ordinance "creates a limitation on speech." *Id.* This, of course, is the subject matter of this lawsuit and Plaintiffs' motion for summary judgment.

The preamble to the Ordinance begins with three generic recitals about the County's concern for unimpeded access to healthcare facilities and a "documented history of obstruction and interference" with access to such facilities in Louisville.[4] However, the only "documented history" referred to on the face of the Ordinance is contained in the next ten recitals which mention one—and only one—healthcare facility: EMW. [Ordinance, 3:21-cv-691, Doc. 1-1, PageID.20.]

Following these exclusively EMW-related recitals is a series of recitals expressing the County's respect for First Amendment freedoms, and its conclusion that curtailing those freedoms in traditional public forums is warranted under decisions of "courts across the United States, including the United States Supreme Court." [*Id.* at PageID.21–22.] Only one such decision, however, is specifically cited and quoted: *Hill v. Colorado*, 530 U.S. 703, 730 (2000). Conspicuous by its absence in the Ordinance's recitals about the legal basis for its adoption is any reference to the most recent, clearly controlling, and directly on-point decision of the United States Supreme Court: *McCullen*.

Perhaps not coincidentally, also absent from the Ordinance's lengthy recitals is any mention of the following facts the *McCullen* Court viewed as prerequisites to a government's resort to closing traditional public forums by means of buffer zones: prosecutions by the County under already existing laws against obstruction and interference; previous efforts by the County to enact legislative measures or adopt law enforcement policies that would not involve cutting off part of the public forum to speech; and any previous efforts by the County to obtain injunctive relief that would target only

---

[4] As the Eleventh Circuit has observed, "[t]he recitals of findings and purposes contained in an ordinance's preamble can serve to identify governmental interests for the purposes of this analysis." *Nationalist Movement v. Cumming*, 913 F.2d 885, 889 n.3 (11th Cir. 1990) (citing *Frisby v. Schultz*, 487 U.S. 474, 477, 484 (1988)). In fact, "such recitals may well be entitled to greater weight in identification of governmental interests than post hoc articulations by counsel in judicial proceedings." *Id.*

lawbreakers and those acting in concert with them. The only references to law enforcement difficulties justifying the Ordinance's restrictions are two recitals that mention the need of the Louisville Metro Police Department ("LMPD") "to make judgment calls" about whether enforcing existing laws would violate First Amendment rights and how the Ordinance would eliminate that need. [Ordinance, 3:21-cv-691, Doc. 1-1, PageID.21.]

Following the Ordinance's preamble are the Ordinance's definitions of "Driveway," "Entrance," and "Healthcare facility." [*Id.* at Page.ID.23–24, § I(A).] The last term appears to encompass scores of entities, public and private, for-profit or not, "and others providing similarly organized services regardless of nomenclature." [*Id.* at PageID.24.]

After the definitions come Section I (B) ("Access to a healthcare facility"). Subsection (B)(1) prohibits knowingly obstructing, detaining, hindering, impeding, or blocking someone's entry to or exit from a healthcare facility. [*Id.*] Subsection (B)(2) states that no person shall knowingly "enter, remain on, or create any obstruction within" a healthcare facility's driveway, or "within a 'buffer zone' on the public way or sidewalk extending from the entrance of a healthcare facility to the closest adjacent sidewalk curb and 10 feet from side to side during the facility's posted business hours." [*Id.*]

Next, the Ordinance lists four classes of persons who are exempt from its prohibitions: persons entering or exiting the health care facility; law enforcement, other first responders, and municipal agents acting within the scope of their employment; employees or agents of the facility acting within the scope of their employment; and "persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility." [*Id.*]

Section I (C) ("Signage") follows. This section says that the Department of Public Works "shall, at the request of a healthcare facility, paint or lay on the public way or sidewalk two easily-distinguishable demarcation lines running from either side of the facility entrance to the closest

adjacent sidewalk curb and extending 10 feet from each other." [*Id.* at PageID.24–25.] It further dictates that healthcare facilities "shall" post their buffer zones with signage reading: "Healthcare facility: No standing within this zone. [Metro Ordinance]." [*Id.* at PageID.25.]

Sections I (D) and (E) of the Ordinance set up a system of reporting, monitoring, and documentation. In Section I (D), responsibility is given to the DPW to solicit from any facility requesting the demarcation lines information regarding the efficacy of the buffer zone and reporting the results to Metro Council. [*Id.*] In Section I (E), healthcare facilities with buffer zones are charged with monitoring the zones and providing to DPW, the Department of Public Health and Wellness, and LMPD, every six months, documentation of "obstructions" created in the buffer zones, "and instances when anyone other than those allowed by the ordinance are otherwise present in the buffer zone." [*Id.*]

Following the County's adoption of the Ordinance in June 2021, a set of lines 10 feet apart was painted on the sidewalk going from the curb at Market Street to the entrance doors of EMW. [Verified Complaint, 3:21-cv-691, Doc. 1, PageID.7, ¶ 37.] On October 12, 2021, signs were posted on the edge of EMW's property about 30 feet to either side of the painted lines. [*Id.* at PageID.7, ¶ 38.] The signs do not contain the specific language called for by the Ordinance. Instead, they read: "Healthcare Facility: No Standing or Obstructions In This Zone – LMCO §132.09." [*Id.*]

The effect of the Ordinance on Harpring and Kenney's sidewalk counseling efforts has been profound. [*Id.* at PageID.8, ¶ 39.] Before the appearance of the buffer zone, they were able to approach women on the sidewalk leading to the entrance to EMW and walk alongside them, speaking in a quiet, caring, personal manner while handing them pamphlets with information about abortion alternatives. [*Id.* at PageID.8, ¶ 40.] Harpring estimates that, before the Ordinance went into effect, around 50–60 times a year he and other sidewalk counselors were successful in persuading women to choose alternatives to abortion, frequently in the last few feet before they entered EMW. [*Id.* at PageID.5, ¶

7

23.] That kind of approach is now foreclosed by the buffer zone, which requires counselors to come to a dead halt on the painted lines of the no-speech zone and abruptly cease their efforts. [*Id.* at PageID.8.]

In addition to eliminating Plaintiffs' ability to engage in leafletting and pamphleteering—activities the *McCullen* Court called "the essence of First Amendment expression," 573 U.S. at 489—the buffer zone outside EMW forces Plaintiffs to choose between abandoning sidewalk counseling, with its emphasis on quiet, caring, personal encounters between counselor and patient, and remaining silent. [*Id.* at PageID.9, ¶ 44.] The artificial distance now required between counselors and patients requires counselors to raise their voices and/or go into Market Street and hover over the vehicles dropping women off in order to try to speak with them. [*Id.* at PageID.9, ¶ 45.]

Harpring testified that if he is walking with a patient heading towards the front doors of EMW, that conversation prematurely comes to an end when he gets to the painted line, even if the woman is responding to what he has to say. [Harpring Depo., Doc. 45, PageID.1892–93.] This makes an enormous difference in Harpring's ability to converse with women outside EMW. Harpring testified that, before the Ordinance, women who changed their minds about abortion have told him "that the last thing [Harpring] said when [he] was right at the entrance of the doorway" were "the words she actually heard"—words like "God loves you and your baby, or you don't have to do this ma'am; we can help you next door." [*Id.*]

With the buffer zone in place, however, Harpring can no longer offer those last words before a woman makes the final choice to enter the clinic. Instead, he must "elevate" his voice to continue the conversation "so that quiet conversation becomes more of a louder voice and not as welcoming as it would have been if I had got to continue on to the door with her." [*Id.* at PageID.1893.]

Additionally, Kenney testified about a concrete example of how the buffer zone burdens her ability to engage in quiet conversations with patients. She was speaking with a patient while that patient was walking to the clinic.

> . . . [W]hen we got to the buffer zone, she was very much confused because – this was after I had received my citation – and I felt like I couldn't walk into that buffer zone, so I walked out into the middle of the street. We had been talking about walking down to BSIDEU, the resource center, for her to get an ultrasound.
>
> When she approached the buffer zone and I had to walk out toward the street, she was confused. She didn't know where I went, because at that point she was surrounded by escorts, and then she was ushered into the abortion clinic, so I wasn't able to continue my conversation with her and continue on to BSIDEU . . . as I believe she was interested in doing.

[Kenney Depo., Doc. 46, PageID.1892–93.]

Given the configuration of the buffer zone at EMW, the real-world effect on Plaintiffs' sidewalk counseling has been far-reaching. The Ordinance has made true sidewalk counseling all but impossible. It has not merely or incidentally burdened Harpring's and Kenney's First Amendment freedoms. For all practical purposes, the Ordinance eliminated them. [Verified Complaint, 3:21-cv-691, Doc. 1, PageID.8–9.]

Even though EMW allegedly stopped providing abortion services last year, Harpring still goes to the public sidewalk in front of the EMW doors two to three times a week to pray and counsel. [Ex. A, Harpring Declaration, ¶¶ 3 and 5.] He has witnessed persons entering and exiting EMW on several occasions and has seen the car belonging to the EMW manager parked in the back of the building. [*Id.* at ¶ 4.]  Even after EMW allegedly stopped performing abortions, Harpring has met a number of women outside EMW who were not aware that EMW is not providing abortion services. [*Id.* at ¶ 5.] He has counseled them and directed some of them to BsideUforLife, a pro-life crisis pregnancy center next door to EMW. [*Id.*]

According to EMW's website, it is "OPEN and seeing patients!" *See* emwomens.com (last visited March 14, 2023). At the bottom of the website's landing page are the posted business hours

for EMW. [*Id.*; *see also* Lynch Declaration, Doc. 72-1, PageID.2362-2363.]

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper if Plaintiffs Harpring and Kenney can "show[] that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "The moving party bears the burden of specifying the basis for its motion and showing the lack of a genuine issue of material fact." *State Farm Fire & Cas. Co. v. Amazon*, 528 F. Supp. 3d 686, 693 (W.D. Ky. 2021) (citation omitted). If the moving party satisfies this burden, "the non-moving party must produce specific facts showing a material issue of fact for trial." *Id.* (citation omitted).

In opposing Plaintiffs' motion, the County must do more than show some "metaphysical doubt as to the material facts." *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Rather, the County must show a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" *Id.*

Finally, given the procedural posture of this case, it is important to note that "findings of fact and conclusions of law by an appellate court are generally binding in all subsequent proceedings in the same case in the trial court or on a later appeal." *United States v. Hughes*, 505 F.3d 578, 591 (6th Cir. 2007) (quoting *Heathcoat v. Potts*, 905 F.2d 367, 370 (11th Cir. 1990)).

## ARGUMENT

## I.   The Ordinance Fails Narrow Tailoring and Violates the First Amendment.

Regulations of speech on public streets and sidewalks can be content-based or content-neutral. *See Sisters for Life*, 56 F.4th at 403. Content-neutral regulations "must be narrowly tailored to serve a significant government interest." *Id.* Content-based regulations are subject to strict scrutiny. *Id.*

Based on the testimony of the County's Rule 30(b)(6) representative, indicating that escorts can say whatever they please to EMW patients, the content-based application of the Ordinance is

apparent. [Stewart Depo., Doc. 47, PageID.2013.] Nonetheless, Plaintiffs Harpring and Kenney do not press that argument here, where the Ordinance clearly does not satisfy the demands of intermediate scrutiny. *See, e.g.*, *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2375 (2018) (declining to apply strict scrutiny in compelled "professional" speech case because the challenged law "cannot survive even intermediate scrutiny"); *Sisters for Life* 56 F.4th 404 (noting that the court did not need to resolve the content-based application of the Ordinance "because the ordinance fails narrow tailoring anyway").

The Sixth Circuit identified two critical narrow tailoring problems with the Ordinance: (1) its breadth and scope, and (2) the County's failure to use less intrusive measures before regulating speech. *Sisters for Life*, 56 F.4th at 405. These are discussed, respectively, in Sections D and E below. Before those discussions, however, three matters must first be addressed: (1) the County's burden to justify its regulation of speech, (2) the narrow tailoring analysis of *McCullen*, and (3) the burden imposed by the Ordinance on Plaintiffs' speech activities.

### A.      The County bears the burden of justifying its regulation of speech.

It is the County's burden to prove that the Ordinance comports with the First Amendment. *See, e.g.*, *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000) ("[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions") (citations omitted); *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 571 (6th Cir. 2012) (governmental entity that enacts content-neutral speech regulation "bears the burden of establishing" that it is narrowly tailored). In other words, it is not Plaintiffs' duty to show that the Ordinance fails constitutional scrutiny. **It is the County's burden to show that the Ordinance satisfies it.** If the County cannot do so—and it cannot—then Plaintiffs are entitled to summary judgment.

The First Amendment scrutiny the Ordinance must withstand is clear: "[f]or a content-neutral time, place, or manner regulation to be narrowly tailored, it must not 'burden substantially more speech

than is necessary to further the government's legitimate interests.'" *McCullen*, 573 U.S. at 486 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)). While the speech restriction "need not be the least restrictive or least intrusive means of" serving the government's interests, the government must "not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.* (citations omitted).

That standard is no rubber stamp for the government. "To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *Id.* at 495. *See also Bruni v. City of Pittsburgh*, 824 F.3d 353, 357 (3d Cir. 2016) ("[T]he City cannot burden [speech] without first trying, or at least demonstrating that it has seriously considered, substantially less restrictive alternatives that would achieve the City's legitimate, substantial, and content-neutral interests"); *Reynolds v. Middleton*, 779 F.3d 222, 229 (4th Cir. 2015) (noting that intermediate scrutiny under *McCullen* "require[s] the government to present actual evidence supporting its assertion that a speech restriction does not burden substantially more speech than necessary; argument unsupported by the evidence will not suffice to carry the government's burden.").

As demonstrated herein, the County had ample ways to further its interests of ensuring unobstructed access to healthcare facilities without burdening the speech of law-abiding citizens, including Plaintiffs. Instead of narrowly tailoring its efforts to address those individuals and/or groups causing problems outside EMW (through prosecutions under existing laws, injunctions, legislation that does not restrict speech, etc.), the County chose "the path of least resistance" by creating buffer zones, i.e., no-speech zones for non-exempt persons, at every healthcare facility within the area. *Sisters for Life*, 56 F.4th at 404 (quoting *McCullen*, 573 U.S. at 486). Under prevailing law, the County cannot do this.

**B.      The narrow tailoring analysis of *McCullen*.**

The single most relevant Supreme Court case addressing Plaintiffs' First Amendment claim is *McCullen*. In fact, that decision is determinative. Not only did *McCullen* address a challenge to a fixed buffer zone law in the abortion context (as here), brought by sidewalk counselors (as here), the Ordinance closely resembles the law unanimously struck down in *McCullen*, i.e., **not** *Hill v. Colorado*, 530 U.S. 703 (2000). *See Sisters for Life*, 56 F.4th at 408. For these reasons, a detailed description of *McCullen*'s narrow tailoring analysis is in order.

In *McCullen*, the Supreme Court unanimously struck down a Massachusetts statute that created a 35-foot buffer zone around entrances and driveways of reproductive health care facilities, 573 U.S. at 469–72. That law was adopted because enforcement officials had a difficult time enforcing a prior statute regulating speech outside reproductive facilities and the few prosecutions brought under it were unsuccessful. *Id.* at 470. The captain of the Boston Police Department testified that a fixed buffer zone would "make our job so much easier." *Id.*

The amended law was challenged by a group of "sidewalk counselors," who, as the Court pointed out, "are not protestors":

> [Petitioners] seek not merely to express their opposition to abortion, but to inform women of various alternatives and to provide help in pursuing them. Petitioners believe that they can accomplish this objective only through personal, caring, consensual conversations. And for good reason: It is easier to ignore a strained voice or a waving hand than a direct greeting or an outstretched arm.

*Id.* at 489.

The Court ruled that the Massachusetts buffer zones directly burdened the speech of the sidewalk counselors and negatively impacted their ability to counsel women through the spoken and written word. It observed that the zones "compromise[d] petitioners' ability to initiate the close, personal conversations that they view as essential to 'sidewalk counseling,'" and "made it substantially more difficult for petitioners to distribute literature to arriving patients." *Id.* at 487.

The Court held that the state's interests in ensuring public safety, preventing harassment and intimidation, and combating the obstruction of clinic entrances could have all been served with a more narrowly tailored law that directly prohibited these types of conduct. *Id.* at 490. Indeed, the Court pointed out that a provision of the Massachusetts law not challenged by the *McCullen* plaintiffs subjected to criminal punishment "[a]ny person who knowingly obstructs, detains, hinders, impedes or blocks another person's entry to or exit from a reproductive health care facility." *Id.* (A similar provision in Louisville's Ordinance is likewise not being challenged by Plaintiffs. [Ordinance, 3:21-cv-691, Doc. 1-1, PageID.22, § I (B)(1).].)

The Court observed that if existing laws were inadequate, Massachusetts could have enacted legislation similar to the federal Freedom of Access to Clinic Entrances Act of 1994 ("FACE"), 18 U.S.C. § 248, as other states have done. *Id.* FACE bars "physical obstruction" meant to "interfere with" access to "reproductive health services." 18 U.S.C. § 248(a)(1)-(c).

The Court also pointed out that cities within Massachusetts already had laws on the books that prohibit the obstruction of sidewalks, streets, and highways. *Id.* The Court observed that these laws, "in addition to available generic criminal statutes forbidding assault, breach of the peace, trespass, vandalism, and the like," were examples of the state's "failure to look to less intrusive means of addressing its concerns." *Id.*

The Court also emphasized "the First Amendment virtues of targeted injunctions as alternatives to broad, prophylactic measures." *Id.* The virtue of injunctive relief is that it "focuses on the precise individuals and the precise conduct causing a particular problem." *Id.* The Court held that "the [Massachusetts] Act, by contrast, categorically excludes non-exempt individuals from the buffer zones, unnecessarily sweeping in innocent individuals and their speech." *Id.*

In response to the various more narrowly tailored alternative means Massachusetts could have adopted to serve its interests, the state had "but one reply: 'We have tried other approaches, but they

do not work.'" *Id.* The Court rejected that contention. It noted that the state could not identify one prosecution brought under state or local laws for criminal activities outside abortion clinics. *Id.* And while Massachusetts claimed it had already tried pursuing injunctive relief, the last time such injunctions were obtained was much earlier, in the 1990s. *Id.* In short, the government had "not shown that it seriously undertook to address the problem with less intrusive tools readily available to it." *Id.*

Responding to the state's assertion that intentional or deliberate obstruction, intimidation, or harassment can be "difficult to prove," *McCullen* affirmed the critical point that ease of enforcement is "not enough to satisfy the First Amendment": "A painted line on the sidewalk is easy to enforce, but the prime objective of the First Amendment is not efficiency." *Id.* at 495.

Finally, and importantly, *McCullen* emphasized that even if adopting and enforcing conduct-based laws (as opposed to speech-regulating ones) would be "ineffective," the state had "another problem." *Id.* at 493. The record before the Court supporting the state's anti-congestion interests pertained "mainly to one place at one time: the Boston Planned Parenthood clinic on Saturday mornings." *Id.* at 493-4. Nothing in the record revealed that "individuals regularly gather at other clinics, or at other times in Boston, in sufficiently large groups to obstruct access." *Id.* The Court held that "[f]or a problem shown to arise only once a week in one city **at one clinic**, creating 35-foot buffer zones at every clinic across the Commonwealth **is hardly a narrowly tailored solution**." *Id.* (emphasis added).

### C.    The Ordinance burdens Plaintiffs' speech.

At the preliminary injunction stage of this case, the County argued that the Ordinance imposed only a "very minimal" burden on Plaintiffs' speech activities. [County PI Opp., 3:21-cv-00691, Doc. 13, PageID.115.] In light of the Sixth Circuit's decision in this case, applying *McCullen*, that argument is now a dead letter.

[The Ordinance] makes things "substantially more difficult" for [Plaintiffs]: they cannot "initiate" as many "close, personal conversations" with clinic entrants, since

> they must now stand several feet away from them; they cannot distribute as much literature, since distribution now takes place beyond an arm's length; and they can attempt far fewer "quiet conversations" with EMW's patients, since noise from protestors makes such conversations infeasible absent entry into the buffer zone. As a result, and as in *McCullen*, it is uncontested that [Plaintiffs have] persuaded "far fewer people" to decline abortion in the ordinance's wake. **The ordinance self-evidently burdens [Plaintiffs'] speech.**

*Sisters for Life*, 56 F.4th at 407 (citations omitted) (emphasis supplied).

Importantly, the fact that "the buffer zone in *McCullen* was larger does not change things." *Id.*

The Sixth Circuit observed that:

> Once a buffer zone burdens speech, *McCullen* demands narrow tailoring. *Id.* at 489 (explaining that narrow tailoring takes effect "[w]hen the government makes it more difficult to engage in" speech). Subsequent cases confirm the point: Narrow tailoring turns on whether a law sweeps more broadly than necessary, not on whether its yoke is heavy or light. *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2384-85 (2021).

*Id.*

In other words, *McCullen* "does not create distinct sets of rules for a 35-foot buffer zone near an entrance, a 10-foot buffer zone near an entrance, and all manner of buffer zones in between. It instead says that narrow tailoring is required for **all such burdens on speech**." *Id.* (emphasis supplied).

Finally, and for three straightforward reasons, this Court should place no reliance on *Hill v. Colorado* concerning the size of the buffer zone, the burden on speech, or, for that matter, anything else. First, the Sixth Circuit was clear that "the County's ordinance more closely resembles the fixed buffer zone invalidated in *McCullen* than the floating bubble zone upheld in *Hill.*" *Sisters for Life*, 56 F.4th at 408.

Second, even though both *Hill* and *McCullen* considered legislation involving the regulation of speech in the abortion context, *McCullen* does not rely upon or apply *Hill* in its narrow tailoring analysis. In fact, except to note that the prior Massachusetts law was modeled after the Colorado statute at issue in *Hill*, *see* 573 U.S. at 471, *McCullen* does not even cite the decision.

Third, *Hill* now stands on weak precedential ground. In *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022), the Supreme Court observed that *Hill* "distorted First Amendment doctrines." *Id.* at 2276 & n.65 (citing *Hill*, 530 U.S. at 741–742 (2000) (Scalia, J., dissenting); *id.* at 765 (Kennedy, J., dissenting)).

In sum, as far as this case is concerned, any reliance by the County on *Hill* (cited as authority in the Ordinance's preamble) would be woefully misplaced.

### D.   The breadth of the Ordinance alone demonstrates that it lacks *any* tailoring.

As the Sixth Circuit held in this case, the Ordinance not only lacks narrow tailoring; it is not tailored at all. *Sisters For Life*, 56 F.4th at 405.

On its face, the Ordinance creates buffer zones at all healthcare facilities in the County. [Ordinance, 3:21-cv-691, Doc. 1-1, PageID.24, § I(B)(2).] *See Sisters for Life*, 56 F.4th at 405 ("the County sought to advance its interests by imposing a buffer zone on **all** medical facilities in Louisville") (emphasis in original). "Healthcare facility" is defined so broadly as to, indisputably, cover—at a minimum—dozens and dozens of entities in the County. [Ordinance, 3:21-cv-691, Doc. 1-1, PageID.23, § I(A).] *See Sisters for Life*, 56 F.4th at 405 ("the ordinance covers every single hospital, clinic, and dentist's office in the area"). But the vast bulk of the evidence, statistics, and anecdotes in the record of this case address just one healthcare facility: EMW. *See Sisters for Life*, 56 F.4th at 405 ("The record does not reveal access problems beyond EMW, and indeed the County concedes that EMW's challenges are 'unique.'").

Instead of legislatively dealing with the issues principally outside EMW, the one facility where alleged bad conduct allegedly needed to be addressed, the Ordinance creates buffer zones outside the entrance of every healthcare facility within its jurisdiction. The Massachusetts law struck down in *McCullen* applied only, and more narrowly, to "reproductive health care facilit[ies]", 573 U.S. at 471

(emphasis added), and yet the Court held that because problems were only to be found at one such facility, to create zones outside all clinics in the state "is hardly a narrowly tailored solution." *Id.* at 493.

As the Sixth Circuit held: "Because the County may not 'burden substantially more speech than is necessary' to further the County's order and access interests, *McCullen*, 573 U.S. at 486, and because the County has not made any showing that **all** medical facilities need this kind of regulation, the ordinance lacks **any tailoring**, to say nothing of narrow tailoring." *Sisters For Life*, 56 F.4th at 405 (first emphasis in original).

The Sixth Circuit's ruling in this regard is hardly unique. Courts have held, some in light of *McCullen* itself, that the government cannot regulate speech on a county- or city-wide level when the problem giving rise to the regulation is not a county- or city-wide problem. *See, e.g., Reynolds*, 779 F.3d at 231–32 ("Given the absence of evidence of a county-wide problem, the county-wide sweep of the Amended Ordinance [banning solicitation within all county roadways] burdens more speech than necessary, just as the statute in *McCullen*—a statewide statute aimed at a problem in one location—burdened more speech than necessary."); *Cutting v. City of Portland*, 802 F.3d 79, 89 (1st Cir. 2015) (citing *McCullen*, 573 U.S. at 493) (holding that a city-wide ban on lingering on median strips was "geographically over-inclusive" because of a lack of evidence of a city-wide problem); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 949 (9th Cir. 2011) ("The Ordinance is also geographically overinclusive. The Ordinance applies citywide to all streets and sidewalks in the City, yet the City has introduced evidence of traffic problems only with respect to a small number of major streets and medians.").

The requirement of narrow tailoring "prevents the government from too readily 'sacrific[ing] speech for efficiency'"—precisely what the County has done here with its county-wide approach to problems arising only at one location. *McCullen*, 573 U.S. at 486 (citation omitted).

**E.      The County failed to apply less intrusive measures before regulating speech.**

*McCullen* is clear: "[t]o meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." 573 U.S. at 495. The County cannot meet this burden. As the Sixth Circuit held: "the County has not shown that it 'seriously undertook to address' its concerns 'with less intrusive tools.'" *Sisters for Life*, 56 F.4th at 405 (quoting *McCullen*, 573 U.S. at 494).

The preamble to the Ordinance sets forth the undisputed importance of patients' access to healthcare facilities and the County's legitimate concern about the alleged "willful obstruction" of such access. [Ordinance, 3:21-cv-691, Doc. 1-1, PageID.20.] While the preamble states there is a history of "obstruction and interference with" access to such facilities, all the statistics and references to "report logs" and police activity concern only one healthcare facility: the EMW abortion clinic. [*Id.* at PageID.20-21.] *See McCullen*, 573 U.S. at 493 ("The portions of the record that respondents cite to support the anticongestion interest pertain mainly to one place at one time: the Boston Planned Parenthood clinic on Saturday mornings.").

Throughout the Ordinance's recitals, the County misses the same point Massachusetts missed by ascribing the problem the Ordinance purports to address to the behavior of "protestors."[5] The Ordinance shows no awareness of the important distinction the *McCullen* Court went to great lengths to delineate between "protestors" and sidewalk counselors in this same context. *Id.* at 489 ("[Massachusetts] misses the point. Petitioners are not protestors."). *See also Sisters for Life*, 56 F.4th at 406 ("the goal of the plaintiffs is not to harass or protest, whether loudly or violently. The point of

---

[5] The recitals contain 13 separate references to "protestors" or "protests." There are *zero* references to "sidewalk counselors," despite the *McCullen* Court's clear explanation of the difference. [Ordinance, 3:21-cv-691, Doc,.1-1, PageID.20–26.]

their speech is to offer a compassionate ear.").

Perhaps of equal significance to what Louisville says in the preamble to the Ordinance to explain its adoption, is what Louisville does not say. Missing from the Ordinance's recitals is any reference to a single prosecution for violations of already existing laws prohibiting obstruction, blocking, trespassing, assault, or harassment. [Ordinance, 3:21-cv-691, Doc. 1-1, Page ID.20–23.] *See McCullen*, 573 U.S. at 494 ("Although respondents claim that Massachusetts 'tried other laws already on the books,' [citation omitted], they identify not a single prosecution brought under those laws within at least the last 17 years."). In fact, the LMPD Memorandum submitted by the County in opposition to Plaintiffs' motion for a preliminary injunction concluded that "most of the activity of the protestors is **clearly lawful**." [Doc. 13-5, PageID.141 (emphasis added).]

The County also fails to identify any efforts to pursue injunctions to address problems at EMW. [Ordinance, 3:21-cv-691, Doc. 1-1, PageID.20–23.] This, despite the *McCullen* Court emphasizing the "broad virtues of targeted injunctions as alternatives to broad, prophylactic measures. Such an injunction 'regulates the activities, and perhaps the speech, of a group,' but only because of the group's past actions in the context of a specific dispute between real parties.'" *McCullen*, 573 U.S. at 492. Further, "injunctive relief focuses on the precise individuals and the precise conduct causing a particular problem." *Id.* By contrast, the Ordinance, like the Massachusetts law, "categorically excludes non-exempt individuals from the buffer zones, unnecessarily sweeping in innocent individuals and their speech." 573 U.S. at 492–93. *See also Sisters for Life*, 56 F.4th at 405-06 ("The County offers little explanation why customized injunctive relief would serve its interests less effectively. . . . What was problematic for Massachusetts in *McCullen*—its failure to focus regulation on the problem through targeted injunctions—is problematic for Louisville here.").

When one comes to the Ordinance preamble's sole explanation for its failure to solve its EMW problems through existing laws, the preamble practically paraphrases the excuse flatly rejected by the

*McCullen* Court. It states that LMPD "indicates that when incidents occur, officers are required to make judgment calls" and that a buffer zone "would eliminate the need for LMPD to make judgment calls on whether enforcing existing laws or ordinances would impede on the protestor's First Amendment rights." [Ordinance, 3:21-cv-691, Doc. 1-1, PageID.22.] In other words, in Louisville, as in Boston, painting lines on the sidewalk to categorically exclude even those legitimately exercising their First Amendment rights, would "make our job easier." *McCullen*, 573 U.S. at 495. But, while "[a] painted line on the sidewalk is easy to enforce, the prime objective of the First Amendment is not efficiency." *Id. See also Sisters for Life*, 56 F.4th at 405 ("More than some difficulty . . . is required to uphold regulations that suppress speech.").

Any supposed difficulty in identifying unlawful actions or individuals to prosecute under existing laws or target for injunctions is belied by the recitals in the Ordinance that contain detailed numbers about protestors present at EMW during specific time periods and cite two separate LMPD memoranda with further details about protestors and their activities. [Ordinance, 3:21-cv-691, Doc. 1-1, PageID.20–21.] As the *McCullen* Court put it, in response to Massachusetts's assertion of enforcement difficulties, "[i]f Commonwealth officials can compile an extensive record of obstruction and harassment to support their preferred legislation, we do not see why they cannot do the same to support injunctions and prosecutions against those who might deliberately flout the law." *McCullen*, 573 U.S. at 495. *See also Sisters for Life*, 56 F.4th at 405 ("Most of the protestors that the law targets, moreover, appear to be repeat visitors to the Clinic. That permits the County or EMW to seek targeted injunctions preventing those individuals—and them alone—from standing outside the Clinic's entrances.").

In addition to this undermining of any justification arising from an alleged difficulty in enforcing laws against lawbreakers on the sidewalk in front of EMW, we now have the benefit of Plaintiff Kenney's written warning to demonstrate just how easy such enforcement is. [Kenney

Warning, 3:21-cv-691, Doc. 1-2, Page ID.28.] That warning indicates that security footage from EMW was forwarded to the Metro County Attorney's Office. The county attorney reviewed the footage and determined that "a violation of BZO" (buffer zone ordinance) had occurred. [*Id.*] Shortly thereafter, Kenney was handed the written warning. [Verified Complaint, 3:21-cv-691, Doc. 1, PageID.10, ¶ 47.] As the Sixth Circuit observed, "EMW keeps video surveillance of its entrance. The County does not explain why it cannot use EMW's footage and, in connection with law enforcement, identify and cite harassing or obstructing protestors." *Sisters for Life*, 56 F.4th at 405. *See also* Stewart Depo., Doc. 47, PageID.2025 (stating that he could "[o]ftentimes" "ascertain a violation" of laws based on EMW's video footage).

To paraphrase *McCullen*, 573 U.S. at 495, if County officials can collect video evidence of allegedly unlawful activities taking place at EMW by readily identifiable perpetrators, it is difficult to see why they could not have been doing so all along to support injunctions and prosecutions against the lawbreaking "protestors" whose actions are the purported basis for shutting down a public forum to law-abiding citizens exercising their First Amendment rights.

Finally, a provision of the Ordinance that Plaintiffs do not challenge prohibits one to "knowingly obstruct, detain, hinder, impede, or block another person's entry to or exit from a healthcare facility." [Ordinance, 3:21-cv-691, Doc. 1-1, PageID.22, § I (B)(1).] The County cannot explain why this provision alone is not enough to satisfy the interests identified in the Ordinance, i.e., "unimpeded access to healthcare facilities." [Ordinance, 3:21-cv-691, Doc. 1-1, PageID.20.] *See Sisters for Life*, 56 F.4th at 405 ("The County offers no tenable, or for that matter record-supported, explanation why [the anti-obstruction provision of the Ordinance] will not work."). It cannot explain why, in addition to this conduct-based law, the County needs a speech-based one. The County has banned **both** speech **and** conduct, despite no evidence that banning both is required. "Solving policy

problems by regulating speech is a means of last resort, not first resort," but regulating speech was the County's first legislative attempt to deal with problems outside EMW. *Sisters for Life*, 56 F.4th 404.

In light of *McCullen* and the Sixth Circuit opinion in this case, the County cannot justify the Ordinance's regulation of speech in traditional public forums. The Ordinance lacks narrow tailoring and is unconstitutional under the First Amendment. Plaintiffs are entitled to summary judgment on that claim.

## II.    This Case is Not Moot.

In the Joint Status Report filed with the Court on March 2, 2023, the County stated that because EMW has (allegedly) been closed since August 1, 2022, on account of Kentucky's trigger ban, KRS 311.772, and heartbeat ban, KRS 311.7707-11, this case has become moot. [JSR, Doc. 72, PageID.2358–2359.] That position is untenable.

The "'heavy burden' of demonstrating mootness falls on the party asserting it." *Thomas v. City of Memphis*, 996 F.3d 318, 324 (6th Cir. 2021) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs (TOC), Inc.*, 528 U.S. 167, 189 (2000)). As the Supreme Court has explained, "[a] case might become moot if subsequent events made it **absolutely clear** that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 189 (emphasis added). That is not the case here.

As an initial matter, if this case has been moot since last August, the County should have moved the Sixth Circuit to dismiss Plaintiffs' appeals soon after that date or, at the very least, filed a supplemental brief with that court arguing that it lacked jurisdiction to hear the appeal. It did not do so. Instead, the County allowed the appeal to proceed to oral argument before the Sixth Circuit on December 8, 2022, and a final decision by the Sixth Circuit on December 21, 2022. Only now, after the Sixth Circuit held that Plaintiffs are likely to succeed on the merits of their First Amendment claims, and after this Court entered a preliminary injunction on January 3, 2023 [Doc. 64], does the

23

County claim that the case is moot.[6] While mootness is a jurisdictional issue that can be raised at any time, the County's declining to do so until this time reveals how weak it must think the argument to be. In fact, one can fairly question whether the County would be arguing that the case is now moot had it prevailed before the Sixth Circuit.

The essential problem with the County's mootness argument is that the County has not voluntarily changed the source of what the Sixth Circuit held likely violates Plaintiffs' First Amendment rights: the Ordinance. The Ordinance has not been amended or repealed—though it is subject to a preliminary injunction—and it's still on the books.[7] That injunction bars the County not just from enforcing the Ordinance's buffer zone outside EMW, but buffer zones outside "every single hospital, clinic, and dentist's office" within the County's jurisdiction. *Sisters for Life*, 56 F.4th at 405. The County's assertion that EMW "is the only health care facility with a buffer zone pursuant to Louisville Metro Code of Ordinances" [JSR, Doc. 72, PageID.2359] is therefore not just wrong; it's an assertion squarely rejected by the Sixth Circuit:

> The County maintains that the ordinance creates buffer zones only when a facility requests painted lines outside its entrance. But that is not what the ordinance says. It applies always and everywhere there is a healthcare facility.

*Sisters For Life*, 56 F.4th at 408.

As the Sixth Circuit further explained, the fact that Plaintiffs "mainly visit[] EMW rather than other medical facilities," is irrelevant. *Id.* at 407.

> In facial First Amendment challenges, we consider a statute's full range of applications **even when some of them do not implicate a particular plaintiff**. Put differently,

---

[6] In fact, less than two months before oral argument before the Sixth Circuit, the County filed a motion with the Sixth Circuit asking that oral argument be continued. [22-5151, Doc. 33.] The motion was not predicated on any alleged mootness grounds, but because of a scheduling conflict. The motion was denied the following day. [22-5151, Doc. 34.]

[7] For this reason, none of the cases cited by the County in support of its mootness claim are relevant. [Doc. 72, PageID.2360.]

> if a statute is not narrowly tailored, it cannot be constitutionally applied to anyone, even if a more narrowly tailored statute might still capture a plaintiff's conduct.

*Id.* (citations omitted) (emphasis added).

In other words, should this Court issue a final decision on the merits in this case by entering a permanent injunction against enforcement of the Ordinance, not only will the free speech rights of Plaintiffs be vindicated, but the free speech rights of those not before the Court will also be protected. *See, e.g., Odle v. Decatur Cty.*, 421 F.3d 386, 393 (6th Cir. 2005) ("The overbreadth doctrine is an extraordinary but firmly-established means of enforcing First Amendment rights. Traditional standing is not a requirement, i.e., a plaintiff may assert the interests of others not before the court even if it is only their protected expression, not the plaintiff's, that the challenged ordinance is said to infringe.").

While the Kentucky Supreme Court in *Cameron v. EMW Women's Surgical Center, P.S.C., et al.*, --- S.W.3d ---, 2022-SC-0329-TG, 2023 Ky. LEXIS 4 (Ky, Feb. 16, 2023), did not disturb the Court of Appeals' determination that the Circuit Court abused its discretion in granting the plaintiff abortion providers preliminary relief, that case is far from over. And how it will be concluded is, of course, anyone's guess. The County's suggestion that if the trigger ban is held unconstitutional, "the General Assembly could easily, and would, remove it now that they are empowered to prohibit abortion," is, of course, speculation. [Doc. 72, PageID.2359.] A court is "not required to dismiss a live controversy as moot merely because it may become moot in the near future." *Hunt v. Imperial Merch. Servs., Inc.*, 560 F.3d 1137, 1142 (9th Cir. 2009).

As matters stand presently, "[i]ntervening events have not **irrevocably** eradicated the effects of the alleged violation.'" *Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)) (emphasis added). Until litigation against the trigger ban is ultimately resolved, there remains the possibility that any three levels of the Kentucky judiciary will grant the plaintiffs in that case a preliminary and/or permanent injunction and that abortions will resume. The constitutionality of the Ordinance should not be tethered to a case that has yet to be finally adjudicated

on its merits. Indeed, if "an action is not automatically rendered moot by the mere existence of a similar pending action," why would the existence of a **dissimilar** pending action render it moot? *ConnectU LLC v. Zuckerberg*, 522 F.3d 82, 89 (1st Cir. 2008).

Finally, and most critically, as the Declarations of Harpring [Ex. A, Harpring Declaration] and Joe Lynch [Lynch Declaration, Doc. 72-1, PageID.2362-2363] make clear, EMW appears to still be open for business, even if it is not allegedly providing abortion services. As explained, Plaintiff Edward Harpring continues to go to the public sidewalk outside EMW to pray and counsel women. [Ex. A, Harpring Declaration, ¶¶ 3 and 5.] He has personally witnessed patients entering and leaving EMW and has seen the vehicle belonging to the EMW manager parked in the back of the building. [*Id.* at ¶ 4.]

If Harpring were not protected by preliminary relief issued by this Court on January 3, 2023 [Doc. 64], he would not be able to pray and counsel women within the buffer zone outside EMW, as he does to this day. Because that preliminary injunction protects the rights of all Plaintiffs, in addition to those not before the Court, to engage in protected free speech activities at the current time—and not just outside EMW, but all healthcare facilities within the County—the case is not moot. A permanent injunction will settle those rights once and for all.

## III.    Plaintiffs are Entitled to a Permanent Injunction.

Should this Court grant Plaintiffs' motion for summary judgment, Plaintiffs ask that the Court enter a permanent injunction barring the County and its agents from enforcing the Ordinance. When a "plaintiff establishes a constitutional violation . . . the plaintiff will be entitled to permanent injunctive relief upon a showing of: (1) a continuing irreparable injury if the court fails to issue the injunction, and (2) the lack of an adequate remedy at law." *Warren v. City of Athens*, 411 F.3d 697, 711 (6th Cir. 2005) (citing *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1067 (6th Cir. 1998)).

Plaintiffs satisfy each of these criteria. First, as explained, Plaintiffs have demonstrated that the Ordinance violates the Constitution's First Amendment. Second, Plaintiffs have suffered an irreparable injury because the Ordinance violates their First Amendment right to free speech. *See Zillow, Inc. v. Bork*, 593 F. Supp. 3d 619, 636 (E.D. Ky. 2022). "Loss of such rights 'unquestionably constitutes irreparable injury.'" *Id.* (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). *See also Sisters for Life*, 56 F.th at 408 ("Because the ordinance likely violates the First Amendment, applying it to [Plaintiffs] would irreparably injure them."). Third, there is "no other adequate remedy at law because there are no money damages that can compensate a violation of one's First Amendment rights." *Zillow*, 593 F. Supp. 3d at 636.

## CONCLUSION

For the foregoing reasons, Plaintiffs Harpring and Kenney ask the Court to grant their motion for summary judgment on their First Amendment free speech claim and enter a permanent injunction barring the County from enforcing the Ordinance.

Respectfully submitted on this 16th day of March 2023.

s/ Geoffrey R. Surtees
Geoffrey R. Surtees
American Center for Law & Justice
Post Office Box 60
New Hope, Kentucky 40052
Tel. 502-549-7020; Fax 502-549-5252
gsurtees@aclj.org

Edward L. White III*
American Center for Law & Justice
3001 Plymouth Road, Suite 203
Ann Arbor, MI 48105
734-680-8007
ewhite@aclj.org

*Admitted pro hac vice

*Counsel for Plaintiffs Harpring and Kenney*

**CERTIFICATE OF SERVICE**

I certify that I have served the foregoing via the Court's CM/ECF system, which will provide notice to all counsel or parties of record, on this 16th day of March 2023.

s/Geoffrey R. Surtees
Geoffrey R. Surtees
Counsel for Plaintiffs Harpring and Kenney
