UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

SISTERS FOR LIFE, INC., ET AL.                                    Plaintiffs

v.                                              Civil Action No. 3:21-cv-367-RGJ

LOUISVILLE-JEFFERSON COUNTY METRO                          Defendants
GOVERNMENT, ET AL.

* * * * *

## MEMORANDUM ORDER & OPINION

## I.    INTRODUCTION

This case comes before the Court on two motions for summary judgment and permanent injunctive relief and one motion to dismiss. Kentucky Right to Life Association, Angela Minter ("Minter"), and Sisters for Life, Inc. (collectively, "*Sisters* Plaintiffs"), [DE 74], and Edward Harpring ("Harpring") and Mary Kenney ("Kenney") (collectively, "*Harpring* Plaintiffs"),[1] [DE 75], move separately for summary judgment and permanent injunctive relief.   Defendants Greg Fischer, Louisville-Jefferson County Metro Government ("Louisville Metro"), Mike O'Connell, and Erika Shields (collectively, "Defendants") move to dismiss Plaintiffs' claims on mootness grounds.  [DE 76].

On October 11, 2023, the Court held an evidentiary hearing to determine mootness.  [DE 106].  Briefing is complete and the matters are ripe.  [DE 77; DE 78; DE 81; DE 82; DE 83; DE 85; DE 86; DE 122; DE 123; DE 124; DE 125; DE 126; DE 127].  For the reasons below,

---

[1] This case is the result of consolidation of two actions, one brought by the *Sisters* Plaintiffs (civil action number 3:21-cv-367-RGJ) and one brought by the *Harpring* Plaintiffs (original civil action number 3:21-cv-691-RGJ). The Court consolidated the actions on January 6, 2022.  [*Harpring* DE 19 at 177].  All docket entries from the original *Harpring* case are referred to as "*Harpring* DE." The *Sisters* and *Harpring* Plaintiffs are collectively referred to as "Plaintiffs."

Defendants' motion to dismiss [DE 76] is **DENIED**.  Plaintiffs' motions for summary judgment [DE 74; DE 75] are **ADMINISTRATIVELY REMANDED** pending an evidentiary hearing on the merits as requested below.

## II.    BACKGROUND

### A.    Parties and Procedural History

The *Harpring* Plaintiffs are "sidewalk counselors who. . . have been active in speaking with and distributing pamphlets, handbills, and other literatures to individuals using the services. . . where abortions are performed." [*Harpring* DE 1 at 2].  The *Sisters* Plaintiffs use "sidewalk ministry. . . [which] involves offering both verbal and written materials outlining alternatives to abortion and help for anyone wishing to pursue those options." [DE 28, *Sisters* Second Amended Complaint, at 1478].  Plaintiffs also engage in prayer outside of healthcare facilities they perceive as involved in the provision of abortion services.  [DE 120, Evidentiary Hr'g Tr., at 2825–26, 2869, 2878].

Plaintiffs challenge the constitutionality of a city ordinance, Ordinance O-179-21 ("Ordinance") passed by Louisville Metro and signed by then-Mayor Greg Fisher in 2021.  [DE 2-1 at 43].  The Ordinance prohibits persons from entering or obstructing a 10-foot wide "buffer zone" in front of healthcare facilities except in certain circumstances.  Louisville Metro Ordinance § 132.09(A) (2021).

At the outset of the case, Plaintiffs focused on one specific healthcare clinic: EMW Women's Surgical Center ("EMW").  [*Harpring* DE 1 at 2-16; DE 28 at 1475-86].  At the time, much of their sidewalk counseling efforts took place at EMW, where a buffer zone has been established pursuant to the Ordinance.  [*Harpring* DE 1 at 2, 15; DE 28 at 1475, 1486].  Plaintiffs sued asserting that the Ordinance is unconstitutional because it violates the First Amendment's

Free Speech, Freedom of Assembly, and Free Exercise clauses as well as the Kentucky Religious Freedom Restoration Act ("KRFRA"). [*Harpring* DE 1 at 1-15; DE 28 at 1485-88].[2]

On February 25, 2022, the Court denied Plaintiffs' motion to preliminarily enjoin the Ordinance. [DE 55]. Plaintiffs appealed. [DE 56; DE 57]. On June 24, 2022, the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization* triggered a Kentucky state law banning abortion. Ky. Rev. Stat. § 311.772(2). On December 21, 2022, the Sixth Circuit reversed the denial of Plaintiffs' preliminary injunction, finding that Plaintiffs had shown a likelihood of success on the merits for their First Amendment claim.[3] *See Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400 (6th Cir. 2022). Accordingly, the Court ordered a preliminary injunction, barring Louisville Metro from enforcing the Ordinance pending a trial on the merits of Plaintiffs' claims. [DE 64].

Now, Defendants move to dismiss Plaintiffs' claims for mootness, citing the outlawing of abortion in Kentucky. [DE 76]. Plaintiffs move for summary judgment on all their claims. [DE 74; DE 75].

The facts of the case have changed drastically over the course of the litigation. Since the Sixth Circuit's decision, the record of the case has been substantially developed with the benefit of additional briefing and hearing testimony on mootness. For analyzing the parties' motions on the facts as they currently exist, the Court details the circumstances before the Ordinance, during its enforcement, and its application today, post-*Dobbs*.

---

[2] The *Harpring* Plaintiffs originally brought a Fourteenth Amendment due process claim alongside their First Amendment claim. [*See Harpring* DE 1]. They have since abandoned their Fourteenth Amendment claim. [DE 75 at 2405].

[3] The Sixth Circuit's decision makes no mention of *Dobbs* or the change of law in Kentucky. *See Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400 (6th Cir. 2022). Defendants did not move to dismiss Plaintiffs' claims until after the Sixth Circuit ruling. Thus, the appellate panel did not address the issue of mootness.

**B.     The Ordinance**

The Ordinance states, in relevant part and as amended:

(A) *Definitions*.  For the purpose of this chapter, the following definitions shall apply unless the context clearly indicates or requires a different meaning.

> **DRIVEWAY.**  An entry from a public street to a public or private parking area used by a healthcare facility.
> **ENTRANCE.** Any door to a healthcare facility that directly abuts the public sidewalk; provided, however, that if the door does not directly about [sic] the public sidewalk, the 'entrance' shall be the point at which the public sidewalk intersects with a pathway leading to the door.

. . . .

(B) *Access to a healthcare facility*.

> (1) No person shall knowingly obstruct, detain, hinder, impede, or block another person's entry to or exit from a healthcare facility.
> (2) No person shall knowingly enter, remain on, or create any obstruction within the driveway of a healthcare facility or within a "buffer zone" on the public way or sidewalk extending from the entrance of a healthcare facility to the closest adjacent sidewalk curb and ten feet from side to side, during the facility's posted business hours, except:
>> (a) Persons entering or leaving such facility;
>> (b) Persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility; or
>> (c) Law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; or
>> (d) Employees or agents of such facility acting within the scope of their employment.

(C) *Signage*. The Department of Public Works shall, at the request of a healthcare facility, paint or lay on the public way or sidewalk two easily-distinguishable demarcation lines running from either side of the facility entrance to the closest adjacent sidewalk curb and extending ten feet from each other.  Healthcare facilities shall post such zone with signage stating: "Healthcare facility: No standing within this zone. [Metro Ordinance]."

Louisville Metro Ordinance § 132.09(A)-(C) (2021).

Lieutenant Caleb Stewart ("Stewart") testified that the ordinance operates in two steps: (1) a healthcare facility contacts the city to have a buffer zone marked, and (2) police may then enforce the buffer zone.[4]  [DE 47, Stewart Dep. at 2008].  The only operational buffer zone in the city is

---

[4] As discussed below, this differs from the Sixth Circuit's reading of the statute.  *See infra*, Part III.A.

4

located at EMW.  [DE 120 at 2816].  The zone, which is ten feet wide, places protestors and sidewalk counselors approximately five feet from patients passing through it.  [*Id*. at 2032].  If someone violates the buffer zone, Louisville Metro Police Department ("LMPD") issues a written warning before giving a citation. Louisville Metro Ordinance § 132.09(F)(1); [DE 120 at 2800–01].  Clinic escorts—volunteers who offer to walk with and shuttle patients from the parking lot to EMW's front doors—are treated as "agents" under the Ordinance and are exempted from the buffer zone restrictions.  Louisville Metro Ordinance § 132.09 (B)(2)(d); [DE 47 at 2010–11].

While the buffer zone was operational, EMW complied with the Ordinance by submitting bi-annual reports to the city.  Louisville Metro Ordinance § 132.09 (D)-(E); [DE 120 at 2770].

### C.      Pre-Buffer Zone

When EMW was providing abortion services and before the operation of the buffer zone, the sidewalk outside the clinic was often busy. Minter testified that she and her fellow sidewalk counselors both approached patients and congregated in front of the clinic's doors and windows to "minister" to the people inside.  [DE 44, Minter Dep. at 1831].  Along with sidewalk counselors there were often anti-abortion protestors who used bullhorns, signs, and shouting to deliver their messages.  [*Id*. at 2764, 1845].  Joe Lynch ("Lynch"), a sidewalk counselor, testified that it was often "hard to hold a conversation" in front of EMW's entrance due to the number of people in the area.  [DE 120 at 2836–37].  Ona Marshall ("Marshall"), co-owner of EMW, testified that there "was very loud, aggressive, demeaning behavior, harassment, intimidation, [ ]stalking patients from a city parking garage to the front of the EMW, loudspeakers, pushing, assaulting, harassment, [and] verbal threats." [*Id*. at 2764].

Additionally, volunteer escorts positioned themselves within nearby parking lots and on the sidewalk to accompany patients past the protestors and into the clinic.  [DE 46, Kenney Dep.

at 1928]. Marshall testified that before the buffer zone was placed, escorts were EMW's main way to ensure patient safety. [DE 120 at 2793]. They are an independent organization that collaborates with EMW; they are not clinic employees. [*Id*. at 2791].

Patients approached the clinic on foot and by car. Patients who did not park themselves were often dropped off at the curb in front of the clinic doors, either by a clinic escort or by a private party. [DE 44 at 1834; DE 45, Harpring Dep. at 1888]. When a patient entered the sidewalk, after either parking or being dropped off, sidewalk counselors would "walk alongside" them, encouraging them not to pursue abortion. [DE 120 at 2857–58]. When a patient arrived via car, protestors and counselors would stand at the car door to attempt to speak with them and hand them literature. [DE 44 at 1823-24]. Some patients engaged with the counselors and others did not. [*Id*. at 1820–27].

The sidewalk counselors testified that before the buffer zone was enacted clinic escorts often blocked them from passing literature or talking to patients. [DE 120 at 2857–58]. They also noted frustration with the other anti-abortion protestors, whose more aggressive tactics they saw as hindering their own efforts. [DE 44 at 1845; DE 120 at 2836–37].

During this time, LMPD was called to the clinic multiple times per week for allegations of harassment, assault, and similar offenses. [*Id*. at 2797–2798]. Yet few citations were issued due to the requirement that an officer witness a violation first-hand before issuing a citation.[5] [*Id*. at 2819].

---

[5] The Sixth Circuit cited the availability of video surveillance and targeted citations as one of the reasons why the Ordinance was likely to fail narrow tailoring. *Sisters for Life*, 56 F.4th at 405 ("The County does not explain why it cannot use EMW's footage and, in connection with law enforcement, identify and cite harassing or obstructing protestors."). Stewart's testimony contradicts the availability of this "less intrusive tool[]",by indicating that citations could not be issued unless seen by an officer, but he does not explain why citations could not be issued based on the video evidence. *Id*. (quoting *McCullen v. Coakley*, 573 U.S. 464, 494 (2014).

D.    **Buffer Zone In Force**

The buffer zone created a ten-foot-wide path from the street curb to the front door of EMW. [DE 47 at 2008–09].  Patients who chose to park still approached the clinic via the sidewalk, where counseling and protesting remained unencumbered. [DE 120 at 2880].  Many patients, however, chose to use the escort shuttle service, which would pick them up at their vehicle and drop them off at the curb in front of the buffer zone—bypassing the crowded sidewalk. [*Id*. at 2886–87].  The sidewalk counselors testified that while many patients still chose to walk along the sidewalk, the number that used the escort shuttle increased once the buffer zone was placed.  [*Id*. at 2860–62].  Many expressed frustration with the shuttle service's effect on their efforts.  [DE 44 at 1840-42].  Harpring stated: "I wish it wasn't that way, but it is that way. . . I mean that's obviously their prerogative, their right to drop off right there." [DE 45 at 1899].

With the buffer zone in place, it takes approximately ten seconds to travel from the curb to EMW's front door.  [DE 47 at 1969, 2031, 2035, 2041].  This is the same amount of time it took a dropped-off patient to reach the front door before the buffer zone was in effect.  [DE 44 at 1823].  Even so, Marshall testified that the zone had a "tremendous impact" because it allowed patients to walk unimpeded. [DE 120 at 2793–94].  She agreed that patients were still able to hear the demonstrators and receive the literature being offered to them.  [*Id*.].  Harpring testified that even with the buffer zone, he was still able to (1) place literature in patients' hands,[6] and (2) converse with any patient who wanted to stop in the buffer zone to speak with him.  [DE 45 at 1898].

Various counselors testified about the general effect of the buffer zone on their efforts.  Minter testified that the zone was "catastrophic" to her ability to speak with patients.  [DE 44 at 1846 "they are being escorted to the buffer zone in front of the door and so we don't have that

---

[6] This contradicts the Sixth Circuit's assumption that "distribution now takes place beyond an arm's length." *Sisters for Life*, 56 F.4th at 407.

opportunity to talk to them. If they were walking down the sidewalk, [we could] talk with them, connect with them. . ."].  She also testified, however, that she was able to talk with many non-shuttling patients as they walked down the sidewalk.  [*Id*. at 1858; DE 120 at 2860].  Harpring testified that the buffer zone would end his conversations with patients as they approached the EMW doors.  [DE 45 at 1893 "my voice is now elevated because I'm not next to her, and so that quiet conversation becomes more of a louder voice, and not as welcoming as it would have been if I had got to continue on to the door with her."].

Much of the sidewalk counselors' testimony about the buffer zone were unrelated to the Ordinance.  Three chief complaints emerged from the testimony: the noise, the crowds, and the escorts.

First, many counselors complained that the noise level outside EMW hampered their efforts.  Minter testified that both before and after the buffer zone was placed, the protestors' noise inhibited her efforts to talk with patients.  [DE 44 at 1845]. This was corroborated by Stewart, who testified that the sidewalk counselors have often expressed frustration with the loudspeakers and generally aggressive behaviors demonstrated by the protestors.  [DE 47 at 2006]. Such use of loudspeakers and amplifying devices is not prohibited by the Ordinance.  [*Id*. at 1996].  Complaints about the noise levels remained consistent before and after the buffer zone was put into place.

The counselors also testified that the sheer number of people outside the clinic often impeded their ability to "quiet counsel." [DE 120 at 2836].  On a busy day, up to fifty demonstrators congregated within about thirty feet of the entrance to EMW.  [DE 47 at 1965-67, 2073]. Lynch testified that the area around the buffer zone was "awful distracting" and that the crowd "made it more difficult to have a personal conversation. . .[.]" [DE 120 at 2837, 2836 "I would try to [continue the conversation], but it was—it would be—there would be a lot of people

out there. I wouldn't always have that access."]. Complaints about the crowds remained consistent before and after the buffer zone was put into place.

Third, the sidewalk counselors all expressed frustration with the volunteer escorts. They testified that the shuttle service kept patients from having to encounter them on the sidewalk. [DE 45 at 1888]. They also testified that escorts often physically blocked them from reaching patients, either by standing in front of them or by pushing their outstretched hands away. [DE 46 at 1932; DE 45 at 1901–02; DE 44 at 1851]. Harpring testified that escorts have taken away literature that he placed in patients' hands. [DE 45 at 1901–02]. Escorts would also often talk with patients when they exited the shuttle into the buffer zone, which Minter testified made it difficult for the sidewalk counselors to strike up their own conversations with the patient. [DE 44 at 1844]. Even patients who did not utilize the shuttle were often accompanied by escorts or private parties down the sidewalk, who would talk with them as they approached the clinic. [DE 120 at 2841]. Complaints about the escorts remained consistent before and after the buffer zone was put into place.

The buffer zone changed the way LMPD policed the area around EMW. Stewart testified that the Ordinance allowed officers to issue written warnings for buffer zone violations based on security video footage. [*Id*. at 2819–20]. Immediate citations were still limited to violations that an officer observed first-hand. [*Id*. at 2819–20]. If a violation was captured on video after a written warning had been issued, LMPD could file a report with a district judge upon request by EMW. [*Id*. at 2819–20]. Stewart kept record of who was issued written warnings in a spreadsheet. [*Id*. at 2793]. Plaintiff Mary Kenney—who expressed confusion about the operation of the buffer zone—testified that she was issued one such warning. [DE 46 at 1938].

### E.      Post-Injunction, Post-*Dobbs*

At present, EMW is not open to the public or seeing any patients. [DE 120 at 2761].  Any prospective patient is referred to the National Abortion Federation's hotline. [*Id*. at 2762] There are still staff on-site, answering phones and performing clerical work.  [*Id*. at 2788].  Volunteer escorts stopped their services around December 2022.  [*Id*. at 2762].  Marshall testified that, although it is not being enforced due to the injunction, EMW has no plans to rescind their request for the buffer zone, which served to protect clinic employees as well as patients.  [*Id*. at 2780].  She confirmed that anti-abortion protestors still visit the clinic a few times per week, but the ones with bullhorns and loudspeakers have ceased. [*Id*. at 2763].

As for enforcement, Stewart testified that if the injunction were lifted, LMPD would not enforce EMW's buffer zone because they are not open.  [*Id*. at 2803]. He also testified that he has not witnessed any counselors or  protestors at EMW since the fall of 2022.  [*Id*. at 2797].

Immediately after Kentucky outlawed abortion, some prospective patients continued to show up at EMW, seeking care.  Harpring testified in those first few days he counseled "at least fifteen" patients, which was made easier "because the escorts were not showing up then." [*Id*. at 2879].

Minter, Harpring, and Lynch each testified that they are still visiting EMW regularly. Without any patients to counsel, however, their activities have shifted from sidewalk counseling to prayer.[7]  [*Id*. at 2833].

---

[7] Lynch testified that he has encountered people experiencing homelessness within EMW's buffer zone and has ministered to them, albeit not about abortion.  [DE 120 at 2830–31].

Lynch testified that he visits EMW once per week to pray aloud in and around the buffer zone because he believes he is in a "spiritual battle over abortion."[8]   [*Id.* at 2825–28].   Minter similarly testified that as long as EMW is making abortion referrals she feels the "need to be there and continue to pray. . .pray that that ends, and continue to pray that women would have an opportunity to receive help from ministries that are offering life-affirming help." [*Id.* at 2854]. Harpring testified that he too prays in front of EMW, likening it to how "people go to 9/11 to pray for human atrocities or go to Auschwitz to pray for human atrocities." [*Id.* at 2878]. Praying directly within the buffer zone is important to him because he "want[s] people to see [him] there. . .right in front of the door." [*Id.* at 2878].

In addition to shifting their activities to individual prayer, Plaintiffs testified that they now visit the public sidewalk outside of Planned Parenthood along with EMW.[9]   Each gave differing testimony about their activities there:  Minter testified that there is no quiet counseling taking place at Planned Parenthood, only prayer.  [*Id.* at 2869]. Lynch testified that he counseled to a woman exiting the Planned Parenthood parking lot six to eight weeks prior to the hearing.  [*Id.* at 2831–32].  Regardless of their activity, the sidewalk counselors testified that there are no restrictions on where they can stand on the sidewalk outside of Planned Parenthood.[10]  [*Id.* at 2883–84].

### III.    DISCUSSION

#### A.    Law of the Case

"The law-of-the-case doctrine precludes reconsideration of issues decided at an earlier stage of the case." *Caldwell v. City of Louisville*, 200 F. App'x. 430, 433 (6th Cir. 2006).   One

---

[8] He testified that reinstitution of the buffer zone would "burden" his prayer ministry but did not expound on how.  [DE 120 at 2829].

[9] Planned Parthood is not mentioned anywhere in either complaint.  [*See Harpring* DE 1; DE 28].

[10] This is in tension with the Sixth Circuit's understanding that the Ordinance "applies always and everywhere there is a healthcare facility."  *Sisters for Life*, 56 F.4th at 408.

aspect of the doctrine prevents district courts from relitigating issues on remand which were necessarily decided by a court of appeals. *See Scott v. Churchill*, 377 F. 3d 565, 570 (6th Cir. 2004). An issue was "necessarily decided" on appeal if it was "fully briefed and squarely decided." *Perkins v. Am. Elec. Power Fuel Supply, Inc.*, 91 F. App'x 370, 374 (6th Cir.2004) (citing 1B James Moore, Moore's Federal Practice ¶ 0.404[1], at II–5 (2d ed.1996)). In contrast, law of the case does not apply to issues which were not conclusively decided in a prior appeal. *Roberts v. Galen of Virginia, Inc.*, 112 F. Supp. 2d 638, 640 (W.D. Ky. 2000).

> The doctrine is often inapplicable in the context of preliminary injunctions.
>
> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.

*Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Additionally, the burden of proof required to support a motion for preliminary injunction is not the same as that which is required to succeed on a motion for summary judgment. *William G. Wilcox, D.O., P.C. Emps.' Defined Benefit Pension Tr. v. United States*, 888 F.2d 1111, 1114 (6th Cir. 1989) (holding the district court erred by applying law of the case to a preliminary injunction decision when disposing of a later summary judgment motion). Thus, "law-of-the-case doctrine may be inapplicable when the legal conclusions in a preliminary-injunction decision were based on an underdeveloped record, issued under time pressures related to the circumstances of the preliminary injunction at issue, or were otherwise not conclusively decided." *Daunt v. Benson*, 999 F.3d 299, 308 (6th Cir. 2021).

However, if "'a court reviewing the propriety of a preliminary injunction issues a fully considered ruling on an issue of law with the benefit of a fully developed record, then the conclusions with respect to the likelihood of success on the merits are the law of the case in any

subsequent appeal.'" *Id.* (quoting *Howe v. City of Akron*, 801 F.3d 718, 740 (6th Cir. 2015)).  In *Daunt*, the Sixth Circuit held that their previous ruling denying a preliminary injunction was law of the case in deciding the subsequent motion to dismiss.  *Id.* at 309.  The court reasoned that the Plaintiffs asked the district court in the first instance to consolidate their motion for a preliminary injunction with a full trial on the merits.  *Id.* Additionally, the factual record remained unchanged from the first appeal to the second.  *Id.* ("Plaintiffs have not directed us to any allegations in their complaint that differ from or go beyond the preliminary-injunction record.").

The Sixth Circuit's opinion here concerned Plaintiffs' motion for preliminary injunctive relief.  *See Sisters for Life*, 56 F.4th at 400.  The appeal was briefed before the change of law in *Dobbs*.  The panel then based its opinion on the factual record at the time of the briefing.  *Id.* The decision makes no mention of the change in law or its effect on the case.  *Id.* Further, Plaintiffs have not amended their complaints to reflect the new bases for their claims.

As was made clear at the evidentiary hearing, the facts of the case look different today than they did at the preliminary injunction stage.  First, EMW has ceased providing abortions.  [DE 120 at 2761].  Second, the Plaintiffs have stopped quiet counseling and are now only praying outside the clinic. [DE 120 at 2854–69].  And third, many assumptions on which the Sixth Circuit based its ruling—the inability of patients to hear sidewalk counselors from the buffer zone and the inability of counselors to pamphleteer from outside the buffer zone—have been directly contradicted by Plaintiffs' proffered testimony. *See Sisters for Life*, 56 F.4th at 406.  This alone distinguishes the case from *Daunt*, where the factual record remained unchanged after the preliminary injunction stage.  999 F.3d at 308.

One fact—perhaps the only fact—that remains unchanged is that the Ordinance is still in force.  The scope of the Ordinance was "necessarily decided" in the Sixth Circuit opinion.  *See*

*Perkins*, 91 F. App'x at 374.   The panel interpreted the text of the Ordinance to "impose[] a prophylactic ten-foot 'buffer zone' around the entrance of any 'healthcare facility' in the County and forbid[] any non-exempt individual from 'knowingly enter[ing]' or 'remaining . . . within' it." *Sisters for Life*, 56 F.4th at 402.   Defendants maintain that the Ordinance was not intended to create buffer zones at facilities which do not request them, and that it has never been enforced as such.[11] [DE 77 at 2473; DE 78 at 2504 ("A buffer zone is not created automatically, nor can a healthcare facility create a buffer zone themselves.   It must be requested through Public Works.")].   Stewart testified that LMPD treats section (C) of the Ordinance—which instructs facilities to request a buffer zone be painted—as a necessary precondition for the enforcement of a zone as envisioned in section (B).   [DE 47 at 2008]. Regardless, the Sixth Circuit disagreed, reading the plain language of the statute as "appl[ying] always and everywhere there is a healthcare facility." *Sisters for Life*, 56 F.4th at 408.   This Court is bound by the Sixth Circuit's interpretation of the statute as an issue explicitly and necessarily decided in a prior appeal.   *See Westside Mothers v. Olszewski*, 454 F.3d 532, 538 (6th Cir. 2006) ("The [law of the case] doctrine precludes a court from reconsideration of issues decided at an early stage of the litigation, either explicitly or by necessary inference from the disposition.") (internal quotation omitted).   Thus, the Court assumes for the purposes of this and subsequent analyses that the Ordinance creates a ten-foot buffer zone outside of every healthcare facility[12] in the city of Louisville, regardless of whether the zone is requested or visibly marked.

---

[11] The legislative history of the Ordinance reveals that the Metro Council was concerned particularly with the activities in front of EMW, as the only abortion clinic in the area.   *See* [DE 11-5, Legislative Record, at 1230–32].   However, the Council also noted that "the EMW Clinic may be the most public healthcare facility in need of a safety zone, but at least eight (8) other healthcare providers have expressed support and the need for safety zone legislation." [*Id*. at 1231].

[12] The Ordinance defines "healthcare facility" as "any institution, place, building, agency, or portion thereof, public or private, whether organized for profit or not, used, operated, or designed to provide medical

## B.        Motion to Dismiss for Mootness

Defendants argue that Plaintiffs' claims have become moot since EMW has stopped performing abortions, thus eliminating "the entire purpose of [Plaintiffs'] sidewalk counseling efforts outside of EMW. . .[.]" [DE 76-1 at 2445–49]. Plaintiffs argue that the case still presents a live controversy because the Ordinance remains in force and Plaintiffs' speech activities at healthcare facilities persist.  [DE 123 at 2929–35; DE 124 at 2954–63].

### i.   Standard

Federal Rule of Civil Procedure 12(b)(1) allows dismissal for "lack of jurisdiction over the subject matter" of claims asserted in the complaint.  As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing that the exercise of jurisdiction is proper.  *Taylor v. KeyCorp*, 680 F.3d 609, 612 (6th Cir.2012).  When the motion challenges the existence of a jurisdictional fact—such as mootness—"no presumption of truthfulness applies to the allegations." *Gentek Bldg. Prods., Inc. v. Sherwin–Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007).  The Court then may examine evidence beyond the pleadings to ascertain whether the jurisdictional fact exists. *Id.*  Lack of subject matter jurisdiction is a non-waivable, fatal defect.  *Von Dunser v. Aronoff*, 915 F.2d 1071, 1074 (6th Cir. 1990).

### ii.   Analysis

Article III limits the jurisdiction of federal courts to "Cases" and "Controversies," U.S. Const. art. III, § 2, cl. 1, or "actual and concrete disputes, the resolution of which have direct consequences on the parties involved." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013).  To invoke federal court jurisdiction, "a plaintiff must demonstrate that he possesses a

---

diagnosis, treatment, nursing, rehabilitative, or preventive care and includes alcohol abuse, drug abuse, and mental health services . . .[.]" Louisville Metro Ordinance § 132.09 (A) (2021).

legally cognizable interest, or 'personal stake,' in the outcome of the action." *Id*. at 71 (quoting *Camreta v. Greene*, 563 U.S. 692, 701 (2011)).  The presence of a case or controversy is a "cradle-to-grave requirement"—necessary not only at the outset, but throughout the course of litigation. *Fialka–Feldman v. Oakland Univ. Bd. of Trs.*, 639 F.3d 711, 713 (6th Cir. 2011).  "[W]hen a case at first presents a question concretely affecting the rights of the parties, but—as a result of events during the pendency of the litigation—the court's decision would lack any practical effect, the case is moot." *Resurrection Sch. v. Hertel*, 35 F.4th 524, 528 (6th Cir.), cert. denied, 143 S. Ct. 372, 214 L. Ed. 2d 181 (2022) (internal quotation omitted).  The "heavy burden of demonstrating mootness rests on the party claiming mootness." *Cleveland Branch, NAACP v. City of Parma*, 263 F.3d 513, 530–31 (6th Cir. 2001).

When a claim seeks injunctive relief involving a statute, the general rule is that "legislative repeal of a statute renders a case moot." *Kentucky Right to Life, Inc. v. Terry*, 108 F.3d 637, 645 (6th Cir. 1997) (citation omitted); *see also Jones v. Haynes*, 736 F. App'x 585, 590 (6th Cir. 2018) ("we find it unnecessary, but also imprudent to determine the constitutionality of a statute that no longer exists and which has not been enforced and shows no sign of being enforced against Appellants") (internal quotations omitted); *Libertarian Party of Ohio v. Husted*, 497 F. App'x. 581, 583 (6th Cir. 2012) ("Absent special circumstances. . ., the legislative repeal of a statute renders a case challenging that statute moot.").  Legislative repeal is treated differently than voluntary non-enforcement of a law.

Normally, "a defendant's voluntary cessation of a challenged practice does *not* deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's*

*Castle, Inc.*, 455 U.S. 283, 289 (1982) (emphasis added)).  It is the defendant's burden to show

that it "could not be reasonably expected" to resume enforcement of the law.  *Id.* at 190.

"[C]essation of the allegedly illegal conduct by government officials has been treated with

more solicitude by the courts than similar action by private parties." *Bench Billboard Co. v. City*

*of Cincinnati*, 675 F.3d 974, 981 (6th Cir. 2012) (quoting *Mosley v. Hairston*, 920 F.2d 409, 415

(6th Cir. 1990) (internal quotations omitted)).  Such government "self-correction provides a secure

foundation for a dismissal based on mootness so long as it appears genuine.'" *Id.* (quoting *Mosley*,

920 F.2d at 415 (internal quotations omitted)).  For example, in *Hanrahan v. Mohr*, the Sixth

Circuit held that prison officials' voluntary policy change mooted the plaintiffs' First Amendment

challenge.  905 F.3d 947, 961 (6th Cir. 2018) ("The new policies were formally promulgated . . .

after a lengthy internal process.  And there is no indication that ODRC will return to its previous

policies, and the defendants have represented that the new policies will remain in place.  Thus, we

conclude that the self-correction appears genuine.") (internal quotation omitted). However, in a

different case, the Sixth Circuit declined to dismiss a plaintiff's claims when the defendant

university did "not put forth enough evidence to satisfy its burden to show that its voluntary

cessation makes it 'absolutely clear that the allegedly wrongful behavior could not reasonably be

expected to recur.'" *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 770 (6th Cir. 2019) (quoting

*Friends of the Earth*, 528 U.S. at 189).

Defendants focus on the "amendment" of abortion law in Kentucky as dispositive of the

mootness issue.  [DE 122 at 2912].  This confuses the law at issue in the case.  Plaintiffs do not

challenge the legality of abortion in Kentucky.  The Ordinance does not speak of abortion at all—

it applies to healthcare facilities of every type.  *Sisters for Life*, 56 F.4th at 408.  The Ordinance

has not been repealed or fundamentally amended over the course of this litigation. Thus, the legislative repeal component of mootness doctrine is inapplicable.

Defendants also argue that even though the Ordinance is still in force, Louisville Metro has no plans to enforce it at EMW. [DE 122 at 2909]. To prove voluntary cessation, Defendants must show that the city "could not be reasonably expected" to resume enforcement of the law. *Friends of the Earth*, 528 U.S. at 189. They have failed to do so.

Unlike in *Mohr*, Defendants point to no formal change in city policy applying the Ordinance.[13] Instead, they assert only that, if the injunction is lifted, "Louisville Metro has no reason to enforce the buffer zone which was established in order to protect patient ingress and egress due to the ongoing protests and obstructions outside of EMW." [DE 122 at 2909]. That may be true, but it is far from an assurance that the city will not enforce the Ordinance at *any* healthcare facility. Nor is it an assurance that the Ordinance would not be enforced at EMW if the situation was to drastically change again. Defendants argue that the change in Kentucky law has rendered enforcement of the Ordinance unnecessary and the issue moot. This is not to be confused with voluntary cessation, which occurs when a defendant—of its own volition—changes its enforcement policy for all circumstances.

Plaintiffs argue that voluntary cessation cannot moot this case because abortion could again become legal in Kentucky. [DE 128, Notice of Suppl. Fact Development, at 3015]. They are correct—but not for the reason they state. Voluntary cessation concerns actions within the discretion of the defendant. *See Friends of the Earth*, 528 U.S. at 189. Altering the legal status of abortion is not within the discretion of these Defendants. Put another way, Plaintiffs cannot burden

---

[13] The only evidence offered on this point comes from Stewart's testimony that absent the injunction, LMPD would not enforce the buffer zone at EMW because there are no patients entering or exiting the facility. [DE 120 at 2803].

the Defendants with responsibility for a decision that is not theirs to make.  The circumstances which have led to the Ordinance's non-enforcement were not caused by Defendants.  Whether the actions of some third party—here, the state government—could lead to EMW re-opening and protestors re-appearing is not what makes this a live controversy.  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) ("To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized . . . not conjectural or hypothetical." (internal quotation omitted)).  What makes this controversy live is that the Ordinance has not been repealed and Plaintiffs are still engaged in speech at healthcare facilities around the city.  Defendants have given the Court no reason to believe that they will not enforce buffer zones should the need arise from a change in law, or for any other reason. *See Speech First, Inc. v. Schlissel*, 939 F.3d at 770. Thus, voluntary cessation does not apply.

Finally, Defendants argue that there can no longer be any burden on Plaintiffs' speech because protesting has ceased, there are no longer any patients at EMW, and there are no longer any escorts blocking their efforts.  This is all true—many of Plaintiffs' chief complaints about the environment outside of EMW no longer exist.  Such arguments may very well undercut the merits of Plaintiffs' claims—but it does not moot them. Adopting the Sixth Circuit's reading of the Ordinance, an invisible, yet enforceable, buffer zone exists outside of every healthcare facility in the city and Plaintiffs state that prayer is still occurring at certain of these facilities.  Plaintiffs' facial challenge applies just as forcefully to the buffer zone outside of a downtown hospital, or a fertility clinic, as it does EMW.  Thus, faced with a live controversy and a facial challenge to an in-force ordinance, this Court finds that the case is not moot.

### C.  Summary Judgment Motion

Plaintiffs now ask the Court to award them summary judgment on all their claims. [DE 74; DE 75].  As explained above, the Court is not bound by the Sixth Circuit's free speech merits analysis.  Even if it were, the appellate opinion did not address Plaintiffs' free exercise or KRFRA claims.  *See Sisters for Life*, 56 F.4th at 400. Thus, the Court will analyze each of Plaintiffs' claims when deciding their motions.

Amid the morass that is this case's factual record, a return to first principles is in order. Plaintiffs raise four distinct claims.  First, they assert two First Amendment challenges, claiming that the Ordinance violates their rights to free speech and assembly.[14] Because the Ordinance "restricts sidewalk expression, namely speech within the buffer zone," it is considered a time, place or manner restriction. *Sisters for Life*, 56 F.4th at 403.  Such restrictions are permissible only if they (1) are content neutral, (2) are "narrowly tailored to serve a significant governmental interest," and (3) "leave open ample alternative channels for communication of the information." *McCullen v. Coakley*, 573 U.S. 464, 465(2014) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (internal quotations omitted)). Narrow tailoring "does not require that the means chosen 'be the least restrictive or least intrusive means' of serving [the government's] goals." *Richland Bookmart, Inc. v. Knox Cnty.*, 555 F.3d 512, 528 (6th Cir. 2009) (quoting *Ward*, 491 U.S. at 799).

Plaintiffs also bring a free exercise claim under the First Amendment.  Laws that incidentally burden religious practice are generally permissible if they are content neutral and generally applicable. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) (quoting

---

[14] These are two distinct claims but First Amendment free speech and assembly claims are often analyzed together because the inquiry is identical. *See Ramsek v. Beshear*, 468 F. Supp. 3d 904, 914-15 (E.D. Ky. 2020), *appeal dismissed as moot* 989 F.3d 494 (6th Cir. 2021) ("Although the First Amendment protects several categories of rights, it is often difficult in practice to determine where one right ends and the next begins. This is particularly true with freedom of speech and freedom of assembly. . .Consequently, Courts typically evaluate free speech, assembly. . .claims under the same analysis.") (citing cases).

*Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 879–81 (1990)).  If not, the government must pass strict scrutiny by showing the law is "justified by a compelling state interest" and "narrowly tailored in pursuit of that interest." *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993).

Lastly, Plaintiffs claim that the Ordinance violates the KRFRA by substantially burdening the exercise of their sincerely held religious beliefs.  Ky. Rev. Stat. § 446.350.

Evaluating the merits of these various claims requires further factual development. As the Sixth Circuit noted, the record surrounding the "requisite degree of fit" between the Ordinance's ends and means is far from clear.  *Sisters for Life*, 56 F.4th at 405.  First, Defendants have provided no testimony about what "less intrusive tools" the city may have considered before enacting the Ordinance, including the availability of targeted injunctions.  *Id.* (quoting *McCullen*, 573 U.S. at 494).  Second, there has been no testimony about why a simple non-obstruction ordinance would not have achieved the city's purposes.  *Id.*  Third, while there has been testimony about LMPD's policy requiring police witness to issue citations, there has been no testimony about why increasing police patrols and enforcement of existing laws was insufficient to ensure patient access to healthcare facilities.  *Id.* at 406.

The summary judgment briefing—as it stands—has not adequately developed the record. The earlier hearing on mootness offered some additional testimony but did not address certain of the Sixth Circuit's concerns.  At the time of the first evidentiary hearing, the Court limited presentation to issues of mootness.  While some other issues were explored based on the testifying witnesses, the parties were not asked to present evidence on the merits.  To reach the merits of Plaintiffs' claims, the Court orders an evidentiary hearing.  Issues addressed at the hearing should include, but not be limited to, the factual insufficiencies identified by the Sixth Circuit.  Plaintiffs

are entitled to present any rebuttal evidence as well as any other merits evidence not already presented to the Court.

## IV.    CONCLUSION

Having thus considered the parties' filings and the applicable law, and being otherwise sufficiently advised, the Court **ORDERS** that:

(1) Defendants' motion to dismiss [DE 76] is **DENIED**.

(2) Plaintiffs' motions for summary judgment [DE 74; DE 75] are **ADMINISTRATIVELY REMANDED**.

(3) An evidentiary hearing is scheduled for **May 14, 2024 at 9:30 a.m.** at the Gene Snyder United States Courthouse before the Honorable Rebecca Grady Jennings.

(4) **No later than 14 days before the hearing**, the parties shall file:

    a.   a list of witnesses to be presented at the hearing, including the subject matter of each witness's testimony and the purpose for which such testimony is offered; and

    b.   a list of exhibits to be presented at the hearing, including any demonstrative and/or summary exhibits and a description of each exhibit in sufficient detail to permit adequate identification thereof.

(5) **No later than 14 days before the hearing**, the parties shall exchange proposed pre-marked exhibits.

(6) **No later than seven days before the hearing**, the parties shall file any written objections to the lists of witnesses and exhibits previously filed by any other party. Objections not so disclosed, other than objections under Rules 402 and 403 of the

Federal Rules of Evidence, **shall be deemed waived unless excused by the court for good cause shown.**

March 30, 2024

Rebecca Grady Jennings, District Judge
United States District Court

cc:     Counsel of record