UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

SISTERS FOR LIFE, INC., ET AL.                                    **Plaintiffs**

v.                                                    Civil Action No. 3:21-cv-367-RGJ

LOUISVILLE-JEFFERSON COUNTY METRO                    **Defendants**
GOVERNMENT, ET AL.

\* \* \* \* \*

**MEMORANDUM OPINION & ORDER**

This case comes before the Court on two motions for summary judgment and permanent injunctive relief.  The first motion is raised by Plaintiffs Kentucky Right to Life Association, Angela Minter ("Minter"), and Sisters for Life, Inc. (collectively, "*Sisters* Plaintiffs").  [DE 74]. The second motion is raised by Plaintiffs Edward Harpring ("Harpring") and Mary Kenney ("Kenney") (collectively, "*Harpring* Plaintiffs").[1]  [DE 75].  Defendants Greg Fischer, Louisville-Jefferson County Metro Government ("Louisville Metro"), Mike O'Connell, and Erika Shields (collectively, "Defendants") responded.  [DE 77; DE 78].

On May 30, 2024, the Court held an evidentiary hearing on the motions for summary judgment.  [DE 145, Hr'g Tr.].  Briefing is complete and the matters are ripe.  [DE 77, DE 78; DE 85; DE 148; DE 149; DE 150; DE 152; DE 153; DE 154]. Finding no dispute of facts raised by

---

[1] This case is the result of a consolidation of two actions, one brought by the *Sisters* Plaintiffs (civil action number 3:21-cv-367-RGJ) and one brought by the *Harpring* Plaintiffs (original civil action number 3:21-cv-691-RGJ). The Court consolidated the actions on January 6, 2022. [*Harpring* DE 19 at 177].  All docket entries from the original *Harpring* case are referred to as "*Harpring* DE." The *Sisters* and *Harpring* Plaintiffs are collectively referred to as "Plaintiffs."

any party, the Court gave notice under Fed. R. Civ. P. 56(f). [DE 155]. *Sisters* Plaintiffs objected. [DE 156].[2]

For the reasons below, *Sisters* Plaintiffs' motion for summary judgment [DE 74] is **GRANTED** as to Count I of their Second Amended Complaint. Count II of *Sisters* Plaintiffs' Second Amended Complaint is **DISMISSED as forfeited**. Having previously given notice under Rule 56(f), summary judgment is **GRANTED** in favor of Defendants as to Counts III and IV of the *Sisters* Plaintiffs' Second Amended Complaint. *Harpring* Plaintiffs' motion for summary judgment [DE 75] is **GRANTED**.

## BACKGROUND

### I.        Parties and Procedural History

The *Harpring* Plaintiffs are "sidewalk counselors who. . . have been active in speaking with and distributing pamphlets, handbills, and other literatures to individuals using the services. . . where abortions are performed." [*Harpring* DE 1 at 2]. The *Sisters* Plaintiffs use "sidewalk ministry. . . [which] involves offering both verbal and written materials outlining alternatives to abortion and help for anyone wishing to pursue those options." [DE 28, *Sisters* Second Am. Compl., at 1478]. Plaintiffs also engage in prayer outside of healthcare facilities they perceive as involved in providing abortion services. [DE 120, Evidentiary Hr'g Tr., at 2825–26, 2869, 2878].

Plaintiffs challenge the constitutionality of a city ordinance, Ordinance O-179-21 ("the Ordinance") passed by Louisville Metro in 2021 and signed by then-Mayor Greg Fisher. [DE 2-1 at 43]. The Ordinance prohibits persons from entering or obstructing a 10-foot-wide "buffer zone" in front of healthcare facilities except in certain circumstances. Louisville Metro Ordinance § 132.09(A) (2021).

---

[2] *Sisters* Plaintiffs' objection is based on grounds not relied on in this Order. Thus, the Court need not address it.

At the outset of the case, Plaintiffs focused on one specific healthcare clinic: EMW Women's Surgical Center ("EMW"). [*Harpring* DE 1 at 2-16; DE 28 at 1475-86]. At the time, much of their sidewalk counseling efforts took place at EMW, where a buffer zone has been marked pursuant to the Ordinance. [*Harpring* DE 1 at 2, 15; DE 28 at 1475, 1486]. Plaintiffs sued asserting that the Ordinance is unconstitutional because it violates the First Amendment's Free Speech, Freedom of Assembly[3], and Free Exercise clauses as well as the Kentucky Religious Freedom Restoration Act ("KRFRA"). [*Harpring* DE 1 at 1-15; DE 28 at 1485-88].[4]

On February 25, 2022, the Court denied Plaintiffs' motion to preliminarily enjoin the Ordinance. [DE 55]. Plaintiffs appealed. [DE 56; DE 57]. On June 24, 2022, the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization* triggered a Kentucky state law banning abortion. Ky. Rev. Stat. § 311.772(2). On December 21, 2022, the Sixth Circuit reversed the denial of Plaintiffs' preliminary injunction, finding that Plaintiffs had shown a likelihood of success on the merits for their First Amendment claim.[5] *See Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400 (6th Cir. 2022). Accordingly, the Court ordered a preliminary injunction, barring Louisville Metro from enforcing the Ordinance pending a trial on the merits of Plaintiffs' claims. [DE 64].

---

[3] *Sisters* Plaintiffs' Second Amended Complaint raised a First Amendment claim under a freedom of assembly theory. [DE 28 at 1427]. Despite the parties agreeing that there are no facts in dispute, *Sisters* Plaintiffs failed to raise it in their motion for summary judgment or subsequent briefing. [DE 74 at 2394; DE 148]. Thus, the Court considers the claim forfeited.

[4] The *Harpring* Plaintiffs originally brought a Fourteenth Amendment due process claim alongside their First Amendment claim. [*See Harpring* DE 1]. They have since abandoned the Fourteenth Amendment claim. [DE 75 at 2405].

[5] The Sixth Circuit's decision makes no mention of *Dobbs* or the change of law in Kentucky. *See Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400 (6th Cir. 2022). Defendants did not move to dismiss Plaintiffs' claims until after the Sixth Circuit ruling. Thus, the appellate panel did not address the change in circumstances or the issue of mootness.

Defendants then moved to dismiss Plaintiffs' claims for mootness, citing the lack of patients and protestors at EMW after the outlawing of abortion in Kentucky.  [DE 76]. On October 11, 2023, the Court held an evidentiary hearing on the motion. Based on testimony elicited during the hearing showing Plaintiffs were still involved in speech activities outside of healthcare facilities, the Court denied Defendants' motion to dismiss for mootness.  [DE 130].

Meanwhile, Plaintiffs moved for summary judgment on all their claims.  [DE 74; DE 75]. The Court ordered a second evidentiary hearing to establish evidence of the type the Sixth Circuit identified as dispositive.  [*See* DE 130].  Plaintiffs' motions for summary judgment are presently before the Court.

The facts of the case have changed drastically over the course of the litigation.  Since the Sixth Circuit's decision, the record of the case has been developed with the benefit of additional briefing and hearing testimony on the issue of narrow tailoring. For clarity, the Court details these facts in chronological order.

## II.        Pre-Buffer Zone Ordinance

When EMW was providing abortion services and before the operation of the buffer zone, the sidewalk outside the clinic was often busy.  Minter testified that she and her fellow sidewalk counselors both approached patients and congregated in front of the clinic's doors and windows to "minister" to the people inside.  [DE 44, Minter Dep. at 1831].  Along with sidewalk counselors there were often anti-abortion protestors who used bullhorns, signs, and shouting to deliver their messages.  [*Id*. at 2764, 1845].  Joe Lynch ("Lynch"), a sidewalk counselor, testified that it was often "hard to hold a conversation" in front of EMW's entrance due to the number of people in the area.  [DE 120 at 2836–37].  Ona Marshall ("Marshall"), co-owner of EMW, testified that there "was very loud, aggressive, demeaning behavior, harassment, intimidation, [ ]stalking patients

4

from a city parking garage to the front of the EMW, loudspeakers, pushing, assaulting, harassment, [and] verbal threats." [*Id*. at 2764].   The Ordinance's legislative record included photos of the EMW entrance prior to the buffer zone:





[DE 11-5, Legislative Record at 249–50].

5

Additionally, volunteer escorts positioned themselves within nearby parking lots and on the sidewalk to accompany patients past the protestors and into the clinic. [DE 46, Kenney Dep. at 1928]. Marshall testified that before the buffer zone was placed, escorts were EMW's main way to ensure patient safety. [DE 120 at 2793]. They are an independent organization that collaborates with EMW; escorts are not clinic employees. [*Id*. at 2791]. Some patients chose to accept the escorts assistance while others chose personal supporters or family to accompany them into the facility.

Patients approached EMW on foot and by car. Patients who did not park themselves were often dropped off at the curb in front of the clinic doors, either by a clinic escort or by a private party. [DE 44 at 1834; DE 45, Harpring Dep. at 1888]. When a patient entered the sidewalk, after either parking or being dropped off, sidewalk counselors would "walk alongside" them, encouraging them not to pursue abortion. [DE 120 at 2857–58]. When a patient arrived via car, protestors and counselors would stand at the car door to attempt to speak with them and hand them literature. [DE 44 at 1823-24]. Some patients engaged with the counselors and others did not. [*Id*. at 1820–27].

The sidewalk counselors testified that before the buffer zone was enacted clinic escorts often blocked them from passing literature or talking to patients. [DE 120 at 2857–58]. They also noted frustration with the other anti-abortion protestors, whose more aggressive tactics they saw as hindering their own efforts. [DE 44 at 1845; DE 120 at 2836–37]. These large groups of protestors often came to EMW from out of town by the busload, and often on Saturdays:

> [S]ome of the groups that only show up on limited occasions who are from out of town were the ones causing issues. It seems that the groups from Henryville and Shelbyville were causing most, if not all, of the issues. Sergeant Beaven learned that they often use social media to get organized to come to Louisville to protest.

[DE 11-5, Lt. Stewart Memo at 237].  Metro Council considered these large "outside" groups as "the biggest safety concern" at EMW.  [DE 145, Hr'g Tr. at 3128].

These conditions persisted for years outside of EMW.  [DE 145 at 3124].  During that time, LMPD was called to the clinic multiple times per week for allegations of harassment, assault, and similar offenses.  [*Id.* at 2797–2798; DE 11-5 at 200–02].  EMW was ranked sixteenth in the city for the number of police-reported incidents at a healthcare facility in 2020.  [DE 11-5, Legislative Record at 196].  A group of trained legal observers undertook to observe and document potential violations of existing laws.  [DE 145 at 3128].  Yet few citations were issued.[6]  [*Id.* at 2819]. Louisville Metro Police ("LMPD") Lieutenant Caleb Stewart ("Stewart") testified that it was often difficult to file a report because "[w]e [police] really can't file a report absence some very special circumstances if we don't have a victim—cooperative victim." [*Id.* at 3188].  LMPD engaged in multiple Saturday morning patrols to watch for violations.  [*See* DE 11-5 at 236–41].  On one Saturday in early 2021, Stewart summed up LMPD's observations: "it seems that most of the activity of the protestors is clearly lawful.  There is some activity that could be interpreted as violations of city ordinances or perhaps KRS, but it is a very fine line and clarification needs to be provided[.]" [*Id.* at 241].  The incident reports from the Saturday morning patrols do not include minor police interactions for which a report was not written.  [DE 145 at 3186].

---

[6] The Sixth Circuit cited the availability of video surveillance and targeted citations as one of the reasons why the Ordinance was likely to fail narrow tailoring. *Sisters for Life*, 56 F.4th at 405 ("The County does not explain why it cannot use EMW's footage and, in connection with law enforcement, identify and cite harassing or obstructing protestors.").  Lieutenant Caleb Stewart testified that officers could use security video to cite for misdemeanors that no officer witnessed as long as it was sufficient to establish probable cause. [DE 145 at 3180].  For a "violation or [sic] a local ordinance, then that's something that we would have to take a report for and then a criminal complaint could be filed." [*Id.*].

### III.        The Ordinance

The Louisville Metro Council ("Council") was aware of the issues at EMW and sought to "turn down the temperature" at the clinic. [*Id*. at 3123]. While Council had attempted to address the issue before, "previous efforts to pass similar legislation [] had been unsuccessful." [*Id*. at 3124]. At the evidentiary hearing on the motion for summary judgment, former Metro Council Member Cassie Chambers Armstrong ("Armstrong") testified as one of the Ordinance's drafters and primary sponsors. [*Id*.]. She explained that the Ordinance was "designed to prohibit specific conduct outside of healthcare facilities, specifically conduct that would hinder, impede, detain people who were trying to enter and exit healthcare facilities." [*Id*. at 3121]. She also testified that she was concerned with creating better health outcomes for patients, because "whenever patients entering and exiting the clinic experienced stress and elevated heart rate, [] that can actually lead to worse patient outcomes." [*Id*. at 3131]. Through the drafting process, various other healthcare facilities expressed interest in obtaining a buffer zone, including domestic violence shelters and emergency rooms. [*Id*. at 3123].

Council also considered other options to achieve the goal of de-escalating issues regarding access to healthcare clinics, including some that had been tried in the past. For example, the City had previously attempted to increase police patrols in the area around EMW. But at the time of the Ordinance's drafting, Louisville was experiencing a police officer shortage of around 250-300 officers. [*Id*. at 3124–25]. Additionally, Armstrong testified that she discussed with EMW representatives the option of having patients enter the clinic through back and side of the building instead of the front door. [*Id*. at 3126]. Security experts advised against this option. [*Id*.].

Armstrong testified she also considered increasing enforcement of existing laws, including the disorderly conduct, noise, and assault ordinances. [*Id*. at 3127]. She testified that each ordinance posed enforcement problems—both from an ease and equitability perspective. [DE 145 at 3127]. The noise ordinance, for example, uses an "unreasonable or annoying" standard. [*Id*.]. Because such standards create "a need for a lot of judgment calls," Armstrong believed they also posed a risk of "potentially uneven, inequitable enforcement, and possibly sort of unconstitutional enforcement." [*Id*.]. Armstrong also testified that targeted injunctions were considered ineffective because "we didn't know who would have arrived on any particular day." [*Id*. at 3128].

Finally, Council decided to adopt a non-obstruction ordinance with painted lines. [*Id*. at 3129 "If by non-obstruction ordinance you mean something that just says you cannot obstruct the entrance of the healthcare facility, in my view that's largely what the safety zone ordinance, the one we had before us, does. The difference is that it has the lines in front of it."]. Armstrong testified that the lines were added to "provide sort of clear expectations and clear guidance" for patients and demonstrators. [*Id*. at 3129]. A clearly marked buffer zone "allows patients in the zone to get in and out [of the healthcare facility] safely." [*Id*.]. And "it provides protestors with a very clear line of where they can and cannot be." [*Id*.]. Armstrong testified that the painted lines got "rid of any sort of vagueness that might exist" from a pure non-obstruction ordinance. [*Id*. at 3157 "The reason we included the signage was to actually make it more narrow and more sort of clear-cut for people"].

Armstrong testified that the selection of ten feet for the buffer zone was done intentionally: "I selected the ten foot narrow line area after sitting down, measuring out ten feet, making sure that it was still something where people could have consensual conversations, leaflets could be exchanged, whatever protected activity needed to happen could still happen." [*Id*. at 3129]. A

previous version of the Ordinance set the buffer zone at twelve feet instead of ten.  [*Id*. at 3130].

The size was reduced to accomplish the goal of ensuring someone outside of the zone can "very clearly make eye contact" with someone inside the zone, engage them in conversation, and "offer them a leaflet." [*Id*. at 3130].

Armstrong testified that every item in the legislative record was used throughout the legislative process from drafting and editing to enactment. [*Id*. at 3132; DE 11-5].

The enacted Ordinance states, in relevant part and as amended:

(A) *Definitions*.  For the purpose of this chapter, the following definitions shall apply unless the context clearly indicates or requires a different meaning.

> **DRIVEWAY.**  An entry from a public street to a public or private parking area used by a healthcare facility.
>
> **ENTRANCE.** Any door to a healthcare facility that directly abuts the public sidewalk; provided, however, that if the door does not directly about [sic] the public sidewalk, the 'entrance' shall be the point at which the public sidewalk intersects with a pathway leading to the door.

. . .

(B) *Access to a healthcare facility*.

> (1) No person shall knowingly obstruct, detain, hinder, impede, or block another person's entry to or exit from a healthcare facility.
>
> (2) No person shall knowingly enter, remain on, or create any obstruction within the driveway of a healthcare facility or within a "buffer zone" on the public way or sidewalk extending from the entrance of a healthcare facility to the closest adjacent sidewalk curb and ten feet from side to side, during the facility's posted business hours, except:
>
>> (a) Persons entering or leaving such facility;
>>
>> (b) Persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility; or
>>
>> (c) Law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; or
>>
>> (d) Employees or agents of such facility acting within the scope of their employment.

(C) *Signage*. The Department of Public Works shall, at the request of a healthcare facility, paint or lay on the public way or sidewalk two easily-distinguishable demarcation lines running from either side of the facility entrance to the closest adjacent sidewalk curb and extending ten feet from each other.  Healthcare facilities shall post such zone with signage stating: "Healthcare facility: No standing within this zone. [Metro Ordinance]."

10

Louisville Metro Ordinance § 132.09(A)-(C) (2021).

Stewart testified that the ordinance operates in two steps: (1) a healthcare facility contacts the city to have a buffer zone marked, and (2) police may then enforce the buffer zone.  [DE 47, Stewart Dep. at 2008].  Armstrong similarly testified that "the intent behind the ordinance was only healthcare facilities that requested a buffer zone would receive a buffer zone." [DE 145 at 3122; 3167 "Because the ordinance was intended only to apply to facilities that were having access issues and specifically requested a buffer zone"].  The only operational buffer zone in the city at the time of the Court's injunction was located at EMW.  [DE 120 at 2816].  The zone, which is ten feet wide, places protestors and sidewalk counselors approximately five feet from patients passing through it.  [*Id*. at 2032].



[DE 28 at 1481]. If someone violates the buffer zone, LMPD issues a written warning before giving a citation. Louisville Metro Ordinance § 132.09(F)(1); [DE 120 at 2800–01]. Clinic escorts are treated as "agents" under the Ordinance and are exempted from the buffer zone restrictions. Louisville Metro Ordinance § 132.09 (B)(2)(d); [DE 47 at 2010–11].

While the buffer zone was operational, EMW complied with the Ordinance by submitting bi-annual reports to the city.[7] Louisville Metro Ordinance § 132.09 (D)-(E); [DE 120 at 2770].

## IV.      Buffer Zone Ordinance In Force

The buffer zone created a ten-foot-wide path from the street curb to the front door of EMW. [DE 47 at 2008–09]. Patients who chose to park still approached the clinic via the sidewalk, where counseling and protesting remained unencumbered. [DE 120 at 2880]. Many patients, however, chose to use the escort shuttle service, which would pick them up at their vehicle and drop them off at the curb in front of the buffer zone—bypassing the crowded sidewalk. [*Id.* at 2886–87]. The sidewalk counselors testified that while many patients still chose to walk along the sidewalk, the number that used the escort shuttle increased once the buffer zone was placed. [*Id.* at 2860–62]. Many expressed frustration with the shuttle service's effect on their efforts, indicating that it provided them less time to speak with the patients because they would just walk from the curb to the door as opposed to going down the sidewalk. [DE 44 at 1840-42]. Harpring stated: "I wish it wasn't that way, but it is that way. . . I mean that's obviously their prerogative, their right to drop off right there." [DE 45 at 1899].

With the buffer zone in place, it takes approximately ten seconds to travel from the curb to EMW's front door. [DE 47 at 1969, 2031, 2035, 2041]. This is the same amount of time it took

---

[7] This requirement was added in a floor amendment as a result of the Louisville police officer shortage. [DE 145 at 3137]. Armstrong testified the goal of the monitoring "was to require facilities to take some ownership over that process and to make sure they were in fact monitoring the efficacy of the buffer zone that they had requested, I guess, colloquially to say they had some skin in the game." [*Id.*].

a dropped-off patient to reach the front door before the buffer zone was in effect.  [DE 44 at 1823].
Even so, Marshall testified that the zone had a "tremendous impact" because it allowed patients to
walk unimpeded. [DE 120 at 2793–94].  She agreed that patients were still able to hear the
demonstrators and receive the literature being offered to them.  [*Id.*].  Harpring testified that even
with the buffer zone, he was still able to (1) place literature in patients' hands,[8] and (2) converse
with any patient who wanted to stop in the buffer zone to speak with him.  [DE 45 at 1898].

Various counselors testified about the general effect of the buffer zone on their efforts.
Minter testified that the zone was "catastrophic" to her ability to speak with patients.  [DE 44 at
1846 "they are being escorted to the buffer zone in front of the door and so we don't have that
opportunity to talk to them. If they were walking down the sidewalk, [we could] talk with them,
connect with them. . ."].  She also testified, however, that she was able to talk with many non-
shuttling patients as they walked down the sidewalk even after the buffer zone.  [*Id.* at 1858; DE
120 at 2860].  Harpring testified that the buffer zone would end his conversations with patients as
they approached the EMW doors.  [DE 45 at 1893 "my voice is now elevated because I'm not next
to her, and so that quiet conversation becomes more of a louder voice, and not as welcoming as it
would have been if I had got to continue on to the door with her."]. This, however, was also true
pre-buffer zone because of the crowds that were directly in front of the doors and the loud nature
of those protests.  [DE 120 at 2836–37].

Much of the sidewalk counselors' testimony about the buffer zone was unrelated to the
Ordinance itself.  Three chief complaints emerged from their testimony: the noise, the crowds, and
the escorts.

---

[8] This contradicts the Sixth Circuit's assumption that "distribution now takes place beyond an arm's length."
*Sisters for Life*, 56 F.4th at 407.

First, many counselors complained that the noise level outside EMW hampered their efforts. Minter testified that both before and after the buffer zone was placed, the protestors' noise inhibited her efforts to talk with patients. [DE 44 at 1845]. This was corroborated by Stewart, who testified that the sidewalk counselors have often expressed frustration with the loudspeakers and generally aggressive behavior of protestors. [DE 47 at 2006]. Such use of loudspeakers and amplifying devices is not affected by the Ordinance. [*Id*. at 1996]. Complaints about the noise levels remained consistent before and after the buffer zone was enacted.

The counselors also testified that the sheer number of people outside the clinic often impeded their ability to "quiet counsel." [DE 120 at 2836]. On a busy day, up to fifty demonstrators congregated within about thirty feet of the entrance to EMW. [DE 47 at 1965-67, 2073]. Lynch testified that the area around the buffer zone was "awful distracting" and that the crowd "made it more difficult to have a personal conversation. . .[.]" [DE 120 at 2837, 2836 "I would try to [continue the conversation], but it was—it would be—there would be a lot of people out there. I wouldn't always have that access."]. Complaints about the crowds remained consistent before and after the buffer zone was enacted.

Third, the sidewalk counselors all expressed frustration with the volunteer escorts. They testified that the shuttle service kept patients from having to encounter them on the sidewalk. [DE 45 at 1888]. They also testified that escorts often physically blocked them from reaching patients, either by standing in front of them or by pushing their outstretched hands away. [DE 46 at 1932; DE 45 at 1901–02; DE 44 at 1851]. Harpring testified that escorts have taken away literature that he placed in patients' hands. [DE 45 at 1901–02]. Escorts would also talk to patients when they exited the shuttle into the buffer zone, which Minter testified made it difficult for the sidewalk counselors to strike up their own conversations with the patient. [DE 44 at 1842–44]. She also

14

testified that her husband has overheard escorts telling patients "don't listen to them, don't talk to them, you know, these sorts of things." [*Id*. at 1843]. Even patients who did not utilize the shuttle were often accompanied by escorts or private parties down the sidewalk, who would talk with them as they approached the clinic. [DE 120 at 2841]. Complaints about the escorts remained consistent before and after the buffer zone was put into place.

The buffer zone changed the way LMPD policed the area around EMW. Stewart testified that the Ordinance allowed officers to issue written warnings for buffer zone violations based on security video footage. [*Id*. at 2819–20]. Immediate citations were still limited to violations that an officer observed first-hand. [*Id*. at 2819–20]. If a violation was captured on video after a written warning had been issued, LMPD could file a report with a district judge upon request by EMW. [*Id*. at 2819–20]. Stewart kept record of who was issued written warnings in a spreadsheet. [*Id*. at 2793]. Plaintiff Mary Kenney—who expressed confusion about the operation of the buffer zone—testified that she was issued one such warning. [DE 46 at 1938].

V.      **Post-Injunction, Post-*Dobbs***

At present, EMW is not open to the public or seeing any patients. [DE 120 at 2761]. Any prospective patient is referred to the National Abortion Federation's hotline. [*Id*. at 2762] There are still staff on-site, answering phones and performing clerical work. [*Id*. at 2788]. Volunteer escorts stopped their services around December 2022. [*Id*. at 2762]. Marshall testified that, although it is not being enforced due to the injunction, EMW has no plans to rescind their request for the buffer zone, which served to protect clinic employees as well as patients. [*Id*. at 2780]. She confirmed that anti-abortion protestors still visit the clinic a few times per week, but the ones with bullhorns and loudspeakers have ceased. [*Id*. at 2763].

As for enforcement, Stewart testified that if the injunction were lifted, LMPD would not enforce EMW's buffer zone because they are not open. [*Id.* at 2803]. He also testified that he has not witnessed any counselors or protestors at EMW since the fall of 2022. [*Id.* at 2797].

Immediately after Kentucky outlawed abortion, some prospective patients continued to show up at EMW, seeking care. Harpring testified in those first few days he counseled "at least fifteen" patients, which was made easier "because the escorts were not showing up then." [*Id.* at 2879].

Minter, Harpring, and Lynch each testified that they are still visiting EMW regularly. Without any patients to counsel, however, their activities have shifted from sidewalk counseling to prayer.[9] [*Id.* at 2833].

Lynch testified that he visits EMW once per week to pray aloud in and around the buffer zone because he believes he is in a "spiritual battle over abortion."[10] [*Id.* at 2825–28]. Minter similarly testified that as long as EMW is making abortion referrals she feels the "need to be there and continue to pray. . . pray that that ends, and continue to pray that women would have an opportunity to receive help from ministries that are offering life-affirming help." [*Id.* at 2854]. Harpring testified that he too prays in front of EMW, likening it to how "people go to 9/11 to pray for human atrocities or go to Auschwitz to pray for human atrocities." [*Id.* at 2878]. Praying directly within the buffer zone is important to him because he "want[s] people to see [him] there. . .right in front of the door." [*Id.* at 2878].

---

[9] Lynch testified that he has encountered people experiencing homelessness within EMW's buffer zone and has ministered to them, albeit not about abortion. [DE 120 at 2830–31].

[10] He testified that reinstitution of the buffer zone would "burden" his prayer ministry but did not expound on how. [DE 120 at 2829].

16

In addition to shifting their activities to individual prayer, Plaintiffs testified that they now visit the public sidewalk outside of Planned Parenthood along with EMW.[11]  Each gave differing testimony about their activities there:  Minter testified that there is no quiet counseling taking place at Planned Parenthood, only prayer.  [*Id*. at 2869]. Lynch testified that he counseled to a woman exiting the Planned Parenthood parking lot six to eight weeks prior to the Court's mootness hearing.  [*Id*. at 2831–32].  Regardless of their activity, the sidewalk counselors testified that there are no restrictions on where they can stand on the sidewalk outside of Planned Parenthood.[12]  [*Id*. at 2883–84].

## STANDARD

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of specifying the basis for its motion and showing the lack of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this burden, the non-moving party must produce specific facts showing a material issue of fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  "Factual differences are not considered material unless the differences are such that a reasonable jury could find for the party contesting the summary judgment motion."  *Bell v. City of E. Cleveland*, 125 F.3d 855 (6th Cir. 1997) (citing *Liberty Lobby*, 477 U.S. at 252).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations but must view the evidence and draw all reasonable inferences in a light most favorable to the non-moving party.  *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696,

---

[11] Planned Parthood is not mentioned anywhere in either complaint.  [*See Harpring* DE 1; DE 28].

[12] This is in tension with the Sixth Circuit's understanding that the Ordinance "applies always and everywhere there is a healthcare facility."  *Sisters for Life*, 56 F.4th at 408.

702 (6th Cir. 2008); *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000).  The non-moving party must do more than show some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, the non-moving party must show a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. Pro. 56(c)(1)(A)–(B); *see also Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Liberty Lobby*, 477 U.S. at 252.

## ANALYSIS

### I.  Free Speech Claims

Litigants have two options when bringing a claim under the First Amendment: challenge the law as applied to them and their unique circumstance—an "as-applied" challenge—or challenge the law as it applies to *anyone*, including the litigant—a "facial challenge."  *See Speet v. Schuette*, 726 F.3d 867, 871–72 (6th Cir. 2013).  Plaintiffs here have collapsed these inquiries. They point to the operation of the Ordinance on sidewalk counselors' speech, but also argue that the statute is facially invalid because it applies too broadly.  Thus, the Court will construe Plaintiffs' Complaints to raise both challenges.  *Citizens United v. Fed. Election Comm'n.*, 558 U.S. 310, 331 (2010) ("the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge").  First, the Court addresses Plaintiffs' as-applied challenge. *See Connection Distribg. Co. v. Holder*, 557 F.3d 321, 327–28 (6th Cir. 2009) ("The usual judicial practice is to address an as-applied challenge before a facial

challenge because it generally will be more efficient because this sequencing decreases the odds that facial attacks will be addressed unnecessarily" (quoting *Bd. of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 484–85 (1989) (cleaned up)).

A. Level of Scrutiny

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." The government's ability to restrict speech in a traditional public forum, such as a sidewalk, is "very limited." *McCullen v. Coakley*, 573 U.S. 464, 477 (2014) (citation omitted). Within a traditional public forum, the "government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293 (1984)). If, however, the law restricts speech based on its content or message, "it must run the gauntlet of strict scrutiny—that is, it must be the least restrictive means to serve a compelling interest." *Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 403 (6th Cir. 2022) (citing *United States v. Grace*, 461 U.S. 171, 177 (1983)). The threshold question, therefore, is whether the Ordinance here is content based or content neutral.

There is no dispute that the Ordinance does not "draw content-based distinctions on its face." *McCullen*, 573 U.S. at 479. Whether Plaintiffs violate the Ordinance "depends not on what they say, but simply where they say it." *Id.* (quoting *Holder v. Humanitarian Law Project*, 561 U.S. at 27 (2010) (internal quotation marks omitted)). Violations can occur simply by "standing in the buffer zone, without displaying a sign or uttering a word." *Id.* at 480.

19

Nevertheless, Plaintiffs argue that the Ordinance has become content based on the function of its exceptions.  [DE 74 at 2381].[13]  The Ordinance creates four exceptions to the proscribed conduct:

> (a) Persons entering or leaving such facility;
> (b) Persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility; or
> (c) Law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; or
> (d) Employees or agents of such facility acting within the scope of their employment.

Louisville Metro Ordinance § 132.09(B)(2)(a)-(d) (2021). "[A]n exemption from an otherwise permissible regulation of speech may represent a governmental 'attempt to give one side of a debatable public question an advantage in expressing its views to the people.'" *City of Ladue v. Gilleo,* 512 U.S. 43, 51 (1994) (quoting *First Nat. Bank of Boston v. Bellotti,* 435 U.S. 765, 785–786 (1978)). However, "[t]here is nothing inherently suspect about providing some kind of exemption to allow individuals who work at the clinics to enter or remain within the buffer zones." *McCullen*, 573 U.S. at 483. While Plaintiffs allege that subsection (d) is "simply a carve-out for the clinic escorts," its language is not so limited; "it also covers employees such as the maintenance worker shoveling a snowy sidewalk or the security guard patrolling a clinic entrance." *Id*.

The Supreme Court encountered an identical argument in *McCullen*.  There, the Court held that "[g]iven the need for an exemption for clinic employees, the 'scope of their employment' qualification simply ensures that the exemption is limited to its purpose of allowing the employees to do their jobs." *McCullen*, 573 U.S. at 483.  Here, the "scope of employment" limitation in subsection (d) "performs the same function as the identical 'scope of their employment' restriction on the exemption for "law enforcement, ambulance, fire-fighting, construction, utilities, public

---

[13] Only *Sisters* Plaintiffs assert this argument.  [DE 74 at 2380–82].  *Harpring* Plaintiffs do not argue that the Ordinance is subject to strict scrutiny.  [DE 75-1 at 2413].

works and other municipal agents" in subsection (c). *Id*. The limitation "thus seems designed to protect against exactly the sort of conduct" Plaintiffs fear: that clinic escorts are allowed to express pro-abortion speech in the buffer zone while Plaintiffs' anti-abortion speech is prohibited. *Id*.

The *Sisters* Plaintiffs argue that "the record evidence is unrebutted that the clinic escorts regularly engage in pro-abortion speech." [DE 74 at 2381]. The record is not so clear. There has been testimony that the EMW escorts speak to patients as they are escorting them and block sidewalk counselors from passing literature. [DE 44 at 1851; DE 45 at 1901]. However, the record does not suggest that such speech was "within the scope of the escorts' employment" or that such speech was necessarily "pro-abortion." *McCullen*, 573 U.S. at 484. Merely talking with an individual or pushing away materials blocking the patient from moving toward the facility does not prevent the patient from accepting the literature or from listening to the sidewalk counselors. The same would be true for family members or friends walking alongside a patient talking with them or clearing their path.

In fact, Meg Stern, a clinic escort, submitted an affidavit stating, "pro abortion communications with patients is not within the scope of escorts job duties based upon the policies of the Louisville Clinic Escorts." [DE 77-8, Stern Aff. at 2496 ("Louisville Clinic Escort Points of Unity states: *The clinic is not an appropriate place for political speech or protesting of any kind*.")]. Minter also expressed doubt that such speech was endorsed by EMW: "I don't have any working knowledge about what they [escorts] are being trained—how they are being trained. Again, some of the conduct that they exhibit, I wouldn't think the EMW would want to train them in that manner." [DE 44 at 1851]. There has been no evidence proffered to suggest that EMW authorizes escorts to speak about abortion inside the buffer zones as part of the scope of their

21

duties.   Thus, Plaintiffs have failed to establish that the Ordinance's exemptions constitute viewpoint discrimination.  *See McCullen*, 573 U.S. at 484–85.

Nor is there evidence that LMPD "will never prosecute" escorts for violations of the Ordinance.  [DE 74 at 2381].[14] Thus, Plaintiffs' complaint seems to be that police failed to enforce the Ordinance equally against clinic escorts who engaged in speech outside the scope of their employment and protestors who engaged in anti-abortion speech.  "While such allegations might state a claim of official viewpoint discrimination"—if there were sufficient evidence to show a practice of selective enforcement— "that would not go to the validity of the [Ordinance]." *McCullen*, 573 U.S. at 484.  Regardless, just as in *McCullen*, Plaintiffs do not allege a claim of selective enforcement.  Nor have they produced facts by which a reasonable juror could conclude the LMPD engaged in content-based selective enforcement.  *Id.* Moreover, the exemption allows

---

[14] The Court finds this assertion by *Sisters* Plaintiffs to be overstated.  *Sisters* Plaintiffs argue Stewart testified that he will never prosecute escorts under the Ordinance.  [DE 74 at 2381] Stewart's testimony reads:

> Q: If my client were to say that there are frequent conversations that escorts have with clinic patients within the buffer zone, would you have any reason to dispute that?
> A: I mean, I don't–I don't have any knowledge of it.
> . . .
> Q: Okay. And again, there would be nothing that would violate the ordinance for them to do that, correct? For escorts to have those conversations?
> A: I do not believe the ordinance addresses the escorts speaking to the patients.
> Q: Right, under the ordinance, the escorts are permitted to speak to the patients; right?
> A: I don't see where the ordinance prohibits it.
> . . .
> Q: In terms of the clinic escorts and speaking to patrons, having seen the video, you're aware that at least that does occur to some degree; correct?
> A: I don't know if I recall a specific video we watched where I could definitively say we were speaking to them period.
> Q: Okay. Has anyone ant EMW ever told you that they are not allowed — that the clinic escorts are not allowed to speak to the patrons?
> A: No.
> Q: Or that — has anyone at EMW ever told you that the clinic escorts are not performing the duties within the scope of their employment if they speak to patrons within the zone?
> A: No, I have not been told that.

[DE 47 at 2012–13; 2044–45].

an escort to be in the zone. Patient choice is the driver as to whether an escort is present. If there were no Ordinance, patients could still choose to have an escort accompany them into the facility (and attend an appointment) whether that escort is a family member, friend, or volunteer or employee of the facility. The Ordinance's exemption for escorts simply recognizes patients have the choice to have a person or persons accompany them into the facility and operates without reference to religious or secular intentions. Thus, the Court concludes that the Ordinance is neither content based nor discriminatorily applied. Accordingly, it should be analyzed under intermediate scrutiny.[15]

## B. Intermediate Scrutiny

The government may impose content neutral restrictions on the time, place and manner of speech in public forums only if those restrictions are "narrowly tailored to serve a significant government interest and [] they leave open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 796. Suppressing speech should not be undertaken for "mere convenience"—"hence the 'demand of a close fit between means and ends.'" *Sisters*, 56 F.4th at 404 (quoting *McCullen*, 573 U.S. at 486) (cleaned up).

Defendants claim that the Ordinance serves to "protect[] patients entering and exiting healthcare facilities." [DE 77 at 2463]. Plaintiffs do not dispute that this is a significant government interest. Nor could they, as the Supreme Court has repeatedly "recognized the

---

[15] This is consistent with the approach of a growing majority of courts to have considered analogous buffer zone challenges. *See McCullen*, 573 U.S. at 483–85 (holding buffer zone law was content neutral facially and as enforced); *Hill v. Colorado*, 530 U.S. 703, 719–25 (2000) (holding Colorado buffer zone law was content neutral); *Bruni v. City of Pittsburgh*, 941 F.3d 73, 87 (3d Cir. 2019) (finding ordinance content neutral), *cert. denied*, 141 S. Ct. 578 (2021); *Fla. Preborn Rescue, Inc. v. City of Clearwater, Fla.*, No. 8:23-CV-1173, 2023 WL 7181593, at *11 (M.D. Fla. Oct. 20, 2023) (finding ordinance likely to be content neutral facially and as enforced); *Turco v. City of Englewood, New Jersey*, No. 22-2647, 2024 WL 361315 (3d Cir. Jan. 31, 2024) ("We have already held—and the parties agree—that the restrictions imposed are content-neutral. Thus, intermediate scrutiny applies.").

legitimacy of the government's interests in 'ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services.'" *McCullen*, 573 U.S. at 486–87 (quoting *Schenck v. Pro–Choice Network of W. N.Y.*, 519 U.S. 357, 376 (1997).  The 10-foot buffer zones in front of Louisville healthcare facilities clearly serve these interests.

The dispute here lies in the way that Metro government chose to accomplish their purposes. Plaintiffs allege that the buffer zone ordinance is (1) not sufficiently tailored to the government's interest and (2) that the legislature did not sufficiently consider less restrictive alternatives to establishing a buffer zone.  [DE 150 at 3369–77; DE 148 at 3355–47].  Defendants argue that they have carried their burden under intermediate scrutiny and that the Ordinance does not excessively burden speech.  [DE 149 at 3356–60].

The Court does not work from a blank slate in this area.  Across the country, similar buffer zone laws have been adopted and challenged.  Thus, a survey of the precedents is necessary before undertaking the analysis in this case.

### 1.  The Precedents

The Supreme Court first considered the constitutionality of similar buffer zones in two cases involving injunctions aimed at addressing large-scale abortion clinic blockades: *Madsen v. Women's Health Ctr., Inc.,* 512 U.S. 753, 758–59 (1994) and *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 377 (1997).  In *Madsen*, the Court considered an injunction imposing a 36-foot no-entrance buffer zone and a floating 300-foot "no-approach" zone against named defendants.  *Madsen,* 512 U.S. at 760. The Court noted that injunctions "carry greater risks of censorship and discriminatory application than do general ordinances." *Id*. at 764–65.

Accordingly, the Court upheld the smaller no-entrance buffer zone but invalidated the larger floating "no approach" zone. *Id*. at 773–74.

The *Schenck* Court upheld a federal court injunction prohibiting defendants from entering a fixed 15-foot buffer zone in around the entrances and exits of certain abortion clinics. 519 U.S. at 380–83. Similar to *Masden*, however, the *Schenck* Court struck down the provision creating a 15-foot floating buffer zone around anyone entering or leaving the clinics because such a floating zone restricted defendants "from communicating a message from a normal conversational distance or handing leaflets to people entering or leaving the clinics who [were] walking on the public sidewalks." *Id*. at 377. The Court was concerned with (1) the restriction of speech in the most traditional of public forums; and (2) the level of tailoring accomplished by a floating zone. *Id*. The Court reasoned: "[w]ith clinic escorts leaving the clinic to pick up incoming patients and entering the clinic to drop them off, it would be quite difficult for a protester who wishes to engage in peaceful expressive activity to know how to remain in compliance with the injunction," resulting in "substantial risk that much more speech will be burdened than the injunction by its terms prohibits." *Id*. at 378.  In contrast, the fixed buffer zone was upheld over an objection that the district court should have first adopted a narrower, no-obstruction rule:

> This argument, however, ignores the record in this case. Based on defendants' past conduct, the District Court was entitled to conclude that some of the defendants who were allowed within 5 to 10 feet of clinic entrances would not merely engage in stationary, nonobstructive demonstrations but would continue to do what they had done before: aggressively follow and crowd individuals right up to the clinic door and then refuse to move. . .

*Id*. at 381–82.

The Supreme Court returned to the issue of buffer zones and abortion protestors in *Hill v. Colorado*, where it reviewed facial and as-applied challenges to a Colorado law that created an 8-foot floating buffer zone within 100 feet of any healthcare facility entrance. 530 U.S. 703, 708

(2000).  The statute applied to every entrance at every healthcare facility in the state, although the Court noted "the legislative history makes it clear that its enactment was primarily motivated by activities in the vicinity of abortion clinics." *Id.* at 715.  Applying intermediate scrutiny, *Hill* concluded that the floating buffer zone was narrowly tailored to achieve the government's interest in preserving clinic access and protecting patients from unwelcome speech. *Id.* at 716–18. The Court distinguished the zone from the no-approach zone struck down in *Schneck*: "Unlike the 15-foot zone in *Schenck*, this 8-foot zone allows the speaker to communicate at a 'normal conversational distance.'" *Id.* at 726–27 (quoting *Schenck*, 519 U.S. at 377).  Further, the smaller zone does not "prevent a leafletter from simply standing near the path of oncoming pedestrians and proffering his or her material, which the pedestrians [could] easily accept." *Id.*; *see also id.* at 727 ("whether or not the 8-foot interval is the best possible accommodation of the competing interests at stake, we must accord a measure of deference to the judgment of the Colorado Legislature").  The Court also rejected an argument that the legislature should have adopted less restrictive means, holding that the statute's "prophylactic aspect" would "sometimes inhibit a demonstrator whose approach in fact would have proved harmless," but was nevertheless justified based on the "great difficulty" of analyzing the nature of "each individual movement within the 8–foot boundary." *Id.* at 729.

Nearly fourteen years passed before another buffer zone case reached the Supreme Court. *McCullen* considered an as-applied challenge by anti-abortion sidewalk counselors to a Massachusetts law imposing a fixed 35-foot buffer zone around the entrance, exit, and driveway of every abortion clinic in the state. *McCullen*, 573 U.S. at 471.  The law replaced a 6-foot floating buffer zone law that had proven to be "unenforceable." *Id.* ("Captain Evans testified that the 18–foot zones were so crowded with protestors that they resembled 'a goalie's crease,' making it hard

to determine whether a protestor had deliberately approached a patient or, if so, whether the patient had consented." (internal citation omitted)). The Attorney General suggested that the police needed "a fixed buffer zone" to make enforcement easier—and the legislature acquiesced. *Id*. The new law prevented anyone from entering the 35-foot area save certain persons who fell into one of the enumerated exemptions: those entering or leaving the clinic; employees or agents of the clinic; law enforcement, firefighters, construction and utility workers, and other municipal agents; and persons using the sidewalk or public way to reach a destination other than the clinic. *Id*. at 472. The Court applied intermediate scrutiny, rejecting an argument that the statute was applied in a content-based manner. *Id*. at 478–85.  It went on to emphasize that while a content-neutral law "'need not be the least restrictive or least intrusive means of' serving the government's interests," the government "still may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id*. at 486 (quoting *Ward*, 491 U.S., at 798).

Petitioners in *McCullen* documented the law's significant effects on their speech, including that sidewalk counselors were "reduced to raising [their] voice at patients from outside the zone— a mode of communication sharply at odds with the compassionate message [they] wish[] to convey." *Id*. at 487; *see also id*. at 488 ("[sidewalk counselors] often cannot approach [patients] in time to place literature near their hands—the most effective means of getting the patients to accept it."). Accordingly, petitioners claimed the buffer zone caused a "precipitous decline" in "successful interactions" by limiting the types of communication available. *Id*. at 487.

The *McCullen* Court found this record illustrated that the buffer zone burdened substantially more speech than necessary to achieve Massachusetts's interests in "ensuring public safety outside abortion clinics, preventing harassment and intimidation of patients and clinic staff,

27

and combating deliberate obstruction of clinic entrances." *Id*. at 490.  First, the Court noted that the non-obstruction portion of the statute alone may have been sufficient to accomplish the state's goals. This was one of many examples the Court offered as alternatives that the legislature failed to consider before enacting the prophylactic 35-foot buffer zone amendment.  If concerned about harassment, the Court reasoned, Massachusetts could have considered making it a crime to follow and harass people within a certain radius of reproductive healthcare facilities; if concerned about the obstruction of driveways, the legislature could have considered using existing non-obstruction ordinances; it could also have considered targeted injunctions against egregious actors, or enacted an ordinance requiring crowds to disperse when ordered by police. *Id*. at 491–94.  The Court was not persuaded by the record that the Commonwealth had seriously considered these—or any—less burdensome alternatives.  The history of enforcement difficulty with the previous version of the law was not sufficient to show that no other less restrictive alternatives would have worked:

> Respondents emphasize the history in Massachusetts of obstruction at abortion clinics, and the Commonwealth's allegedly failed attempts to combat such obstruction with injunctions and individual prosecutions. They also point to the Commonwealth's experience under the 2000 version of the Act. . . . According to respondents, this history shows that Massachusetts has tried less restrictive alternatives to the buffer zones, to no avail. We cannot accept that contention. Although respondents claim that Massachusetts 'tried other laws already on the books,' . . . they identify not a single prosecution brought under those laws within at least the last 17 years. And while they also claim that the Commonwealth 'tried injunctions,'[] the last injunctions they cite date to the 1990s.

*Id*. at 494 (internal citations omitted).

The Court also noted that the record suggested the nature of the clinic access problem was "limited principally to" one specific clinic and its repeat visitors "on Saturday mornings." *Id*. at 495.  It also dismissed the argument that a fixed buffer zone is easier to enforce, holding "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier. A

28

painted line on the sidewalk is easy to enforce, but the prime objective of the First Amendment is not efficiency." *Id*. at 495. Further, any argument that obstruction violations would go unnoticed was undermined by the fact that "the police maintain a significant presence outside Massachusetts abortion clinics." *Id*. at 496. Thus, the Court struck down the buffer zone provision as not sufficiently narrowly tailored and declined to consider petitioners' facial challenge.

The obvious question for litigations and courts alike after *McCullen* was what remained of *Hill*. *McCullen* did not expressly overrule *Hill*. *But see McCullen* 573 U.S. at 505 ("the Court itself has *sub silentio* (and perhaps inadvertently) overruled *Hill*") (Scalia, J. concurring). However, the Supreme Court undisputedly called some parts of *Hill*'s reasoning into question, and directly contradicted others. When analyzing buffer zone laws post-*McCullen*, courts have applied the cases differently.

As the Seventh Circuit pointed out in *Price v. City of Chicago*, "*Hill*'s narrow-tailoring analysis conflicts with *McCullen*'s insistence that 'the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve [its] interests, not simply that the chosen route is easier.'" 915 F.3d 1118 (7th Cir. 2019) (quoting *McCullen* 573 U.S. at 495). *McCullen*, the Court said, emphasized that it was not sufficient for Massachusetts to simply say that other options have not worked, while *Hill* "specifically approved the 'bright-line prophylactic' aspect of Colorado's bubble-zone law precisely because other less restrictive measures—e.g., laws against harassment and breach of the peace—were harder to enforce." *Id*. 1118–19 (quoting *Hill*, 530 U.S. at 729). Regardless, the Seventh Circuit, faced with a nearly identical statute to the one in *Hill*, held that *Hill* must control because it was not expressly overruled. *Id*. at 1119.

29

The Third Circuit, in *Turco v. City of Englewood*, considered a challenge to an ordinance that "created three overlapping buffer zones in front of all healthcare and transitional facilities: 'Two semicircular buffer zones extended outwards eight feet from either side of the facility's entrance. The third buffer zone spanned the width of the facility's entrance and extended to the street.'" No. 22-2647, 2024 WL 361315, at *1 (3d Cir. Jan. 31, 2024) (*Turco II*) (quoting *Turco v. City of Englewood*, 935 F.3d 155, 159 (3d Cir. 2019) (*Turco I*)).[16]  The *Turco* Court concluded that plaintiff sidewalk counselors had not proven a substantial burden on their speech because the buffer zones still allowed them to counsel, follow patients down the sidewalk, and "engage in several forms of communication" because they were often less than eight feet from patients.  *Id.* at *3; *see also Fla. Preborn Rescue, Inc. v. City of Clearwater, Fla.*, No. 8:23-CV-1173, 2023 WL 7181593 (M.D. Fla. Oct. 20, 2023) (denying preliminary injunction of 5-foot buffer zone in front of a single clinic because of its small size relative to precedential cases).  Thus, the burden was distinguishable from that imposed by the 35-foot buffer zone in *McCullen*, the Court reasoned.  *Id.* Further, the Third Circuit agreed with the lower court that the city had sufficiently considered alternatives, including increased police patrols and targeted injunctions.[17] Thus, the buffer zone ordinance was found to be narrowly tailored.  *Id.* at *5.

### 2.  Analysis

Turning to this case, the Sixth Circuit previously held that that *McCullen*, not *Hill*, should govern.  The Court noted "there may be some tension between *Hill* (which upheld a floating bubble

---

[16] *Harpring* Plaintiffs' counsel litigated this closely analogous case and has filed a cert petition currently pending before the Supreme Court.  They do not address this case in their briefing before this Court.

[17] The police patrols were unsuccessful "due to financial constraints, vacancies in the police department, and ongoing violent crime" and because any de-escalation effect was lost when police left the premises. *Id.* at *4.  Targeted injunctions proved unsuccessful because victims refused to submit complaints for fear of retribution.  *Id.* at *5. The Court afforded the city "the required deference" in concluding that it had undertaken to consider alternative solutions. *Id.*

zone restriction) and *McCullen* (which invalidated a fixed buffer zone restriction)," but did not consider *Hill*'s effect on the constitutionality of the Ordinance because, in its view, "the County's ordinance more closely resembles the fixed buffer zone invalidated in *McCullen* than the floating bubble zone upheld in *Hill*."[18] *Sisters*, 56 F. 4th at 408. With this direction in mind, the Court considers whether the Ordinance is narrowly tailored to achieve the government's goal of "protecting patients entering and exiting healthcare facilities." [DE 77 at 2463].

To be narrowly tailored, the Ordinance must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S., at 799. It "'need not be the least restrictive or least intrusive means of' serving the government's interests. . . [b]ut the government still 'may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.'" *McCullen*, 573 U.S. at 486 (quoting *Ward*, 491 U.S., at 798–99). The burden imposed on a plaintiff's speech need not be substantial to trigger the narrow tailoring requirement. *See Sisters*, 56 F.4th at 407 ("[n]arrow tailoring turns on whether a law sweeps more broadly than necessary, not on whether its yoke is heavy or light.") (citing *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2384-85 (2021)).

Defendants argue that Plaintiffs' speech is not substantially burdened by the buffer zone. [DE 77 at 2472]. Plaintiffs argue that the buffer zone hampered their sidewalk counseling efforts. The Sixth Circuit agreed:

---

[18] At times, the as applied and facial challenge analyses are blended. *See Sisters*, 56 F. 4th at 407 ("Put differently, if a statute is not narrowly tailored, it cannot be constitutionally applied to anyone, even if a more narrowly tailored statute might still capture a plaintiff's conduct."). To be clear, the Court only addresses Plaintiffs' as-applied challenge.

> [The buffer zone] makes things 'substantially more difficult' for Sisters for Life's members: they cannot 'initiate' as many 'close, personal conversations' with clinic entrants, since they must now stand several feet away from them; they cannot distribute as much literature, since distribution now takes place beyond an arm's length; and they can attempt far fewer 'quiet conversations' with EMW's patients, since noise from protestors makes such conversations infeasible absent entry into the buffer zone.

*Sisters*, 56 F.4th at 407 (quoting *McCullen*, 573 U.S. at 487–89).

However, with the benefit of a fully developed record, the court finds that the burden imposed by the Ordinance in this case is distinguishable from that in *McCullen* in several ways. Most obviously, the Ordinance creates a much smaller buffer zone: 10 feet compared to 35 feet in *McCullen*. The size of the zone affects the amount of speech that is burdened—one half of the narrow tailoring equation. In *McCullen*, the 35-foot zone made leafletting impossible. Here, sidewalk counselors testified that they were able to reach out and hand patients literature while the zone was in force. [DE 120 at 2793–94; DE 45 at 1898]. Further, the counselors testified that they were able to talk with patients as they approached the clinic and while walking through the buffer zone. [DE 120 at 2793–94; DE 45at 1898]. As a result, the Plaintiffs have failed to show a burden on pamphleteering as speech as a result of the Ordinance.

It is also clear from the fully developed record that a large portion of Plaintiffs' alleged burden has *no causal relationship* to the Ordinance. This is important to the analysis. One of Plaintiffs' principal complaints is that patients are shuttled to the curb in front of EMW's front door, thereby bypassing the crowd of protestors and denying counselors the opportunity to follow them down the sidewalk. [DE 45 at 1888]. However, Plaintiffs testified that it takes the same amount of time for a patient to walk from the curb to the front door whether the buffer zone is in place. [DE 44 at 1823]. These shuttles and the ability of private parties to drop patient off at the curb were available before and after the buffer zone was put in place. [DE 120 at 2886–87; DE 44

at 1834; DE 45, Harpring Dep. at 1888]. Whether a patient chose to be dropped off at the curb or to park in the garage at the rear of the building and walk around the block is purely patient choice and is not regulated by this Ordinance. And as Harpring himself testified, "I wish it wasn't that way, but it is that way. . . I mean that's obviously their prerogative, their right to drop off right there." [DE 45 at 1899]. As a result, this asserted burden on speech is not a result of the Ordinance, but instead other independent factors (such as patient choice) and cannot be considered as a burden for purposes of analyzing this Ordinance.

Plaintiffs also complain about the presence of escorts and the fact that they are able to walk with a patient through the buffer zone and to the front doors. Again, this complaint predated the Ordinance. Escorts remained at EMW before and after the buffer zone was enacted. [DE 45 at 1888]. Moreover, whether the escort is a EMW escort or a family member or friend of the patient, this asserted burden is not affected by the Ordinance.

Plaintiffs also point to the volume at the clinic as hindering their ability to have quiet, close conversations. [DE 44 at 1845; DE 47 at 2006]. However, this problem predated the Ordinance. [*Id.*]

Likewise, Harpring testified that with the buffer zone "my voice is now elevated because I'm not next to her [the patient], and so that quiet conversation becomes more of a louder voice, and not as welcoming as it would have been if I had got to continue on to the door with her." [DE 45 at 1893]. The undisputed evidence shows that this was likely true with or without the buffer zone. First, counselors were never able to follow patients to the EMW doors because it is private property. Second, Plaintiffs testified that protestors were loudest around the entrance, making it more difficult to engage in quiet conversations. [DE 120 at 2836–37]. The buffer zone was not

33

the principal cause for Harpring's articulated burden.  Accordingly, the Ordinance here sweeps up decidedly less speech than the 35-foot buffer zone in *McCullen*.

*McCullen*, however, also considered the impression of untrustworthiness caused by stopping at a painted border to be a burden on counselors' speech.  *See McCullen*, 573 U.S. at 487 ("even when [the sidewalk counselor] does manage to begin a discussion outside the zone, she must stop abruptly at its painted border, which she believes causes her to appear 'untrustworthy' or 'suspicious.'").  In this way, the buffer zone may make it more difficult for some counselors to engage with patients.  It is also undisputed that inside the 10-foot zone, all of Plaintiffs' speech— abortion-related or otherwise—is prohibited unless they fall into one of the exempted categories. Therefore, while the buffer zone does not affect Plaintiffs' speech to the extent alleged in their complaints, it may, for some people, make it more difficult to engage in their preferred method of counseling.  *See McCullen*, 573 U.S. at 489 ("When the government makes it more difficult to engage in these modes of communication [leafletting and close conversation], it imposes an especially significant First Amendment burden."); *but see Hill*, 520 U.S. at 726 ("[W]hen a content-neutral regulation does not *entirely foreclose* any means of communication, it may satisfy the tailoring *requirement* even though it is not the least restrictive or least intrusive means of serving the statutory goal." (emphases added)). This is underscored by the fact that at least one Plaintiff was issued a written warning for violating the Ordinance while counseling outside of EMW.  [DE 46 at 1938].

Further, it must be noted that this analysis was done under the original facts of the case, when EMW was seeing patients and Plaintiffs were routinely engaged in sidewalk counseling. Considering current circumstances, the ordinance burdens even less speech. Quiet counseling is not occurring regularly because there are no longer any patients arriving at the clinic.  Instead, the

sidewalk counselors have taken up praying outside healthcare facilities they perceive to be associated with abortion.  Lynch testified that he visits the sidewalk outside of EMW to pray the rosary.  [DE 120 at 2828–29]. His hope is that passers-by "see my Rosary and hear the words I'm praying, and—and they know what I'm doing." [*Id.*]. Harpring also testified that he engages in prayer inside and outside the painted buffer zone in front of EMW. [*Id.* at 2878 "I want people to see me there. I want them to see me right in front of the door."]. And Minter visits EMW once per week to pray. [DE 120 at 2851–52 "the purpose is to be in front of those doors, be in front of that building to make sure that we're claiming that building for the kingdom. And we're accustomed to being there because the women go through those doors. So it makes sense that we would continue to pray in front of [them]."].

Plaintiffs have failed to establish any burden the buffer zone imposes on these speech activities of praying outside healthcare facilities.  First, independent prayer is distinguishable from the close talking and pamphleting at issue in *McCullen*—not because it is entitled to any less First Amendment protection, but because it does not require one to be in close physical proximity to another person.  *McCullen* held that Plaintiffs' speech was burdened because they were not able to pass out literature or converse closely with patients. 573 U.S. at 489.  Conversely, the painted buffer zone at EMW imposes no such restriction.  Plaintiffs may continue to pray along the sidewalk, silently or aloud, and may be "seen" in front of the building.  As for other facilities, like Planned Parenthood, the sidewalk counselors testified that there are no restrictions on where they can pray.  [*Id.* at 2883–84].

Next, the Court turns to the alternatives considered by the legislature.  At the time of its opinion, the Sixth Circuit noted that "the County has not shown that it 'seriously undertook to address' its concerns 'with less intrusive tools.'" *Sisters*, 56 F.4th at 405 (quoting *McCullen*, 573

U.S. at 494).   The developed record shows that the Council considered various alternative solutions.

For example, the Sixth Circuit questioned why the Council did not adopt only the first half of the Ordinance—the non-obstruction provision.  *Id.* at 405.  Armstrong testified that Metro Council adopted the painted zone as opposed to a simple non-obstruction ordinance because they were concerned with clarity for protestors, sidewalk counselors, and patients.[19] [DE 145 at 3129–30 "The reason we included the signage was actually to make it more narrow and more sort of clear-cut for people."].   This is different from *McCullen*, where city representatives testified that they enacted the zone for ease of police enforcement.[20]  Clarity for law enforcement may not be an appropriate interest after *McCullen*, but the Supreme Court has historically been concerned with the ability of protestors to know if they are in compliance with the law. *See Schenck*, 519 U.S. at 379 ("This lack of certainty leads to a substantial risk that much more speech will be burdened than the injunction by its terms prohibits."). Armstrong testified that clarity of compliance was also why existing ordinances were insufficient to deal with the problems outside of EMW.  [DE 145 at 3127]. Stewart agreed.  [DE 47 at 2074 ""Whereas with—with the buffer zone ordinance, it's a little more concrete in that,you know, here are the lines and if somebody is in there without one of the exceptions, the that's something that could be enforced"].

---

[19] Plaintiffs object to the use of Armstrong's testimony to show legislative intent. [DE 148 at 3345]. Such an argument goes to the testimony's weight, not its admissibility. "Even though any one statement cannot be imputed to the entire body, the evidence can still be probative." *N.E. Ohio Coalition for the Homeless v. Husted*, No. 2:06-CV-896, 2016 WL 1047130, at *2 (S.D. Ohio Mar. 16, 2016). In a case where the crux of the analysis rests on legislative intent, "nothing is more relevant than evidence that the legislature did in fact act with such intent." *Id.* Furthermore, Plaintiffs had the same opportunity as Defendants to present contradictory evidence of the legislature's considerations.  That they chose not to does not make Armstrong's testimony irrelevant.

[20] Although Stewart also testified that the buffer zone ordinance was "more concrete" and easier for LMPD to enforce than other city ordinances.  [DE 47 at 2074].

Additionally, the Sixth Circuit identified increased police patrols and targeted injunctions as alternatives that should have been considered. *Sisters*, 56 F.4th at 406.  Armstrong testified that increasing police patrols was considered but was not possible because of LMPD's ongoing police officer shortage. [DE 145 at 3124–25].  *See also Turco*, 2024 WL 361315, at *4 (holding buffer zone ordinance was narrowly tailored when "due to financial constraints, vacancies in the police department, and ongoing violent crime throughout Englewood, police were limited in how often they could patrol the streets).  Targeted injunctions were likewise considered.  In *McCullen*, the Court suggested targeted injunctions would be effective because clinic access issues were limited to certain repeat players outside the same clinic on Saturday mornings.  *McCullen* 573 U.S. at 494–95.  In this case, injunctions were rejected because Louisville's clinic access issues were not limited to repeat players. [DE 145 at 3128 "we didn't know who would have arrived on a particular day"]. As such, targeted injunctions would not have been a close fit with the government's stated interest.

Finally, the Court considers what portion of the burdened speech serves to advance the government's goal of patient safety.  *See Ward*, 491 U.S., at 798–99 (the government "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals").  In assessing the ordinance's "fit", this case shares one major similarity with *McCullen*.  At the time of the ordinance's passage, the city had established healthcare access problems at only one facility—EMW—and principally on Saturday mornings.  [DE 145 at 3128]; *McCullen*, 573 U.S. at 494 ("The portions of the record that respondents cite to support the anticongestion interest pertain mainly to one place at one time: the Boston Planned Parenthood clinic on Saturday mornings.").  It is clear from the record that the Council intended for the ordinance to create buffer zones only at facilities which were having access or safety issues and

37

chose to request a buffer zone, like abortion clinics, battered women's shelters, and emergency rooms. [DE 145 at 3123]. This is what the legislators expected in drafting and passing the ordinance. [*Id*. at 3122; 3167 "Because the ordinance was intended only to apply to facilities that were having access issues and specifically requested a buffer zone"] And how EMW understood the ordinance to work. [DE 120 at 2782–83]. And how LMPD enforced its terms. [DE 47 at 2008].

By its text, however, the Sixth Circuit found that the Ordinance creates a buffer zone at the entrance of every healthcare facility in the city, regardless of whether there were safety issues, it was requested or demarcated.[21] *McCullen* explicitly held that such an approach is not "a narrowly tailored solution." *Id*. at 493. And the Sixth Circuit agreed. *See Sisters for Life*, 56 F. 4th at 405; *but see Turco II*, 2024 WL 361315 at *5 (rejecting First Amendment challenge to similar law creating buffer zones at every healthcare facility because "the record contains no evidence that the City has "enforced" these buffer zones in any way outside of" the demarcated facilities). Metro Council gave careful consideration to each alternative and endeavored to choose the least burdensome option. But for its inadvertent application to facilities with no established access issues, it is difficult to imagine how the ordinance could be more closely tailored to the city's interest in preserving safe access to healthcare facilities.[22]

Regardless, the Court is bound by the Sixth Circuit's holding: "The [Supreme] Court's conclusion in *McCullen* applies here. This buffer zone is not narrowly tailored." *Sisters*, 56 F.4th at 407. Because the ordinance is not narrowly tailored as applied, the Court need not consider

---

[21] This Court is bound by the Sixth Circuit's interpretation of the statute as an issue explicitly and necessarily decided in a prior appeal. *See Sisters for Life*, 56 F.4th at 408.

[22] Metro Council's drafting simply did not accomplish its intentions. Metro Council intended to effectuate a lawful Ordinance that carefully considered all competing interests. But for the absence of a few words in the Ordinance, the outcome likely would be different.

whether it is facially invalid. *See Connection Distribg. Co. v. Holder*, 557 F.3d 321, 327–28 (6th Cir. 2009) ("The usual judicial practice is to address an as-applied challenge before a facial challenge because it generally will be more efficient because this sequencing decreases the odds that facial attacks will be addressed unnecessarily" (quoting *Bd. of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 484–85 (1989) (cleaned up)). To be clear, the Court's rulings are not based on over burden of speech, as Plaintiffs have not proven such.  Instead, the Court's ruling is based on the Ordinance not being narrowly tailored in location.

## II.    Free Exercise Claim

*Sisters* Plaintiffs also move for summary judgment on their First Amendment Free Exercise claim. [DE 74 at 2390].  Laws that incidentally burden religious practice are generally permissible as long as they are content neutral and generally applicable. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) (quoting *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 879–81 (1990)).   "A government policy will fail the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way,' or if it provides 'a mechanism for individualized exemptions.'" *Id*. at 526 (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021)).  If the law is not neutral and generally applicable, the government must pass strict scrutiny by showing the law is "justified by a compelling state interest" and is "narrowly tailored in pursuit of that interest." *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993).

*Sisters* Plaintiffs argue that the ordinance is not generally applicable because the buffer zone exceptions allow for passage of "[p]ersons using the public sidewalk or street right-of-way . . . solely for the purpose of reaching a destination other than" the healthcare facility, but do

not allow for sidewalk counselors enter the buffer zone to minister to patients. [DE 74 at 2391].[23] In response, Defendant assert that any burden the ordinance imposes on religious practices is incidental and the exceptions are generally applicable.  [DE 77 at 2475].

The ordinance is neutral and generally applicable.  It is not "specifically directed at . . .religious practice." *Smith*, 494 U.S. at 878. Any person seeking to stand in the buffer zone without meeting one of the exemptions is prohibited from doing so regardless of whether they are engaged in religious conduct or not. Subsection (B) of the ordinance, allowing persons to pass through the zone as a right-of-way, does not require "individualized exemptions." *Kennedy*, 597 U.S. at 526; *see Dahl v. Bd. of Trustees of W. Michigan U*., 15 F.4th 728, 733 (6th Cir. 2021) (holding a vaccination policy that said "medical or religious exemptions and accommodations will be considered on an individual basis," was not generally applicable).

*Sisters* Plaintiffs rely principally on the Sixth Circuit's ruling in *Maryville Baptist Church, Inc. v. Beshear*, but that case does not counsel finding a free exercise violation here. 957 F.3d 610 (6th Cir. 2020). In that case, the Kentucky Governor's COVID-19-era executive order prohibited gatherings at church services but exempted "law firms, laundromats, liquor stores, and gun shops" as "life-sustaining businesses." *Id*. at 614. Because the court found no reason to exempt one and not the other under the government's stated purpose of stopping the virus' spread, it held that the order was not generally applicable. *Id*.

In contrast, the ordinance's exemptions all operate without reference to either religious or secular intentions.  *See Ward v. Polite*, 667 F.3d 727. 739–40 (6th Cir. 2012) (explaining that

---

[23] Sisters Plaintiffs also assert that the sidewalk counselors "were not the people causing any issues" at healthcare clinics like EMW.  [DE 74 at 2391].  This is belied by the record.  While it is true that the legislature was concerned with the large out of town groups that protested outside EMW, Stewart testified that LMPD would also "recognize" the regular players, including the sidewalk counselors, because of their previous involvement in calls for service at EMW.  [DE 47 at 1981, 2053].  Further, one of the sidewalk counselors was issued a written warning for violating the ordinance.  [DE 46 at 1938].

"[w]hat poses a problem is not the adoption of an anti-discrimination policy [by defendant]; it is the implementation policy, permitting secular exemptions but not religious ones and failing to apply the policy in an even-handed, much less a faith-neutral, manner to" plaintiff). While churches and grocery stores may have posed similar risks in relation to the government's interests in *Maryville*, a person momentarily passing through a buffer zone does not pose the same risk to healthcare facility access as a person loitering in front of the clinic's doors. Because the ordinance is both neutral and generally applicable, any burden it imposes on Plaintiffs' religious practices is merely incidental. *See Roberts v. Neace*, 958 F.3d 409, 413 (6th Cir. 2020).

### III.    KRFRA Claim

*Sisters* Plaintiffs also bring a statutory claim under Kentucky's Religious Freedom Restoration Act ("KRFRA"). KRFRA forbids the government from "substantially burden[ing] a person's freedom of religion . . .unless the government proves by clear and convincing evidence that it has a compelling governmental interest. . . ." Ky. Rev. Stat. 446.350. The statute defines a "burden" to "include indirect burdens such as withholding benefits, assessing penalties, or an exclusion from programs or access to facilities." *Id*. If a burden is imposed, the government "must show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties in these cases." *On Fire Christian Ctr*., 453 F. Supp. 3d at 913 (citing *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 727 (2014)).

For many of the reasons already stated, the Court does not find that the buffer zone imposes a "substantial" burden on Plaintiffs' conduct. They may attend protests, counsel patients up and down the sidewalk, pray up and down the sidewalk, and be both seen and heard by anyone arriving at the clinic. *See infra* Part I.B.2. In short, none of the conduct in which Plaintiffs seek to participate is "substantially burdened" by the ordinance. *C.f. On Fire Christian Ctr.*, 453 F. Supp.

3d at 910 (finding social distancing order that did not allow drive-thru church services to be a substantial burden on plaintiff's exercise of religion).

### IV.      Rule 56(f) Notice

Finally, because the pending motions request that the Court reach all ultimate issues presented, but because Plaintiffs did not move for summary judgment on the KRFRA claim or otherwise mention it and Defendants did not cross move for summary judgment, the Court issued a notice to the parties under Fed. R. Civ. P. 56(f). [DE 155]. As permitted by Rule 56(f), the Court notified the parties that resolving all issues as requested may require the Court the Court to consider summary judgment on matters not raised and for the nonmovant Defendants. [DE 155].  The Court's notice provided the parties the ability to notify the Court if there were any additional arguments, issues, or facts not previously presented before ruling on summary judgment. [DE 155].

Plaintiffs filed an objection to the notice because it was unclear to them "[i]n light of the extensive briefing in this matter . . . what grounds, not raised or briefed already, that could be the basis of such a determination."  [DE 156].  Plaintiffs did not otherwise seek to file any additional information in the record and the Court does not believe there would be any additional information to file because the factual record has been fully developed and the parties have exhaustively briefed the questions presented.

That Defendants did not cross move for summary judgment, but that the Court could potentially grant summary judgment on all or any claim in Defendants' favor, was straightforward to understand.  Similarly, that Plaintiffs asked the Court to resolve the case, but did not move for summary judgment on their KRFRA claim, was straightforward to understand. The notice was given out of an abundance of caution and the Court's decisions are not based on any information not in the record. The Court has extensively endeavored to resolve the parties' issues, does not

believe there are any additional arguments, facts, or issues that could have been considered not already before it.

## V.    CONCLUSION

Having thus considered the parties' filings and the applicable law, and being otherwise sufficiently advised, the Court **ORDERS**:

1) *Sisters* Plaintiffs' motion for summary judgment [DE 74] is **GRANTED** as to Count I of their Second Amended Complaint.

2) Count II of *Sisters* Plaintiffs' Second Amended Complaint is **DISMISSED** as forfeited.

3) Having previously given notice under Rule 56(f), summary judgment is **GRANTED** in favor of Defendants as to Counts III and IV of the *Sisters* Plaintiffs' Second Amended Complaint.

4) *Harpring* Plaintiffs' motion for summary judgment [DE 75] is **GRANTED**.

5) Defendants are permanently enjoined from enforcing Louisville-Jefferson Ord. Code § 132.09(B)(2).

Rebecca Grady Jennings, District Judge
United States District Court

September 13, 2024

cc:    Counsel of record